Carol A. Sobel, SBN 84483
Colleen Mullen  SBN 299059
Justine M. Schneeweis  SBN 305672
LAW OFFICE OF CAROL A. SOBEL
3110 Main Street, Suite 210
Santa Monica, CA 90405
(t)  310 393-3055; (f) 310 399-1854
(e)  carolsobel@aol.com
(e)  mullen.colleen1@gmail.com
(e)  Justine.schneeweis@gmail.com

Paul Hoffman, SBN 71244
Catherine Sweetser, SBN 271142
SCHONBRUN, SEPLOW, HARRIS &
HOFFMAN LLP
723 Ocean Front Walk
Venice, California 90291
(t)  310 396-0731; (f)  310 399-7040
(e)  hoffpaul@aol.com
(e)  catherine.sdshh@gmail.com

Barrett S. Litt, SBN 45527
KAYE, MCLANE, BEDNARSKI & LITT
234 Colorado Blvd., Suite 230
Pasadena, California 91101
(t)  626 844-7660; (f) 626 844-7670
(e) blitt@kmbllaw.com

Attorneys for Plaintiffs
Additional Counsel on Following Page

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| CHARMAINE CHUA, TORIE RIVERA, LYDIA HICKS, and KYLE TODD, individually and on behalf of a class of similarly situated persons, and the NATIONAL LAWYERS GUILD,<br><br>PLAINTIFFS,<br><br>vs.<br><br>CITY OF LOS ANGELES, a municipal entity, CHIEF CHARLIE BECK, COMMANDER ANDREW SMITH, and DOES 1-10 inclusive,<br><br>DEFENDANTS. | Case No.:<br><br>**COMPLAINT: CLASS ACTION INJUNCTIVE RELIEF AND DAMAGES**<br><br>**42 U.S.C. § 1983: FIRST, FOURTH AND FOURTEENTH AMENDMENT**<br><br>**CALIFORNIA CONSTITUTION: ARTICLE I, § 1, 2, 3, 7**<br><br>**CALIF. CIVIL CODE §52.1**<br><br>**FALSE ARREST/ FALSE IMPRISONMENT**<br><br>**CALIF. CIVIL CODE § 1798.14**<br><br>**DEMAND FOR JURY TRIAL** |

Colleen Flynn, SBN 234281
LAW OFFICE OF COLLEEN FLYNN
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA 90010
(t)  213 252-9444
(f)  213 252-0091
(e) cflynn@yahoo.com

Matthew Strugar, SBN 232951
LAW OFFICE OF MATTHEW STRUGAR
2108 Cove Avenue
Los Angeles, CA 90039
(t) 323 696-2299
(e) matthewstrugar@gmail.com

1.     This action arises out of the unlawful detention and arrest of approximately 170 individuals engaged in demonstrations at or near the intersection of Beverly and Alvarado Streets on November 24, 2014, and Sixth and Hope Streets on November 26, 2014. The police herded Plaintiffs as they marched, finally surrounding them and preventing them from moving forward on the sidewalk. By kettling the demonstrators, detaining, interrogating and searching them, and arresting those at Sixth and Hope without first issuing a lawful order to disperse, Defendants violated Plaintiffs' rights under the U.S. and California constitution, as well as their statutory and common law rights.

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction over the Plaintiffs' claims pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (civil rights jurisdiction), and 28 U.S.C. § 1367 (supplemental jurisdiction). This Court has jurisdiction to issue declaratory or injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57.

3.     Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391, as all Defendants and events giving rise to the claims herein occurred in the Central District of California.

## PARTIES

4.     Plaintiff Charmaine Chua was peaceably and lawfully protesting in downtown Los Angeles on November 26, 2014 in response to the decision of the grand jury not to indict police officer Darren Wilson for the shooting death of Michael Brown in Ferguson, Missouri. Ms. Chua, without notice or warning, was surrounded by police officers and kettled on the sidewalk at Sixth and Hope streets. Immediately after she was kettled on the sidewalk, Ms. Chua approached an officer and asked if she was being detained and asked to leave. The officer told Ms. Chua that she was not permitted to leave. Ms. Chua was arrested and held for almost an

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

entire day. No criminal charges were filed against Ms. Chua. She sues as an individual and on behalf of a class of similarly situated individuals.

5.     Plaintiff Lydia Hicks is a resident of Los Angeles.  On November 26, 2014, she was engaged in lawful and peaceful protesting when she was kettled by the LAPD at Sixth and Hope, when, without notice or warning, she was detained and arrested.  No criminal charges were filed against her.  She sues as an individual and on behalf of a class of similarly situated individuals.

6.     Plaintiff Torie John Rivera is a resident of Los Angeles County and works in downtown Los Angeles. On November 26, 2014, Mr. Rivera was peaceably and lawfully participating in a protest in downtown Los Angeles in response to a grand jury decision not to indict police officer Darren Wilson for the shooting death of Michael Brown in Ferguson, Missouri. Mr. Rivera, without notice or warning, was surrounded by police officers and kettled on the sidewalk at Sixth and Hope streets. Mr. Rivera was arrested and held for almost an entire day. No criminal charges were filed against Ms. Rivera. He sues as an individual and on behalf of a class of similarly situated individuals.

7.     Plaintiff Kyle Todd is an attorney and a member of the National Lawyers Guild.  He is a resident of Los Angeles.  He acted as a legal observer during a protest on November 28, 2014, when he was kettled by LAPD officers, without notice or warning, while with a group of protestors on a public sidewalk at Beverly and Alvarado.  The entire assembly was detained for more than an hour, without a prior dispersal order and an opportunity to leave.  Todd, like the others with him, had his personal property searched, even though Todd expressly did not consent to the search.  On threat of arrest, he was required to provide personal identifying information to the LAPD before he was finally cleared and given an individual dispersal order.  He sues as an individual and on behalf of similarly situated individuals.

