**Exhibit A Pt. 2**

The Honorable Marsha J. Pechman

_____ FILED    _____ ENTERED
_____ LODGED   _____ RECEIVED

**OCT 26 2007**

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                              DEPUTY

00-CV-01672-PET

UNITED STATES DISTRICT COURT, WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| KENNETH HANKIN, JENNIFER HUDZIEC, STEPHANIE LANE, and DENISE COOPER, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> THE CITY OF SEATTLE, a municipality, <br><br> Defendant. | No. C00-1672P <br><br> [PROPOSED] ORDER REGARDING ATTORNEYS' FEES AND COSTS AND INCENTIVE AWARDS |

This matter having come before the Court on the application of counsel for the named Plaintiffs and the Class for an award of attorneys' fees and expenses incurred in the above-captioned action, and for an incentive award for each of the Class representatives, the Court having considered all papers filed and proceedings conducted herein and otherwise being fully informed in the premises, and good cause appearing therefore,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.      This Court has jurisdiction over the subject matter of this litigation and over all parties, including their counsel, to this litigation, including all members of the Class.

2.      The Court hereby awards to Class counsel an award of attorneys' fees and costs in the aggregate amount of $450,000.00. Plaintiffs' counsel shall distribute this award amongst

[PROPOSED] ORDER REGARDING
ATTORNEYS' FEES AND INCENTIVE
AWARDS

- 1 -

Hagens Berman Sobol Shapiro LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1    themselves. This shall be deducted from the settlement fund in accordance with ¶ 6.a of the

2    Settlement Agreement.

3         3.    Class representatives Kenneth Hankin, Jennifer Hudziec, Stephanie Lane and

4    Denise Cooper shall each be entitled to an award of $2,500, to be deducted from the settlement

5    fund. This award shall be in addition to their share of the common fund as members of the

6    Class.

7         DATED this **26** day of **Oct.**                , 2007.

8

9

10                                        HONORABLE MARSHA J. PECHMAN
                                          United States District Court Judge

11

12   Presented by:

13   HAGENS BERMAN SOBOL SHAPIRO LLP

14

15   By:    /s/ Tyler S. Weaver
             Steve W. Berman, WSBA No. 12536
16           Tyler S. Weaver, WSBA No. 29413
     1301 Fifth Avenue, Suite 2900
17   Seattle, WA 98101
     (206) 623-7292

18   Lead Counsel for Plaintiffs and the Class

19

20

21

22

23

24

25

26

[PROPOSED] ORDER REGARDING
ATTORNEYS' FEES AND INCENTIVE              - 2 -          Hagens Berman Sobol Shapiro LLP
AWARDS                                                   1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
                                                         TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

Avery, Michael 10/9/2018
For Educational Use Only

Robert HICKEY, Kenneth Hankin, Jennifer Hudziec,..., 2006 WL 1857378...

2006 WL 1857378 (W.D.Wash.) (Trial Pleading)
United States District Court, W.D. Washington.

Robert HICKEY, Kenneth Hankin, Jennifer Hudziec, Stephanie Lane, Carroll Jackson, Denise Cooper, Nicole Pearson, and Emily Maloney, on behalf of themselves and all others similarly situated, Plaintiffs,
v.
THE CITY OF SEATTLE, a municipality; Paul Schell, Mayor of the City of Seattle; and Norman Stamper, Chief of Police of the City of Seattle, Defendants.

No. C00-1672 P.
May, 2006.

**Second Amended Class Action Complaint for Violation of Civil Rights**

## I. NATURE OF THE CASE

1. Plaintiffs and the class they seek to represent assembled in downtown Seattle to exercise their democratic rights during the 1999 World Trade Organization Ministerial. They included people from a wide variety of well-known and non-violent movements and concerns, including consumer groups, environmentalists, labor unions, human rights groups, small farmers, and many other organizations aligned with a particular social issue or those who simply wished to observe this exchange of ideas in a public forum. Plaintiffs and the class sought to exercise their rights of assembly and free speech in a variety of fashions: peaceful protest, the exchange of ideas, silent observation. These rights are the bedrock upon which this country was founded and are among the most precious in our society.

2. The World Trade Organization ("WTO") had come to Seattle with the express approval and encouragement of the City, and in particular its Mayor, Paul Schell. Mayor Schell was determined to showcase Seattle to the watching world.

3. After witnessing one day of widespread and active, but largely peaceful protest against the WTO, Mayor Schell and his Chief of Police, Norman Stamper, decided that the City's image was being jeopardized, as was the vision they had for how the WTO conference should proceed. Mayor Schell and Police Chief Stamper thus conceived and implemented a course of police action that was designed to suppress and stifle any further protest which might hint of unruliness, or reflect badly on the image of Seattle authorities wanted the world to see.

4. Thus, Mayor Schell, with the input and assistance of Police Chief Stamper, issued orders and directives aimed at eliminating all demonstrations or "protests" from major portions of downtown Seattle. The policies of Mayor Schell, Police Chief Stamper and the City were intended to create insulated zones inside which no form of unwanted ideological expression would be allowed. These unwanted forms of expression were labeled "protests" and as such were deemed undesirable. Therefore, inside these zones, even the simplest of expressive acts - talking, gathering, and walking -- were entirely prohibited by City authorities if exercised by individuals the City deemed undesirable. Reminiscent of what one might expect in repressive societies, all attempts at such activities in these zones, and as it later developed outside those zones as well, were subject to aggressive police harassment and arrest.

5. The suppressive "no protest" policies of Mayor Schell, Police Chief Stamper and the City ostensibly empowered their police agents to conduct massive and instantaneous arrests of all individuals who attempted to demonstrate inside, or even physically enter any zone of the City in which such activities were not desired by municipal authorities. These policies eventually became embodied in Local Proclamation of Civil Emergency Order Number 3 (and subsequent revisions) ("Order Number 3").

**Avery, Michael 10/9/2018**
**For Educational Use Only**

Robert HICKEY, Kenneth Hankin, Jennifer Hudziec,..., 2006 WL 1857378...

6. Pursuant to these policies, the defendants engaged in a concerted and illegal effort to stifle free speech and assembly, prohibiting the activities of both ideological protestors and citizens who were just using the streets in the course of their daily lives.

7. This policy of repression included forcible and sometimes violent denials of the rights to assemble, to express ideas, and to petition the government for redress of grievances. It encompassed unreasonable and wrongful seizures of persons and incarceration under inhumane conditions. This course of conduct was summarized in the Seattle City Council's WTO Accountability Review Committee Final Report ("Accountability Report"):

Members of the public, including demonstrators, were victims of ill-conceived and sometimes pointless policy actions to "clear the streets." Police response, particularly on Capitol Hill, was sometimes out of proportion to the threats faced. *Our inquiry found troubling examples of seemingly gratuitous assaults on citizens, including use of less-lethal weapons like tear gas, pepper gas, rubber bullets, and "beanbag guns," by officers who seemed motivated more by anger or fear than professional law enforcement.*

8. In carrying out its oppressive policy, the City of Seattle hunted, accosted and incarcerated hundreds of individuals who had gathered to speak their minds in a public forum. The City's police agents shot unarmed civilians with rubber pellets. They sprayed peaceful civilians with nerve agents such as tear gas and pepper, forcibly handcuffed them, and in some cases violently beat them with clubs. After summarily arresting as many people as they could, the City's police herded them into cramped jail facilities where they were held for as many as 72 hours - often without adequate food, water or space to lie down. In numerous cases, access to legal counsel was denied to those incarcerated. All of these illegal actions were taken pursuant to the dictates and authority of the City itself, its mayor and its Chief of Police.

9. This suit is brought as a class action on behalf of all the individuals wrongfully arrested pursuant to the City's extensive "no protest" policies - policies which were ultimately embodied in Order Number 3. It seeks to recover damages for those who, pursuant to City directives, were improperly arrested while *inside* the City's designated "no protest" zones and who were thus forcibly deprived of their right to free speech and assembly under the First Amendment to the United States Constitution, of their right to speak freely under Article 1, Section 5 of the Washington State Constitution, and of their right to freedom from unreasonable search and seizure under the Fourth Amendment to the United States Constitution. The improper arrests of these individuals violated 42 U.S.C. § 1983 (the Civil Rights Act of 1871).

10. This suit also seeks damages for those individuals who were wrongfully arrested pursuant to the City's "no protest" policies while *outside* any of the City's actual designated "no protest" zones. These individuals were forcibly deprived of their First Amendment rights to free speech and assembly, and their Article 1, Section 5 right to speak freely. Additionally, these individuals were forcibly deprived of their federal Fourth Amendment right to freedom from unreasonable search and seizure. The improper arrests of these individuals violated 42 U.S.C. § 1983 (the Civil Rights Act of 1871).


## II. THE PARTIES

11. Former Plaintiff Robert Hickey is a citizen of the United States and a resident of New York State. He was arrested by police agents of the City of Seattle on December 1, 1999. Mr. Hickey is a member of the Teamsters Union and is currently working on a Ph.D at Cornell University in Labor Relations. He came to Seattle to express his solidarity with the Steelworkers who were engaged in peaceful demonstrations during the WTO. Mr. Hickey's claims have been resolved via settlement, along with the claims of the class he represented.

12. Kenneth Hankin is a citizen of the United States, and a resident of Washington State. He was arrested by police agents of the City of Seattle on December 1, 1999. Mr. Hankin is an advocate of animal rights and environmental concerns. He came to the WTO to exercise his free speech and assembly rights on these and other issues.

**Avery, Michael 10/9/2018**
**For Educational Use Only**

Robert HICKEY, Kenneth Hankin, Jennifer Hudziec,..., 2006 WL 1857378...

13. Jennifer Hudziec is a citizen of the United States and a resident of New Hampshire. She was arrested by police agents of the City of Seattle on December 1, 1999. Ms. Hudziec was at the WTO to observe and join in peaceful assembly and speech.

14. Stephanie Lane is a citizen of the United States and a resident of New York state. She was arrested by police agents of the City of Seattle on December 1, 1999 and was illegally incarcerated for four days. Ms. Lane is a resident of Illinois and came to Seattle to observe the WTO demonstrations.

15. Former Plaintiff Carroll Jackson is a citizen of the United States and a resident of Washington State. She was arrested by police agents of the City of Seattle on December 1, 1999 and was illegally incarcerated for four days. Ms. Jackson is a 64 year old retired school teacher. She was at the WTO to observe and take photographs of the demonstrations. Ms. Jackson's claims have been resolved via settlement, along with the claims of the class she represented.

16. Denise Cooper is a citizen of the United States and a resident of Washington State. She was arrested by police agents of the City of Seattle on December 1, 1999 and was illegally incarcerated for four days. Ms. Cooper is a student at the University of Washington. She was at the WTO to voice the concerns of African-Americans and other people of color who are affected by the policies of the WTO.

17. Nicole Pearson is a citizen of the United States. She was arrested by police agents of the City of Seattle on December 1, 1999 and was illegally incarcerated for four days. She was at the WTO to voice the concerns of African-Americans and other people of color who are affected by the policies of the WTO.

18. Former Plaintiff Emily Maloney is a citizen of the United States and a resident of the State of California. She was arrested by police agents of the City of Seattle on December 1, 1999 and was illegally incarcerated for over 40 hours. Ms. Maloney is a 68 year old lawyer and was in Seattle December 1, 1999 to exercise her First Amendment right to protest the policies of the WTO. Her claims were resolved via settlement.

19. The City of Seattle is a municipal corporation organized under the laws of the State of Washington. The defendant City includes, as one of its agencies, the Seattle Police Department.

20. Paul Schell is, and was at all times pertinent to this suit, the Mayor of the City of Seattle, with overall executive and supervisory responsibility for the acts of defendants described herein. At all times material to this complaint, defendant Schell was an agent and employee of the City of Seattle, and was acting within the scope of his employment and under color of the laws of the State of Washington. The claims against Mr. Schell have been dismissed.

21. Norman Stamper was, at all times pertinent to this suit, the Chief of Police of the City of Seattle, with executive and supervisory responsibility for the acts of Seattle police officers during all acts of the defendants described herein. He was responsible for the policies, practices and customs of the Seattle Police Department. He possessed final policy-making and decisional authority regarding issues of law enforcement, discipline and training within the Police Department. At all times material to this complaint, defendant Stamper was an agent and employee of the City of Seattle, and was acting within the scope of his employment and under color of the laws of the State of Washington. The claims against Mr. Stamper have been dismissed.

### III. JURISDICTION AND VENUE

22. This Court has jurisdiction over the plaintiffs because they are either residents of the State of Washington or submit to jurisdiction in this forum. The Court has jurisdiction over the defendants because they are residents of the State of Washington. This Court has jurisdiction over the subject matter of the suit pursuant to 28 U.S.C. § 1343(3) and 42 U.S.C. § 1983. The Court has jurisdiction over plaintiffs' state law claims pursuant to 28 U.S.C. § 1337.

**Avery, Michael 10/9/2018**
**For Educational Use Only**

Robert HICKEY, Kenneth Hankin, Jennifer Hudziec,..., 2006 WL 1857378...

23. Venue is proper in the Western District of Washington at Seattle pursuant to 28 U.S.C. § 1391(b).

## IV. FACTUAL ALLEGATIONS

### A. The WTO Comes to Seattle

24. Between November 30, 1999, and December 3, 1999, a ministerial conference of the WTO was held in Seattle, Washington. The WTO is an international policy body that according to its charter promotes global trade. The WTO claims authority to impose economic sanctions upon member nations that are at odds with this objective.

25. The City of Seattle had actively sought to host the WTO's 1999 winter ministerial conference. Mayor Schell considered landing the WTO to be a prize for the city and believed it would add to the city's prestige, as well as his own.

26. On January 25, 1999, after months of behind the scenes solicitation, Mayor Paul Schell announced that the White House had chosen Seattle to be the site of the 1999 WTO Ministerial Conference. Holding the conference in Seattle was portrayed as a coup that would bring millions of dollars in revenues to local business owners. More importantly, hosting the WTO Ministerial Conference would solidify Seattle's reputation as a "world class" city and place us at the hub of international trade. As Mayor Schell noted in an interview with the SEATTLE POST-INTELLIGENCER reported on January 26, 1999, "[W]e'll get advertising through the news media that we couldn't afford to buy." Other leaders called the conference a "phenomenal opportunity to showcase Washington State." Senator Murray observed that the WTO's coming to Seattle was like "winning the jackpot." Mayor Schell shared their sentiments.

27. Mayor Schell was so anxious to host the WTO that he was willing to have the City incur millions in WTO-related expenses because "in terms of furthering the city's role ... this is a huge plus." He was also willing to override downtown merchants' concerns, in the process noting that, "This event is a momentous exciting affair for Seattle" and "speaks to the growing stature of Seattle's place on the world stage."

28. On October 12, 1999, Seattle City Councilwoman Tina Podlowski observed about Schell, "[T]his is all about the Mayor's desire to put on the best possible face for the WTO. All he cares about is the outside show and he doesn't give a damn about people in the neighborhoods." As events would have it, she turned out to be correct.

### B. Legitimate, Well-Recognized Groups Express Their Intent to Exercise Rights of Free Speech and Assembly in Protest of the WTO

29. Unfortunately for Mayor Schell's Norman Rockwell-like plans, dark clouds (from his perspective) began to form shortly after Seattle was selected as the site of the WTO conference.

30. The convening of this conference had, for months, drawn the attention of thousands of citizens and organizations who disagreed with WTO policies, including the Direct Action Network, Public Citizen, the AFL-CIO and its affiliated unions, the Earth Justice Legal Defense Fund, Sierra Club, the International Forum on Globalization, and many other well-known and respected organizations. The opposition to the ministerial conference also included many diverse organizations within the environmental, consumer rights, labor, pro-democracy, and other movements, both in the United States and worldwide. Interested parties even included presidential candidate Ralph Nader.

31. This opposition created an organized free speech presence in Seattle from the summer of 1999 through December of that year. Opposition groups sponsored numerous educational conferences and seminars concerning the WTO, many of which resulted in publications of books and journals detailing their view that the WTO's policies and practices were anti-consumer,

**Avery, Michael 10/9/2018**
**For Educational Use Only**

Robert HICKEY, Kenneth Hankin, Jennifer Hudziec,..., 2006 WL 1857378...

anti-environmental, and anti-union. There were widely attended and publicized events dealing with the elements and logistics of protest, including a training session on civil disobedience and nonviolent actions conducted by the Direct Action Network. These expressions of public protest and preparations for non-violent demonstrations were well known to City officials and to the Seattle Police Department.

32. Through a series of public declarations and press conferences, the opposition to the WTO made clear that its intention was to hold large demonstrations and rallies in downtown Seattle. Some protestors expressed the desire to block delegates' entrance to the WTO conference being held at the Washington Trade Center. The sites where the demonstrators would convene were widely publicized. In addition, a large labor march was granted a City permit to march from Memorial Stadium to the Trade Center site, starting at noon on November 30, 1999.

### C. Defendants Were on Notice That the Constitution Does Not Permit the Banning of Legitimate Free Speech and Assembly

33. The City, Mayor Schell and Police Chief Stamper knew that WTO demonstrators had the constitutionally protected right to conduct their planned assemblies, and to voice their opinions in Seattle's public places. The controversial, passionate, even contentious nature of the WTO did not afford the City any excuse to limit such activities. Clearly established law regarding public demonstrations - such as the case of *Collins v. Jordan,* 110 F.3d 1363 (9th Cir. 1996) - mandated that the City could not act to abbreviate or violate the public's federal First Amendment right of expression because of a prospective fear regarding potentially unruly activity. Long standing precedent, *e.g. Bering v. Share,* 106 Wash.2d 212, 721 P.2d 918 (1986), dictated that the public's right to speak freely under Article 1, Section 5 of the Washington Constitution was even more expansive than their federal rights to freedom of expression.

34. Clearly established law also informed the City that it could not place any general or blanket limitations on the public's right to lawful protest even if some instances of illegal or destructive conduct did occur during the anticipated demonstrations. Authority such as *Collins* and *Bering* clearly determined that such general restrictions would be fatally overbroad, unconstitutional and unreasonable.

35. Further, decades of well established constitutional law prohibits the City from picking and choosing, based on the content or form of speech or assembly, which citizens may exercise their constitutional rights of speech and assembly.

36. Based on well known legal precepts, the City, Mayor Schell and Police Chief Stamper well knew that the only limitations they could properly impose on demonstrators were those which were carefully tailored to prevent illegal behavior while simultaneously allowing the continued expression of lawful speech.

### D. Lawful and Peaceful Assembly and Protest Take Place on November 30, 1999

37. By 7:00 a.m. on November 30, 1999, the first day of the WTO ministerial, groups of political protesters had gathered and organized themselves outside the hotels where out-of-town delegates were staying. Other demonstrators filled the streets around these hotels and around the Trade Center, carrying signs, chanting slogans, and passing out leaflets.

38. The Seattle Police Department commissioned numerous Metro buses that were used to encircle the Trade Center and establish a perimeter beyond which protestors could not advance. This tactic was successful in keeping the public away from the WTO's meeting place, however it apparently did not result in enough perceived crowd control to satisfy City authorities. Then, early in the day on November 30, 1999, City police agents began liberally employing pepper spray, tear gas and rubber pellets against demonstrators in an attempt to remove them entirely from the streets of downtown Seattle.

**Avery, Michael 10/9/2018**
**For Educational Use Only**

Robert HICKEY, Kenneth Hankin, Jennifer Hudziec,..., 2006 WL 1857378...

39. For understandable reasons, Mayor Schell and the City refrained from imposing any state of emergency or "no protest" zones on the afternoon of November 30. They knew that the officially scheduled and sanctioned labor march was unavoidably bringing numerous families - including young children - and recognizable citizens into the downtown area. Indeed, Seattle's Deputy Mayor Tom Byers was part of that march. Consequently, the City limited its crowd control efforts to piecemeal and often uncoordinated use of pepper spray, tear gas, and other weapons-oriented methods on first day of the WTO conference. In spite of these pain-inflicting activities, numerous protests and political demonstrations took place in the heart of the City streets. Although not treated as such, these lawful forms of expression were almost entirely peaceable and restricted to passive civil disobedience. Several isolated instances of destructive behavior did occur on the fringes of larger ideological gatherings. Yet although the few perpetrators of such detrimental behavior were often known to, and even witnessed by, the City and its police agents, no action was taken by any City authority to impede or contain them.


### E. Institution of Curfew Zones and a No Protest Policy

40. By the evening of November 30, 1999, Mayor Schell and the City had decided that their attempts to stunt the protests were not achieving their desired effects. If anything, the number of people who planned to speak and assemble appeared to be growing. With a growing appreciation of their inadequate preparations for the WTO events, the City, Mayor Schell and Police Chief Stamper declared a State of Civil Emergency in the evening of November 30,1999. First, a general nightlong curfew was imposed on the downtown area. Then, in an ever-escalating series of restrictions, the City, Mayor Schell and Police Chief Stamper began to dictate various policies and orders that would authorize the mass arrests of anyone perceived to be protesting - peacefully or otherwise - in the downtown area after the lifting of the general curfew. In fact, these directives and orders mandated the arrest of anyone who, without proper credentials, even ventured into the downtown core.