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

8.    Plaintiff National Lawyers Guild, Los Angeles Chapter ("NLG-LA"), is the local chapter of the nation's first racially integrated voluntary bar association, formed in 1937 with a mandate to advocate for fundamental principles of human and civil rights, including the protection of rights guaranteed by the United States Constitution.  Since then, the Guild has been at the forefront of efforts to develop and ensure respect for the rule of law and basic legal principles. The NLG-LA works to ensure legal and practical access to demonstrations in Southern California by regularly providing legal observers at demonstrations to observe and document potentially unlawful or unjustified interference with demonstrators' rights from law enforcement. The NLG-LA also works to ensure the right to protest by helping to secure legal representation for demonstrators facing criminal charges arising out of demonstration activity and affirmative civil cases against local governments and law enforcement agencies for unlawful interference with demonstrators' rights. It expends money conducting work to protect the right to lawfully demonstrate without police interference in Los Angeles. The NLG-LA has also served as an organizational Plaintiff in cases challenging interference with demonstrators' rights, including an action arising from the disruption of lawful assemblies and use of unlawful force during the Democratic National Convention ("DNC") in Los Angeles in 2000 and a subsequent demonstration on October 22, 2000. The settlement in that action provided for important changes in the policy and practices of the LAPD as applied to demonstrations.

9.    In addition, the NLG-LA has long advocated against unlawful surveillance of persons engaged in protected First Amendment activity, including the compilation of databases of participants in public protest. The NLG-LA suffered injury when the Defendants kettled the demonstrators, issued an unlawful and inadequate dispersal order, arrested them, denied them released on their own recognizance, and collected personal identifiers on individuals engaged in lawful First Amendment activity.  On information and belief, the NLG-LA alleges that the

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

LAPD used both individual officers and electronic equipment to collect personal information on those engaged in the protests in November 2014, including the use of a Stingray and similar electronic equipment to sweep up any cell phone numbers used at the time and in the vicinity of the protests.  Defendants' actions interfered with the NLG-LA's right to assembly and speech. The NLG-LA plans to assist, plan, participate in, hold similar events in the future, on its own or in conjunction with others, and is fearful that the police actions of November, 2014, including the unlawful collection of information on those participating in First Amendment activity in public places, will be repeated absent injunctive relief to prohibit the practices, policies, and customs of the LAPD that resulted in the unlawful action against peaceful demonstrators on November 26, 2014 in downtown Los Angeles.

10.     The Plaintiff class consists of approximately 170 individuals who were unlawfully kettled by the LAPD in November 2014 in the protests against a number of recent widely publicized police killings of civilians, the most recent spark being the grand jury decision in Ferguson, Missouri.  The class consists of two subclasses: all those at Beverly and Alvarado on November 28, 2014, who were kettled, detained, interrogated and forced to give up personal information; and all those detained and arrested at Sixth and Hope on November 26, 2014, then denied OR release, but who, ultimately, were not prosecuted.  The Beverly and Alvarado subclass consists of approximately 40 persons; the Sixth and Hope subclass consists of approximately 130 persons.

11.     Defendant City of Los Angeles is a municipal corporation duly organized and existing under the Constitution and laws of the State of California. The Los Angeles Police Department ("LAPD") is a local government entity and an agency of Defendant City of Los Angeles, and all actions of the LAPD are the legal responsibility of the City of Los Angeles. The City of Los Angeles is sued in its own right on the basis of its policies, customs, and practices which gave rise to Plaintiffs'

federal rights claims, and on the basis of respondent superior, under California Government Code § 815.2, for Plaintiffs' state law claims.

12.   Defendant Chief Charlie Beck, is and was, at all times relevant to this action, the LAPD police chief and a policymaker for his department. He is sued in both his individual and official capacities.

13.   Defendant Commander Andrew Smith, was the field commander directing the operations.  He is sued in both his individual and official capacities in that he was delegated the policy making authority by Defendant Chief Beck for these incidents.

14.   Plaintiffs are informed, believe, and thereupon allege that Does 1 through 10 were the agents, servants, and employees of Defendants City of Los Angeles and/or the LAPD. Plaintiffs are ignorant of the true names and capacities of Defendants sued herein as Does 1 through 10, inclusive, and therefore sue these Defendant by such fictitious names. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained. The individual Doe Defendants are sued in both their individual and official capacities.

15.   Plaintiffs are informed, believe, and thereupon allege that at all times relevant hereto Does 1 through 10, in addition to the named Defendants, are responsible in some manner for the damages and injuries alleged herein.

16.   Plaintiffs are informed, believe, and thereupon allege that at all times relevant hereto Defendants, and each of them, were the agents, servants and employees of the other Defendants and were acting at all times within the scope of their agency and employment and with the knowledge and consent of their principal and employer. At all times Defendants were acting under color of state law.

17.   Plaintiffs are informed, believe, and thereupon allege that the practices, policies, and customs of the City of Los Angeles and/or the LAPD caused the unlawful action taken against Plaintiffs.

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## FACTS

**THE ARRESTS AT SIXTH AND HOPE:**

18.    On Wednesday, November 26, 2014, a crowd of peaceful protesters gathered in front of the federal courthouse on Temple and Spring Street at 3:00 pm in protest over a grand jury's decision not to indict Ferguson, Missouri police officer Darren Wilson in the shooting death of Michael Brown.

19.    At the conclusion of the rally at the Federal Courthouse, the protesters peacefully marched to the LAPD Headquarters on 1st Street. LAPD officers monitored and traveled alongside the march.

20.    From LAPD Headquarters, the protesters marched through part of downtown Los Angeles.  At approximately 7:00 p.m., the protesters marched south on Flower street and attempted to turn west on 7th Street. LAPD officers formed a line on Seventh Street to the west of the demonstrators and in front of Figueroa Street and prevented the demonstrators from continuing west on Seventh Street.