41. Thus, for the first time in the city's history, peaceful protestors or citizens wishing to use the streets, were subject to arrest merely for being present in a public place. A radio exchange showed that even some members of the Seattle police department were often surprised by the import of the City's policies and orders:
Let me get this straight [officer on the radio] we're just supposed to arrest all protestors?

That's affirmative.


42. The defendants' directives and orders creating these "no protest" and/or curfew zones were unconstitutional on their face. They were designed to deprive the plaintiffs, Class members and public at large of their federal First Amendment right to free speech and assembly, as well as their Washington State Constitutional right to speak freely. They were, in effect, content-based and discriminatory restrictions aimed at denying specific individuals their lawfully guaranteed freedoms of expression. They were also unconstitutional as applied. As applied, they were directed at individuals who were lawfully gathered to exercise protected freedoms.

43. The City, Mayor Schell, and Police Chief Stamper elected to enforce their restrictions on free speech and assembly by using disruptive and painful "crowd control" measures such as rubber pellets, pellet grenades, tear gas and pepper spray.[1] These measures were employed by the City in a manner which unfairly punished peaceful demonstration, failed to curtail destructive behavior, and did not foster general conditions of public safety in the downtown Seattle area.

44. On December 1, 1999, Mayor Schell's and the City's "no protest" policies and directives culminated in the issuance of Local Proclamation of Civil Emergency Order Number 3 (and subsequent revisions) ("Order Number 3"). The provisions of Order Number 3 embodied the City's official policy of banning the general public from gathering in, or even from entering, an area of approximately 24 city blocks in downtown Seattle described as: "Starting on the corner of 4th 13 Avenue and Lenora Street, then proceeding south on 4th Avenue to Seneca Street, then east on Seneca Street to the I-5 freeway, then north along the I-5 freeway to Boren Avenue, then north on Boren Avenue to Pine Street, then west on Pine Street to 6th Avenue, then north on 6th Avenue to Lenora Street, then west on Lenora Street to, and concluding at [sic] 4th Avenue and

**Avery, Michael 10/9/2018**
**For Educational Use Only**

Robert HICKEY, Kenneth Hankin, Jennifer Hudziec,..., 2006 WL 1857378...

Lenora."

45. This restricted area, which came to be the best known of the City's "no protest" zones, included the Washington State Convention Center, which was the hub of all WTO activity in Seattle. The area also incorporated Westlake Plaza, numerous hotels, much of the retail-shopping core of the city, and many other public areas in which peaceful political demonstrations had been held prior to the issuance of Order Number 3. The blanket speech, assembly and physical presence restrictions imposed by Order Number 3 were declared to be effective until 12:00 a.m. on December 2, 1999. Following this expiration date and time, Order Number 3 was revised and extended to 12:00 a.m. on December 3, 1999.

46. Like the City's other "no protest" directives which had preceded it, Order Number 3 authorized law enforcement agents to arrest and summarily incarcerate any member of the general public who entered specified areas of downtown for any reason - including the expression of political ideas or the exchange of constitutionally protected speech. The only individuals exempted from this order were credentialed WTO personnel, law enforcement officials, members of the press, and residents (both commercial and domestic) of the restricted downtown area. The "credential" exception to Order Number 3 provided:

> No person shall entered or remain in a public place as defined in SMC 15.02.046C within the above described limited curfew area except the following: Delegates and personnel authorized by the WTO to participate in official WTO functions; Employees and owners of businesses within the limited curfew area and other personnel necessary to the operation of those businesses; Persons who reside within the limited curfew area; Representatives of the press with proper credentials; City officials with valid identification, and; Emergency and public safety personnel.

47. Thus, Order No. 3 made it legal for one group of people to exercise their rights of expression, but not others. WTO delegates were free to move about in the "no protest" zone, as were credentialed press, while peaceful law abiding citizens, whether protesting or not, were prohibited from assembly or speech.

48. On December 1 and 2, 1999, in accordance with the City's "no protest" policies and even before the effective commencement of Order Number 3, numerous groups of peaceful individuals were accosted and arrested by City police agents merely for attempting to express their opinions of the WTO, or by offering silent support to those who were expressing their opinion. Many more people were waylaid and arrested by police for nothing more than being physically present in the City's targeted sections of the downtown area. All of these individuals were confronted by armed City police agents who forcibly detained them, stifled their efforts of expression, subdued them with painful crowd control weapons, searched their persons and belongings, and transported them to incarceration facilities for long periods of holding. In almost no case did the individuals detained in this manner offer any resistance to the City's police agents. At Second Avenue and Pine Street marchers were chanting "peaceful protest" when police attacked them with rounds of tear gas, rubber pellets and concussion bombs. Many officers, against Seattle Police Department policy, actually masked their identification so they could attack protestors with anonymity.

TABLE

49. Although the City's Order Number 3 ostensibly designated very specific zones as being subject to speech restrictions, the City often chose to stifle all expression and demonstration in a much more expansive area. With the consent of the Mayor and Chief of Police, citizens and visitors were consequently arrested pursuant to City "no protest" policies and directives even though they were actually *outside* any designated "no protest" zone. In all cases, these people were subjected to the liberal use of crowd control weaponry, searches and seizures of their person, and lengthy incarceration. Such weaponry included tear gas, rubber pellets and pepper spray.

50. For example, on the morning and afternoon of December 1, 1999, pursuant to a permit issued by the City of Seattle itself, members and supporters of a steelworkers union were allowed to participate in a political march which occurred well outside the designated no protest zone. After the march terminated near the Seattle waterfront, many of the participants began making

**Avery, Michael 10/9/2018**
**For Educational Use Only**

Robert HICKEY, Kenneth Hankin, Jennifer Hudziec,..., 2006 WL 1857378...

their way back toward the demonstration's starting point by angling east, in the general direction of the downtown core. As one large group neared the location of 1st Avenue and Pike Street, the City of Seattle's police agents confronted it and used painful crowd control weapons such as pepper spray and rubber pellets to stop its progress. Importantly, at all times that such force was used, the group of protesters was well *outside* the no protest zone of Order Number 3.

51. After stopping the protestors, the City's police agents employed more crowd control weapons to herd them northward along 1st Avenue for approximately one mile, in a direction that took them even further away from the no protest zone. The demonstrators were ultimately forced into a second group of City police agents, who had been pre-positioned to block their path. Finding their progress impeded in all directions, the protestors could do nothing but remain frozen in an area around the intersection of 1st Avenue and Clay Street. Yet once they had ceased moving, the City's police agents moved in and forcibly arrested the protestors for ostensibly failing to "clear" the street "in accordance with Mayor [sic] order." The area of all these protestors' arrest was well outside any of the City's "no protest" zones. Numerous other individuals were also arrested at locations outside of any declared "no protest" zone. The police dragnet was so broad that even WTO delegates were captured. As reported in the Seattle P.I. on December 2, 1999, the City's police agents dragged away Mr. Victor Menotti, a delegate from San Francisco who was peacefully discussing environmental issues with a group of protestors. Observers reported that he was "arrested in mid-sentence."

52. On other occasions, the police force, using tear gas, rubber pellets, spray and crowd-control methods, drove protesters out of downtown Seattle and arrested others, even though they were outside the curfew area established by Order 3.

## F. Allegations Specific to Former Plaintiff Hickey

53. Former Plaintiff Robert Hickey took part in a peaceful, municipally licensed, police-sanctioned demonstration organized by the Teamsters and Steelworkers unions on December 1, 1999. As part of this demonstration, thousands of people marched down to a rally on the Seattle waterfront, where a series of speeches about WTO policies were delivered. After this march and rally had concluded, many of the participants began making their way toward the downtown area of the City. Former Plaintiff Hickey was among these individuals, all of whom were peaceful and well-behaved.

54. Near the intersection of First Avenue and Broad Street, Hickey left the group of rally participants and entered the Labor Temple at that location. Hickey used a telephone inside the Labor Temple to make several personal calls, then returned to the streets. Outside, Hickey met an acquaintance who informed him that many of the participants from the labor rally were currently being accosted and detained by police forces near the intersection of First Avenue and Clay Street. Out of solidarity, Hickey hurried to this location, where he observed a cordon of riot police forces in the process of surrounding a large group of peaceful individuals.

TABLE

55. Hickey attempted to cross the police lines in order to join the besieged demonstrators. The police allowed him to do so. From several members of the crowd, Hickey learned that as the rally participants had moved east, away from the waterfront, armored City police agents had suddenly assembled to block their way. Without issuing any instructions or communications to the demonstrators, these agents had then begun to discharge projectile weapons and tear gas at them. The demonstrators had retreated from the police, using both chants and gestures to indicate their peaceful intentions. Police agents had pursued the demonstrators, herding them away from downtown. Other police agents had blocked side streets so as to insure that the demonstrators could proceed in only one direction.

56. While Hickey spoke with other rally participants, police agents gave the crowd a vague order to "disperse." However, both during and after the delivery of this dispersal order, police kept the demonstrators encircled and did not provide them with any means of leaving the area. Some individuals who actually tried to depart, including Hickey, were actively prevented

**Avery, Michael 10/9/2018**
**For Educational Use Only**

Robert HICKEY, Kenneth Hankin, Jennifer Hudziec,..., 2006 WL 1857378...

from doing so. Many of these people were even targeted with tear gas and concussion devices to prevent any movement.

57. Police then arrested all of the surrounded demonstrators, including Hickey. Hickey was handcuffed and loaded onto a transport that took him to Sandpoint Naval Station for processing. At no point did Hickey offer any resistance to these police actions. He was never read his rights by any police agent, or informed of the charges on which his arrest was predicated.

58. After being arrested, Hickey was held in custody by the Seattle Police and its agents for approximately 72 hours before being released. At no time during his custodial incarceration was Hickey ever informed of the charges brought against him.

59. All charges against Hickey were later withdrawn by the City of Seattle without a trial on the merits.


### G. Allegations Specific to Plaintiff Hankin and Which Are Common to Members of the Class

60. Plaintiff Kenneth Hankin took part in a peaceful demonstration that began in Denny Park on the morning of December 1, 1999. Hankin and other non-violent protestors marched toward downtown Seattle, singing songs, playing music and chanting ideological slogans concerning the WTO. Many in the crowd with him repeated the words "peaceful protest" as they advanced. No acts of violence could be observed in the area.

61. At some time near 9:00 a.m., the demonstration involving Hankin was stopped by City police forces at the public square near Westlake Center, in the City's commercial district. Police agents wearing riot armor and others mounted on horses surrounded the demonstrators and prevented their further progress in any direction. At this point, many of the demonstrators sat on the ground to communicate their non-violent intentions.

62. The City's police agents then informed the demonstrators that any individuals sitting down would be summarily arrested. The Police stated that those persons who did not wish to be arrested should remove themselves to a building front on one side of the public square. Not wanting to be arrested, plaintiff Hankin walked over to stand in the indicated area.

63. Police agents proceeded to arrest all of the non-violent protestors who remained seated in the public square, often using pain and "compliance" holds on individuals who offered them no resistance. After placing all of these demonstrators on buses for transport to incarceration facilities, police agents then arrested all of the individuals who had placed themselves in the "non-arrest" area pursuant to prior police instructions.


TABLE

64. Plaintiff Hankin was arrested by Seattle Police agents at this time, handcuffed and placed on a bus for transport to an incarceration and processing facility at the Sandpoint Naval Station. Plaintiff Hankin offered no resistance to any police action. He was never read his rights by any police agent, or informed of the charges on which his arrest was predicated.

65. After being arrested, plaintiff Hankin was held in custody by the Seattle Police and its agents for approximately 60 hours before being released. At no time during his custodial incarceration was plaintiff Hankin ever informed of the charges brought against him.

66. All charges against plaintiff Hankin were later dismissed by the City of Seattle without a hearing.


### H. Allegations Specific to Plaintiff Hudziec and Which Are Common To Members of the Class

67. Plaintiff Jennifer Hudziec took part in the peaceful demonstration that began in Denny Park on the morning of December

**Avery, Michael 10/9/2018**
**For Educational Use Only**

Robert HICKEY, Kenneth Hankin, Jennifer Hudziec,..., 2006 WL 1857378...

1, 1999. Hudziec marched with those who sang and chanted their ideas concerning the WTO. One of the demonstrators played accompanying music on a flute, others including Ms. Hudziec were singing the national anthem.

68. At some time around 9:00 a.m., the demonstration involving Hudziec was stopped by Seattle Police forces at the public square near Westlake Center. Seattle Police agents then informed the demonstrators that any individuals who did not remove themselves to one side of the square would be summarily arrested. The Police stated that those persons who did not wish to be arrested should proceed to a designated building front. Making what she considered to be one of the most difficult decisions of her life, but not wanting to be arrested, plaintiff Hudziec followed the police's directives and walked over to stand in the indicated area. She believed that by doing so she would not be arrested.

69. Police agents arrested all of the non-violent protestors who remained in the middle of the public square. The Police then began arresting all of the individuals who had purposely placed themselves in the "non-arrest" area, pursuant to prior police instructions. Plaintiff Hudziec was thus arrested by Seattle Police agents at this time, handcuffed and placed on a bus for transport to an incarceration and processing facility at the Sandpoint Naval Station. Plaintiff Hudziec offered no resistance to any police action. She was never read her rights by any police agent, or informed of the charges on which her arrest was predicated and was denied for hours the right to speak to a lawyer in private. After the media left the area, the bus she was on was taken behind the Naval Station whereupon Seattle Police began pepper spraying people on the bus and forcibly removed others. All of this was purposely done outside the presence of the media.

70. After being taken off the bus, she was shackled by handcuffs and a waist cuff, and transported to King County Jail. She was arrested on a Wednesday night and was not informed of the charges against her until before her arraignment on Friday.

71. All charges against plaintiff Hudziec were later dismissed by the City of Seattle without a hearing.

### I. Allegations Specific to Plaintiff Lane and Which Are Common to Members of the Class

72. Plaintiff Stephanie Lane, like plaintiffs Hankin and Hudziec, took part in the peaceful demonstration that began in Denny Park on the morning of December 1, 1999.

73. Plaintiff Lane was with this demonstration when it was stopped by Seattle Police forces at the public square near Westlake Center, in the City's commercial district. At the time it was stopped, there were no acts of violence associated with this march.

74. Plaintiff Lane was among those individuals who did not want to be arrested.

75. However, plaintiff Lane was nonetheless arrested by Seattle Police agents, who handcuffed her and placed her on a bus for transport to an incarceration and processing facility. At no time did plaintiff Lane offer any resistance to police action. She was never read her rights by any police agent.

76. After being arrested, plaintiff Lane was held in custody by the Seattle Police and its agents for over 48 hours before being released.

77. All charges against plaintiff Lane were later dismissed by the City of Seattle without a hearing.

### J. Allegations Specific to Former Plaintiff Jackson

78. Former Plaintiff Carroll Jackson was observing the march in which Robert Hickey participated, described above. Jackson

**Avery, Michael 10/9/2018**
**For Educational Use Only**

Robert HICKEY, Kenneth Hankin, Jennifer Hudziec,..., 2006 WL 1857378...

had participated in marches earlier in the week, and she had taken her camera downtown on December 1, 1999 to take photographs of the demonstrations. She observed the City's police agents drive the demonstration of which Hickey was a part. After the police agents had driven those demonstrators far north of the "no protest zone", Jackson was taking photographs of the demonstrators. At that point, she was ordered to move across the street, and she was then ordered to sit down with a group of demonstrators.

79. The police then ordered Jackson's group of demonstrators to join a larger group of demonstrators. Police then arrested all of the surrounded demonstrators, including Jackson. Jackson was handcuffed and loaded onto a transport that took her to Sandpoint Naval Station for processing. At no point did Jackson offer any resistance to these police actions.

80. After being arrested, Jackson was held in custody by the Seattle Police and its agents for more than four full days before being released. She was incarcerated for more than 72 hours before she was arraigned. She was never read her rights.

81. All charges against Jackson were later withdrawn by the City of Seattle without a trial on the merits.


### K. Allegations Specific to Plaintiff Cooper and Which are Common to Members of the Class

82. Plaintiff Cooper joined the march that had begun in Denny Park on the morning of December 1, 1999. This was the same march in which plaintiffs Hankin, Hudziec and Lane, took part.

83. Plaintiff Cooper was with this demonstration when it was stopped by Seattle Police forces at the public square near Westlake Center, in the City's commercial district. At the time it was stopped, there were no acts of violence associated with this march.

84. Plaintiff Cooper was among those individuals who did not want to be arrested. She thus followed the police's directives to stand in an indicated "non-arrest" area and await further instructions.

85. However, plaintiff Cooper was nonetheless arrested by Seattle Police agents, who handcuffed her and placed her on a bus for transport to an incarceration and processing facility. At no time did plaintiff Cooper offer any resistance to police action. After being arrested, plaintiff Cooper was held in custody by the Seattle Police and its agents for more than four days before being released.

86. All charges against plaintiff Cooper were later dismissed by the City of Seattle without a hearing.


### L. Allegations of Plaintiff Pearson Which are Common to the Members of the Class.

87. Plaintiff Pearson joined the march that had begun in Denny Park on the morning of December 1, 1999. This was the same march in which plaintiffs Hankin, Hudziec, Lane and Cooper, took part.

88. Plaintiff Pearson was with this demonstration when it was stopped by Seattle Police forces at the public square near Westlake Center, in the City's commercial district. At the time it was stopped, there were no acts of violence associated with this march.

89. Plaintiff Pearson was among those individuals who did not want to be arrested. She thus followed the police's directives to stand in an indicated "non-arrest" area and await further instructions.

90. However, plaintiff Pearson was nonetheless arrested by Seattle Police agents, who handcuffed her and placed her on a bus

**Avery, Michael 10/9/2018**
**For Educational Use Only**

Robert HICKEY, Kenneth Hankin, Jennifer Hudziec,..., 2006 WL 1857378...

for transport to an incarceration and processing facility. At no time did plaintiff Pearson offer any resistance to police action. After being arrested, plaintiff Pearson was held in custody by the Seattle Police and its agents for more than four days before being released.

91. All charges against plaintiff Pearson were later dismissed by the City of Seattle without a hearing.

## M. Allegations of Former Plaintiff Maloney

92. Former Plaintiff Emily Maloney took part in a peaceful demonstration that began in Denny Park on the morning of December 1, 1999. Maloney and other non-violent protestors marched toward downtown Seattle, singing songs, playing music and chanting ideological slogans concerning the WTO. Many in the crowd with her repeated the words "peaceful protest" as they advanced. No acts of violence could be observed in the area.

93. Maloney continued marching toward downtown Seattle with this group, and turned onto 8th Avenue. When the group approached the vicinity of 8th Avenue and Blanchard Street, a police line formed to block their path. The crowd remained peaceful. No acts of violence could be observed. Then, without warning, the police began arresting the group. Maloney was among those arrested.

94. The Seattle Police agents handcuffed Maloney and placed her on a bus for transport to an incarceration and processing facility. At no time did Maloney offer any resistance to police action. Nevertheless, the police placed the handcuffs so tight on her wrists that they started to bleed. Despite the fact that Maloney is a sixty-eight year old woman, despite the fact that the police had inflicted this pain upon her, and despite the cries for help by her and others, the police made no attempt to loosen her handcuffs for several hours. Worse, she was illegally incarcerated for 36 hours before she was given anything to eat.

95. Maloney was held in custody by the Seattle Police and its agents for over 40 hours before being released.

96. All charges against Maloney were later dismissed by the City of Seattle without a hearing.

## N. The Impact of the Defendants' Policies

97. The impact of defendants' policy and orders as created and then implemented was far-reaching and included, but was not limited to:
(a) Plaintiff and members of the class were prohibited from peaceful free speech and assembly;

(b) Free speech and assembly was chilled, not just for plaintiffs and members of the class, but for thousands of others who were considering lawful free speech and assembly, but who were dissuaded from doing so by defendants' policies;

(c) Plaintiffs and members of the class experienced well-founded fear and anxiety as their free speech rights were quashed by an aggressive, armed police force;

(d) Plaintiffs and members of the class had to endure arrest, including being handcuffed and forced onto buses and jails against their will;

(e) Plaintiffs and members of the class had to suffer the indignity and burden of being jailed for exercising their constitutional rights; and

(f) Plaintiffs and members of the class each experienced distress and physical discomfort both from the deprivation of their

**Avery, Michael 10/9/2018**
**For Educational Use Only**

Robert HICKEY, Kenneth Hankin, Jennifer Hudziec,..., 2006 WL 1857378...

civil rights and their physical treatment.