21.    Soon thereafter, LAPD officers formed a line at Flower and Seventh, preventing the demonstrators from heading east on Seventh and cutting off all access to Flower Street.  These two lines blocked all access to both Flower and Figueroa Streets, kettling the protesters on the single block of Seventh Street.

22.    Once LAPD established the line at Seventh and Flower and kettled the protesters, the LAPD officers at Seventh and Figueroa moved their line to the east, pushing the demonstrators east and concentrating them on the eastern portion of the block of Seventh Street between Figueroa and Flower.

23.    According to subsequent media reports, LAPD Captain Jeff Bert issued a dispersal order around this time. *See, e.g.*, "L.A. files few charges in Ferguson police shooting protests despite mass arrests"" LOS ANGELES TIMES, July 29, 2015: http://www.latimes.com/local/crime/la-me-lapd-mass-arrests-20150716-story.html.

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

However, as reported by the Los Angeles Times, Captain Bert concedes that the dispersal order was inadequate. Plaintiffs never heard a dispersal order, if one was given. After approximately ten to fifteen minutes of kettling the protesters on Seventh Street, LAPD officers then opened the police line on Flower and Seventh Streets to allow the protesters to proceed north on Flower.  Based on this action, Plaintiffs believed that they were free to continue to protest since they were released by the LAPD with no instruction to disperse.  The LAPD continued to block Flower to the South and Seventh to the east and west. With northbound on Flower as the only option, the protesters proceeded in that direction.

24.     When the demonstrators attempted to head west on Wilshire Boulevard, the LAPD blocked the intersection of Wilshire and Figueroa.  The demonstrators continued north on Lebanon Street, an alley-like street that runs north-south from Seventh to Sixth Streets between Figueroa and Flower Streets. When Lebanon Street came to a dead end at Sixth Street, the protesters turned west of Sixth Street.

25.     LAPD formed another line at the intersection of Sixth and Figueroa Streets, blocking Figueroa Street on the south side of the intersection and Sixth Street on the west side of the intersection. LAPD officers in full "tactical" or "riot" gear were seen running north up Figueroa toward the police line and protesters. Having come from the east and without access to the south or west, the protesters turned north up Figueroa.

26.     One block up, at Fifth and Figueroa, the LAPD formed lines at the intersection blocking Fifth Street to the west and Figueroa to the north. LAPD officers, including the officers in full "tactical" or "riot" gear, continued up Figueroa from the south. The only direction open to the protesters was east on Fifth Street. The protesters went east.

27.     At Fifth and Flower Streets, LAPD officers instructed demonstrators to continue east on Fifth Street. But when the demonstrators began to head east on Fifth

Street, they saw a separate group of LAPD officers in full "tactical" or "riot" gear jogging toward them from the east on Fifth Street.

28.     Without other options, the protesters proceeded through the walkways of the Central Library. LAPD officers closed in around the bushes on the north and west sides of the Library. The protesters proceeded through the walkways around the Central Library to the south side of the building where Hope Street dead-ends at Library building, just north of Sixth Street.

29.     LAPD officers then kettled the demonstrators on Hope Street between Sixth Street and the Central Library. Throughout all of this time, since the failed attempt to give a dispersal order some distance away, no further attempt was made to give a dispersal order of any type.  Chua and other Plaintiffs requested but were denied permission to leave. After approximately fifteen minutes after they were trapped on Hope Street, without any instruction or information, the LAPD announced that all of the Plaintiffs were under arrest.

30.     Officers arrested approximately 130 individuals at this location. Each was arrested on charges of misdemeanor Failure to Disperse pursuant to Penal Code § 409.

31.     Among those who were indiscriminately kettled and arrested were individuals who were not participating in the demonstration but were simply bystanders waiting for the bus on the northeast corner of the intersection of Sixth and Hope Streets, or walking by, or otherwise present in the area at the time the LAPD kettled the area. The statute applied to Plaintiffs, Penal Code § 409, has long been interpreted to require that law enforcement distinguish between participants who engaged in a clear and present danger of imminent violence and innocent bystanders.  This cardinal rule was not applied in this instance.

32.     Officers separated Plaintiffs into groups of six and each group was processed on-site by two LAPD officers. The officers photographed Plaintiffs,

collected and recorded their names, searched them, handcuffed them using zip-ties, and loaded them onto buses.

33.    Plaintiffs were then transported to the LAPD's Metropolitan Detention Center (MDC) or the Van Nuys jail. On information and belief, Plaintiffs allege that, prior to their release, many of those arrested at Sixth and Hope were first transported to the 77th Station jail in South Los Angeles.

34.    The majority of Plaintiffs were incarcerated for approximately 14 hours, despite the fact that they were entitled to release on their own recognizance (OR) pursuant to California Penal Code § 853.6.

35.    LAPD Lieutenant Andy Neiman was quoted in the media as saying all demonstrators who were unable to post bail would be held until they were able to appear in court early the following week. Commander Andy Smith told news media that while LAPD would typically release individuals with similar charges OR, "In this case, because these people are part of a protest that is continuing, they will not be released on their own recognizance."  After holding Plaintiffs for an extended period of time, they were finally released OR only because Chief Beck decided to let them go at that time.

36.    Penal Code § 853.6 imposes a mandatory requirement to release misdemeanor violators on their own recognizance either before or immediately after booking unless individualized probable cause exists to believe that one or more exceptions to the statute exists as a basis to deny OR release.  There was no reasonable basis to believe that each and every one of the Plaintiffs came within any of these enumerated exceptions, but no individual assessment was made. The entire Plaintiff class was denied the individuals assessment of criminal liability that is the hallmark of due process and each had their liberty unlawfully restricted as a result of a deliberate decision by Defendant City to ignore the command of Penal Code § 853.6.