98. The foregoing impacts are common to plaintiffs and members of the class.

## V. CLASS ACTION ALLEGATIONS

99. Plaintiffs originally brought this action individually and as a class action on behalf of the Class defined as follows ("the Original Class"):

> All persons who were arrested by the City of Seattle and its police agents or its affiliated police agents on December 1 and 2, 1999, pursuant to the defendants' "no protest" polices and directives which were eventually embodied by the City of Seattle's Local Proclamation of Civil Emergency Order Number 3 (and subsequent revisions) and who were subsequently not convicted of any crime. Included in this class are all persons arrested pursuant to such policies both inside and outside the zone established by Order Number 3.

On January 25, 2002, the Court denied certification of this Class. On November 5, 2002, the Court certified the following Class:

> All individuals arrested on December 1, 1999, at or near the intersections of First Avenue and Broad Street or First Avenue and Clay Street in Seattle, Washington, whose arrest records indicate that a reason for arrest was a violation of Seattle Municipal Code § 12A.26.040.

The claims of this Class (the "First and Broad Class") were settled and dismissed in 2004 following notice to the First and Broad Class and final approval of the Court. Following a reversal of the January 25, 2002, denial of class certification by the Ninth Circuit Court of Appeals, Plaintiffs now seek certification of the following Class (referred to herein as "the Class"):

> All individuals arrested on the morning of December 1, 1999, in Seattle, Washington, in Westlake Park or the streets or sidewalks immediately adjacent to Westlake Park.

100. This action is brought and may properly be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(b)(1) and (b)(3). The action satisfies the numerosity, typicality, adequacy, commonality, predominance and superiority requirements of those provisions.

101. The Class is so numerous that the individual joinder of all of its members is impracticable. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs are informed and believe that the Class includes approximately two hundred members whose identities can be easily ascertained from City records.

102. Common questions of fact and law exist as to all members of the Class which predominate over any questions affecting individual members of the Class. These common legal and factual questions, which do not vary from Class member to Class member, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

(a) whether the defendants' policies and directives which were ultimately embodied by Local Proclamation of Civil Emergency Order Number 3 (and subsequent revisions) of the City of Seattle, and which attempted to create extensive curfew zones, or "no protest" zones, throughout the City's downtown area, violated the First Amendment of the United States

**Avery, Michael 10/9/2018**
**For Educational Use Only**

Robert HICKEY, Kenneth Hankin, Jennifer Hudziec,..., 2006 WL 1857378...

Constitution, and Article 1, Section 5 of the Washington State Constitution;

(b) whether the arrests of plaintiffs and the Class while physically within one of the City's declared curfew zones or "no protest" zones violated the federal First and Fourth Amendment rights of plaintiffs and the Class;

(c) whether the arrests of plaintiffs and the Class while physically within one of the City's declared curfew zones or "no protest" zones violated the rights of plaintiffs and the Class guaranteed under Article 1, Section 5 of the Washington State Constitution;

(d) whether, pursuant to 42 U.S.C. § 1983, plaintiffs and the Class are entitled to an award of compensatory damages resulting from the violation of their federal First Amendment rights by the City of Seattle;

(e) whether, pursuant to 42 U.S.C. § 1983, plaintiffs and the Class are entitled to an award of punitive damages resulting from the violation of their federal First Amendment rights;

(f) whether, pursuant to 42 U.S.C. § 1983, plaintiffs and the Class are entitled to an award of compensatory damages from the City resulting from the violation of their federal Fourth Amendment rights by the City of Seattle;

(g) whether pursuant to Article 1, Section 5 of the Washington State Constitution plaintiffs and the Class are entitled to an award of compensatory damages from the City for the violation of their guaranteed rights to speak freely.

103. Plaintiffs' claims are typical of the claims of the members of the Class, and the representative plaintiffs interests are coincident with and not antagonistic to those of the other Class members they seek to represent. Plaintiffs and all members of the Class have sustained damages from defendants' common course of conduct as complained of herein. The damages of each member of the Class were caused directly by defendants' wrongful conduct.

104. Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained attorneys experienced in the prosecution of class actions, and plaintiffs intend to prosecute this action vigorously.

105. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Individual Class members do not have a cognizable interest in individually controlling the prosecution of separate actions. Given the relatively small amount of any potential damage awards attributable to each Class member, it would be impractical for them to pursue separate suits. Such suits would also be unduly burdensome to the courts in which they would proceed. Moreover, individualized litigation would present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expenses to all parties and to the court system resulting from multiple trials of the same factual and legal issues.

106. Owing to the predominance of common issues among Class members, as well as the availability of adequate records regarding Class membership, the conduct of this litigation as a class action will encounter no significant manageability obstacles.

**FIRST CAUSE OF ACTION (Violation of Federal Civil Rights - Declaration of Unconstitutionality)**

107. Plaintiffs, individually and on behalf of the Class, incorporate the preceding paragraphs as though fully set forth herein.

108. The actions of the City of Seattle in formulating, issuing and causing to be effectuated the curfew and "no protest" policies and directives, which were ultimately embodied by Order Number 3, were taken under color of state law. These policies, directives and Order Number 3 represented the official policy of the City of Seattle and were implemented by the City's police force.

**Avery, Michael 10/9/2018**
**For Educational Use Only**

Robert HICKEY, Kenneth Hankin, Jennifer Hudziec,..., 2006 WL 1857378...

109. These policies and Order Number 3 were unconstitutional as enacted, and as applied, in that they restricted peaceful free speech and assembly based on its content, protecting certain forms of speech and assembly (for example, that of WTO delegates) while prohibiting the free speech of others who were engaging in "unwanted" forms of speech or expression. These policies and orders were also unconstitutional as applied in that they restricted lawful, peaceful free speech and assembly based on its content. The policies therefore violated plaintiffs' and the Class's federal constitutional rights under the First Amendment.

### SECOND CAUSE OF ACTION (Violation of Washington State Civil Rights - Declaration of Unconstitutionality)

110. Plaintiffs, individually and on behalf of the Class, incorporate the preceding paragraphs as though fully set forth herein.

111. The actions of the City of Seattle in formulating, issuing and causing to be effectuated the curfew and "no protest" policies and directives which were ultimately embodied by Local Proclamation of Civil Emergency Order Number 3 were taken under color of state law. These policies and Order Number 3 represented the official policy of the City of Seattle and were implemented by the City's police force.

112. The restrictions on physical presence, assembly and expression incorporated in defendants' curfew and "no protest" policies and directives - which included Order Number 3 - violated plaintiffs' and the Class's rights under Article 1, Section 5 of the Washington State Constitution.

### THIRD CAUSE OF ACTION (Violation of Federal Civil Rights - Damages)

113. Plaintiffs, individually and on behalf the Class, incorporate the preceding paragraphs as though fully set forth herein.

114. The actions of the City of Seattle in formulating, issuing and causing to be effectuated the curfew and "no protest" policies and directives which were ultimately embodied by Order Number 3 were taken under color of state law. These policies, directives and Order Number 3 represented the official policy of the City of Seattle and were implemented by the City's police force.

115. The mass arrests of plaintiffs and Class members while physically inside one of the defendants' designated curfew or "no protest" zones violated their rights under the First and Fourth Amendments to the United States Constitution. Pursuant to 42 U.S.C. § 1983, the defendants are therefore liable for all of plaintiffs' and Class members' damages which proximately resulted therefrom. 115. The mass arrests of plaintiffs and Class members while physically outside one of the defendants' designated curfew or "no protest" zones violated their federal constitutional rights under the First and Fourth Amendments to the United States Constitution. Pursuant to 42 U.S.C. § 1983, the defendants are therefore liable for all of plaintiffs' and Class members' damages which proximately resulted therefrom.

### FOURTH CAUSE OF ACTION (Violation of State Civil Rights - Damages)

116. Plaintiffs, individually and on behalf the Class, incorporate the preceding paragraphs as though fully set forth herein.

117. The actions of defendants the City of Seattle in formulating, issuing and causing to be effectuated the curfew and "no protest" policies and directives which were ultimately embodied by Order Number 3 were taken under color of state law. These policies, directives and Order Number 3 represented the official policy of the City of Seattle and were implemented by the City's police force.

**Avery, Michael 10/9/2018**
**For Educational Use Only**

Robert HICKEY, Kenneth Hankin, Jennifer Hudziec,..., 2006 WL 1857378...

118. The mass arrests of plaintiffs and Class members pursuant to the defendants' curfew and "no protest" policies, directives and Order Number 3 violated their rights to speak freely guaranteed by Article 1, Section 5 of the Washington State Constitution. Pursuant to this article and section of the constitution, the defendants are therefore liable for all of plaintiffs' and Class members' damages which proximately resulted therefrom, including the denial of the right to speak freely and the arrests and incarcerations associated with such denial.

## VI. JURY DEMAND

119. Pursuant to Federal Rule of Civil Procedure 38, a jury trial is demanded on all causes of action alleged in the Complaint.

## VII. PRAYER FOR RELIEF

120. Plaintiffs, on behalf of themselves and the Class, pray for the following relief:

A. Declaratory relief specifying that the defendants' policies and directives which were intended to establish extensive curfew or "no protest" zones - and which included Local Proclamation of Civil Emergency Order Number 3 (and subsequent revisions) - violated the First Amendment of the United States Constitution, as well as Article 1, Section 5 of the Washington State Constitution;

B. Declaratory Relief specifying that the defendants' arrest of individuals, both inside and outside the "no protest" zones, violated plaintiffs' and class members' rights under the Fourth Amendment to the United States Constitution.

C. A uniform award of compensatory damages against all defendants for plaintiff and each member of the Class in an amount to be proven at trial;

D. An award of reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

E. For such other additional relief as the Court may deem just and proper.

Footnotes

1    Pepper spray - also called "OC," in reference to its active ingredient: oleoresin capsicum - is a projectile substance derived from cayenne peppers. The chemical agents in oleoresin capsicum produce sensations of heat and burning on human nerve-endings, in particular those located in the eyes, nose and mouth. The intensity of this burning is measured along a scale known as the Scoville heat unit rating. One to three Scoville units are detectable by the tongue as a level of heat. The pepper spray used by police in Seattle - the strongest and purest available - contained 10 - 15% oleoresin capsicum extract, with a Scoville rating of 1.5 to 2 million units. *Hawken, Paul,* "On the Streets of Seattle," The Amicus Journal, Spring 2000, p.29, 2000.

**End of Document**                                              © 2018 Thomson Reuters. No claim to original U.S. Government Works.

The Honorable Marsha Pechman

UNITED STATES DISTRICT COURT, WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ROBERT HICKEY, KENNETH HANKIN,
JENNIFER HUDZIEC, STEPHANIE LANE,
CARROLL JACKSON, DENISE COOPER,
NICOLE PEARSON, and EMILY
MALONEY, on behalf of themselves and all
others similarly situated,

                              Plaintiffs,

      v.

THE CITY OF SEATTLE, a municipality;
PAUL SCHELL, Mayor of the City of Seattle;
and NORMAN STAMPER, Chief of Police of
the City of Seattle,

                             Defendants.

No. C00-1672P

DECLARATION OF TYLER S.
WEAVER IN SUPPORT OF MOTION
FOR FINAL APPROVAL AND MOTION
FOR AWARD OF ATTORNEYS' FEES
AND COSTS

**NOTED: July 2, 2004**

I, Tyler S. Weaver, declare as follows:

      1.      I am an attorney in the law firm of Hagens Berman LLP, lead counsel for the

Plaintiffs. Since February 2002, I have been the primary attorney leading this litigation. I

submit this declaration in support of Plaintiffs' Motion for Final Approval of Settlement and

Plaintiffs' Motion for Award of Attorneys' Fees and Costs and Incentive Awards.

      2.      Attached as Exhibit 1 is a true and correct copy of the Settlement Agreement

finalized by the parties on February 25, 2004, to settle the claims of Robert Hickey, Carroll

Jackson, and the Class they represent. The parties reached this agreement only after multiple

DECLARATION OF TYLER S. WEAVER IN
SUPPORT OF MOTION FOR FINAL
APPROVAL
1428.10 0189 MTN.DOC

- 1 -

HAGENS BERMAN LLP
*Attorneys at Law*

CAMBRIDGE LOS ANGELES PHOENIX [PLLC] SEATTLE

1  mediation sessions with a third-party mediator, the Honorable Terrence Carroll.

2      3.     I believe that this settlement is an excellent result for the members of the Class

3  and strongly recommend its final approval. I believe that when the full recovery we achieved for

4  the Class (the Court's ruling on summary judgment, the expunction of arrest records, and the

5  cash settlement) is taken into consideration, it is comparable to what we would have achieved for

6  the Class following a verdict in our favor. Without waiving any attorney-client or work-product

7  privileges that might be asserted in future litigation, I note that in the weeks and months leading

8  up to trial, I personally engaged in investigations of the potential value of the claims of the Class,

9  as did my co-counsel. Based on those investigations, my knowledge of the witnesses, the

10  discovery, and the facts to be presented at trial, and my understanding of the legal issues, I

11  believe that the settlement is within the range of what Class members could have expected to

12  receive at trial if they had prevailed as to liability.

13      4.     In accordance with the Court's April 9, 2004 order preliminarily approving the

14  settlement, on April 23, 2004, my office sent a copy of the approved class notice and claim form

15  to the last-known address for all Class members. This included individuals whose last-known

16  addresses were reflected on their arrest records, as well as individuals for whom we had received

17  updated addresses. The notice and claim form, which are attached as Exhibits 2 and 3, clearly

18  state that all claim forms, any objections, must be sent no later than June 22, 2004.

19      5.     On May 16, 2004, the published notice approved by this Court on April 9, 2004,

20  also appeared in the *Seattle Times* and the *Seattle Post-Intelligencer*. A copy of the newspapers'

21  certification of publication is attached as Exhibit 4.

22      6.     In addition to the direct mailings and published notice, I have also sent, via

23  electronic mail, several notices of the settlement to three separate internet and email groups

24  maintained by and for the benefit of those who were arrested during the WTO. The first message

25  was sent in January 2004, shortly after the settlement was reached, and indicated the basic terms

26  of the settlement and encouraged people to send me their contact information. I sent another

electronic message on April 23, 2004, the same day notices were mailed, informing individuals

DECLARATION OF TYLER S. WEAVER IN
SUPPORT OF MOTION FOR FINAL                    - 2 -
APPROVAL
1428.10 0189 MTN.DOC



HAGENS BERMAN LLP
*Attorneys at Law*

CAMBRIDGE  LOS ANGELES  PHOENIX [PLLC]  SEATTLE

of the settlement and generally of their rights, and encouraged anyone who did not receive a claim form or notice in the mail to contact me or my paralegal for a class notice and a claim form. In early June 2004, I sent another message to these internet and email groups, reminding Class members to return their claim forms by the June 22 deadline. I have received several responses to these emails and have provided a class notice and claim form to those who identified themselves as members of the Class. In fact, the email communication has worked so well that we were able to contact, and have received a claim form from, one Class member who currently lives in Guinea, Africa, where they do not have reliable standard mail service.

7. As of June 15, 2004, my office had received 40 signed and completed claim forms. We have cross-referenced these claims with the arrest records and databases we have on file and have no reason to doubt the validity of these claims. However, one of the claims was submitted by a person who was arrested at First Avenue and Broad Street but had previously filed his own individual lawsuit over the arrest, a suit that was resolved independently of this suit. The settlement agreement specifically excludes this person from the Class definition. I had previously spoken with this individual about that fact in January 2004 and on June 16, 2004, I wrote him a letter formally denying his claim. His claim is the only claim that I presently have any reason to doubt or deny.

8. We have been recently receiving claim forms at the rate of 3 or 4 per day. I expect that we will receive a significant number at the close of the claim period on June 22, 2004, and shortly thereafter, and expect to have 60 or 70 returned forms by the end of the period.

9. I have not heard a single negative comment about the settlement from any Class member. In fact, the response has been overwhelmingly positive and many expressed surprise that we were able to recover anything for them, much less what we did.

10. My firm and my co-counsel accepted representation of the Plaintiffs and filed the complaint in this case on a contingent basis, and without any fee agreement with the Plaintiffs and therefore no guarantee that we would recover any costs or fee in this case.

11. I have reviewed the billing records for my firm as well as those submitted to me

DECLARATION OF TYLER S. WEAVER IN
SUPPORT OF MOTION FOR FINAL
APPROVAL                                    - 3 -
1428.10 0189 MTN.DOC

HAGENS BERMAN LLP
*Attorneys at Law*

CAMBRIDGE  LOS ANGELES  PHOENIX [PLLC]  SEATTLE

1   by several of my co-counsel. To the extent possible, I separated fees and costs related to the

2   claims of Robert Hickey, Carroll Jackson, and the Class from the fees and costs related to the

3   claims of the other named Plaintiffs in this case. For the early stages of the case, in which the

4   claims of all of the Plaintiffs were litigated together, I attributed one quarter of the fees and costs

5   to Hickey and Jackson's claims, as they represent one quarter of the Plaintiffs. My co-counsel

6   who are requesting a portion of any award have informed me that they did the same.

7       12.     Based on these calculations, I have compiled composite numbers for the

8   aggregate costs and fees of all of Class counsel. As of June 11, 2004, the costs incurred related

9   to the Hickey/Jackson/Class portion of the litigation were $33,948.79. The total time invested in

10  this portion of the case, as of June 4, 2004, using current billing rates for counsel and staff, is

11  over $370,000. These costs were both reasonable and necessary, given the extensive history of

12  this case, the discovery conducted, and the fact that the case did not settle until the Friday before

13  trial was scheduled to commence.

14      13.     I strongly support an incentive award of $2,000 each to Robert Hickey and Carroll

15  Jackson. As lead Plaintiffs, they remained actively involved in this litigation from the start to the

16  finish. They participated in depositions and written discovery, kept in regular contact with me

17  about the case and the status of the case, assisted me in preparing the case, and were prepared to

18  testify at trial if necessary.

    I declare under penalty of perjury under the laws of the State of Washington that the

19

20  foregoing is true and correct, and that this declaration was executed on June 17, 2004, at Seattle,

21  Washington.

22

23  

24  _____
    Tyler S. Weaver

25

26

DECLARATION OF TYLER S. WEAVER IN
SUPPORT OF MOTION FOR FINAL
APPROVAL                                          - 4 -
1428.10 0189 MTN.DOC

HAGENS BERMAN LLP
Attorneys at Law

CAMBRIDGE  LOS ANGELES  PHOENIX [PLLC]  SEATTLE

# EXHIBIT 1

## SETTLEMENT AGREEMENT

A.      Introduction.  This Settlement Agreement is made as of February 25, 2004, by and
between named plaintiffs Robert Hickey and Carroll Jackson (the "Named Plaintiffs") and the
members of the Class as defined below (collectively, "Plaintiffs"), and defendant the City of Seattle
("the City"), by and through their respective attorneys of record in the class action pending in the
United States District Court for the Western District of Washington at Seattle ("U.S. District
Court"), *Hickey, et. al. v. City of Seattle, et. al.*, Civil Case No. C00-1672P, and subject to such
approval of the U.S. District Court.  This Settlement Agreement concerns only that portion of
*Hickey, et. al. v. City of Seattle, et. al.*, Civil Case No. C00-1672P, that relates to the claims of the
Named Plaintiffs and the Class defined below (hereinafter, this portion of the case is referred to as
the "Class Action"), and does not concern or affect the claims of any other plaintiff named in that
case or of any other putative class that could be represented by the other plaintiffs named in that
case.  Pursuant to the terms set forth below, Plaintiffs and the City are entering into this Settlement
Agreement to bring about a full, complete and final resolution of all claims that were asserted in the
Class Action.

B.      History of Litigation.  *Hickey, et. al., v. City of Seattle, et. al.*, Civil Case No. 00-
1672P, was originally filed in the U.S. District Court on October 2, 2000, and following amendment
of the complaint, there were 9 named plaintiffs, including Named Plaintiffs Robert Hickey and
Carroll Jackson.  The suit was filed as a putative class action challenging the constitutionality of
hundreds of arrests made by the City of Seattle in December 1999, while the World Trade
Organization was meeting in Seattle.  Following an initial period of discovery, in the summer of
2001, the parties filed cross-motions for summary judgment as to whether the City's order that
limited access to the downtown core from December 1 to December 3 ("Order No. 3"), was
constitutional.  On October 29, 2001, the U.S. District Court ruled that Order No. 3 did not violate
the First Amendment to the United States Constitution.  That ruling effectively vitiated the claims of
the plaintiffs and putative class members who had been arrested within the restricted area (the
"Zone").  Five of the plaintiffs named in the lawsuit had been arrested inside the Zone.  On
November 5, 2002, the U.S. District Court granted those five plaintiffs final judgment under FRCP
54(b), thus allowing them to appeal the U.S. District Court's October 29, 2001, order.  That appeal
is currently pending before the U.S. Court of Appeals for the Ninth Circuit, Case No. 02-36027, and
that appeal is not affected by this Settlement Agreement.