37.     This action was in keeping with the City's unlawful policy, beginning on or around November 17. 2011, of denying OR release to individuals arrested for engaging in civil disobedience. According to LAPD Deputy Chief Perez, who first announced this policy during the Occupy protests in Los Angeles in 2011, the decision was made to deny OR release to those engaged in First Amendment activity to "teach people a lesson." Subsequently, small groups of individuals involved in acts of civil disobedience at the Bank of America headquarters on November 17, 2011, were arrested on non-violent misdemeanor offenses arising from protest activity and denied OR release. Again, on November 30, 2011, the City denied OR release to the nearly 300 people arrested in connection with the mass arrests at City Hall made in connection with the Occupy L.A. demonstration.

38.     Such a basis for a blanket decision to deny Plaintiffs' liberty and detain them without justification for prolonged times violates the First, Fourth, and Fourteenth Amendment rights of Plaintiffs and the class members, and was done with the specific and deliberate intent to interfere with the exercise of Plaintiffs' rights to assembly and due process.

**THE DETENTION AT BEVERLY AND ALVARADO:**

39.     At approximately 3:00 p.m. on November 28, 2014, Plaintiffs gathered at Grand Park across from Los Angeles City Hall. Peaceful protestors, legal observers, pedestrians, and members of the media spoke out against the Ferguson grand jury's decision not to indict Darren Wilson for the murder of Mike Brown.

40.     After an hour, Plaintiffs began to march peacefully west on Beverly Boulevard.  They traveled approximately 2.5 miles, with LAPD officers monitoring the march, traveling alongside by foot, bicycle, motorcycle, patrol car, and, eventually, helicopter. At the start of the march, officers instructed Plaintiffs that they would be arrested if they marched in the street. Plaintiffs adhered to this instruction and marched on the sidewalks.  After some time, however, the LAPD

intentionally blocked the Beverly Boulevard sidewalk with officers and motorcycles, forming a line across the sidewalk and the bike lane. The demonstrators were ordered by the LAPD to continue the protest by marching in the street.  Plaintiffs proceeded with some hesitation to obey this new contradictory command.  Not long after, officers approached Plaintiffs again and threatened to arrest anyone marching in the street. Plaintiffs quickly returned to the sidewalk, only to be faced with another LAPD motorcycle blockade just ahead of them.  Once again, the officers directed Plaintiffs to walk in the street. At least one protestor responded that he would not walk in the street, because he feared he would be arrested.

41.     Notwithstanding the LAPD's disruptive activities, the march was peaceful, with no violence or threat of violence by the protestors.  The only threats to traffic or safety were created by the LAPD when they ordered Plaintiffs to march in the street because the LAPD was blocking the sidewalks with officers and motorcycles.   At approximately 5:15 p.m., Plaintiffs turned north onto Alvarado Street. Plaintiffs did not get much farther; LAPD officers lined the road ahead, waiting to kettle and detain Plaintiffs.  Approximately 100 riot-gear clad LAPD officers advanced on Plaintiffs.  LAPD officers on foot, bicycles, motorcycles, in patrol cars, and helicopters, quickly surrounded approximately forty Plaintiffs even though at this point, the march had not been declared an "unlawful assembly" and no order to disperse was given.

42.     More than an hour after Plaintiffs were kettled, the LAPD finally read a "dispersal order" in English and Spanish. Many of those present did not hear or understand the announcement.  The Order stated that the march had been declared an unlawful assembly and that Plaintiffs would not be released until after being questioned individually.  It did not inform the protestors of the possibility to leave within a set time and by an announced route.

43.     The pretext for the LAPD's actions was the purported interference with traffic caused by the march.  Several LAPD officials represented to the media that

the march constituted an unlawful assembly because "demonstrators ran into traffic and blocked motorists" after being "warned repeatedly" to "stay off the street" and "remain on the sidewalk."  Contrary to these assertions, video footage of the march shows the LAPD blocking the sidewalk with motorcycles and ordering the demonstrators to walk in the street.  Any "interference" with traffic was caused and created by the LAPD itself.

44.    The LAPD detained the Plaintiffs, handcuffed them with zip-ties, and compelled them to provide private identifying information, including social security numbers, birthplace, employment, telephone numbers, and home addresses before being released. At least one person was asked to identify any non-visible tattoos although he did not have any tattoos visible to the officer.  The officers patted down the demonstrators' clothing and searched their personal belongings, including backpacks and wallets, without consent or proper cause.   LAPD officers ran wants and warrants on each Plaintiff.  After all of this, an officer read a dispersal order to one individual at a time. Another officer stood nearby, video recording the faces of each individual as the other officer read the dispersal letter.

45.    On information and belief, the LAPD collected Plaintiffs' personal information for the purpose of maintaining a database of protestors and for the dissemination of this information to other law enforcement and government agencies. The LAPD has a long history of engaging in unlawful surveillance and information collecting on those engaged in lawful expressive activity, a practice declared unconstitutional by both the California Supreme Court and Court of Appeal in two separate cases.  The LAPD also has a history of allowing its confidential information to be shared with private advocacy and ideological groups.

**MONELL ALLEGATIONS**

46.    The City, through Chief Charlie Beck and the LAPD, has failed to train its officers in the constitutional responses to peaceful demonstrations as revealed by

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

the above allegations.  The City is well aware of its constitutional duties in light of the settlement agreements discussed below in *National Lawyers Guild v. City of Los Angeles* and *MIWON v. City of Los Angeles*, as well as other agreements entered into on these issues over the years.  The need for training and discipline to enforce constitutional guarantees in such circumstances is obvious. The City has known of the deficiencies in its training since at least 2000 and entered into a settlement agreements in June 2005 and June 2009, each time agreeing to revised policies and training, yet the City has failed to promulgate adequate policies effectuating the terms of the settlement agreement and/or to train its command staff and officers on the revised policies, if any exist.

**THE SETTLEMENT IN NATIONAL LAWYERS GUILD V. CITY OF LOS ANGELES:**

47.    In June, 2005, the City of Los Angeles entered into a settlement agreement in *National Lawyers Guild, et al. v. City of Los Angeles, et al.*, CV 01-6877 FMC (CWx), an action arising from the disruption of lawful assemblies and use of unlawful force during the Democratic National Convention ("DNC") in Los Angeles in 2000 and a subsequent demonstration on October 22, 2000. The settlement provided for important changes in the policy and practices of the LAPD as applied to demonstrations. At least three of those provisions were violated by the LAPD's actions at Beverly and Alvarado as alleged above.