Also on November 5, 2002, the U.S. District Court certified the Class, as defined below, and
appointed Named Plaintiffs Robert Hickey and Carroll Jackson as representatives of the Class.
Following notice to the Class, the parties litigated the claims of the Named Plaintiffs and the Class
for more than a year.  On December 29, 2003, the U.S. District Court ruled that the City was unable
to carry its burden of production as to the Class members' claims of wrongful arrest under the
Fourth Amendment to the United States Constitution, but left open the question of whether the City
could be held liable for the arrest of the Class.  Following that ruling, and shortly before the
scheduled trial date of January 20, 2004, the parties agreed to settle the Class Action.

C.      Settlement Negotiations.  The parties engaged in extensive settlement negotiations,
including one mediation conference assisted by the Honorable Terrence A. Carroll, and further

1

negotiations assisted by Judge Carroll, that were conducted in good faith and at arms' length.
Through these settlement negotiations, the parties have reached agreement on a proposed settlement
of the Class Action. The Defendants agree to pay $250,000 to fully resolve all of the Class claims,
including any claims for attorneys' fees under 42 U.S.C. § 1988 or any other theory. Named
Plaintiffs and Plaintiffs' counsel believe these terms to be fair, adequate and reasonable, and in the
best interests of the Named Plaintiffs and the members of the Class. This Settlement Agreement
memorializes the terms of the final settlement agreement agreed to by the parties.

NOW, THEREFORE, IT IS HEREBY AGREED AND STIPULATED, by and among the
Plaintiffs and the City, by and through their respective counsel, and subject to such approval of the
U.S. District Court as may be required, that the Class Action is hereby being compromised and
settled, and that all claims asserted in the Class Action will be dismissed with prejudice as to the
Named Plaintiffs and all members of the Class, pursuant to the following terms and conditions:

1.   Definitions

   a.   "Attorney Fees/Costs Award" shall have the meaning provided in paragraph
6.a.

   b.   "City" shall have the meaning provided in paragraph A, above.

   c.   "Claim Deadline" shall have the meaning provided in paragraph 10.b.

   d.   "Claim Form" shall have the meaning provided in paragraph 8.b.

   e.   "Class" shall mean all individuals arrested on December 1, 1999, at or near
the intersections of First Avenue and Broad Street or First Avenue and Clay Street in Seattle,
Washington, whose arrest records indicate that a reason for arrest was a violation of Seattle
Municipal Code § 12A.26.040. The Class shall not, however, include Craig Irwin or Jonathan
Moore, who filed separate individual actions against the City that were previously resolved.

   f.   "Class Action" shall have the meaning provided in paragraph A, above.

   g.   "Common Fund" shall have the meaning provided in paragraph 4.

   h.   "Date of Resolution of Disputed Claims" shall mean the following:

      i.   If Plaintiffs' counsel does not receive any claim that Plaintiffs'
counsel denies, the Date of Resolution of Disputed Claims shall be the same date as the Claim
Deadline.

      ii.   If Plaintiffs' counsel does receive a claim that Plaintiffs' counsel
denies, the Date of Resolution of Disputed Claims shall the first day on which one of the following
is true for each denied claim:
         (a)   The claimant did not deliver a challenge to the denial of a
claim by Plaintiffs' counsel within the 15-day period in 10.f, below.

2

    (b) Plaintiffs' counsel reversed the initial denial upon reviewing the claimant's challenge.

    (c) The Honorable Terrence Carroll notifies Plaintiffs' counsel of his decision on the validity of any disputed claim referred to him for his review pursuant to paragraph 10.f., below.

    i. "Effective Date." As used in this Settlement Agreement, "Effective Date" means the date on which the Settlement Agreement has been finally approved as provided in paragraph 12 below and the U.S. District Court's Final Judgment becomes final. For purposes of this paragraph, the U.S. District Court's Final Judgment "becomes final" upon the later of (i) the expiration of the time for filing an appeal from the Final Judgment or (ii) if an appeal is timely filed, the date of final affirmance of the Final Judgment.

    j. "Final Settlement Approval Hearing" shall have the meaning provided in paragraph 7.

    k. "Incentive Awards" shall have the meaning provided in paragraph 11.

    l. "Mailed Notice" shall have the meaning provided in paragraph 8.a..

    m. "Named Plaintiffs" shall have the meaning provided in paragraph A, above.

    n. "Objection Deadline" shall have the meaning provided in paragraph 9.

    o. "Plaintiffs" shall have the meaning provided in paragraph A, above.

    p. "Preliminary Order" shall have the meaning provided in paragraph 7.

    q. "Published Notice" shall have the meaning provided in paragraph 8.c.

    r. "Settlement Award" shall have the meaning provided in paragraph 6.c.

  2. Dismissal of Class Action and General Release. Subject to the terms and conditions of this Settlement Agreement and specifically paragraph 3 below, all claims asserted in the Class Action shall be dismissed on the merits with prejudice as to the Named Plaintiffs and all members of the Class if this Settlement Agreement is approved by the U.S. District Court. As of the Effective Date, this Settlement Agreement will constitute a full and final settlement and general release of any claim that was asserted by the Plaintiffs against the City or its agents, based on or arising out of the arrest of the Plaintiffs on December 1, 1999, and Plaintiffs' subsequent incarceration. This release shall not apply to claims related to personal injuries suffered by any Class member, which claims were not stated in the Class Action.

  3. No Affect on Claims of Other Plaintiffs or Pending Appeal. Nothing in this Settlement Agreement shall be construed to affect the claims of any plaintiff or putative class

member other than the Named Plaintiffs and the Class. This Settlement Agreement specifically does not resolve or affect the claims of Kenneth Hankin, Jennifer Hudziec, Stephanie Lane, Denise Cooper, or Nicole Pearson against the City, nor does it resolve or affect the claims of any putative class that these individuals represent. This Settlement Agreement also does not resolve or affect the appeal currently pending before the U.S. Court of Appeals for the Ninth Circuit, Case No. 02-36027.

        4.    <u>Payment of $250,000; Trust Account</u>. Within 10 days of the execution of this agreement, the City shall pay to Plaintiffs' lead counsel, Hagens Berman LLP, the amount of $250,000 ("Common Fund"). Hagens Berman will place this amount in a client trust account pending final approval of this settlement by the U.S. District Court and distribution as provided in paragraph 6, below.

        5.    <u>Expungement</u>. Plaintiffs intend to move the U.S. District Court for an order requiring the City and/or other entities to delete or expunge all records arising from or related to the Class members' December 1, 1999, arrests. Nothing in this agreement shall be construed to prevent Plaintiffs from filing such a motion on behalf of themselves, the Class, or any Class member, either in the U.S. District Court or any other court of competent jurisdiction, and nothing in this agreement shall be construed to prevent any court from ordering the City and/or other entities to delete or expunge any or all records arising from or related to the Class members' December 1, 1999, arrests. Nor shall anything in this agreement be construed to prevent any Class member from requesting that the City or other entities delete or expunge any or all records related to arising from the Class member's December 1, 1999, arrests. Nor does this agreement prohibit the City or any other agency from contesting any effort to delete or expunge any such records.

        6.    <u>Distribution of Common Fund</u>. The Common Fund shall be distributed as follows:

        a.    Within 30 days after the Effective Date, Plaintiffs' counsel shall be entitled to withdraw from the Common Fund trust account such amount as may be awarded by the District Court for attorneys fees and costs (the "Attorney Fees/Costs Award") up to a maximum amount of one-third of the common fund. The Attorneys Fees/Costs Award shall include the costs of providing notice as provided in paragraph 8.

        b.    Within 30 days after the Effective Date, , the Incentive Awards, if any, as provided in paragraph 11 will be deducted from the Common Fund and mailed to the Named Plaintiffs.

        c.    Following the deduction of the Attorneys Fees/Costs Award and the Incentive Awards, and within 30 days after the later of (i) the Effective Date, or (ii) the Date of Resolution of Disputed Claims, the remainder of the Common Fund shall be distributed evenly among each member of the Class that submitted a claim form in accordance with paragraph 10. The amount distributed to each individual will be equal to the amount remaining after deduction of the Attorneys Fees/Costs Award and the Incentive Awards, divided by the total number of valid claims made. This amount (the "Settlement Award") will be mailed to each claimant's last-known address.

7.    Preliminary Approval of Settlement Agreement.  As part of this Settlement Agreement, Plaintiffs will file a motion with the U.S. District Court to obtain an order (the "Preliminary Order") (i) preliminarily approving the Settlement Agreement, (ii) setting a date for a final settlement approval hearing (the "Final Settlement Approval Hearing") at which the U.S. District Court will determine whether to grant final approval of the Settlement Agreement, and (iii) authorizing the parties to send notice of the Settlement Agreement to Class Members.

8.    Notice of Settlement.

a.    Mailed Notice.  Upon entry of the Preliminary Order, Plaintiffs shall mail of a Notice of Proposed Settlement Agreement and Dismissal of Class Action ("Mailed Notice"), in a form approved by the U.S. District Court, via first-class regular U.S. mail to the last known address of all Class members who can be identified through the arrest records for the Class as well as any additional updated address database that Plaintiffs' counsel has developed.  The Notice shall be mailed to all such identified Class Members on the same day, no later than fifteen (15) days after the entry of the Preliminary Order.  The Mailed Notice shall describe the nature and status of the Class Action; the positions of the Parties; the substance of the Settlement Agreement; the proposed dismissal of the Class Action; the procedure for submission of Claim Forms; the procedure for objecting to the Settlement Agreement; the date, time and location of, and procedure for participation in, the Final Settlement Approval Hearing; and the method for submitting inquiries concerning the Settlement Agreement or related matters.

b.    Claim Form.  The Mailed Notice above shall include a form (the "Claim Form") to be used by Class Members to request to participate in the settlement s under the terms of this Settlement Agreement.  Class Members who wish to participate in the settlement under the terms of this Settlement Agreement shall be required to return the Claim Form in accordance with the provisions of paragraph 10 below.  The Claim Form shall provide instructions, and shall notify Class Members that the Claim Form must be completed, signed and returned by mail no later than the Claim Deadline (as defined in paragraph 10.b) in order for any Class Member to be eligible to receive a Settlement Award.

c.    Published Notice.  Subject to approval by the U.S. District Court, Plaintiffs shall arrange for the publication of a summary notice of the settlement ("Published Notice") in the *Seattle Times* and the *Seattle Post-Intelligencer*.  Such Published Notice shall be published one time in each newspaper at least thirty (30) business days before the Objection Deadline (as defined in paragraph 9).

d.    Additional Notice.  Plaintiffs may additionally distribute the Mailed Notice and Claim Form, or other notice of the Settlement Agreement and Claim Deadline, through other means, including posting notice and Claim Forms on the Internet or distributing notice and Claim Forms through email.  Nothing in this Settlement Agreement shall be construed as in any way limiting the ways in which Plaintiffs may notify the Class of the settlement or solicit claims from the Class.

5

9.   Opportunity for Objections.

Class Members who wish to object to any aspect of the Settlement Agreement must file with the U.S. District Court and serve on counsel for all parties a written statement containing their objection no later than sixty (60) days after the date the Mailed Notice is mailed to Class Members pursuant to paragraph 8.a. above (the "Objection Deadline"). Class Members who fail to file and serve timely written objections in the manner specified above shall be deemed to have waived any objections and shall be foreclosed from making any objection (whether by appeal or otherwise) to the Settlement Agreement. A copy of any written objections or related materials received by a party or its counsel shall be provided to counsel for the opposing party no later than seven (7) calendar days after receipt of such materials.

10.   Submission of Claims; Content of Claim Form; Claim Deadline.

a.   To be eligible for a Settlement Award, a Class Member must submit a valid and timely Claim Form in accordance with the provisions of this Paragraph. All Claim Forms submitted by Class Members must be dated and signed under penalty of perjury, and must be completed in full so as to provide all requested information.

b.   The Claim Form shall include instructions on how to submit the form, and shall notify Class Members that the Claim Form must be completed, signed and returned no later than 60 days after the date that the Mailed Notice is sent ("the Claim Deadline"). Claimants may either hand-deliver a completed Claim Form to Hagens Berman, LLP, 1301 Fifth Avenue, Suite 2900, Seattle, Washington, or may return the Claim Form by mail. If the Claim Form is delivered by hand, the date of delivery shall determine whether the claim was timely. If the Claim Form is mailed, the date of the postmark on the return envelope shall be the exclusive means used to determine whether a Class Member has timely returned a Claim Form on or before the Claim Deadline. In the event the date of the postmark on the return envelope is illegible or cannot otherwise be determined, the date of receipt of the Claim Form shall be used to determine whether the Class Member has timely returned the Claim Form on or before the Claim Deadline, and Plaintiffs' counsel shall subtract 3 days from the date of receipt to determine whether the claim was timely. All Claim Forms shall be returnable to Plaintiffs' lead counsel, Hagens Berman LLP.

c.   Plaintiffs counsel shall have the discretion to determine whether a claim is valid and timely. In so doing, Plaintiffs counsel shall be entitled to rely on a claimant's signature on a Claim Form, as made under penalty of perjury, that the claimant is a member of the Class and is therefore entitled to a Settlement Award. However, Plaintiffs' counsel may request additional verifying information if they have reason to question that the claimant is a Class member, and may deny a claim if such verification is not provided.

d.   Class Members who are eligible to receive a settlement award under the terms of this Settlement Agreement, but who fail to submit a valid and timely Claim Form or otherwise comply with the eligibility requirements for settlement awards, shall not receive any settlement award but shall be bound by all terms of the Settlement Agreement and any Final Judgment entered by the U.S. District Court if it grants final approval to the Settlement Agreement.

6

        e.     Any of the following shall constitute grounds for denial of a submitted
Claim:

           (i) Failure to sign and mail the Claim Form by the Claim Deadline;

           (ii) Failure to provide any required information; or

           (iii) Failure to complete the Claim Form in full; or

           (iv) Failure to document that the claimant is a member of the Class, as
Plaintiffs' counsel may, but is not required to, request.

        f.     <u>Disputed Claims</u>.  In the event Plaintiffs' counsel determines that a claim is
untimely or is otherwise not valid, Plaintiffs' counsel shall mail or otherwise provide written notice
to the claimant within 5 days after determining that the claim should be denied.  This notice shall
include the reasons for denial of the claim and shall also set forth the procedure for challenging the
denial as described in this paragraph.  The claimant shall have 15 days from the date notice of denial
is sent to notify Plaintiffs' counsel, in writing, that the claimant challenges the basis of the denial,
provide evidence why the claim should not be denied, and request review of the denial.  Failure to
deliver such a challenge to Plaintiffs' counsel within 15 days shall constitute a waiver of the right to
challenge the denial.  Upon reviewing the challenge and any additional evidence submitted by the
claimant, Plaintiffs' counsel, at their discretion, may either uphold or reverse the denial.  If Plaintiffs
counsel upholds the denial, Plaintiffs' counsel will, within 10 days of reaching that conclusion, refer
the dispute to the Honorable Terrence Carroll, who will determine the validity of the claim, and
whose determination will be final and binding on all parties and the claimant.

     11.    <u>Incentive Awards</u>

        Each Named Plaintiff shall be entitled to receive, subject to approval by the U.S. District
Court, an amount equal to $2,000 to recognize the execution of their duties as representatives of the
Class (an "Incentive Award").  This shall be in addition to the Settlement Award to which the
Named Plaintiffs are entitled.

     12.    <u>Final Settlement Approval and Entry of Final Judgment</u>.

        Upon expiration of the Objection Deadline, and with the U.S. District Court's permission, a
Final Settlement Approval Hearing shall be conducted to determine whether the U.S. District Court
should grant final approval of the Settlement Agreement.  Upon final approval of the Settlement
Agreement by the U.S. District Court at or after the Final Settlement Approval Hearing, the parties
shall present the Final Judgment to the U.S. District Court for its approval and entry.  As part of the
Final Judgment, the U.S. District Court shall dismiss the Class Action with prejudice as to the
Named Plaintiffs and all the Class.  After entry of the Final Judgment, the U.S. District Court shall
have continuing jurisdiction over these parties' claims solely for purposes of addressing and/or
resolving (i) settlement administration matters, (ii) any dispute between the parties concerning the

interpretation, application or enforcement of the Settlement Agreement, and (iii) such post-Final Judgment matters as may be appropriate under court rules.

13.    Nullification of Settlement Agreement.

In the event (i) the U.S. District Court does not enter the Preliminary Order as provided above, (ii) the U.S. District Court does not finally approve the Settlement Agreement as provided above, (iii) the U.S. District Court does not enter a Final Judgment which becomes final, or (iv) the Settlement Agreement does not become final for any other reason, this Settlement Agreement shall be null and void. In the event the Settlement Agreement is terminated, canceled or fails to become effective in accordance with its terms, all parties shall be returned to their respective statuses as of the date and time immediately prior to the execution of this Settlement Agreement, and the parties shall proceed in all respects as if this Settlement Agreement had not been executed. In the event an appeal is filed from the U.S. District Court's Final Judgment, or any other appellate review is sought prior to the Effective Date, consideration and execution of the Settlement Agreement shall be stayed pending final resolution of the appeal or other appellate review.

14.    Miscellaneous Provisions.

a.    Interim Stay of Proceedings.  The parties agree to hold all further proceedings in the Class Action in abeyance pending the Final Settlement Approval Hearing to be conducted by the U.S. District Court, except such proceedings as are necessary to seek approval of this Settlement Agreement and effectuate its terms.

b.    Modification of Settlement Agreement.  This Settlement Agreement may be amended or modified only by a written instrument signed by counsel for all parties or their successors-in-interest and, if the modification occurs after that court has preliminarily or finally approved the Settlement Agreement, upon approval of the U.S. District Court.

c.    Entire Agreement.  This Settlement Agreement constitutes the entire agreement among these parties, and no representations, warranties or inducements have been made to any party concerning this Settlement Agreement other than the representations, warranties and covenants contained and memorialized herein.  This Settlement Agreement supersedes and replaces any prior oral or written understanding, practice, policy or agreement among the parties regarding any matters addressed herein or forming a basis for the settlement of the Class Action.

d.    Authorization to Enter Into Settlement Agreement.  Counsel for all parties warrant and represent that they are expressly authorized by the parties whom they represent to enter into this Settlement Agreement and to take all appropriate action required or permitted to be taken by such parties pursuant to this Settlement Agreement to effectuate its terms, and to execute any other documents required to effectuate the terms of this Settlement Agreement.  The parties and their counsel will cooperate with each other and use their reasonable efforts to effect the implementation of the Settlement Agreement.  In the event the parties are unable to reach agreement on the form or content of any document needed to implement the Settlement Agreement, or on any supplemental provisions that may become necessary to effectuate the terms of this Settlement

8

Agreement, the parties may submit such issue to the U.S. District Court for resolution pursuant to the U.S. District Court's continuing jurisdiction as specified in paragraph 12 above.

      e.    <u>Settlement Agreement Binding on Successors and Assigns</u>. This Settlement Agreement shall be binding upon, and inure to the benefit of, any successors or assigns of the parties hereto.

      f.    <u>Washington Law Governs</u>. All terms of this Settlement Agreement and any exhibits hereto shall be governed by and interpreted according to the laws of the State of Washington.

      g.    <u>Execution of Settlement Agreement in Counterparts</u>. This Settlement Agreement may be executed in one or more counterparts. All executed counterparts and each of them shall be deemed to be one and the same instrument provided that counsel for the parties to this Settlement Agreement shall exchange among themselves original signed counterparts.

      h.    <u>Waiver</u>. The waiver by one party of any breach of this Settlement Agreement by another party shall not be deemed a waiver of any other prior or subsequent breach of this Settlement Agreement.

      i.    <u>Settlement Agreement Fair, Adequate and Reasonable</u>. Plaintiffs and the City believe that this is a fair, adequate and reasonable Settlement Agreement, and that the parties have arrived at this Settlement Agreement through arms' length negotiations that have taken into account all relevant factors, both present and potential.

HAGENS BERMAN LLP

By

    Steve W. Berman, WSBA No. 12536
    Tyler S. Weaver, WSBA No. 29413

Lead Counsel for Plaintiffs

STAFFORD FREY COOPER

By

    Ted Buck, WSBA No. 22029

Counsel for the City

9

# EXHIBIT 2

Case 2:00-cv-01672-JLR Document 124-3 Filed 10/05/20 Page 35 of 89 Page ID

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON

# If you were arrested in Seattle, Washington, on December 1, 1999, on First Avenue between Broad and Eagle Streets, you could get a payment from a class action settlement.

\*     This settlement resolves a lawsuit over the legality of the arrest of a group of individuals on First Avenue between Broad and Eagle Streets in Seattle on December 1, 1999.