48.    Under the terms of the settlement in *National Lawyers Guild*, demonstrators, while participating in lawful assemblages, are not to be prevented from using public sidewalks to march.

49.    The terms of the settlement also expressly provided that LAPD officers are not to use their motorcycles as a form of crowd control against peaceful demonstrators.

50.    Finally, the settlement provided that, prior to declaring an unlawful assembly, the LAPD Incident Commander should evaluate the feasibility of isolating

and arresting those responsible for any unlawful conduct, and if feasible, take action only against those individuals.

**THE SETTLEMENT IN *MULTI-ETHNIC WORKER ORGANIZING NETWORK V. CITY OF LOS ANGELES*:**

51.   On May 1, 2007, the LAPD assaulted a peaceful, permitted immigration march in MacArthur Park.  The attack on the demonstrators was without warning.  No dispersal order was given until more than three minutes into the police action and, even then, the dispersal order was grossly inadequate, given from helicopters in English to a largely Spanish-speaking assembly.  During the course of litigating the *MIWON* action, the LAPD conceded that it had not fully implemented training and policy orders regarding the *NLG* settlement two years earlier.  In fact, no policy changes were ever finalized.

52.   On June 24, 2009, the federal district court approved and entered a Structural Relief Order as part of the settlement of a class action lawsuit brought on behalf of all those subjected to the LAPD's May Day action.  Through this settlement, the LAPD agreed that it would not obstruct the use of sidewalks by protestors and, significantly, that, where practicable, the LAPD would consider facilitating demonstrations that may temporarily block traffic. This latter provision is consistent with established law in the Ninth Circuit, recognizing the need for local agencies to accommodate "spontaneous" protests in the streets, particularly in response to allegations of police misconduct.

53.   The *MIWON* order also set out requirements to declare an unlawful assembly: an amplified loudspeaker system with an officer at the far side of the crowd to record the officer; if there is no serious violence occurring, the order shall be made repeatedly over a period of time, including an "objectively reasonable" period of time to disperse and identification of "a clear and safe route" to follow to

disperse.  The order should be given so that it is heard by the entire crowd.  These requirements were not met in this instance.

54.     The terms of the *MIWON* structural relief agreement were to be included in the LAPD's Crowd Control and Use of Force Manuals and every officer at the rank of Sergeant I and above, as well as the entire Metropolitan Division, were to undergo training every two years.  Chief Beck, as well as those members of his command staff officers to whom he has delegated his responsibility to enact and implement lawful policies on the declaration of an unlawful assembly and the use of motorcycles as a crowd control tool, are aware of the unlawful policies, practices, and customs of the City and the LAPD which resulted in the settlement in *National Lawyers Guild v. City of Los Angeles* in June, 2005.  Moreover, Chief Beck and his delegated command staff are aware that the use of unlawful dispersal orders to break up lawful protests, in particular, is a custom so ingrained in the marrow of the LAPD that it was critical to take all steps necessary to ensure that official policy was implemented in a manner sufficient to address the deeply rooted custom to violate First Amendment rights in the specific ways identified in the *National Lawyers Guild* settlement agreement. The failure to take such steps directly lead to the injuries suffered by the Plaintiffs. On information and belief, Plaintiffs allege that this did not occur.

55.     Chief Beck, as well as those members of his command staff officers to whom he has delegated his responsibility to enact and implement lawful policies on the declaration of an unlawful assembly, are aware of the unlawful policies, practices, and customs of the City and the LAPD which resulted in the settlements in *NLG* and *MIWON*.  Moreover, Chief Beck and his delegated command staff are aware that the use of unlawful dispersal orders to break up lawful protests is a custom so ingrained in the marrow of the LAPD that it was critical to take all steps necessary to ensure that official policy was implemented in a manner sufficient to address the deeply rooted custom to violate First Amendment rights in the specific ways identified in

15

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

the settlement agreements. The failure to take such steps directly lead to the injuries suffered by the Plaintiffs.   This failure amounted to an "acquiescence in the constitutional deprivations of which [the] complaint is made" and deliberate indifference to the rights of persons with whom the police come into contact, and constituted a conscious choice by the City not to properly train its law enforcement personnel on these issues.

56.    The City, through Chief Beck and his command staff to whom he delegated decision-making, also knew from the recent litigation involving the Occupy-protest arrests, *Aichele v. City of Los Angeles*, that it violated Plaintiffs' right to due process and deprived them of their liberty interest in violation of Penal Code § 853.6 based on their perceived association with the protest.

57.    On information and belief, Chief Beck delegated final responsibility and authority to persons within his command staff to act as the final policy maker in declaring the assembly unlawful at the November 26 and 28, 2014 marches.  The persons who made these decisions, including Defendant Commander Andrew Smith, acted as the delegated policy maker for the City of Los Angeles on these issues. There was no time, opportunity, or procedure for anyone to review or revise the decisions made by these delegated policy makers prior to their final implementation.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

58.    Plaintiffs timely filed class claims with the Defendant City pursuant to Cal. Gov't Code § 910 et seq. Defendant City of Los Angeles denied the claims.

## CLASS ACTION ALLEGATIONS

59.    The named Plaintiffs bring this action individually and on behalf of a proposed class of all other persons similarly situated pursuant to FRCivP Rule 23(b)(1), (b)(2) and (b)(3). The damages class is defined as persons who were present at either Sixth and Hope on November 26, 2014, or Beverly and Alvarado

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

on November 28, 2014, and who were kettled, detained, and/or arrested, then denied

OR release by the LAPD, all in association with the protest against the grand jury

decision in Ferguson, Missouri in the killing of Michael Brown.