\*     Your legal rights will be affected whether or not you act.

| YOUR RIGHTS AND OPTIONS | |
|---|---|
| **SUBMIT A CLAIM FORM BY JUNE 22, 2004** | The only way to get payment. |
| **OBJECT** | Write the Court about why you don't like the settlement. |
| **GO TO A HEARING** | Anyone can attend the hearing. If you have filed an objection, you can also ask to speak about the fairness of the settlement. |
| **DO NOTHING** | Get no payment. Give up your rights. |

\* These rights and options – **and the deadlines for exercising them** – are explained in this notice.

## BASIC INFORMATION

**1.    Why did I get this notice package?**

Records indicate that you were arrested on December 1, 1999, in Seattle, Washington, on First Avenue between Broad Street and Eagle Street. The Court has sent you this notice because you have a right to know about a proposed settlement of a class action lawsuit that was brought on behalf of all of those arrested at this location who were charged with the crime of violating Seattle Municipal Code § 12A.26.040 (this group is known as "the Class"). If the Court approves the settlement, and after any appeals have been resolved, payments will be made to Class members who have made valid claims. The Court in charge of this case is the United States District Court for the Western District of Washington, and the case is *Hickey, et. al. v. City of Seattle, et. al.*, 00-1672P.

**2.    What is the lawsuit about?**

The lawsuit claimed that the City of Seattle violated the federal and state constitutional rights of the Class. In November 2002, the Court certified the Class and appointed Robert Hickey and Carroll Jackson as the Class Representatives. On December 29, 2003, the Court ruled that the City was unable to carry its burden of demonstrating that the City's officers had individualized probable cause to arrest any member of the Class, but left open the question of whether the City could be held liable for the arrests.

**3.  Why is there a settlement?**

The Court's ruling did not decide the case in favor of either the Class or the City. Instead, both sides agreed to a settlement.  That way, the parties avoid the costs and risk of a trial, and the Class members will receive compensation in addition to the Court's ruling that the City could not produce evidence of individualized probable cause.  The attorneys for the Class believe the settlement is in the best interests of the Class.

## WHO IS IN THE SETTLEMENT

**4.  How do I know if I am part of the settlement?**

You are part of the settlement if:  (1) you were arrested on December 1, 1999, in Seattle, Washington, on First Avenue between Broad and Eagle Streets, (2) you were charged with violating Seattle Mun. Code § 12A.26.040 (violation of a mayoral order), and (3) you have not filed your own suit.

**5.  I'm not sure if I am included.**

If you are unsure whether you are included, you can ask for help.  You can either call 1-877-694-0660 (press 9, then 7) or email allison@hagens-berman.com for more information.

## THE SETTLEMENT BENEFITS – WHAT YOU GET

**6.  What does the settlement provide?**

The City will pay $250,000 to compensate the Class and pay attorneys' fees and costs.

**7.  How much will my payment be?**

Your share of the fund will depend on the number of Class members who submit valid claims.  After a deduction of an amount for attorneys' fees and costs (see question 11) and deduction of incentive awards for the Class Representatives (see question 11), the remaining fund will be distributed evenly among all Class members, depending on the number of claims made by Class members.  There are 155 Class members.  The anticipated total amount to be paid to the Class will be $162,667.  If that were so, and every Class member returned a valid claim form, each would receive $1049.46.

## HOW YOU GET A PAYMENT – SUBMITTING A CLAIM FORM

**8.  How can I get a payment?**

*To qualify for payment, you **must** mail or hand-deliver a claim form.* A claim form is attached to this notice. Read the instructions carefully, fill out the form, sign it, and mail it **postmarked no later than June 22, 2004 or hand-deliver it by June 22, 2004.**

**9.     When will I get payment?**

The Court will hold a hearing on July 15, 2004 at 9:00 a.m. to determine whether to approve the settlement. If Judge Pechman approves the settlement, there may be appeals. No payment can be made until the settlement is finally approved and any disputes are resolved.

## THE LAWYERS REPRESENTING YOU

**10.     Do I have a lawyer in this case?**

Yes. The Court appointed Hagens Berman LLP, Seattle, Washington, and attorneys Steve Berman and Tyler Weaver, as lead counsel for the Class. The other lawyers for the Class are Arthur Bryant and Victoria Ni of Trial Lawyers for Public Justice in Oakland, California; Fred Diamondstone of Seattle; Mike Withey of Strittmatter Kessler Withey Whelan and Coluccio in Seattle; John Muenster of Muenster & Koenig in Seattle; Ben Schwartzman of Lovell, Stewart, Halebian & Barth LLP in Seattle; Erwin Cherminsky of the University of Southern California; and Yvonne Ward of Auburn, Washington.

**11.     How will the lawyers be paid?**

Class Counsel will ask the Court for attorneys' fees and costs of $83,333, to be deducted from the $250,000 paid by the City under the terms of the settlement. Class Counsel will also ask that the Class Representatives each receive a $2,000.00 incentive award in addition to the award they will receive as Class members. The Court may award less than these amounts.

## OBJECTING TO THE SETTLEMENT

**12.     Can I object to the Settlement?**

If you are a Class member, you can object to all or part of the settlement if you do not like it. You can give reasons why the Court should not approve it. The Court will consider your views. To object, you must send a letter saying that you object to the proposed settlement in *Hickey et. al. v. City of Seattle, et. al.*, 00-1672P. Be sure to

include your name, address, telephone number, your signature, and the reasons you object. Mail the objection to these three places and postmark it no later than June 22, 2004:

| COURT | CLASS COUNSEL | DEFENSE COUNSEL |
|---|---|---|
| Clerk of the Court | Tyler Weaver | Ted Buck |
| United States District Court for | Hagens Berman LLP | Stafford Frey Cooper |
| the Western District of Washington | 1301 Fifth Avenue, Suite 2900 | 3100 Two Union Square |
| 1010 Fifth Street | Seattle, WA 98101 | 601 Union Street |
| Seattle, WA 98104 | | Seattle, WA 98101 |

## THE COURT'S FAIRNESS HEARING

### 13.     When and where will the Court decide whether to approve the settlement?

The Court will hold a fairness hearing at 9:00 a.m. on July 15, 2004, at the United States District Court for the Western District of Washington, 1010 Fifth Street, Seattle, WA 98104. At this hearing, the Court will consider whether the settlement is fair, reasonable, and adequate. If there are objections, the Court will consider them. Judge Pechman will listen to people who have asked to speak at the hearing, and may decide how much to pay Class Counsel. After the hearing the Court will decide whether to approve the settlement.

### 14.     Do I have to be at the hearing?

No. Class counsel will answer questions Judge Pechman may have. You are welcome to come at your own expense or pay for your own attorney to attend. If you have submitted a timely written objection, the Court will consider it and you do not need to also attend.

## IF YOU DO NOTHING

### 15.     What happens if I do nothing?

If you do nothing, you will not get any money from the settlement and will not be able to start a lawsuit or continue a lawsuit regarding the issues in this case.

## GETTING MORE INFORMATION

### 16.     Are there more details to the settlement?

This notice summarizes the proposed settlement, the details of which are set out in a settlement agreement. You can get a copy of the settlement agreement by visiting www.tlpj.org or by writing to Tyler Weaver, Hagens Berman LLP, 1301 Fifth Avenue, Suite 2900, Seattle, WA 98101.

### 17.     How do I get more information?

QUESTIONS?  CALL 1-877-694-0660 (PRESS 9, THEN 7)

You can call 1-877-694-0660 (press 9, then 7), write to WTO Settlement, Hagens Berman LLP, 1301 Fifth Avenue, Suite 2900, Seattle, WA 98101, or email allison@hagens-berman.com.

# EXHIBIT 3

# CLAIM FORM

In order to claim a settlement as a member of the Class in the case of *Hickey v. City of Seattle*, 00-1672P, of people who were arrested on First Avenue between Broad and Eagle Streets on December 1, 1999, you must do all the following:

1.  <u>Complete the Required Information.</u>

2.  <u>Sign and date the bottom of this form.</u>

3.  <u>Return this form.</u> You can do this either by mailing it, ***with a postmark of no later than June 22, 2004***, to: WTO Settlement, c/o Hagens Berman LLP, 1301 Fifth Avenue, Suite 2900,Seattle, Washington 98101, or by delivering it, in person, ***no later than June 22, 2004*** to Hagens Berman LLP at the same address.

**<u>Your claim will not be valid, and will not be paid, unless you take each of these steps</u>**. Your claim is subject to verification by counsel, who will confirm whether you are a Class member.

If you have reason to believe Class counsel may have difficulty confirming you are a Class member, you can help by completing the "Optional Information" section below. This may be important if you did not provide your name to the police and were processed as a "John WTO" or "Jane WTO." The section is completely optional, and failure to complete it will not, in and of itself, result in the denial of a claim, but anything you provide will help identify you.

| **REQUIRED Information** | **OPTIONAL Information** |
|---|---|
| Name: | Telephone Number/email address: |
| Current/Permanent Address: | Name at time of arrest: |
| | Your CCN number (from your arrest record): |
| | In addition, it may be helpful if you include with your claim form a copy of any arrest record that you have. |

I hereby certify, under penalty of perjury, that the information provided above is true and correct, and that I was arrested on December 1, 1999, in Seattle, Washington, on First Avenue between Broad and Eagle Streets.

_____     _____
(Signature)                                                  (Date)

**RETURN THIS FORM NO LATER THAN JUNE 22, 2004 TO:**
WTO SETTLEMENT, C/O HAGENS BERMAN LLP, 1301 FIFTH AVE., SUITE 2900, SEATTLE, WA 98110

# EXHIBIT 4

# Affidavit of Publication

2616728 / 1

State of Washington,
Counties of King and Snohomish,

Daniel S. O'Neal being duly sworn, says that he/she is the Authorized Agent of Seattle Times Company, publisher of The Seattle Times and representing the Seattle Post-Intelligencer, separate newspapers published daily in King and Snohomish Counties, State of Washington: that they are newspapers of general circulation in said Counties and State; that they have been approved as legal newspapers by orders of the Superior Court of King and Snohomish Counties; that the annexed, being a classified advertisement, was published in:

| Newspaper | Publication Date |
|-----------|-----------------|
| The Seattle Times | 05/16/04 |

And not in a supplement thereof, and is a true copy of the notice as it was printed and/or distributed in the regular and entire issue of said paper or papers during all of said period, and that said newspaper or newspapers were regularly distributed to its subscribers during all of said period.

Subscribed and sworn to before me this 27th day of May, 2004

Notary Public in and for the State of Washington residing at Seattle



☰

[Home](Home)→[Collections](Collections)→**[Fort Lauderdale](Fort Lauderdale)**

# Fort

- ○
  - ○ [Share on email](Share on email)[Share on print](Share on print)[Share on reddit](Share on reddit)[More Sharing Services](More Sharing Services)
- ○

  ○

  ○

# Lauderdale pays arrested man $30,000 when video contradicts cop's report

August 20, 2012|By Paula McMahon, Sun Sentinel

In the police report, it looked like an open-and-shut case: A Fort Lauderdale police officer responded to a complaint of a man blasting loud music in his back yard, the homeowner refused to turn it off and walked away when the officer tried to arrest him.

Winston Dudley was arrested on misdemeanor charges of disorderly intoxication and resisting arrest without violence shortly before 9 p.m. Sept.18, 2010. He was released on bond the next day.

But prosecutors refused to file formal criminal charges and Dudley won a $30,000 settlement from the city of Fort Lauderdale after he produced a home security video that contradicted the officer's official report.

Officer Daniel R. Gowans wrote in his police report that he could hear Dudley's music from seven houses away and had been called to the house on the 1300 block of Northwest 12th Street before for complaints of loud music. He said he asked Dudley, who was 50 at the time, to show him identification and told him to turn off the music.

"Dudley laughed and stated 'I don't have to, get lost,'" Gowans wrote, adding that he asked Dudley again to shut off the music and give him his ID.

"Dudley laughed again and started to drink his beer. I took Dudley by his left arm and advised him to place his hands behind his back. Dudley pulled away and started to walk into his residence ... Dudley

attempted to pull away and stated 'Get out of here, it's my house.'"

Dudley, who declined to be interviewed by the Sun Sentinel, immediately told his lawyer on the criminal case that he had videotape from a home security system he had installed on his property.

The video showed that, within seconds of the officers walking into his backyard, Dudley immediately stood up from his lounger, went into his house and turned the music down or off.

He came outside again and sat down on the end of the lounger while an officer shone a flashlight in his face and spoke to him. The video shows that, although he had some kind of container in his hand, he did not drink from it and did not walk away or pull away from the officer.

He was arrested about two minutes after officers first walked into his yard.

"To be hauled off in handcuffs in these circumstances, it's blatantly appalling, shocking and wrong," said Hugh Koerner, the attorney who filed the federal civil lawsuit on behalf of Dudley and negotiated the settlement.

"Mr. Dudley is very fortunate that he had a videotape that supported his account of what happened. In a lot of these cases, it's one person's word against the police officer's, and most jurors in a criminal or civil trial are going to assume that law enforcement officers who are well-paid and well-trained are going to testify honestly," Koerner said.

He said he settled the case for $30,000 because Dudley wanted to put it behind him and get on with his life.

The Fort Lauderdale City Commission voted 5-0 to approve the settlement last month, as recommended by city staff.

"The city settled for $30,000 to avoid further litigation costs. We have no additional comments on the matter," said Matt Little, a city spokesman.

Fort Lauderdale police said only that the department did not receive a complaint from Dudley and there has been no internal affairs investigation of the matter.

Tim Donnelly, head of the Broward State Attorney's Office special prosecutions unit, said the case had not been sent to his unit. "Now that it's been brought to our attention, we're going to review it," Donnelly said.

He said his office is reviewing another case where the Broward Public Defender's Office alleged that Gowans and another officer gave a misleading account of a drug-related arrest. That case is still being investigated by prosecutors, Donnelly said.

Efforts to contact Gowans were unsuccessful. His attorney, Mike Dutko, said he was not aware of the Dudley case but said Gowans has a "credible explanation" for the drug arrest case. "I've not had previous experience with Officer Gowans, but he seeems to be a young, conscientious worker and productive police officer," Dutko said.

Dudley's lawyer on the criminal case, Kristina Duhaney, said she was so appalled by the officer's actions on video that she asked Koerner to file the civil lawsuit on Dudley's behalf.

"If [Dudley] didn't have the video, nobody would have believed him," Duhaney said.

Though several police officers have been criminally charged recently in Broward County after video or audio recordings contradicted their sworn testimony, Duhaney said suspects in criminal cases are rarely lucky enough to have videotaped evidence to support them.

Even if the alleged crime occurred in a public place like a mall, restaurant or gas station and was videotaped, the video is often no longer available or has been taped over, Duhaney said.

Often, she said, it takes 30 days or so for prosecutors to file criminal charges and by the time a defense lawyer has been hired, the video evidence is gone.

*Staff researcher Barbara Hijek contributed to this report.*

*pmcmahon@tribune.com, 954-356-4533 or Twitter @SentinelPaula*

**See Also**

| | | | |
|---|---|---|---|
| 1. **Get Back Together** | ❯ | 5. **Criminal Records Search** | ❯ |
| 2. **How to Win a Guy Back** | ❯ | 6. **Arizona Immigration Law** | ❯ |
| 3. **Police Woman** | ❯ | 7. **Police Officer Clip Art** | ❯ |
| 4. **How to Write a Police Report** | ❯ | 8. **Crime Reports** | ❯ |

Featured Articles



# Do Heat appreciate magnitude of Game 5?



# Pines police dive into the past, trying to ID unnamed dead



# $29 no-contract 4G Samsung Galaxy, Nokia phones from Metro PCS

MORE:

# Does Wade retain edge on Stephenson?

# Can Pacers inside game overwhelm Heat?

# Pines police dive into the past, trying to ID unnamed dead

# So perhaps there is a place for Haslem?

# Can Bosh, Wade break out of their funk?

# Sanders Remembered -- He's Cheap, Ex-lion Says

Related Articles

- Swingers Arrested In '99 Sue Sheriff
  February 16, 2003
- Officer Suspended For Actions With Felon
  November 30, 1999
- Broward sheriff's deputy accused of severely beating...
  October 1, 2013

Fort Lauderdale man wins $30.000 settlement after video contradicts police arrest report - Sun Sentinel

Find More Stories About

- [Fort Lauderdale](#)
- [Law Enforcement Officers](#)
- [Loud Music](#)
- [Home Security](#)

 [Index by Keyword](#) | [Index by Date](#) | [Privacy Policy](#) | [Terms of Service](#)

Please note the green-lined linked article text has been applied commercially without any involvement from our newsroom editors, reporters or any other editorial staff.

Avery, Michael 10/8/2018
For Educational Use Only

Hameed vs. Kohl's Corporation, 38 Trials Digest 15th 6 (2012)

Ha

### 38 Trials Digest 15th 6, 2012 WL 4501553 (N.D.Cal.) (Verdict and Settlement Summary)

Copyright (c) 2018 Thomson Reuters/West
United States District Court, N.D. California.

Hameed vs. Kohl's Corporation

**TOPIC:**
Synopsis: Security guard allegedly accused minors of stealing based on race

Case Type: Civil Rights & Constitutional Law; Discrimination; Intentional Torts; False Imprisonment; Intentional Torts; Assault & Battery

DOCKET NUMBER: 11CV02971(LB)

STATE: California
COUNTY: Not Applicable

Verdict/Judgment Date: April 18, 2012

JUDGE: Laurel Beeler

**ATTORNEYS:**
Plaintiff: Brittany S. Armstrong, Lawson Law Offices, Oakland; Antonio M. Lawson, Lawson Law Offices, Oakland.
Defendant: Leila Narvid, Payne & Fears, San Francisco; Rodney B. Sorensen, Payne & Fears, San Francisco.

**SUMMARY:**
Verdict/Judgment: Settlement

Verdict/Judgment Amount: $10,000

Range: $1-49,999
Defendants agreed to pay plaintiffs $10,000. After deducting $2,500 attorney fees, each plaintiff was to receive $2,500.

Trial Type: Settlement

**EXPERTS:**
Plaintiff: Not reported.
Defendant: Not reported.

**TEXT:**

**CASE INFORMATION**

**FACTS/CONTENTIONS**
According to court records: Plaintiffs Qiyamah Hameed, Mint Gardner and Eugena Gardner were three African-American girls who were shopping for clothing and visited defendant Kohl's Corp.'s store in Alameda, Calif. Plaintiffs said they began trying on clothing and noticed a man sitting outside the dressing room watching them. They said they decided not to

**Avery, Michael 10/8/2018**
**For Educational Use Only**

Hameed vs. Kohl's Corporation, 38 Trials Digest 15th 6 (2012)

purchase clothing and left the store. Plaintiffs said the man followed them and ordered them to come back inside for security reasons.

Plaintiffs said they were taken to a back room and detained and the security guard began berating them and accusing them of stealing. Plaintiffs said the guards searched Hameed's personal bag without permission. Eventually, plaintiffs said, they were released and told not to return to the store.

Plaintiffs alleged violation of the Unruh Civil Rights Act, violation of the Civil Rights Act, **false imprisonment**, battery, illegal search and seizure and invasion of privacy.

## CLAIMED INJURIES
NA

## CLAIMED DAMAGES
According to court records:
Not reported.

## SETTLEMENT DISCUSSIONS
According to court records:

Not reported.

## COMMENTS
According to court records:

The complaint was filed in Alameda Superior Court March 9, 2010, case number RG11564899, and removed to federal court.

Trials Digest, A Thomson Reuters/West business
Northern District Federal Court/San Francisco

---

**End of Document**                                                        © 2018 Thomson Reuters. No claim to original U.S. Government Works.

---

The Honorable J. Marsha Pechman

UNITED STATES DISTRICT COURT, WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KENNETH HANKIN, JENNIFER HUDZIEC,
STEPHANIE LANE, and DENISE COOPER,
on behalf of themselves and all others similarly
situated,

                                     Plaintiffs,

          v.

THE CITY OF SEATTLE, a municipality,

                                     Defendant.