60.     There are two damages sub-classes:  the first damages sub-class ("Sixth and Hope Sub-Class") is defined as those persons who were present on November 26, 2014 near or at Sixth and Hope Streets and who were arrested by the LAPD in association with a protest against the grand jury decision in Ferguson, Missouri in the killing of Michael Brown. This sub-class is represented by Plaintiffs Chua, Hicks and Rivera. The second damages sub-class ("Beverly and Alvarado sub-class") is defined as those persons who were present on November 28, 2014, near or at the intersection of Alvarado and Beverly Boulevard and who were detained, handcuffed, interrogated and/or searched in association with a protest against the grand jury decision in Ferguson, Missouri in the killing of Michael Brown.  This sub-class is represented by Plaintiff Todd. Each class is inclusive of people present in order to peacefully protest and those otherwise present in the vicinity as bystanders.  The first sub-class consists of approximately 130 individuals; the second sub-class consists of approximately 40 individuals.

61.     The injunctive relief class is defined as all persons who have in the past, or may in the future, participate in, or be present at, demonstrations within the City of Los Angeles in the exercise of their rights of free speech and petition. Without intervention by this Court, those class members are at risk of having their rights violated in the future due to the City's past and threatened future actions. The injunctive relief Plaintiffs have no adequate remedy at law to protect the future lawful exercise of their constitutional rights, and, without action by this court, will suffer irreparable injury, thereby entitling them to injunctive and declaratory relief. The injunctive relief class is represented by the National Lawyers Guild, as well as the individual class representatives.

62.     Because the issues in the damages sub-classes are the same (except for the addition of the arrest and denial of OR release for the Sixth and Hope Sub-Class), the Rule 23 criteria for the classes and sub-classes are discussed jointly without differentiating between the different classes.

63.     Questions of law or fact common to putative class members predominate over any questions affecting only individual members and a class action is superior to other available methods for fairly and efficiently adjudicating this lawsuit. Alternatively, Defendants have acted on grounds generally applicable to the class, thereby making class-wide declaratory and injunctive relief appropriate.

64.     The claims of the putative class satisfy the requirements of Federal Rule of Civil Procedure 23(b)(3) and, alternatively, Rule 23(b)(2).

65.     The putative class consists of approximately 170 individuals – 130 individuals in the Sixth and Hope Sub-Class and 40 in the Beverly and Alvarado Sub-Class -- and is so numerous as to render joinder impractical.

66.     Defendants detained and/or arrested the putative class and sub-classes as a group and treated all similarly, acting on ground applicable to the putative class. The named Plaintiffs' claims that the First, Fourth, and Fourteenth Amendment rights—and their analogous state Constitution, statutory, and common law rights— were violated raise common question of law and fact.  the Defendants have acted, threaten to act, and will continue to act, on grounds generally applicable to the class, thereby making appropriate final injunctive relief or declaratory relief with respect to the class as a whole.

67.     Questions of law and fact are common to the class and sub-classes, including whether the putative class and sub-classes were detained and/or arrested without probable cause and based on unlawful or non-existent dispersal orders and whether the Sixth and Hope sub-class members were denied the liberty interest in OR release as codified in California Penal Code § 853.6.

68.     The legal theories and factual predicates upon which the damages classes and sub-classes seek relief predominate over any questions affecting only individual members. The legal harms suffered by the named Plaintiffs and the class Plaintiffs are identical.

69.     The named Plaintiffs' claims are typical of those of the putative class and sub-class each represents, as each was engaged in or associated with peaceable and lawful free speech and assembly activity when each was detained or arrested on November 26, 2014 and November 28, 2014.

70.     The named Plaintiffs will fairly and adequately represent the common class interest. The named Plaintiffs have a strong interest in achieving the relief requested in this Complaint, they have no conflicts with members of the Plaintiff class, and they will fairly and adequately protect the interests of the class.

71.     The named Plaintiffs are represented by counsel who are well-experienced in civil rights and class action litigation and are familiar with the issues in this case. Attorneys Paul Hoffman, Barry Litt, and Carol Sobel have successfully litigated a number of class action cases on behalf of protesters in Los Angeles. Most recently, they were appointed by the court as class counsel in *Aichele, et al. v. City of Los Angeles, et al.*, No. 2:12-CV-10863-DMG (C.D. Cal. August 26, 2012), challenging, *inter alia*, the LAPD's denial of OR release to those arrested during the Occupy action at Los Angeles City Hall.  They were also appointed as class counsel in *Multi-Ethnic Immigrant Worker Network v. City of Los Angeles*, 24 F.R.D. 631 (C.D. Cal. 2007), challenging the LAPD's assault on a lawful immigrant-rights rally in MacArthur Park on May 1, 2007. That case resulted in a settle of $12,850,000 -- the largest amount ever paid nationally in a protest case in which there were no arrests of the Plaintiffs. In addition to class action protest litigation, attorneys Hoffman, Litt, and Sobel have served as class counsel in a number of other class actions redressing civil rights violations.

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

72.    Counsel for the named Plaintiffs know of no conflicts among or between members of the class, the named Plaintiffs, or the attorneys in this action.

73.    The Defendants have acted and refused to act on grounds generally applicable to the putative class. Injunctive and declaratory relief for the putative class as a whole is appropriate.

74.    The prosecution of separate actions by individual members of the class would create a risk of inconsistent standards of conduct for the Defendants, thereby making a class action a superior method of adjudicating this lawsuit.

75.    Plaintiffs do not know the identities of all of the class members. Plaintiffs are informed and believe and thereon allege that the identities of class members may be obtained from the personal information compelled by Defendants at the November 28, 2014 incident at Beverly and Alvarado, and from the arrest records from the November 26, 2014 incident at Sixth and Hope.