No. C00-1672P

PLAINTIFFS' MOTION FOR FINAL
APPROVAL OF CLASS SETTLEMENT

**NOTED FOR HEARING:**
**October 26, 2007 at 10:00 a.m.**

PLAINTIFFS' MOTION FOR FINAL
APPROVAL OF SETTLEMENT



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

**TABLE OF CONTENTS**

Page

I.   INTRODUCTION ................................................................1

II.  THE NATURE OF THE CASE AND THE SETTLEMENT ...........................1

   A.   Background ...............................................................1

   B.   Overview of Settlement Terms .........................................2

      1.   Lump Sum Cash Payment; Distribution to Class Members .........2

      2.   Expunction of Records.........................................3

      3.   Incorporation of Court Rulings in Officer Training ...................3

      4.   Releases......................................................4

      5.   Awards to Named Plaintiffs ...................................4

   C.   History of Settlement Administration ...................................4

      1.   Mailed and Published Notice to Class Members ...................4

      2.   The Response of the Class ....................................5

      3.   Rejection of Four Claims; Possible Additional Late Claim.............5

      4.   Certain Class Members Have Requested A Supplemental Notice .............6

      5.   Anticipated Financial Benefit to Each Class Member ...............6

III. THE COURT SHOULD APPROVE THE SETTLEMENT ...........................7

   A.   Applicable Standard of Review ........................................7

   B.   The Settlement Should Be Approved as Fair, Adequate, and Reasonable .............8

      1.   The Likelihood of Success.....................................8

      2.   The Amount of Discovery .....................................9

      3.   The Settlement Terms and Conditions...........................9

      4.   Recommendation and Experience of Counsel .....................9

      5.   The Reaction of the Class to the Settlement ...........................10

      6.   Good Faith and the Absence of Collusion .........................10

PLAINTIFFS' MOTION FOR FINAL
APPROVAL OF SETTLEMENT                    - i -

001428-11 201330 V1



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

1

IV.    PLAINTIFFS REQUEST GUIDANCE AS TO ADDITIONAL NOTICE ......................10

V.    CONCLUSION..................................................................................................11

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

PLAINTIFFS' MOTION FOR FINAL
APPROVAL OF SETTLEMENT       - ii -

001428-11  201330 V1



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

## I.     INTRODUCTION

This case has been a long, arduous journey for the Court, counsel, and members of the Class.  Nearly 8 years after Seattle police officers arrested the Class, Plaintiffs ask the Court to grant final approval to the proposed settlement.  The settlement, if approved as proposed, will pay $550,000 in compensation to the Class members, seal their arrest records, and provide much-needed improvements to Seattle's police training on mass arrests.  This is an excellent result for the Class – a result that has not received a single objection – and Plaintiffs ask for final approval.

## II.     THE NATURE OF THE CASE AND THE SETTLEMENT

### A.     Background

The case was originally filed with eight named plaintiffs, all of whom were arrested in December 1999 while peacefully protesting the WTO meetings being held in Seattle at that time.  All of the plaintiffs challenged the policies of the Seattle police in selectively arresting protesters and, in particular, challenged the City's creation of a "no-protest zone" in the heart of downtown on December 1, 1999.

In October 2001, Judge Rothstein ruled that the no-protest zone was constitutional, thereby extinguishing the claims of several of the plaintiffs but leaving intact the claims of those who were arrested outside that zone.  The claims of those arrested outside that zone, including the Class arrested at First Avenue and Broad Street, on December 1, 1999, have previously been settled and resolved.

As the Court is well aware, the present settlement concerns a Class of individuals arrested at Westlake Park on the morning of December 1, 1999.  The claims of this Class were reviewed on appeal by the Ninth Circuit, and in June 2005, that court remanded the case to this Court for further proceedings.

In June 2006, the Court certified a Class of all those arrested at Westlake Park on December 1, 1999.  Notice was mailed to the Class and published in Seattle newspapers in

PLAINTIFFS' MOTION FOR FINAL
APPROVAL OF SETTLEMENT                               - 1 -

001428-11  201330 V1

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

August 2006, informing Class members of the right to exclude themselves or appear through their own counsel. No Class member chose to exercise either of those rights.

On January 8, 2007, a trial commenced on the liability phase of this case. On January 30, 2007, the jury returned a verdict in favor of the Class on its claims under the Fourth Amendment to the United States Constitution, but also returned a verdict in favor of the City on its claims under the First Amendment to the United States Constitution, as well as Article 1, section 5, of the Washington State Constitution.

Following the liability trial, the Court ordered the parties to mediate the case before Magistrate Judge James P. Donohue. On March 29, 2007, after two full days of mediation with Magistrate Donohue, the parties reached the settlement now before the Court for final approval.

**B.  Overview of Settlement Terms**

The Settlement Agreement is attached as Exhibit A to the Declaration of Tyler Weaver ("Weaver Decl.") in Support of Plaintiffs' Motion for Final Approval. Its terms are summarized below.

### 1.  Lump Sum Cash Payment; Distribution to Class Members

The Settlement Agreement provides that the City will pay to Class counsel a lump sum amount of $1,000,000. Class counsel have received that payment in accordance with the terms of the settlement and have placed it into a separate account pending any final approval and distribution. *See* Weaver Decl., ¶ 2. This amount constitutes the total financial amount of the settlement and will cover both damages for the Class members, as well as attorneys' fees and costs. The settlement anticipates that $550,000 will be distributed to Class members, and that Plaintiffs will petition for attorneys' fees and costs of $450,000 pursuant to 42 U.S.C. § 1988. Plaintiffs have filed a separate petition for those fees and costs.

The amount distributed to the Class will be paid pro rata to each Class member who returned a valid claim form by August 28, 2007, which was ninety (90) days after the date Class counsel mailed notice of the settlement to the Class. Settlement Agreement, ¶ 10.b. All a Class

PLAINTIFFS' MOTION FOR FINAL
APPROVAL OF SETTLEMENT          - 2 -

001428-11 201330 V1

**HAGENS BERMAN**
**SOBOL SHAPIRO LLP**
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

member was required to do to submit a claim was provide their current contact information and social security number, and certify, under penalty of perjury, that the claimant is a member of the Class. *See* Ex. B to Weaver Decl. All claims were subject to verification by Class counsel. *See* Settlement Agreement, ¶ 10. After resolution of any disputes about whether particular individuals who have timely returned claim forms are Class members, each Class member will receive a proportionate amount of the remaining common fund remaining after deduction of court-awarded attorneys' fees and costs, and any incentive awards to the named plaintiffs. *Id.*, ¶ 6.c.

A full description of the notice program that Plaintiffs employed, the response from the Class members, and the resolution of certain facially invalid claims, is described below in Section II(C).

### 2. Expunction of Records

In the settlement, the City agreed not to oppose a motion by Plaintiffs to order that the City seal the arrest records of the Class members. *Id.*, ¶ 4. On June 13, 2007, following Plaintiffs' motion, the Court ruled that those arrest records would be sealed, and the City would be required to send notice to other law enforcement agencies of the sealing, within 30 days after any order of final approval. Dkt. No. 495.

### 3. Incorporation of Court Rulings in Officer Training

The City has further agreed to distribute copies of the Court's December 29, 2003, and December 13, 2006, rulings on summary judgment regarding probable cause for the next four years at its training for new cadets. Those orders, and the City's policies on probable cause in mass-arrest situations, will also be distributed to current officers for the next two years at annual street-skills training sessions and will be posted on the Seattle Police Department's internal website.

PLAINTIFFS' MOTION FOR FINAL
APPROVAL OF SETTLEMENT

- 3 -

001428-11 201330 V1

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

**4.      Releases**

Plaintiffs and the Class agreed to release all claims asserted by Plaintiffs against the City or its agents, based on or arising out of their arrests on December 1, 1999, and Plaintiffs' subsequent incarceration.  Settlement Agreement, ¶ 2.

**5.      Awards to Named Plaintiffs**

Plaintiffs Hankin, Cooper, Hudziec, and Lane, shall also be awarded $2,500 each for their services as Class Representatives, subject to Court approval.  *Id.*, ¶ 11.  This amount would be deducted from the common fund before the fund is distributed to Class members.

**C.      History of Settlement Administration**

**1.      Mailed and Published Notice to Class Members**

In accordance with the terms of the settlement, on May 30, 2007, Plaintiffs mailed a copy of the notice to all of the individuals for whom it had addresses and whose arrest records indicated that they were arrested on December 1, 1999, at either Westlake Park or the intersection of Westlake and Lenora.  *See* Weaver Decl., ¶ 4.  The notice was sent not only to the addresses on the arrest records (to the extent there were any addresses) but also to updated or additional addresses that Class counsel had acquired over years of litigation.  *See id.*  The mailed notice was the notice approved by the Court, modified only to include the deadline for objections and the deadline for returning the form.  *See id.*, Ex. C.

Also in accordance with the Court's proposed order, on June 29, 2007, Plaintiffs published a short-form notice in the *Seattle Times* and the *Seattle Post-Intelligencer*.  *See id.*, ¶ 5 and Ex. D.

In addition, Plaintiffs engaged in an extensive campaign of notifying Class members of the settlement and its terms by email.  Class counsel posted several notices to bulletin boards frequented by people arrested in Seattle while protesting the WTO.  *See id.*, ¶ 6.  Plaintiffs also worked with individual Class members who used their own private databases of information to

PLAINTIFFS' MOTION FOR FINAL
APPROVAL OF SETTLEMENT                                   - 4 -



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

send emails and copies of the notice and claim form to an even broader audience.  *See id.*  As a result of these efforts, Plaintiffs are confident that they sent information to as many Class members as they possibly could locate.  *See id.*

### 2.      The Response of the Class

Plaintiffs received an overwhelmingly positive response to the settlement from the Class.  *See id.*, ¶ 7.  Not a single objection was filed.  *See id.*  In fact, no Class member has ever said anything negative to Class counsel about the terms of the settlement.  *See id.*

Plaintiffs also received claims from an extremely high percentage of the Class members.  Plaintiffs received 157 claim forms that met the minimum criteria for participation in the settlement – meaning they signed the form under penalty of perjury and provided their current address and social security number.  *See id.*, ¶ 8.  Although the exact number of Class members is uncertain due to deficient police records, Plaintiffs estimate that this is a claims-return rate of 85 to 90 percent.  *See id.*, ¶ 9.

### 3.      Rejection of Four Claims; Possible Additional Late Claim

Class counsel reviewed each claim to determine whether there was any reason to believe that the claimant was not a member of the Class.  *See id.*, ¶ 10.  In many cases, Plaintiffs were able to confirm that the claimants were members of the Class.  In many other cases, Plaintiffs were unable to confirm Class membership due to deficient police records but also had no reason to doubt that the person making the claim was not a Class member.  *See id.*, ¶ 11.  However, Plaintiffs' review did indicate that 4 claims were not valid.  *See id.*, ¶ 12.  In one instance, this was because the person had also made a claim to the First and Broad settlement in 2004 and had thus stated under penalty of perjury that they had been arrested at that location.  *See id.*  In another case, the claimant had sent supporting documentation, but those documents showed that the person was arrested the following year, in November 2000.  *See id.*  In the two remaining cases, the claimants had been the subject of individualized arrest records that indicated that they had been arrested at places other than Westlake Park on December 1, 1999.  *See id.*

PLAINTIFFS' MOTION FOR FINAL
APPROVAL OF SETTLEMENT                    - 5 -

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

Pursuant to the settlement agreement, Class counsel wrote each of these claimants to inform them that their claims had been denied, provide the reasons for the denials, and inform them that they could challenge the denials by writing with 10 days if they wished to do so. *See id.* None of them did. *See id.*

In addition, Plaintiffs have received one late claim that they ask the Court to approve, as addressed in a separate motion.

### 4. Certain Class Members Have Requested A Supplemental Notice

Although the settlement does not include a *cy pres* element whereby settlement funds would be paid to an appropriate nonprofit organization, some members of the Class have organized for the purpose of asking Class members to donate some or all of their settlement proceeds to a joint effort aimed at addressing issues of globalization. *See id.*, ¶ 13. These efforts were mentioned in the Class notice that the Court approved and that Plaintiffs sent to all Class members for whom they had addresses. *See id.*, Ex. C, at ¶ 7.

After the notice was sent in late May, the Class members who organized this effort asked Class counsel to send to all Class members an additional notice of their efforts. *See id.*, ¶ 14. Class counsel agreed to bring this to the Court's attention without advocating for or against the proposal, and have included the proposed additional notice for the Court's review. *See* Weaver Decl., Ex. E. As discussed below, Plaintiffs seek guidance from the Court as to whether this notice may be included with the checks that would be sent to Class members following any final approval.

### 5. Anticipated Financial Benefit to Each Class Member

With the four denials, the number of eligible claims is 153. If the Court also grants leave to pay the late claim that Plaintiffs received, as covered in a separate motion, the number of claims is 154. If the Court also grants Plaintiffs' request for incentive awards for each of the four named plaintiffs, $540,000 will be distributed evenly among the 154 claimants, resulting in an award of $3,506.49 per Class member.

PLAINTIFFS' MOTION FOR FINAL
APPROVAL OF SETTLEMENT

- 6 -



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

001428-11 201330 V1

### III.   THE COURT SHOULD APPROVE THE SETTLEMENT

**A.   Applicable Standard of Review**

Settlements of disputed claims are favored by the courts.  *Ahern v. Central Pac. Freight Lines*, 846 F.2d 47, 48 (9th Cir. 1988); *MWS Wire Indus., Inc. v. California Fine Wire Co.*, 797 F.2d 799, 802 (9th Cir. 1986); *United States v. McInnes*, 556 F.2d 436, 441 (9th Cir. 1977).  This policy especially applies in class actions, where there is an overriding public interest favoring settling and ending litigation.  *Ahern*, 846 F.2d at 48; *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982) ("voluntary conciliation and settlement are the preferred means of dispute resolution"); *Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992) (recognizing "the strong judicial policy that favors settlements, particularly where complex class action litigation is concerned"); *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 720 F. Supp. 1379, 1387 (D. Ariz. 1989) (*"WPPSS"*) ("[settlement] is indeed the preferred means of dispute resolution, particularly in complex class action litigation such as this"), *aff'd*, 955 F.2d 1268 (9th Cir. 1992).

Under Fed. R. Civ. P. 23(e), settlements of class actions require court approval and notice to class members.  A proposed class action settlement may be approved if the Court determines that "the settlement is fundamentally fair, adequate and reasonable."  *Officers for Justice*, 688 F.2d at 625; *see also*, *e.g.*, *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993).  Simply stated, the Court must decide whether the recovery achieved is reasonable, balancing the potential rewards of continued litigation against the risk of recovering less or nothing at all.  That determination necessarily involves "an amalgam of delicate balancing, gross approximations and rough justice."  *Officers for Justice*, 688 F.2d at 625 (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 468 (2d Cir. 1974)).

In assessing whether a particular settlement is fair, reasonable, and adequate,

> a district court may consider some or all of the following factors: "the strength of plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement."

*Molski v. Gleich*, 318 F.3d 937, 953 (9th Cir. 2003) (quoting *Linney v. Cellular Alaska P'shp*, 151 F.3d 1234, 1242 (9th Cir. 1998)). When experienced counsel support a settlement, as here, their opinions are entitled to considerable weight. *In re WPPSS*, 720 F. Supp. at 1392; *Reed v. General Motors Corp.*, 703 F.2d 170, 175 (5th Cir. 1983).

**B.     The Settlement Should Be Approved as Fair, Adequate, and Reasonable**

When the relevant factors outlined in *Molski* are analyzed, it is evident that the proposed settlement is fair, adequate, and reasonable. Class counsel believe it is in the best interests of the Class, as it provides for payment of cash benefits to the Class in addition to other benefits, namely (a) a jury verdict in favor of the Class, (b) permanent sealing of the relevant arrest records, and (c) improved training for all City police officers. This is an excellent result.

**1.     The Likelihood of Success**

The parties agreed to settle this case after a liability verdict, and while that certainly removed much of the uncertainty surrounding the case, without this settlement, there would have been substantial further litigation, including a trial or a series of trials to determine damages. Without waiving any privileges that other Plaintiffs might assert in later litigation, it was highly uncertain how much the Class would recover in damages. Class counsel believe that the recovery for each Class member under the settlement is within the range of what the Class members could have expected to receive even after a damages trial. *See* Weaver Decl., ¶ 15.

In addition, it was evident to Class counsel during the liability trial, following the verdict, and during mediation, that at least some of those representing the City were prepared to fight this case through damages trials and subsequent appeals. Plaintiffs believe that they would have prevailed in the end, but certainly there was substantial risk involved in not settling the case. In any event, even assuming a Class member would have recovered damages, it would likely have

PLAINTIFFS' MOTION FOR FINAL
APPROVAL OF SETTLEMENT                               - 8 -



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

001428-11 201330 V1

been years before anything would have ever been paid to that Class member. The settlement ensures that each Class member is entitled to damages and will receive it now, rather than sometime in the distant future.

### 2.     The Amount of Discovery

The settlement in this case came only after substantial discovery, two motions for class certification, an appeal, four motions for summary judgment, and a trial on liability. Plaintiffs were certainly adequately informed as to the facts and legal issues at the center of this case when they agreed to the present settlement.

### 3.     The Settlement Terms and Conditions

The terms of the settlement, already outlined above, also indicate that it is a reasonable and fair settlement. If approved, the settlement will provide every eligible claimant with more than $3,000 in damages, and will also result in the sealing of the arrest records of the Class. There is no way of knowing whether the Class could have obtained additional monetary recovery if they had taken their claims to trial and prevailed. There is at least some risk that even after a damages trial, no Class member would have recovered more than $3,500. However, even if they had, "[i]t is well-settled law that a cash settlement amounting to only a fraction of the potential recovery will not *per se* render the settlement inadequate or unfair." *See Officers for Justice*, 688 F.2d at 628. The settlement is adequate.

### 4.     Recommendation and Experience of Counsel

Class counsel as a whole brought to the bargaining table many years of experience litigating claims of unlawful arrest, class-action litigation, and negotiation of class-action settlements. They now urge approval of the settlement based on their experience, their knowledge of the strengths and weaknesses of the case, and the other factors listed above. *See*, *e.g.*, *In re WPPSS*, 720 F. Supp. at 1392 ("Counsels' opinions warrant great weight both because

PLAINTIFFS' MOTION FOR FINAL
APPROVAL OF SETTLEMENT

- 9 -

001428-11 201330 V1

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

of their considerable familiarity with this litigation and because of their extensive experience in similar actions.").

### 5.     The Reaction of the Class to the Settlement

As described above, notice was sent to all Class members at their last-known address, was published in the local newspaper, and was also distributed via email.  *See* Weaver Decl., ¶¶ 5-6.  Eight-five to ninety percent of the Class returned claim forms, and not a single person has objected to the settlement, either formally in Court, or in private to Class counsel.  *See id.*, ¶ 7.  This support of the proposed settlement is persuasive evidence that the proposal is fair and reasonable.

### 6.     Good Faith and the Absence of Collusion

Courts also generally examine a settlement to ensure that it was not "the product of fraud or overreaching by, or collusion between, the negotiating parties."  *Officers for Justice*, 688 F.2d at 625.  In this case, the settlement was reached only after a closely contested jury trial and two days of arm's-length negotiations before Magistrate James Donohue.  *See* Weaver Decl., ¶ 16.  One of the named plaintiffs, and three other Class members who have remained in active contact with counsel and the Class, also participated fully in all of the negotiations.  *See id.*

## IV.    PLAINTIFFS REQUEST GUIDANCE AS TO ADDITIONAL NOTICE

As indicated above, in § II(C)(4), *supra*, Class counsel have received requests from certain Class members to send other Class members an additional notice that explains that they have an option to donate all or part of their settlement proceeds to a common fund dedicated to issues of globalization.  Class counsel agreed to present the issue to the Court in a neutral manner so that the Court could indicate whether such a notice would be appropriate.

The proposed notice that the organizers have drafted is attached as Exhibit E to the Weaver Declaration.  As the Court can see from reviewing that one-page letter, it is neutral in tone and makes it clear that participation in these efforts is not required under the settlement.  If

PLAINTIFFS' MOTION FOR FINAL
APPROVAL OF SETTLEMENT

- 10 -

001428-11 201330 V1

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

the Court determines that the additional notice is permissible, Plaintiffs would send it along with the checks that Class members receive under the settlement.

Class counsel recognize that this is an unusual request, but Class counsel also believe that this is an unusual case with an unusual Class. The notice is largely neutral, and Class counsel believe that many or most of the Class members (who were arrested while protesting the WTO) may sympathize with the organizing efforts and would be interested in knowing about them. On the other hand, Class counsel are concerned that the Class members do not necessarily have common views on the subject, and counsel do not want to improperly promote one interest over another. Therefore, Class counsel ask that the Court provide guidance as to whether the additional notice of the organizing efforts may be included in any mailing of settlement checks to the Class.

## V.   CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court approve the proposed settlement and provide guidance as to whether the additional notice is permissible.

Dated: October 11, 2007.