### GENERAL ALLEGATIONS

76.    Defendants improperly declared the assemblies unlawful. All the Plaintiffs involved in the demonstrations at issue herein on November 26 and November 28, 2014, were peaceful. The few protestors who were walking in the street were forced to do so as a result of the LAPD's unlawful blockade of public sidewalks; this is no justification for declaring a peaceful assembly unlawful, nor does it justify Defendants' infringement on the First Amendment rights of the peaceful majority.

77.    Plaintiffs are informed and believe and thereon allege that Defendants declared each gathering an "unlawful assembly," and ordered the peaceful participants to disperse, and unlawfully kettled Plaintiffs for the purpose of interfering with the First Amendment rights of the peaceful participants.

78.    Assuming that a dispersal order could have been legally justified under all the facts and circumstances, the orders given were, nonetheless, deficient as they

were not given until long after the officers kettled those participating in the marches, failed to allow the participants any opportunity to disperse, and were unheard or unintelligible by the vast majority of the demonstrators, some of whom were not even participating in the protest at the point where the police allege they gave an admittedly deficient dispersal order.   Any such dispersal orders were not in compliance with state law as well as prior agreements and court orders regarding the LAPD's use of such dispersal orders.

79.   Plaintiffs are informed and believe and thereon allege that the LAPD officers acted in accordance with orders given by supervisors from the highest command positions, in accordance with policies and procedures instituted by the LAPD and the City of Los Angeles, including an order to collect personal identifiers on the demonstrators.

80.   As a direct and proximate cause of the conduct described herein, the named individual Plaintiffs have been denied their constitutional statutory, and legal rights as stated herein, and have suffered general and special damages, including but not limited to, mental and emotional distress, physical injuries and bodily harm, pain, fear, humiliation, embarrassment, discomfort, and anxiety and other damages in an amount according to proof.

81.   Defendants' acts were willful, wanton, malicious, and oppressive, and done with conscious or reckless disregard for, and deliberate indifference to, Plaintiffs' rights.

82.   Defendants' polices practices, customs, conduct and acts alleged herein resulted in, and will continue to result in, irreparable injury the Plaintiffs, including but not limited to violation of their constitutional and statutory rights. Plaintiffs have no plain, adequate, or complete remedy at law to address the wrong described herein. The Plaintiffs and class members intend in the future to exercise their constitutional rights of freedom of speech and association by engaging in expressive activities in the City of Los Angeles. Defendants' conduct described herein has created

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

uncertainty among Plaintiffs with respect to their exercise now and in the future of these constitutional rights. Specifically, Plaintiffs are concerned that, if arrested, whether lawfully or unlawfully, they will again be denied the liberty interest codified at California Penal Code § 853.6 and will be detained until their arraignment unless and until they post a monetary bond. The Beverly and Alvarado sub-class is concerned that Defendants have created a database with the information Plaintiffs were forced to provide to the LAPD and that Plaintiffs will be treated more harshly if an unlawful assembly order issues in the future when they engage in First Amendment activities, even though their identification was compelled under threat of arrest and they were released without arrest. Plaintiffs therefore seek injunctive relief from this court to ensure that Plaintiffs and persons similarly situated will not suffer violations of their rights from Defendants' illegal and unconstitutional policies, customs, and practices described herein.

83.     Plaintiffs also seek injunctive relief in the form of an order requiring that Defendants seal and destroy and records derived from Plaintiffs' arrests, including fingerprints, photographs, and other identification and descriptive information, and all information, and biological samples and information obtained from such biological samples collected from the Plaintiff class, and identify to the Plaintiff class all entities and agencies to which such information has been disseminated; and that all such disseminated records be collected and destroyed.

84.     An actual controversy exists between Plaintiffs and Defendants in that Plaintiffs contend that the policies, practices, and conduct of Defendants alleged herein are unlawful and unconstitutional, whereas Plaintiffs are informed and believe that Defendants contend that said policies, practices, and conduct are lawful and constitution. Plaintiffs seek a declaration of rights with respect to this controversy.

85.     All of the following claims for relief are asserted against all Defendants

## FIRST CLAIM FOR RELIEF

### First Amendment to the U.S. Constitution (42 U.S.C. § 1983); California Constitution, Article I, §§ 2 & 3

86.    Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs of this Complaint.

87.    Defendants' above-described conduct violated Plaintiffs' rights to freedom of speech, assembly, and association under the First Amendment to the United States Constitution and the analogous provisions of the California Constitution.

## SECOND CLAIM FOR RELIEF

### Fourth Amendment to the U.S. Constitution (42 U.S.C. § 1983); California Constitution, Article I, § 7

88.    Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs of this Complaint.

89.    Defendants' above-described conduct violated Plaintiffs' rights to be free from unreasonable seizures, excessive or arbitrary force, and arrest or detention without reasonable or probably caused under the Fourth Amendment to the United States Constitution. Defendants detained, seized, handcuffed, searched their persons and their personnel property and, in the case of those at Sixth and Hope, arrested Plaintiffs without legal authority when Defendants could not have reasonably believed that they had committed or were about to commit any crime or public offense. Plaintiffs were falsely arrested without probable cause for such arrests.

## THIRD CLAIM FOR RELIEF

### Fourteenth Amendment to the U.S. Constitution (42 U.S.C. § 1983); California Constitution, Article I, § 7

90.    Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs of this Complaint.

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

91.     Defendants' conduct deprived Plaintiffs of liberty without due process of law under the Fourteenth Amendment to the United States Constitution. Based on their perceived association with the protests against the grand jury's decision not to indict police officer Darren Wilson for the shooting death of Michael Brown in Ferguson, Missouri and their purported engagement in "civil disobedience," Plaintiffs were uniformly denied the mandatory "liberty" interested codified at California Penal Code § 853.6 when they were denied release on their own recognizance and held in custody for approximately fourteen hours.

## FOURTH CLAIM FOR RELIEF

### Fourteenth Amendment to the U.S. Constitution (42 U.S.C. § 1983); California Constitution, Article I, § 13

92.     Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs of this Complaint.