HAGENS BERMAN SOBOL SHAPIRO LLP

By:    /s/ Tyler S. Weaver
    Steve W. Berman, WSBA No. 12536
    Tyler S. Weaver, WSBA No. 29413
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
(206) 623-7292

Lead Counsel for the Class

PLAINTIFFS' MOTION FOR FINAL
APPROVAL OF SETTLEMENT

- 11 -

001428-11 201330 V1



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

Arthur Bryant
Victoria Ni
TRIAL LAWYERS FOR PUBLIC JUSTICE
Trial Lawyers for Public Justice
555 12th Street, Suite 1620
Oakland, CA 94607

Michael E. Withey
LAW OFFICES OF MIKE WITHEY
Two Union Square
601 Union Street, Suite 4200
Seattle, WA 98101

FRED DIAMONDSTONE
Attorney at Law
700 Dexter Horton Bldg
710 Second Ave
Seattle, WA 98104
(206) 568-0082

Counsel for the Class



## CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2007, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

- **Leslie A Bailey**
  lbailey@tlpj.org

- **Arthur H. Bryant**
  abryant@tlpj.org

- **Theron A. Buck**
  tbuck@staffordfrey.com; bcarranza@staffordfrey.com; dmashburn@staffordfrey.com; swindes@staffordfrey.com

- **Heather L Carr**
  hcarr@staffordfrey.com; erayborn@staffordfrey.com

- **Karen Cobb**
  kcobb@staffordfrey.com; erayborn@staffordfrey.com

- **Fred Diamondstone**
  fdiamondstone@seanet.com

- **Stephen Powell Larson**
  slarson@staffordfrey.com; mnewkirk@staffordfrey.com; dmashburn@staffordfrey.com; swindes@staffordfrey.com

- **John Rolfing Muenster**
  JMKK1613@aol.com

- **Victoria Ni**
  vni@tlpj.org

- **Benjamin Schwartzman**
  bschwartzman@greenerlaw.com

- **Thomas Sean Sheehan**
  sean.sheehan@seattle.gov; donna.robinson@seattle.gov; leslie.filler@seattle.gov; anne.elliott@seattle.gov

- **Michael E. Withey**
  mike@skwwc.com; kristinm@skwwc.com; johank@skwwc.com

PLAINTIFFS' MOTION FOR FINAL
APPROVAL OF SETTLEMENT

- 13 -

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

001428-11 201330 V1

1    Executed this 11th day of October, 2007.

2                                    **s/ Tyler Weaver**
3                                      Tyler Weaver, WSBA No. 29413
     HAGENS BERMAN SOBOL SHAPIRO LLP
4    1301 Fifth Avenue, Suite 2900
     Seattle, WA  98101
5    Telephone:  (206) 623-7292
     Fax: (206) 623-0594
6    Email:  tyler@hbsslaw.com

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

PLAINTIFFS' MOTION FOR FINAL
APPROVAL OF SETTLEMENT                       - 14 -

001428-11 201330 V1



**Avery, Michael 10/7/2018**
**For Educational Use Only**

KENNETH HANKIN, JENNIFER HUDZIECK, DEBORA..., 07 N.W.P.I.Lit.Rpts....

07 N.W.P.I.Lit.Rpts. 109, 2007 WL 1566289 (W.D.Wash.) (Verdict and Settlement Summary)

Copyright (C) 2018 by Jury Verdicts Northwest, Inc.
United States District Court, W.D. Washington

KENNETH HANKIN, JENNIFER HUDZIECK, DEBORA LANE ET AL v. CITY OF SEATTLE

00-1672P
Trial Date: January 8, 2007 (9-day trial)
TOPIC: CIVIL RIGHTS VIOLATION; **FALSE ARREST** (BIFURCATED TRIAL)

**SUMMARY:**
**Result: PLAINTIFF VERDICT. (The jury verdict centered on liability only. On 1/30/07, the Def. was found liable for false arrest violations but not liable for Plffs' freedom of speech violations claims. On 4/2/07, the Def. agreed to pay Plffs $1,000,000 and seal its records of Plffs' arrests.)**
**ATTORNEY:**
Plaintiff: Michael E. Withey, Law Offices of Michael E. Withey (Seattle); Tyler Weaver of Hagens Berman Sobol Shapiro (Seattle)
Defendant: Theron A. Buck of Stafford Frey Cooper (Seattle)
TRIAL JUDGE: Hon. Marsha Pechman

RANGE AMOUNT: $1,000,000-1,999,999

STATE: Washington
COUNTY: Not Applicable

**INJURIES: EMOTIONAL DISTRESS**
Civil rights violations; federal and state free speech rights violations. **False arrests** resulting in 3 to 4 days in jail.

**TEXT:**
12/1/99 - Plffs, protestors. This **class action** case was brought by 175 Plffs. Plffs were arrested at Westlake Park in Seattle, Washington during a protest on the morning of the second day of the World Trade Organization meetings.

Jury Verdicts Northwest, Inc.
U.S. District Court - Western District

PUBLISHED IN: Northwest Personal Injury Litigation Reports, April, 2007

End of Document

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

The Honorable Marsha Pechman

UNITED STATES DISTRICT COURT, WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ROBERT HICKEY, KENNETH HANKIN,
JENNIFER HUDZIEC, STEPHANIE LANE,
CARROLL JACKSON, DENISE COOPER,
NICOLE PEARSON, and EMILY
MALONEY, on behalf of themselves and all
others similarly situated,

                                    Plaintiffs,

            v.

THE CITY OF SEATTLE, a municipality;
PAUL SCHELL, Mayor of the City of Seattle;
and NORMAN STAMPER, Chief of Police of
the City of Seattle,

                                    Defendants.

No. C00-1672P

PLAINTIFFS' MOTION FOR FINAL
APPROVAL OF CLASS SETTLEMENT

**NOTED: July 2, 2004**

**Hearing: July 15, 2004, 9:00 a.m.**

PLAINTIFFS' MOTION FOR FINAL
APPROVAL OF SETTLEMENT

1428.10 0187 MTN.DOC

HAGENS BERMAN LLP
*Attorneys at Law*

CAMBRIDGE  LOS ANGELES  PHOENIX [PLLC]  SEATTLE
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

**TABLE OF CONTENTS**

PAGE

I.     INTRODUCTION ............................................................................ 1

II.    THE NATURE OF THE CASE AND THE PROPOSED SETTLEMENT ...................... 1

     A.     Factual Allegations and Plaintiffs' Claims ............................................ 1

     B.     Procedural History ................................................................. 2

     C.     Mediation ........................................................................ 4

     D.     Overview of Settlement Terms .................................................... 4

         1.     Class ........................................................................ 4

         2.     Common Fund; Claims ....................................................... 5

         3.     Release ..................................................................... 5

         4.     Payment of the Awards ....................................................... 5

         5.     Award to Plaintiffs Hickey and Jackson ...................................... 5

     E.     Distribution of Class Notice and Response ......................................... 6

III.   the court should approve the settlement ................................................. 7

     A.     Applicable Standard of Review ................................................... 7

     B.     The Settlement Should Be Approved as Fair, Adequate, and Reasonable ........... 8

         1.     The Likelihood of Success ................................................... 8

         2.     The Amount of Discovery .................................................... 9

         3.     The Settlement Terms and Conditions ........................................ 9

         4.     Recommendation and Experience of Counsel ................................. 10

         5.     The Reaction of the Class to the Settlement .................................. 10

         6.     Good Faith and the Absence of Collusion ................................... 10

IV.    CONCLUSION .......................................................................... 11

**HAGENS BERMAN LLP**
*Attorneys at Law*

CAMBRIDGE  LOS ANGELES  PHOENIX [PLLC]  SEATTLE
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

# I.   INTRODUCTION

On April 9, 2004, the Court preliminarily approved a settlement on behalf of the Class represented by Plaintiffs Robert Hickey and Carroll Jackson.  Plaintiffs hereby request that the Court enter a final order approving the settlement of this action.  The settlement is fair, reasonable, and adequate.  Under the proposed settlement, all Class members who sign and return a valid claim form by June 22, 2004, will receive a cash payment of no less than $1,000 in settlement of their claims.  This cash payment is in addition to the non-monetary relief secured for the Class during litigation, including the sealing of their arrest records and the ruling of the Court that the City had failed to carry its burden of demonstrating that it had individualized probable cause to arrest the Class members.  This is an excellent result for the Class.

# II.   THE NATURE OF THE CASE AND THE PROPOSED SETTLEMENT

## A.   Factual Allegations and Plaintiffs' Claims

As the Court is aware, this litigation arises out of the mass arrests conducted by the City of Seattle in November and December 1999 when the World Trade Organization ("WTO") was meeting in Seattle.  Although this case, as originally filed, encompassed all the arrests the City made pursuant to its no-protest policies, the portion of the case relevant to the Class and this settlement concerns a single mass arrest of nearly 160 people at the intersection of First Avenue and Broad Street on December 1, 1999.

The allegations of each of the parties concerning the events leading to this arrest have been extensively detailed in pleadings previously filed with this Court.  However, despite differences between the parties as to specifics, it is essentially undisputed that on the afternoon of December 1, 1999, several hundred people were protesting on the streets and sidewalks near the Pike Place Market and the surrounding area when they encountered large groups of police.  The police then pursued and directed several groups of protesters for approximately one mile as they moved northward from the Market toward Denny Way, where police cut off their egress, surrounded them near the intersection of First and Broad, and arrested them en masse.  They

PLAINTIFFS' MOTION FOR FINAL
APPROVAL OF SETTLEMENT                                          - 1 -



HAGENS BERMAN LLP
Attorneys at Law

CAMBRIDGE  LOS ANGELES  PHOENIX [PLLC]  SEATTLE
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1428.10 0187 MTN.DOC

were booked using photocopied, inaccurate arrest records and were then taken to jails where they spent as long as four days before being released. All charges were dropped without prosecution.

Plaintiffs Robert Hickey and Carroll Jackson, who were arrested during this incident, sued on behalf of themselves and a Class of similarly situated individuals, alleging that they were wrongfully arrested in violation of the First, Fourth, and Fourteenth Amendments to the United States Constitution and the Washington Constitution.

**B.     Procedural History**

This case has a complex and lengthy procedural history. When Plaintiffs originally filed this suit in October 2000, they sought to recover on behalf of a putative class of all persons wrongfully arrested pursuant to the City's no-protest policies in December 1999 during the WTO ministerial in downtown Seattle. This included hundreds of people who are not in the current Class because they were arrested at other locations, such as Westlake Park.[1] On behalf of themselves and the putative class of all WTO arrestees, all of the named Plaintiffs in this case extensively litigated their claims. That litigation included extensive document discovery and numerous depositions of key figures in the WTO arrests, including Mayor Paul Schell, Chief of Police Norm Stamper, and several officers, taken during the spring and summer months of 2001. Plaintiffs in this case coordinated their discovery with plaintiffs in several other cases concerning the WTO, all of which had been consolidated for the purpose of discovery and summary judgment.

In the summer of 2001, Plaintiffs moved to certify a Class of all arrestees and the parties also cross-moved for summary judgment on the constitutionality of the "No-Protest Zone," a 25-square block area of downtown that had been declared off-limits to all protest as of December 1, 1999. Several of the Plaintiffs named in this case (Hankin, Hudziec, Lane, Cooper, and Pearson) had been arrested inside that No-Protest Zone.

---

[1] Named Plaintiffs other than Robert Hickey and Carroll Jackson do still seek to represent a Class composed of these individuals and continue to maintain that they were unlawfully arrested.



HAGENS BERMAN LLP
*Attorneys at Law*

CAMBRIDGE   LOS ANGELES   PHOENIX [PLLC]   SEATTLE
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1        On October 29, 2001, Judge Barbara Rothstein ruled that the No-Protest Zone was

2 constitutional and did not violate the First Amendment. This, in effect, vitiated the claims of

3 those Plaintiffs who were arrested inside the Zone. Shortly after the summary judgment ruling,

4 the Court also denied Plaintiffs' motion for class certification. Plaintiffs then moved for final

5 judgment under Fed. R. Civ. P. 54(b) on the constitutionality issue, which the Court denied. The

6 Court later certified its order for interlocutory appeal, but the Ninth Circuit Court of Appeals

7 denied the petition on April 17, 2002.

8        The parties continued to litigate, and in September 2002, Plaintiffs filed their second

9 motion for class certification, requesting that the Court certify the Class of those arrested at First

10 and Broad on December 1, 1999. Plaintiffs also requested again, in a motion filed in October

11 2002, that the Court grant final judgment as to the Plaintiffs who had been arrested inside the

12 No-Protest Zone. On November 5, 2002, the Court granted both motions, certifying the Class

13 and granting final judgment as to the Plaintiffs who had been arrested inside the No-Protest

14 Zone. Those Plaintiffs immediately appealed to the Ninth Circuit, where there case has been

15 fully briefed and argued and the parties now await a ruling from that court.

16        Following notice of certification of an opt-out class (from which no Class member

17 requested exclusion), Plaintiffs Hickey and Jackson continued to litigate in this Court on behalf

18 of themselves and the Class. This included additional written discovery, as well as depositions

19 in the summer and fall of 2003, including expert testimony. In October 2003, the parties again

20 filed cross-motions for summary judgment. The City contended that Plaintiffs had not

21 established a policy adopted by the City's policymakers such that the City could be held liable

22 under 42 U.S.C. § 1983, and that in any event the City had proven it had probable cause to arrest

23 the Class. Plaintiffs contended that at a minimum they had established an issue of fact as to

24 whether or not the arrests of the Class members were pursuant to an official City policy, and also

25 argued that the City had failed, as a matter of law, to carry its burden of proof on the question of

26 whether officers had probable cause to arrest any Class member.

PLAINTIFFS' MOTION FOR FINAL
APPROVAL OF SETTLEMENT
1428.10 0187 MTN.DOC

- 3 -

HAGENS BERMAN LLP
Attorneys at Law

CAMBRIDGE  LOS ANGELES  PHOENIX [PLLC]  SEATTLE
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

On December 29, 2003, the Court partially granted and partially denied both motions. With regard to the question of whether there was an official policy, the Court ruled that Plaintiffs had established a genuine issue of material fact as to whether the City's policymakers had ratified the arrest of the Class members. The Court further ruled that the City had failed to produce any evidence that it had individualized probable cause to arrest any Class member and therefore had, as a matter of law, failed to carry its burden of proof as to whether the Class members were wrongfully arrested. Thus, it was left to Plaintiffs to prove at trial that the City's policymakers had ratified the arrests and prove the amount of damages suffered by the Class.

The parties agreed to settle the case on January 16, 2004, the Friday before trial was scheduled to commence.

## C.    Mediation

The parties engaged in one arm's-length negotiation before the Honorable Terrence Carroll on October 28, 2003. The parties were unable to reach agreement. However, the parties once again engaged Judge Carroll following the Court's ruling on the cross-motions for summary judgment and were able to reach a final agreement.

## D.    Overview of Settlement Terms

The Settlement Agreement is attached as Exhibit 1 to the Declaration of Tyler Weaver in Support of Motion for Final Approval and Motion for Approval of Fees ("Weaver Decl."). Its terms are summarized below.

### 1.    Class

The Class for the purpose of settlement is the same Class that the Court certified in November 2002: "all individuals arrested on December 1, 1999, at or near the intersections of First Avenue and Broad Street or First Avenue and Clay Street in Seattle, Washington, whose arrest records indicate that a reason for arrest was a violation of Seattle Municipal Code § 12A.26.040." Settlement Agreement, ¶ 1.e. The Settlement Agreement, however, explicitly excludes two individuals who litigated their claims against the City individually. *Id.*

PLAINTIFFS' MOTION FOR FINAL
APPROVAL OF SETTLEMENT
1428.10 0187 MTN.DOC

- 4 -



HAGENS BERMAN LLP
*Attorneys at Law*

CAMBRIDGE   LOS ANGELES   PHOENIX [PLLC]   SEATTLE
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

## 2. Common Fund; Claims

The City has agreed to pay a lump sum of $250,000 for awards to members of the Class and for attorneys' fees and costs. Plaintiffs' counsel has agreed not to seek more than one-third of this amount in fees and costs, as addressed in Plaintiffs' separate, accompanying motion for an award of fees and costs. The remainder, after deduction for any incentive awards, will be paid in equal shares to the members of the Class who have made timely claims. Accordingly, under the proposed allocation, even after deduction for fees, costs, and incentive awards, every Class member who returns a valid and timely claim form will receive no less than $1,000.

## 3. Release

The Settlement Agreement releases the claims of all Class members, whether or not they have made a timely claim for a portion of the settlement fund. The release covers all claims against the City or its agents arising out of the arrest, other than personal injury claims. Settlement Agreement, ¶ 2.

## 4. Payment of the Awards

Under the terms of the settlement, in all likelihood the settlement awards will be paid out within (60) days of the date of any final approval by this Court. Settlement Agreement, ¶ 6.c. (30 days after effective date, which is the date the time for appeal expires, under ¶ 1.i). There are only two events that would delay payment following the Court's final approval: (1) an appeal of that final approval; or (2) the process of resolving any disputed claim. *Id.* At present, no person has objected the settlement, although they have until June 22, 2004, to do so. In addition, Class counsel is aware of only one claim that they have had to deny, due to the fact that the individual had litigated his claims individually and therefore is not a member of the Class under the terms of the agreement. Weaver Decl., ¶ 7.

## 5. Award to Plaintiffs Hickey and Jackson

The settlement provides that, pending approval of the Court, Plaintiffs Hickey and Jackson, as Class representatives, are entitled to receive incentive awards of $2,000 in addition to

PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT

1428.10 0187 MTN.DOC

- 5 -

HAGENS BERMAN LLP
*Attorneys at Law*

CAMBRIDGE  LOS ANGELES  PHOENIX [PLLC]  SEATTLE
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1  the portion of the settlement that they will receive as Class members. Plaintiffs have requested

2  approval of these awards in the accompanying motion concerning attorneys' fees and incentive

3  awards.

4  **E.  Distribution of Class Notice and Response**

5  On April 9, 2004, the Court approved the form and manner of the notice of the proposed

6  settlement to the Class. In accordance with that order, on April 23, 2004, the notice, and a copy

7  of the claim form, was mailed to all members of the Class for whom Plaintiffs' counsel had

8  addresses, either from the use of arrest records or from updated information Plaintiffs had

9  acquired and recorded during the litigation of this case. Weaver Decl., ¶ 4. In addition,

10  Plaintiffs published a legal notice in both the *Seattle Times* and the *Seattle Post-Intelligencer* on

11  May16, 2004. *Id.* at ¶ 5. Furthermore, Plaintiffs emailed additional notice of the settlement and

12  a description of the settlement to several email groups maintained by WTO arrestees, including

13  both public lists and databases maintained by private individuals. *Id.* at ¶ 6. Plaintiffs have also

14  sent out reminders to those email groups of the approaching deadlines, and have responded to

15  dozens of inquiries from WTO arrestees regarding the settlement and the status of the case,

16  including forwarding claim forms to individuals who are members of the Class. *Id.*, at ¶ 6.

17  These emails have proven so effective that Class counsel was able to reach, and has received a

18  claim form from, a Class member who resides in Guinea, Africa, and has no regular mail service.

19  *Id.*

20  As of June 16, 2004, Class counsel had received 40 claims, only one of which has been

21  denied due to the fact that the claimant is not a member of the Class. *Id.* at ¶ 7. Plaintiffs have

22  not heard any objections from any Class members, and in fact all the feedback they have

23  received from Class members has been positive, although the close of the period for objections is

24  June 22, 2004. *Id.* at ¶ 9.

25

26

PLAINTIFFS' MOTION FOR FINAL
APPROVAL OF SETTLEMENT
1428.10 0187 MTN.DOC

- 6 -

HAGENS BERMAN LLP
*Attorneys at Law*

CAMBRIDGE LOS ANGELES PHOENIX [PLLC] SEATTLE
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

## III.   THE COURT SHOULD APPROVE THE SETTLEMENT

### A.   Applicable Standard of Review

Settlements of disputed claims are favored by the courts. *Ahern v. Central Pac. Freight Lines*, 846 F.2d 47, 48 (9th Cir. 1988); *MWS Wire Indus., Inc. v. California Fine Wire Co.*, 797 F.2d 799, 802 (9th Cir. 1986); *United States v. McInnes*, 556 F.2d 436, 441 (9th Cir. 1977). This policy especially applies in class actions, where there is an overriding public interest favoring settling and ending litigation. *Ahern*, 846 F.2d at 48; *Officers for Justice v. Civil Serv. Com.*, 688 F.2d 615, 625 (9th Cir. 1982) ("voluntary conciliation and settlement are the preferred means of dispute resolution"); *Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992) (recognizing "the strong judicial policy that favors settlements, particularly where complex class action litigation is concerned"); *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 720 F. Supp. 1379, 1387 (D. Ariz. 1989), *aff'd Class Plaintiffs v. Seattle,* 955 F.2d 1268 (9th Cir. 1992) ("[settlement] is indeed the preferred means of dispute resolution, particularly in complex class action litigation such as this.").

Under Fed. R. Civ. P. 23(e), settlements of class actions require court approval and notice to class members. A proposed class action settlement may be approved if the Court determines that "the settlement is fundamentally fair, adequate and reasonable." *Officers for Justice*, 688 F.2d at 625; *see also, e.g.*, *Torrisi v. Tuscon Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993). Simply stated, the Court must decide whether the recovery achieved is reasonable, balancing the potential rewards of continued litigation against the risk of recovering less or nothing at all. That determination necessarily involves "an amalgam of delicate balancing, gross approximations and rough justice." *Officers for Justice*, 688 F.2d at 625 (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 468 (2d Cir. 1974)).

In assessing whether a particular settlement is fair, reasonable, and adequate,

> a district court may consider some or all of the following factors:
> "the strength of plaintiffs' case; the risk, expense, complexity, and
> likely duration of further litigation; the risk of maintaining class

PLAINTIFFS' MOTION FOR FINAL
APPROVAL OF SETTLEMENT
1428.10 0187 MTN.DOC

- 7 -

HAGENS BERMAN LLP
*Attorneys at Law*

CAMBRIDGE   LOS ANGELES   PHOENIX [PLLC]   SEATTLE
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

> action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement."

*Molski v. Gleich*, 318 F.3d 937, 953 (9th Cir. 2003), *quoting Linney v. Cellular Alaska P'shp*, 151 F.3d 1234, 1242 (9th Cir. 1998). When experienced counsel support a settlement, as here, their opinions are entitled to considerable weight. *In re Washington Pub. Power Supply Sys.*, 720 F. Supp. at 1392; *Reed v. General Motors Corp.*, 703 F.2d 170, 175 (5th Cir. 1983).

**B.     The Settlement Should Be Approved as Fair, Adequate, and Reasonable**

When the relevant factors outlined in *Molski v. Gleich* are analyzed, it is evident that the proposed settlement is fair, adequate, and reasonable. Class counsel believes it is in the best interests of the Class, as it provides for payment of cash benefits to the Class in addition to the benefits obtained through litigation, namely (a) a declaration that the City failed as a matter of law to demonstrate individualized probable cause to arrest any member of the Class; and (b) permanent sealing of the relevant arrest records. This is an excellent result, especially considering the hurdles the Class faced in substantiating their claims.

**1.     The Likelihood of Success**

Class counsel believe that while Plaintiffs presented a strong case against the City for violation of their Fourth Amendment rights, they had an uncertain likelihood of success on the only theory of liability they had remaining for trial – that a policymaker for the City of Seattle ratified the decision to arrest the Class. While Class counsel cannot discuss the likelihood of success in detail, given that other Plaintiffs currently on appeal may litigate same or similar issues following any remand, it suffices to say here that the evidence on ratification was in dispute, and that there was a possibility that the Class could lose at trial.

Without waiving any privileges that other Plaintiffs might assert in later litigation, Class counsel notes that it was uncertain at best whether the Class would recover significant damages even if the Class succeeded in proving the City could be held liable. Class counsel believes that



HAGENS BERMAN LLP
*Attorneys at Law*

CAMBRIDGE   LOS ANGELES   PHOENIX [PLLC]   SEATTLE
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

the recovery for each Class member under the settlement is within the range of what the Class members could have expected to receive at trial if they prevailed as to liability. *See* Weaver Decl., ¶ 3.

For these reasons, Class counsel believe that the settlement is a more than adequate recovery for the Class, particularly given the Court's ruling regarding probable cause and the sealing of the arrest records. Furthermore, it assures that the Class will receive monetary damages now rather than following a period of appeals that would have likely followed any verdict.

### 2. The Amount of Discovery

The settlement in this case came only after substantial discovery between the parties. Plaintiffs took extensive document discovery and written discovery, and took several depositions of both officers and high-ranking officials. In addition, settlement on behalf of the Class followed two motions for class certification and four motions for summary judgment. Class counsel was clearly adequately informed as to the facts and legal issues at the center of this case when they agreed to settle with the City.

### 3. The Settlement Terms and Conditions

The terms of the settlement, already outlined above, also indicate that it is a reasonable and fair settlement. Every Class member who returns a valid claim form postmarked no later than June 22, 2004, is entitled to a portion of the settlement proceeds, which portion will not be any less than $1,000. This amount will be paid, in cash, shortly after this Court grants final approval to the settlement, and is in addition to the non-monetary relief won for the Class during litigation, including the sealing of the arrest records of the Class. There is no way of knowing whether the Class could have obtained additional monetary recovery if they had taken their claims to trial and prevailed. However, even if they had, "[i]t is well-settled law that a cash settlement amounting to only a fraction of the potential recovery will not per se render the

PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT

- 9 -

1428.10 0187 MTN.DOC



HAGENS BERMAN LLP
*Attorneys at Law*

CAMBRIDGE  LOS ANGELES  PHOENIX [PLLC]  SEATTLE
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1   settlement inadequate or unfair." *See Officers for Justice*, 688 F.2d at 628. The settlement is

2   adequate.

3     **4.  Recommendation and Experience of Counsel**

4      Class counsel as a whole brought to the bargaining table many years of experience

5   litigating claims of unlawful arrest, class action litigation, and negotiation of class action

6   settlements. They now urge approval of the settlement based on their experience, their

7   knowledge of the strengths and weaknesses of the case, and the other factors listed above. *See,*

8   *e.g., In re Washington Pub. Power Supply Sys.*, 720 F. Supp. at 1392 ("Counsels' opinions

9   warrant great weight both because of their considerable familiarity with this litigation and

10  because of their extensive experience in similar actions.").

11    **5.  The Reaction of the Class to the Settlement**

12     As described above, notice was sent to all Class members at their last-known address,

13  was published in the local newspaper, and was also distributed via electronic mail. *See* Weaver

14  Decl., ¶ 4-7. While Class members have until June 22, 2004, to object, Class counsel has not

15  received any objections, nor have they heard any complaints about the settlement from any Class

16  member. *See* Weaver Decl., ¶ 9. This support of the proposed settlement is persuasive evidence

17  that the proposal is fair and reasonable.

18    **6.  Good Faith and the Absence of Collusion**

19     Courts also generally examine a settlement to ensure that it was not "the product of fraud

20  or overreaching by, or collusion between, the negotiating parties." *Officers for Justice*, 688 F.2d

21  at 625. In this case, the settlement was reached only after an arm's-length mediation among

22  counsel for the parties, followed by additional litigation before final settlement, and was not the

23  product of collusion or any improper influences. Those mediations were conducted in good faith

24  by counsel for all sides with the assistance of an independent mediator, Judge Carroll. *See*

25  Weaver Decl., ¶ 2.

26



HAGENS BERMAN LLP
*Attorneys at Law*

CAMBRIDGE  LOS ANGELES  PHOENIX [PLLC]  SEATTLE
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

## IV.   CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court approve the proposed settlement.

DATED:  June 17, 2004.

HAGENS BERMAN LLP


By _Tyler Weaver_

Steve W. Berman, WSBA No. 12536
Tyler S. Weaver, WSBA No. 29413
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
(206) 623-7292
Email: steve@hagens-berman.com
       tyler@hagens-berman.com

Arthur Bryant
Victoria Ni
TRIAL LAWYERS FOR PUBLIC JUSTICE
One Kaiser Plaza, Suite 275
Oakland, CA 94612-3684
(510) 622-8150

Michael E. Withey
STRITMATTER KESSLER WHELAN
     WITHEY COLUCCIO
200 Second Avenue West
Seattle, WA 98119-4204
(206) 448-1777

FRED DIAMONDSTONE
Attorney at Law
700 Dexter Horton Bldg
710 Second Ave
Seattle, WA  98104
(206) 568-0082

YVONNE KINOSHITA WARD
Attorney at Law
128 14th St. S.E.
Auburn, WA 98002
(253) 887-8686

PLAINTIFFS' MOTION FOR FINAL
APPROVAL OF SETTLEMENT

1428.10 0187 MTN.DOC

- 11 -

HAGENS BERMAN LLP
_Attorneys at Law_

CAMBRIDGE  LOS ANGELES  PHOENIX [PLLC]  SEATTLE
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1

2

3
John Muenster
MUENSTER & KOENIG
Wells Fargo Center
999 Third Ave., Suite 4100
Seattle, WA 98104

4

5

6
Benjamin Schwartzman
LOVELL STEWART HALEBIAN &
    BARTH, LLP
1420 Fifth Ave., Suite 2200
Seattle, WA 98101

7

8

9

10
ERWIN CHEMERINSKY
Professor of Law
Univ. of So. Calif. Law School
University Park
Los Angeles, CA 90089-0071
Counsel for Plaintiffs

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

PLAINTIFFS' MOTION FOR FINAL
APPROVAL OF SETTLEMENT

1428.10 0187 MTN.DOC

- 12 -



HAGENS BERMAN LLP
Attorneys at Law

CAMBRIDGE   LOS ANGELES   PHOENIX [PLLC]   SEATTLE
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

**Avery, Michael 10/7/2018**
**For Educational Use Only**

Hickey v. The City of Seattle, 2007 WL 2768885 (2007)

2007 WL 2768885 (W.D.Wash.) (Verdict and Settlement Summary)

Copyright (c) 2018 Thomson Reuters/West
WEST'S JURY VERDICTS - WASHINGTON REPORTS

Seattle Settles for $1M Over WTO Protestors' **False Arrest** Claims

United States District Court, W.D. Washington.

Hickey v. The City of Seattle

**Type of Case:**
Civil Rights & Constitutional Law • **False Arrest**

Civil Rights & Constitutional Law • Excessive force

Civil Rights & Constitutional Law • First Amendment

Civil Rights & Constitutional Law • Section 1983

**Specific Liability: City, its mayor and its chief of police ordered and took police action to suppress protest activities during a World Trade Organization meeting, including restricting protestors' access to public places, arresting them without probable cause, and depriving them of due process after the arrests**

**General Injury:** Deprivation of civil rights; emotional distress

**Jurisdiction:**
State: Washington
COUNTY: Not Applicable

**Related Court Documents:**
Defendants' answer to plaintiffs' amended **class action** complaint: 2001 WL 35952326

Plaintiffs' trial brief: 2004 WL 5214565

Defendant Seattle's trial brief: 2004 WL 5214561

Plaintiffs' second amended **class action** complaint: 2006 WL 1857378

Verdict form: 2007 WL 432022

Case Name: Robert Hickey, Kenneth Hankin, Jennifer Hudziec, Stephanie Lane, Carroll Jackson, Denise Cooper, Nicole Pearson, and Emily Maloney on behalf of themselves and all others similarly situated v. The City of Seattle, a municipality; Paul Schell, mayor of the city of Seattle; Norman Stamper, former chief of police of

**Avery, Michael 10/7/2018**
**For Educational Use Only**

Hickey v. The City of Seattle, 2007 WL 2768885 (2007)

the city of Seattle

**Docket/File Number:** C00-1672

**Settlement: Plaintiffs, $1,000,000.00**

**Settlement Range:** $1,000,000 - 1,999,999

**Settlement Date:** March 29, 2007

**Judge:** Marsha J. Pechman

**Attorneys:**

Plaintiffs: Steve W. Berman and Tyler S. Weaver, Hagens Berman Sobol Shapiro, Seattle, Wash.; Arthur H. Bryant, Victoria Ni and Leslie A. Bailey, Trial Lawyers for Public Justice, Oakland, Calif.; Benjamin Schwartzman, Williams & Works, Bainbridge Island, Wash.; Fred Diamondstone and Michael E. Withey, Law Office of Mike Withey,, Seattle, Wash.; John Rolfing Muenster, Muenster & Koenig, Seattle, Wash.; Michael E. Withey, Stritmatter KesslerWhelan Withey Coluccio, Seattle, Wash.; Yvonne Kinoshita Ward, Yvonne Kinoshita Ward Attorney at Law, Auburn, Wash.; Benjamin Schwartzman, Lovell Stewart Halebian & Barth, Seattle, Wash.; Erwin Chemerinsky, Duke University Law School, Durham, N.C.; Erwin Chemerinsky, Southern California Law School, Los Angeles, Calif.; Tyler Weaver, Hagens Berman LLP, Seattle, Wash.; Michael S. McNamara, Thelen ReidBrown Raysman & Steiner, Washington, D.C.

Defendants: Ted S. Buck, Heather L. Carr, Karen L. Cobb, Stephen Powell Larson, Theron A. Buck, Scott D. Bissell and Anne Melani Bremner, Stafford Frey Cooper PC, Seattle, Wash.; Thomas Sean Sheehan, Assistant City Attorney - Seattle, Seattle, Wash.; Lisa M. Marchese, Dorsey & Whitney, Seattle, Wash.

**Trial Type: Settlement**

**Experts:**

Plaintiffs: Lou Reiter, police practices expert, Tallahassee, Fla.
Defendants: Mike Lozensky, video archives librarian, KIRO-TV, Seattle Wash.

**Breakdown of Settlement:**
$550,000.00 to ==class action== plaintiffs arrested in Westlake Park for damages
$450,000.00 to ==class action== plaintiffs arrested in Westlake Park for attorney fees and costs

**Summary of Facts:**

Seattle hosted a World Trade Organization meeting from Nov. 30 to Dec. 3, 1999. The event drew not only the international representatives involved in the organization's activities, but also the anti-WTO groups that typically demonstrate during such events. Among the organizations who attended to demonstrate were environmental groups, union groups, human rights organizations, and consumer rights groups.

Throngs of people surrounded the hotels where the WTO representatives stayed, as well as other areas of the city. According to some demonstrators, police officers began using pepper spray, tear gas and rubber pellets against the demonstrators as early as Nov. 30, the first day of the WTO meeting.

That same evening, Mayor Paul Schell declared a state of emergency. It included a general curfew order, designation of certain restricted areas, and authorization to arrest people who were in designated areas without the proper credentials. By Dec. 1, the mayor modified the emergency order to include the restriction of access to an area of approximately 24 blocks in downtown Seattle. The order prohibited people from engaging in any protest activity in the zone.

According to demonstrators, these orders restricted their right to free speech. According to the city, the restrictions were necessary, because some of the demonstrations had grown violent, destructive and out of control. For example, the city claimed, a crowd surrounded a police car, crawled on top of it, and began rocking it from side to side with the officer in it. A SWAT team had to come to the officer's aid, and the crowd resisted by throwing rocks and bottles at the officers.

**Avery, Michael 10/7/2018**
**For Educational Use Only**

Hickey v. The City of Seattle, 2007 WL 2768885 (2007)

During the altercations, police officers did use non-lethal means of suppressing the crowds, such as pepper spray and rubber bullets. They also arrested hundreds of protestors.n violent, destructive and out of control. For example, the city claimed, a crowd surrounded a police car, crawled on top of it, and began rocking it from side to side with the officer

In one event, demonstrators claimed, police encircled, trapped, and arrested 157 people in Westlake Park on Fourth Avenue between Pine and Pike streets. Members of that group claimed they were arrested without probable cause and held for several days without access to attorneys or a proper reading of their Miranda rights. They said they were ultimately released without any charges. Some alleged they received inadequate food and water during their detention.

Several of the demonstrators who were arrested filed a **class action** lawsuit on behalf of themselves and their peers in 2000 against the city, Schell, and Norman Stamper, the chief of police at the time of the arrests. The named plaintiffs included Robert Hickey, Kenneth Hankin, Jennifer Hudziec, Stephanie Lane, Carroll Jackson, Denise Cooper, Nicole Pearson, and Emily Maloney. All were arrested Dec. 1.

The group alleged the city and its leaders violated their right to assemble, prohibited free speech, and falsely arrested them - violations of the First and Fourth Amendments to the United States Constitution, 42 U.S.C.A. 1983, and state law., Stephanie Lane, Carroll Jackson, Denise Cooper, Nicole Pearson, and Emily Maloney. All were arrested Dec. 1.

They sought damages for the deprivation of their civil rights, as well as damages for emotional distress, attorney fees, and costs. They also sought declaratory judgments regarding the alleged violations of their Constitutional rights.

The city, Schell and Stamper answered together and denied any impropriety or violations in their actions. Some of the protesters engaged in destructive behavior they submitted, and they attempted to address the behavior. Under certain circumstances, they added, some limitations on speech are permissible.

Among their affirmative defenses were arguments that they had just cause for their actions, that the plaintiffs' claims were barred by the doctrine of unclean hands, and that the protesters caused their own damages by fleeing and resisting arrest.they added, some limitations on speech are permissible.

Jackson and Maloney reached settlements with the defendants before the case proceeded to trial before a jury in the Western District of United States District Court in Washington. Through pretrial judgments, the set of plaintiffs that remained for trial was that of 155 people arrested Dec. 1 in Westlake Park, and only the city remained as a defendant.

Judge Marsha Pechman determined that the trial should occur in two phases - a liability phase, and a damage phase.e Western District of United States District Court in Washington. Through pretrial judgments, the set of plaintiffs that r

A jury for the liability phase returned a verdict in favor of the plaintiffs in January 2007, as to the **false arrest** claim. The verdict favored the defendant regarding the federal and state free speech claims.

Judge Pechman ordered the parties to mediate after the jury verdict. They did so and decided to settle for $1,000,000. Of that amount, $550,000 would go to the plaintiffs' attorneys, while the remainder would be distributed to members of the class who filed claims.

The settlement, reached March 29, 2007, also included a provision for the city to expunge and seal the criminal records of the arrested protesters.

Court: United States District Court, W.D. Washington.

End of Document                                              © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**Avery, Michael 10/7/2018**
**For Educational Use Only**

**Hickey v. The City of Seattle, 2007 WL 2768885 (2007)**

**Avery, Michael 10/8/2018**
**For Educational Use Only**

IBRAHIM v. CITY AND COUNTY OF SAN FRANCISCO, JVR No. 1402030024 (2012)

JVR No. 1402030024, 2012 WL 10261906 (N.D.Cal.) (Verdict and Settlement Summary)

**Copyright (c) 2018 Thomson Reuters/West**
**United States District Court, N.D. California.**

IBRAHIM v. CITY AND COUNTY OF SAN FRANCISCO

3:11CV01695
DATE OF INCIDENT: February 22, 2010
DATE OF FILING: April 06, 2011
DATE OF TRIAL/SETTLEMENT: September 25, 2012

TOPIC:

LIABILITY:

General: Law Enforcement

Specific: <mark>False Arrest</mark>

Secondary: Law Enforcement - Illegal Search;

**SUMMARY**
**Outcome: Settlement**
**Total: $35,000**
HIGH AMOUNT: $0

LOW AMOUNT: $0

**Related Court Documents:**
First amended complaint: 2011 WL 10948298

Defendant's motion for judgment on the pleadings: 2012 WL 8897955

Stipulation and order for dismissal: 2012 WL 9083224

**EXPERT-WITNESSES:**
**ATTORNEY:**
Plaintiff: Todd C. Toral, DLA Piper LLC, San Francisco, CA
Plaintiff: Kathleen S. Kizer, DLA Piper LLC, San Francisco, CA
Plaintiff: Vishali Singal, DLA Piper LLC, San Francisco, CA
Plaintiff: Alec Cierny, DLA Piper LLC, San Francisco, CA
Defendant: Meghan K. Higgins, Office of City Attorney, San Francisco, CA
Defendant: Joshua S. White, Office of City Attorney, San Francisco, CA
JUDGE: Richard Seeborg

**Avery, Michael 10/8/2018**
**For Educational Use Only**

**IBRAHIM v. CITY AND COUNTY OF SAN FRANCISCO, JVR No. 1402030024 (2012)**

Range Amount: $1 - 49,999

STATE: California
COUNTY: Not Applicable
**PRIMARY INJURY: Civil Rights Violation: <mark>False Arrest</mark>**

**SUMMARY**
**PLAINTIFF:**
Sex: M

Age: Adult

**DEFENDANT:**
Sex: O

Organization Type: City and County of San Francisco

**DAMAGES:**
Total Compensatory Award: $35,000

Punitive Damages: $0

Hedonic Damages: $0

Property Damages: $0

Interest: $0

Other Damages: $0

Loss of Services: $0

Comparative Negligence Percentage: 0

**FACTS:**
Saeed Ibrahim, an adult male, claimed he suffered a violation of his civil rights and emotional distress due to <mark>false arrest</mark>, battery, and prolonged detainment after he was arrested at his home. The plaintiff contended police officers acting during the course and scope of their employment with the defendant City and County of San Francisco arrived at his home while a tow truck was attempting to tow his vehicle and officers pointed a gun at his head, broke down the gate to his home, shoved him to the ground and arrested him without probable cause of criminal activity. The plaintiff claimed after he was he was taken to the police station, he was stripped and cavity searched, his DNA was taken, he was questioned without being informed of his rights to have an attorney and was held in custody for three days without authority. Defendant City and County of San Francisco agreed to settle the case for $35,000.

Jury Verdict Research
COURT: USDC

**Avery, Michael 10/8/2018**
**For Educational Use Only**

**IBRAHIM v. CITY AND COUNTY OF SAN FRANCISCO, JVR No. 1402030024 (2012)**

End of Document                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.