93.     Defendants' above-described conduct violated Plaintiffs' rights to equal protection of the laws under the Fourteenth Amendment to the United States Constitution.

94.     Defendants, in kettling Plaintiffs, refusing to allow Plaintiffs to disperse, and arresting them without legal justification, intentionally and unlawfully restrained and confined Plaintiffs and intentionally and unlawfully violated Plaintiffs' personal liberty in violation of California law.

## FIFTH CLAIM FOR RELIEF

### Violation of California Constitution, Article I, § 1 – Right of Privacy

95.     Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs of this Complaint.

96.     The Defendants, by their conduct, violated the right of privacy of the Beverly & Alvarado sub-class members by compelling them to disclose personal

identifiers as a condition of being allowed to disperse from the area without arrest. The collection of such information, including Social Security numbers and other personal information, was done based on Plaintiffs' perceived association with the demonstration against police killings of civilians.

97.    On information and belief, Plaintiffs allege that their private identifiers were compelled for the purpose of compiling a database of protestors and for the dissemination of this information to other law enforcement and government agencies. As a consequence of Defendants' actions, Plaintiffs suffered irreparable injury to their constitutional rights.

## SIXTH CLAIM FOR RELIEF
### Violation of California Civil Code § 52.1

98.    Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs of this Complaint.

99.    The Defendants by their conduct interfered by threats, intimidation, or coercion, or attempted to interfere by threats, intimidation, or coercion, with the exercise or enjoyment of Plaintiffs' rights as secured by the First, Fourth, and Fourteenth Amendments to the United States Constitution or laws of the United States, and of the rights secured by the Constitution or laws of the state of California, including but not limited to California Article I, §§ 1, 2 & 7.

100.   There was no lawful justification for Defendants to threaten, intimidate or coerce any of the Plaintiffs or the putative class members or to attempt to use threats, intimidation, or coercion to interfere with Plaintiffs' and the putative class members' rights from being present at the lawful demonstration.

## SEVENTH CLAIM FOR RELIEF
## INFORMATION PRACTICES ACT – CIVIL CODE § 1798.14

101.   Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs of this Complaint.

102.   California Civil Code Section 1798.14, part of the Information Practices Act of 1977, provides that public agencies "shall maintain in its records only personal information which is relevant and necessary to accomplish a purpose of the agency required or authorized by the California Constitution or statute or mandated by the federal government."

103.   California Civil Code Section 1798.45(c) authorizes an individual to bring a civil action for any violation of the Information Practices Act of 1977 when the agency fails to comply with any provision of the law in "a way as to have an adverse effect on an individual."  Any agency that fails to comply with any provision of the Information Practices Act of 1977 may be enjoined by any court of competent jurisdiction.

104.   The retention of Plaintiffs' credit card information, phone numbers, social security numbers, places of birth, home address, and place of employment, is not information "relevant and necessary to accomplish a purpose of the agency required or authorized by the California Constitution or statute or mandated by the federal government." The retention of such information will have an adverse effect on Plaintiffs. Moreover, the dissemination of this information to other law enforcement agencies and other groups will also have an adverse effect on Plaintiffs.

## EIGHTH CLAIM FOR RELIEF
## FALSE ARREST/FALSE IMPRISONMENT

105.   Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs of this Complaint.

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

106. In kettling Plaintiffs, refusing to let them disperse, handcuffing and arresting them without probable cause, then denying them OR release, Defendants intentionally and unlawfully restrained and confined Plaintiffs and intentionally and unlawfully violated Plaintiffs' personal liberty in contravention of California law.

## REQUEST FOR RELIEF

Wherefore, Plaintiffs seek judgment as follows:

1. An order certifying the class and each sub-class defined herein pursuant to Federal Rules of Civil Procedure Rule 23(b)(2) and (3);

2. A preliminary and permanent injunction restraining Defendants from engaging in the unlawful and unconstitutional actions detailed above;

3. A preliminary and permanent injunction requiring Defendants to seal and destroy all records derived from this arrest, including all fingerprints, photographs, identification, and descriptive information collected the Plaintiff class;

4. Entry of an order that disclosure be make in writing to Plaintiffs, the class they represent, and the Court as to all entities and agencies to which such material has been disseminated and by whom gathered; and that all records disseminated be collected and sealed, including all copies of such disseminated records that may have been subject to dissemination by others;

5. Entry of an order declaring the arrests of the Sixth and Hope sub-class null and void;

6. A declaratory judgment that Defendants' conduct detailed herein was a violation of the  rights under the Constitution and laws of the United States and California of Plaintiffs and the class members;

7. General and compensatory damages for Plaintiffs and the class they represent for the violations of their federal and state constitutional and statutory rights, pain and suffering, all to be determined according to proof;

8.     An award of punitive and exemplary damages against the individual Defendants to be determined according to proof;

9.     An award of statutory damages and penalties pursuant to Cal. Civil Code § 52(b) to be determined according to proof;

10.    An award of attorneys' fees pursuant to 42 U.S.C. § 188 and Cal. Civil Code §§ 52(b) & 52.1(h) and Cal. Code of Civ. Proc. § 1021.5;

11.    Costs of suit;

12.    Pre- and post-judgment interest as permitted by law;

13.    Such other and further relief as the Court may deem just and proper.


Dated:  January 12, 2016              Respectfully submitted,


                                      Kaye, McLane, Bednarski & Litt, LLP
                                      Law Office of Carol A. Sobel
                                      Schonbrun, Seplow, Harris & Hoffman
                                      Law Office of Colleen Flynn
                                      Law Office of Matthew Strugar


                                      /s/ Carol A. Sobel


                                      By: CAROL A. SOBEL
                                      Attorneys for Plaintiffs

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs respectfully request a jury trial on all issues and claims triable to a jury.

Dated:  January 12, 2016                    Respectfully submitted,


                                         /s/ Carol A. Sobel
                                        By: CAROL A. SOBEL
                                        Attorneys for Plaintiffs

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF