**Exhibit A Pt. 3**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------x

DEIRDRE MACNAMARA, et al., individually
and on behalf of all others similarly situated,        x    ECF Case

             Plaintiffs,                                            No. 04 Civ. 9216 (RJS) (JCF)

                         x

       -against-                                    **DECLARATION OF JENNY CUDWORTH**
                                                       **RE: NOTICE PROCEDURES**
THE CITY OF NEW YORK, a municipal entity,      x
et al.,

---------------------------------------------------x

I, **JENNY CUDWORTH**, declare:

       1.      I am a Senior Consultant at Kurtzman Carson Consultants LLC ("KCC"), located at 75 Rowland Way, Suite 250, Novato, California. I am over 21 years of age and am not a party to this action. I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently thereto.

       2.      The purpose of this declaration is to provide the Parties and the Court with a summary and the results of the work performed by KCC related to the Notice Procedures for the MacNamara v. The City of New York settlement following the Preliminary Approval.

       3.      KCC was retained to, among other tasks, mail the Notice to Class Members of Proposed

Settlement in Class Action Lawsuit Involving the 2004 Republican National Convention (the "Notice") the Acceptance Form, and the Request for Exclusion "Opt-Out" From the Settlement form (the "Request for Exclusion Form"). Copies of the Notice, Acceptance Form and Request for Exclusion Form are attached hereto as Exhibits A, B and C, respectively.

4. On May 16, 2014, KCC received from Class Counsel a computerized list of 1,234 names and addresses, characterized as the Class Member List, i.e., all demonstrators who were arrested between August 27, 2004 and September 2, 2004 in New York City during the 2004 Republican National Convention ("RNC").

5. On May 19, 2014, I caused the addresses in the Class Member List to be updated using the National Change of Address system, which updates addresses for all people who had moved during the previous four years and filed a change of address with the U.S. Postal Service. New addresses were found for 99 class members. The Class Member List was updated with these new addresses.

6. During data analysis of the Class Member List, KCC identified 69 individuals who had missing or incomplete addresses. KCC retained the names of these 69 individuals but withheld them from the Notice mailing. This resulted in a final mailing count of 1,165.

7. On or before May 23, 2014, I caused a toll-free telephone number to be established, and the staff members of the KCC Call Center to be trained in the details of this settlement, so that they could provide information about the settlement.

8. On May 23, 2014, I caused the Notice to be printed, and each of the names and addresses of the class members to be printed on Acceptance Forms and Request for Exclusion Forms. I then caused a Notice, Acceptance Form and Request for Exclusion Form to be inserted into a window envelope along with a postage prepaid return envelope for each Class Member (the "Notice Packets").

9. On May 23, 2014, I caused the 1,165 Notice Packets to be mailed by First Class postage at the U.S. Post Office in Petaluma, California.

10. During the period May 23, 2014 through July 7, 2014, four Notice Packets were returned to KCC by the U.S. Postal Service with forwarding addresses. I caused the Class Member List to be updated with the new addresses and Notice Packets to be re-mailed to the class members at each of these new addresses.

DECLARATION OF JENNY CUDWORTH RE: NOTICE PROCEDURES

11.     During the period May 23, 2014 through July 7, 2014, 195 Notice Packets were returned to KCC by the U.S. Postal Service without forwarding addresses.  KCC conducted address searches using credit and other public source databases to locate new addresses for 187 of these class members. Eight class members were not searched because they had previously contacted KCC to advise us of their new address.  Of the 187 class members searched, new addresses were found for 90 of them and no new addresses were found for 97 of them.  The Class Member List was updated with these new addresses and Notice Packets were re-mailed to these 90 class members using the new addresses.

12.     Of the 90 class members with newly found addresses, 12 were returned by the U.S. Postal Service once more without a forwarding address.  These addresses were not searched again.

13.     Altogether, there are 109 class members with known bad addresses (12 mailed, returned, searched, re-mailed and returned once more by the U.S. Postal Service a second time and 97 searched without a new address being found).

14.     As of the date of this declaration, 187 calls have been handled by the KCC Call Center. .

15.     As of the date of this declaration, KCC has received two Requests for Exclusion.  A list of the individuals requesting exclusion and copies of the exclusion requests are attached hereto as Exhibit D.

16.     As of the date of this declaration, KCC has received one Objection to the Settlement.  A copy of the objection is attached hereto as Exhibit E.

\\\
\\\
\\\
\\\
\\\
\\\
\\\
\\\
\\\

DECLARATION OF JENNY CUDWORTH RE: NOTICE PROCEDURES

17.     As of the date of this declaration 619 unique Acceptance Forms have been filed.  Of these, 579 are timely and completed; 12 are completed but were received after the filing deadline with missing or illegible postmarks and therefore are not known if they are in fact timely (received through the period of June 25, 2014 and July 8, 2014); 4 timely but incomplete; 19 completed  but filed after the June 23, 2014 filing deadline; 2 incomplete and filed after the filing deadline; and three filed by individuals who were not on the Class List (one filed timely but the other two were filed after the filing deadline).  A report listing the names of those who filed and are not on the Class List is attached hereto as Exhibit F.

I declare under penalty of perjury pursuant to the laws of the State of California that the foregoing is true and correct to the best of my knowledge and that this declaration was executed this 9th day of July 2014 at Novato, California.

JENNY CUDWORTH

DECLARATION OF JENNY CUDWORTH RE: NOTICE PROCEDURES

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------x

DEIRDRE MACNAMARA, et al., individually     ECF Case
and on behalf of all others similarly situated,    x

                                   No. 04 Civ. 9216 (RJS) (JCF)

              Plaintiffs,    x

     -against-                 x

THE CITY OF NEW YORK, a municipal entity,   x
et al.,

---------------------------------------------------------------------x

## NOTICE TO CLASS MEMBERS OF PROPOSED SETTLEMENT IN CLASS ACTION LAWSUIT INVOLVING THE 2004 REPUBLICAN NATIONAL CONVENTION

This is to inform you of a hearing about an agreement to settle a class action relating to demonstrators who were arrested between August 27, 2004 and September 2, 2004 in New York City during the 2004 Republican National Convention ("RNC"). The date and location of the hearing are noted below.

### **Background Information**

This case was brought by a group of 24 individuals who were arrested by the New York City Police Department ("NYPD") in connection with a series of protests held during the 2004 Republican National Convention. Specifically, Plaintiffs contend that the NYPD subjected them to indiscriminate mass arrests without individualized probable cause, unreasonably prolonged detention, and cruel and inhumane conditions of confinement. The class seeks monetary damages for the violation of its constitutional rights. Defendants deny any and all liability arising out of Plaintiffs' allegations.

In an Opinion and Order dated May 19, 2011, the Court granted Plaintiffs' motion for class certification pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure as to the following classes: 1) Mass Arrest Subclasses Two, Four, Five, Six, Seven and Eight, comprising all RNC arrestees from the foregoing Subclass locations; 2) The Excessive Detention Class, comprising all RNC arrestees who were processed pursuant to the New York City Police Department's ("NYPD") Mass Arrest Processing Plan ("MAPP"), detained at Pier 57, and charged only with violations; and 3) The Conditions of Confinement Class, comprising all RNC arrestees who were handcuffed with plastic flex cuffs and detained at Pier 57. At the same time, the Court appointed the 24 individually named Plaintiffs in the certified classes and subclasses as Class Representatives in this case and further appointed Beldock Levine & Hoffman LLP, 99 Park Avenue, 16th Floor, New York, New York 10016, (212) 490-0400 as counsel for the class members and Class Representatives ("Class Counsel").

The parties, however, engaged in extensive settlement discussions under the supervision of a U.S. Magistrate Judge in an effort to settle this lawsuit for a fair amount and spare all parties protracted and uncertain litigation.

If you are a member of any of the below classes or subclasses, you have three options: (1) you can accept the settlement and receive money under the settlement; (2) you can request exclusion, or opt-out, from the settlement in which case you will not receive any payment under this settlement; and (3) you may object to the settlement. The procedures for requesting exclusion and objecting are set forth in this notice.

The Mass Arrest Subclasses certified by this Court on May 19, 2011, include all persons arrested in New York City at the following locations on the dates specified below:

a.    Mass Arrest Subclass Two: August 27, 2004, on 37th Street between Tenth Avenue and Dyer Avenue, between 8:00 p.m. and 11:00 p.m.

b.    Mass Arrest Subclass Four: August 29, 2004, on 37th Street between Seventh Avenue and Broadway, between 12:00 p.m. and 3:00 p.m.

c.    Mass Arrest Subclass Five: August 31, 2004, on Fulton Street between Church Street and Broadway, between 4:00 p.m. and 7:00 p.m.

d.    Mass Arrest Subclass Six: August 31, 2004, on 16th Street between Union Square East and Irving Place, between 7:00 p.m. and 10:00 p.m.

e.    Mass Arrest Subclass Seven: August 31, 2004, on 17th Street between Fifth Avenue and Broadway, between 8:00 p.m. and 10:00 p.m.

f.    Mass Arrest Subclass Eight: August 31, 2004, on 35th Street between Fifth and Sixth Avenue, between 7:00 p.m. and 10:00 p.m.

The Excessive Detention Class is defined as comprising all RNC arrestees who were processed pursuant to the New York City Police Department's ("NYPD") Mass Arrest Processing Plan ("MAPP"), detained at Pier 57, and charged only with violations. Those members of the Excessive Detention Class who were not arrested at one of the six identified mass arrest locations above have no false arrest claim.

The Conditions of Confinement Class is defined as comprising all RNC arrestees who were handcuffed with plastic flex cuffs and detained at Pier 57. As with those individuals who are members of the Excessive Detention Class, those individuals who are members of the Conditions of Confinement Class who were not arrested at one of the six identified mass arrest locations above have no false arrest claim.

The City of New York defends the lawsuit and denies any and all liability arising out of Plaintiffs' allegations.

## __The Settlement__

The settlement of the lawsuit provides for compensation to the 24 individual Class Representatives and to non-representative class members in amounts depending on whether a class member was arrested at one of the six certified mass arrest subclass locations.

Class members who were arrested at one of the certified mass arrest subclasses identified above who timely file a complete and executed Acceptance Form shall receive a payment of $5,000, exclusive of attorneys' fees and costs and expenses in full satisfaction of all claims arising from their arrests and detentions during the RNC. Payments to those individuals who were arrested at one of the six mass arrest subclasses identified above shall be made within a reasonable time

after approval of the settlement by the Court. Payments to individuals who are members of the mass arrest subclasses shall not exceed $2,960,000. All unclaimed funds allocated as payment to the mass arrest subclasses shall revert to the City of New York.

Class members who are members of the Excessive Detention and Conditions of Confinement classes who timely file a complete and executed Acceptance Form shall receive a payment of $1,000, exclusive of attorneys' fees and costs and expenses in full satisfaction of all claims arising from their arrests and detentions during the RNC. Payments to those individuals who are members of the Excessive Detention and Conditions of Confinement classes shall be made within a reasonable time after approval of the settlement by the Court. Payments to individuals who are members of the Excessive Detention and Conditions of Confinement classes shall not exceed $573,000. All unclaimed funds allocated as payment to the Excessive Detention and Conditions of Confinement classes shall revert to the City of New York.

In recognition of the risk incurred by the 24 Class Representatives in assisting the prosecution of the litigation and in bringing to bear added value, and the other burdens sustained by a representative in lending himself or herself to the prosecution of the claim, Class Representatives who timely file a complete and executed Acceptance Form shall receive a payment of $19,458.33, exclusive of attorneys' fees and costs, in full satisfaction of all claims arising from their arrests and detentions during the RNC. Said payments to Class Representatives shall be made within a reasonable time after approval of the settlement by the Court. Payments to the Class Representatives shall not exceed $467,000. All unclaimed funds allocated as payment to the Class Representatives shall revert to the City of New York.

In addition to the amounts paid to class members and Class Representatives, the City of New York has agreed to pay Class Counsel attorneys' fees, costs and expenses in the amount of $2,600,000 in consideration for their work on this case and the cases of *Brian Portera v. City of New York, et al.,* 05 Civ. 9985 (RJS) (JCF) and *Jessica Rechtschaffer v. City of New York, et al.,* 05 Civ. 9930 (RJS) (JCF). The attorneys' fees, costs and expenses will be paid separate and apart from the money available to class members. In other words, no class member shall be denied payment or receive a reduced payment as a result of the amount paid to Class Counsel.

## **Your Options**

You may qualify as a class member and be eligible for inclusion in the settlement. If you do, you have three options:

1. Accept the settlement and receive the settlement amount by completing and returning the enclosed ACCEPTANCE form postmarked by **June 23, 2014**;

2. Exclude yourself from the settlement by completing and sending the enclosed OPT-OUT form postmarked by **June 23, 2014**;

3. Object to the settlement. If you object you must file a written objection with the Court and give notice to the attorneys for the class by hand, overnight mail, or by certified mail, return receipt requested postmarked by **June 23, 2014**.

If you file a written objection to the settlement in the manner set forth above, and the Court approves the settlement anyway, you will still have the option of either accepting the settlement or opting out.

If you opt-out of the settlement, you will not receive any payment under this settlement.

**Release of Claims**

If the settlement receives final court approval and you are a member of the class, and do not opt-out, you will be bound by the settlement and will release all claims, known or unknown, against each of the defendants.

**Settlement Hearing**

United States District Judge Richard J. Sullivan will hold a hearing on **July 11, 2014** at **10:00 a.m.** in Courtroom 905 of the United States District Court for the Southern District of New York, Thurgood Marshall Courthouse, 40 Foley Square, New York, New York 10007 to consider whether to grant final approval to this proposed settlement and to consider the objections of any class member to the settlement. The proposed settlement, if approved by the Court, will be binding on all class members.

If you chose to accept the settlement, you must complete and send in the enclosed Acceptance Form postmarked no later than June 23, 2014. If you chose to exclude yourself from the settlement, you must complete and send in the enclosed Request for Exclusion "Opt-Out" From Settlement Form postmarked no later than June 23, 2014. If you chose to object to the settlement, you must file by mailing or delivering a written objection to the Clerk of the Court, United States District Court for the Southern District of New York, 500 Pearl Street, New York, New York 10007 and give notice to Class Counsel by hand, overnight mail, or certified mail return receipt requested. All such objections must be postmarked or filed in person no later than June 23, 2014. Any class member who fails to object in the manner specified shall not be entitled to contest the final approval of the proposed settlement and the judgment entered thereon, and shall be deemed to have waived such objection and shall be foreclosed from raising any such objection.

Although you do not have to do so, any class member may also appear at the hearing either in person or through an attorney of his or her choice and at his or her own expense. If you intend to appear at the hearing, you or your attorney must notify class counsel within 14 days of the settlement hearing date.

**More Information**

If you have questions or would like more information concerning the lawsuit or the settlement of the lawsuit, you may write to Jonathan C. Moore, Esq., Beldock Levine & Hoffman LLP, 99 Park Avenue, 16th Floor, New York, New York 10016, or contact the Settlement Administrator at 1-866-247-3994. You may also review the pleadings and other papers filed in this case during regular business hours at the Office of the Clerk of the Court for the United States District Court for the Southern District of New York, 500 Pearl Street, New York, New York 10007.

Dated:      May 19, 2014
            New York, New York

Notice Approved by the Honorable Richard J. Sullivan
United States District Judge
Southern District of New York

# EXHIBIT B

*MacNamara v. The City of New York*
**Settlement Administrator**
P.O. Box 43034
Providence, RI 02940-3034

# NYT

«Barcode»

Claim #: NYT-«ClaimID» «MailRec»
«First1» «Last1»
«co»
«Addr1» «Addr2»
«City», «ST»  «Zip»
«Country»

### ACCEPTANCE FORM

*Deirdre MacNamara, et al., v. The City of New York, et al.*
Docket No. 04 Civ. 9216 (RJS) (JCF)

Complete all information requested below, sign and date, and return this form postmarked no later than June 23, 2014. **A FULLY COMPLETED AND EXECUTED FORM MUST BE SUBMITTED IN ORDER TO BE CONSIDERED FOR ANY PAYMENT**.

Name: _____

Social Security Number : _____ _____ _____ - - _____ _____ - - _____ _____ _____ _____

Date of Birth (dd/mm/yy): _____ _____ / _____ _____ / _____ _____

Street Address: _____

City: _____  State: _____  Zip Code: _____

I certify that the information on this claim is true and correct to the best of my knowledge, and that this is the only claim form that I have submitted. I accept this payment as my settlement of the matter, *Deirdre MacNamara, et al., v. The City of New York, et al.*

_____         _____
Date (dd/mm/yyyy)                        Signature

Mail this form to:

*MacNamara v. The City of New York*
**Settlement Administrator**
P.O. Box 43034
Providence, RI 02940-3034



NYTACC1



# EXHIBIT C



«ClaimID» «MailRec»

# REQUEST FOR EXCLUSION "OPT-OUT" FROM THE SETTLEMENT

*Deirdre MacNamara, et al., v. The City of New York, et al.*
Docket No. 04 Civ. 9216 (RJS) (JCF)

Complete and return this form postmarked no later than June 23, 2014 to opt-out of the settlement in *Deirdre MacNamara, et al., v. The City of New York, et al.,* Docket No. 04 Civ. 9216 (RJS) (JCF).

_____

Name

_____

Street Address

_____

City                                                      State                    Zip Code

I certify that I have listed my full name and current address, and that I am aware that I will not be entitled to any payment.

_____          _____

Date (dd/mm/yyyy)                              Signature

Mail this form to:

*MacNamara v. The City of New York*
**Settlement Administrator**
P.O. Box 43034
Providence, RI 02940-3034



NYTRFE1

# EXHIBIT D

**KCC Class Action Services**

MacNamara v  City of New York

List of Individuals who Requested Exclusion, sorted alphabetically

**Count:**        **2**

| Control # | Last | First |
|-----------|------|-------|
| 100003001 | ADAMS | INDIA |
| 100110901 | BRENTON | DAVID |

100003001                3

## REQUEST FOR EXCLUSION "OPT-OUT" FROM THE SETTLEMENT

*Deirdre MacNamara, et al., v. The City of New York, et al.*
Docket No. 04 Civ. 9216 (RJS) (JCF)

Complete and return this form postmarked no later than June 23, 2014 to opt-out of the settlement in *Deirdre MacNamara, et al., v. The City of New York, et al.*, Docket No. 04 Civ. 9216 (RJS) (JCF).

India D'Anthony-Adams
_____
Name

██████████████████████
_____
Street Address

████████          State ███          Zip Code ████████
_____
City                    State          Zip Code

I certify that I have listed my full name and current address, and that I am aware that I will not be entitled to any payment.

01 / 06 / 2014
_____
Date (dd/mm/yyyy)

*India D'Artleny*
_____
Signature

Mail this form to:

*MacNamara v. The City of New York*
**Settlement Administrator**
P.O. Box 43034
Providence, RI 02940-3034

NYTRFE1   

NYT
ADAMS

NO POSTAGE
NECESSARY
IF MAILED
IN THE
UNITED STATES

# BUSINESS REPLY MAIL
FIRST-CLASS MAIL    PERMIT NO. 1810    PROVIDENCE, RI

POSTAGE WILL BE PAID BY ADDRESSEE

MACNAMARA V. THE CITY OF NEW YORK
SETTLEMENT ADMINISTRATOR
P.O.BOX 43034
PROVIDENCE RI 02940-9641

# REQUEST FOR EXCLUSION "OPT-OUT" FROM THE SETTLEMENT

*Deirdre MacNamara, et al., v. The City of New York, et al.*
Docket No. 04 Civ. 9216 (RJS) (JCF)

Complete and return this form postmarked no later than June 23, 2014 to opt-out of the settlement in *Deirdre MacNamara, et al., v. The City of New York, et al.,* Docket No. 04 Civ. 9216 (RJS) (JCF).

DAVID B. BRENTON
_____
Name

███████████████████████
Street Address

_____

_____      _____    _____
City                                    State        Zip Code

I certify that I have listed my full name and current address, and that I am aware that I will not be entitled to any payment.

21/06/2014
_____      _____
Date (dd/mm/yyyy)                      Signature

Mail this form to:

**MacNamara v. The City of New York**
**Settlement Administrator**
P.O. Box 43034
Providence, RI 02940-3034

NYTRFE1


NYT

**BUSINESS REPLY MAIL**
FIRST-CLASS MAIL    PERMIT NO. 1810    PROVIDENCE, RI

POSTAGE WILL BE PAID BY ADDRESSEE

MACNAMARA V. THE CITY OF NEW YORK
SETTLEMENT ADMINISTRATOR
P.O. BOX 43034
PROVIDENCE RI 02940-9641

NO POSTAGE
NECESSARY
IF MAILED
IN THE
UNITED STATES

# EXHIBIT E

Daniel Tischler

June 20, 2014

MacNamara v. The City of New York
Settlement Administrator
P.O. Box 43034
Providence, RI, 02940-3034

Dear Sir or Madam:

This letter serves as notice of my objection to the proposed settlement of the following case:

Deirdre MacNamara, et al., v. The City of New York, et al.
Docket No. Civ. 9216 (RJS) (JCF)

Firstly, I strongly support the proposed settlement in general and most of the terms of the proposed settlement. In recognizing improper behavior by the New York City Police Department, the proposed settlement acts to finally give closure to the injustice many of us experienced before, during, and following the 2004 Republican National Convention in New York City. This settlement also acts to partially restore my faith in the criminal justice system that was shattered in August 2004.

My objection is specifically related to the proposed definitions of the Mass Arrest Subclasses. I believe that the time and place where I was arrested should also be considered a mass arrest incident.

I was arrested on August 27th, 2004 at approximately 9:30 PM at the intersection of E 9th Street and 2nd Avenue in Manhattan. My arrest occurred at the same time and in response to the same event – the monthly Critical Mass bicycle ride – as Mass Arrest Subclass Two. Just like the members of Mass Arrest Subclass Two I was indiscriminately arrested along with a large number of other people. After my arrest I was handcuffed with plastic handcuffs, my bicycle was confiscated, I was loaded onto a bus filled with other arrestees, and I was transported to the temporary holding facility at Pier 57 along with the members of Mass Arrest Subclass Two. *I request that the definition of Mass Arrest Subclass Two be expanded to include people, like myself, that were arrested at the same time as Mass Arrest Subclass Two, but in the vicinity of 2nd Avenue and E 9th Street.*

The nature of my arrest illustrates that the New York City Police Department was engaged in a mass arrest exercise at 2nd Avenue and E 9th Street on August 27th, 2004. Although I admit to being a participant in the monthly Critical Mass bicycle ride, I was not arrested for my participation in the ride. Instead I was arrested for being a pedestrian in possession of a bicycle at a time and location where the police were rounding up any

person on the street that was in possession of a bicycle. The following paragraphs explain the circumstances surrounding my arrest and illustrate that Second Avenue and E 9th Street was a mass arrest location.

After the completion of the bicycle ride a friend and I stayed in the vicinity of the ride's terminus (slightly north of E 9th Street on Second Avenue) for at least fifteen minutes waiting for a third mutual friend. When the third friend did not show up we eventually gave up and decided that we would go to a restaurant on St. Marks Place for dinner. To get there we began walking southbound on the western sidewalk of Second Avenue holding our bicycles. At E 9th Street we encountered a police line, but we had not heard any communication or warnings from the officers lined up across the street. An officer that appeared to be in charge was standing in front of the police line. My friend and I politely approached the officer and asked him where he would like us to go in order to avoid the police activity and to not get in the way. The officer responded by pointing to the police line and inviting us to walk through. He then asked two police officers to move aside and create a gap for us to pass. We thanked the officer and proceeded to walk where we were directed. As we crossed the line the commanding officer ordered the other officers to arrest us.

After we were arrested the police proceeded to round up as many bicyclists in the area as possible and arrest them as well. While many of these bicyclists had been involved in Critical Mass earlier in the evening, the ride was over at the time of this mass arrest activity. At least one of the bicyclists that was arrested in my group was completely unrelated to Critical Mass and was arrested while riding his bicycle home from work.

in summary, the methods used by the New York City Police Department in arresting bicyclists at Second Avenue and E 9th Street constitute unlawful mass arrest. Please recognize our suffering and validate our unfair treatment by adding Second Avenue and E 9th Street to Mass Arrest Subclass Two.

Thank you very much for considering my minor objection to the proposed settlement.

Sincerely,

Daniel Tischler

cc:
Clerk of the Court, United States District Court for the Southern District of New York
Jonathan C. Moore., Esq., Beldock Levine & Hoffman LLP
MacNamara v. The City of New York, Settlement Administrator



7012 2210 0000 9183 9100

UNITED STATES
POSTAL SERVICE

1000    02940

MacNamara v. The City of New York
Settlement   Administrator
P.O.  Box  43034
Providence, RI  02940-3034

0294030343*

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

CERTIFIED MAIL

# EXHIBIT F

**KCC Class Action Services**

MacNamara v  City of New York

List of Individuals who Submitted an Acceptance Form and were not part of the Original Class List, sorted alphabetically

**Count:**     **3**

| Control # | Last | First | Timeliness |
|-----------|----------|--------|------------|
| 900010901 | KULKARNI | KAVITA | Late |
| 900009701 | PAYNE | EVAN | Timely |
| 900008301 | WEIDMAN | DYLAN | Late |

Barrett S. Litt, SBN 45527
Email: blitt@kmbllaw.com
KAYE, MCLANE, BEDNARSKI & LITT
975 East Green Street
Pasadena, California 91106
Telephone: (626) 844-7660
Facsimile: (626) 844-7670

Carol A. Sobel, SBN 84483
Email: carolsobel@aol.com
LAW OFFICE OF CAROL A. SOBEL
3110 Main Street, Suite 210
Santa Monica, California 90405
Telephone: (310) 393-3055
Facsimile: (310) 451-3858

ADDITIONAL COUNSEL LISTED
ON NEXT PAGE
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARMAINE CHUA, ET AL.<br><br>PLAINTIFFS,<br><br>VS.<br><br>CITY OF LOS ANGELES, ET AL.,<br><br>DEFENDANTS. | CASE NO: 2:16-CV-00237-JAK-GJS(X)<br>[HON. JOHN A. KRONSTADT]<br><br>NOTICE OF MOTION AND MOTION FOR LEAVE TO PRESENT CLASSWIDE GENERAL DAMAGES MEMORANDUM OF LAW; DECLARATIONS; EXHIBITS.<br><br>HEARING DATE:   JANUARY 14, 2019<br>HEARING TIME:   8:30 A.M.<br>COURTROOM:      10B<br><br>TRIAL DATE: _   MARCH 19, 2019__<br>TIME:                  9:00 A.M.<br>ACTION FILED:   JAN. 13, 2016 |

ADDITIONAL PLAINTIFFS' COUNSEL

Paul Hoffman, SBN 71244
Email. hoffpaul@aol.com
Catherine Sweetser. SBN271142
Email. catherine.sdshhh@gmail.com
SCHONBRUN, SEPLOW, HARRIS & HOFFMAN
732 Ocean Front Walk
Venice, California 90291
Tel. (310) 396-0731
Fax. (310) 399-7040

Colleen M. Flynn, SBN 234281
Email. cflynnlaw@yahoo.com
LAW OFFICE OF COLLEEN FLYNN
3435 Wilshire Boulevard, Suite 2910
Los Angeles, California 9001 0
Tel. 213 252-9444
Fax. 213 252-0091

Matthew Strugar, SBN 232951
Email. matthewstrugar@gmail.com
LAW OFFICE OF MATTHEW STRUGAR
2108 Cove Avenue
Los Angeles, California 90039
Tel: 323 696-2299

1  TO DEFENDANTS AND TO THEIR ATTORNEYS OF RECORD:

2      PLEASE TAKE NOTICE that, on January 19, 2019, at 8:30 a.m., in

3  Courtroom 10B of the United States District Court for the Central District of

4  California, 350 West First Street, Los Angeles, California 90012, Plaintiffs will, and

5  hereby do, move the Court for leave to present claims of alleged general damages on

6  a classwide basis at trial of the corresponding claims for liability.

7      In connection with this motion, and the Court's September 24, 2018

8  Scheduling Order, Plaintiffs also submit a trial plan for general damages and for

9  statutory damages under Civil Code §52.1.

10     Plaintiffs met and conferred with Defendants regarding this motion on October

11  3, 2018. The parties were unable to agree on classwide treatment of general damages

12  or on how statutory damages would be handled.

13

14   DATED: November 5, 2018        Respectfully Submitted,

15
                                    KAYE, MCLANE, BEDNARSKI & LITT
16                                  LAW OFFICES OF CAROL SOBEL
17                                  SCHOENBRON, DESIMONE, ET AL.
                                    LAW OFFICE OF COLLEEN FLYNN
18                                  LAW OFFICE OF MATTHEW STUGAR

19
                                    By:__/s/ Barrett S. Litt_____
20                                       Barrett S. Litt

21
                                    By:__/s/ Carol A. Sobel_____
22                                       Carol A. Sobel
23                                  Attorneys for Plaintiffs

24

25

26

27

28

1

## TABLE OF CONTENTS

2

3

I.     INTRODUCTION ..........................................................................................1

4

II.    GENERAL NON-INDIVIDUALIZED DAMAGES ARE AVAILABLE IN

5

6      CIVIL RIGHTS CASES, INCLUDING CLASS ACTIONS, LIKE THIS.

7      ..................................................................................................................2

8

III.   THE PROCEDURE COURTS HAVE USED FOR PRESENTATION OF

9      CLASSWIDE GENERAL DAMAGES AND ITS APPLICATION TO

10     GENERAL DAMAGES AND LIABILITY IN THIS CASE..................10

11
       A.  *THE APPROACH TAKEN IN OTHER CLASS ACTIONS CERTIFYING CLASSWIDE*
12         *GENERAL DAMAGES.* ................................................................... 10

13     B.  *PLAINTIFFS' PROPOSED TRIAL PLAN FOR CLASSWIDE GENERAL*
14         *DAMAGES…………….* ...................................................................... 13

15   IV.  LIABILITY AND STATUTORY DAMAGES TRIAL PLAN..............16

16     A.  *TRIAL PLAN FOR 6TH AND HOPE ARRESTS.* ............................................. 16

17     B.  *TRIAL PLAN FOR FAILURE TO PROVIDE TIMELY OR RELEASES.* ........... 18
18
19     C.  *TRIAL PLAN FOR STATUTORY DAMAGES UNDER §52.1 REQUIRES JURY*
           *INSTRUCTIONS AND QUESTIONS POSED IN THE VERDICT FORM………19*

20

21

22

23

24

25

26

27

28

# <u>TABLE OF AUTHORITIES</u>

## Federal Cases

*Aichele v. City of Los Angeles*
  314 F.R.D. 478 (C.D. Cal. 2013 ....................................................................... 2, 10

*Amador v. Baca*
  299 F.R.D. 618 (C.D. Cal. 2014) ....................................................................... 8, 9

*Augustin v. Jablonsky*
  819 F. Supp. 2d 153 (E.D.N.Y. 2011) ............................................................. 11, 12

*Barnes v. Dist. Of Columbia*
  278 F.R.D. 14 (D.D.C. 2011) ..........................................................................*passim*

*Betances v. Fischer*
  304 F.R.D. 416 (S.D.N.Y. 2015) ............................................................ 2, 5, 7, 11

*Carnegie v. Household Intern., Inc.*
  376 F.3d 656 (7th Cir. 2004) ........................................................................ 15, 16

*Cuviello v. City of Oakland*
  No. C 06-5517 MHP, 2010 WL 3063199 (N.D. Cal. Aug. 3, 2010),
  *aff'd in part,* 434 F. App'x 615 (9th Cir. 2011) ................................................ 19

*D.C. by & through Garter v. Cty. of San Diego*
  2017 WL 5177028 (S.D. Cal. Nov. 7, 2017) ..................................................... 8, 9

*Dellums v. Powell*
  566 F.2d 167 (D.C.Cir.1977) ................................................................. 10, 11, 12

*Kerman v. City of New York*
  374 F.3d 93 (2d Cir. 2004) .............................................................................*passim*

*Lambert v. Nutraceutical Corp.*
  870 F.3d 1170 (9th Cir. 2017) .............................................................................. 10

*Memphis Community School District v. Stachura*
  477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986) ............................... 7, 9, 11

*Raysor v. Port Authority of New York and New Jersey*
  768 F.2d 34 (2nd Cir. 1985) ................................................................................... 3

ii

*Rodriguez v. City of Los Angeles*
  2014 WL 12515334 (C.D. Cal. Nov. 21, 2014)……………………………..7, 9

*Rodriguez v. City of Los Angeles*
  No. CV111135DMGJEMX, 2015 WL 13308598 (C.D. Cal. Aug. 11, 2015) ........................................................................................................ 8

*Roy v. Cty. of Los Angeles*
  No. CV1209012ABFFMX, 2018 WL 3436887 (C.D. Cal. July 11, 2018) ...................................................................................................... 10

*Schulz v. Lamb*
  591 F.2d 1268 (9th Cir. 1978) ................................................................. 5

**State Cases**

*Angelucci v. Century Supper Club*
  41 Cal. 4th 160, 158 P.3d 718 (2007) ................................................... 19

*Koire v. Metro Car Wash*
  (1985) 40 Cal.3d 24, 219 Cal.Rptr. 133, 707 P.2d 195.......................... 19

**State Statutes**

Cal. Civ.Code § 52(h) ............................................................................... 19

Cal. Civil Code § 52(a) ............................................................................. 19

Cal. Civil Code § 52.1 ......................................................................... 19, 20

California Penal Code § 853.6 ................................................................... 18

**Constitutional Provisions**

First Amendment ...................................................................................... 4

**Other Authorities**

35 C.J.S. False Imprisonment § 83 ............................................................ 5

McCormick, *Handbook on the Law of Damages* § 107 (1935) ................. 4

*Prosser & Keeton* § 11 ............................................................................. 4

iii

## I.   INTRODUCTION

In its September 24, 2018 Scheduling Order, this Court ordered that the parties meet and confer to attempt to reach agreement on the following issues in connection with this motion: (i) Plaintiffs' request to present claims of alleged general damages on a classwide basis at the trial of the corresponding claims for liability; (ii) a proposed trial plan for the presentation of evidence by Plaintiffs on a classwide basis as to such alleged damages, and any responsive evidence by Defendants; and (iii) a proposed trial plan for the presentation of evidence by Plaintiffs on a classwide basis as to alleged liability and corresponding statutory damages, and any responsive evidence by Defendants.

The parties were unable to agree, and so Plaintiffs present this Memorandum which incorporates Plaintiffs' proposed trial plan for how damages would be tried. Regarding statutory damages, Plaintiffs have concluded that there is no separate evidence to be presented for statutory damages, and that issue is rather addressed by the combination of jury instructions and verdict form.

As the Court is aware, this action is certified for claims of the unlawful detention and arrest of approximately 170 individuals engaged in demonstrations at or near the intersection of 6th and Hope Streets on November 26, 2014. The police herded Plaintiffs as they marched, finally trapping and surrounding them, preventing them from moving forward on the sidewalk. Plaintiffs allege that Defendants unlawfully kettled the demonstrators (preventing them from readily being able to disperse even if they could hear a dispersal order), and detained and arrested them without first issuing a lawful order to disperse (i.e., any order to disperse, to the extent one was given, was not audible to most people, and Defendants failed to ensure it was both heard and that members of the crowd knew what was expected of them). Plaintiffs also allege that Defendants unlawfully denied the class members release on their own recognizance ("OR release") without an individual determination.

1

1   The Court has certified the following damages class: persons who were

2   detained and arrested at 6th and Hope Streets on November 26, 2014, denied release

3   on their own recognizance ("OR") but never prosecuted. To clarify the latter

4   component, Plaintiffs' contention is that Plaintiffs were denied OR release for a

5   period of time that was unjustified. They were eventually released OR but later than

6   they should have been under any reasonable standards.

7   This memorandum first addresses the propriety of the use of general damages

8   generally and in class actions. It then addresses how, in the context of classwide

9   damages, courts have handled the presentation of evidence, and proposes a trial plan

10   for presentation of generally damages evidence in this case. (That discussion overlaps

11   how classwide liability evidence would be presented, so the two are addressed

12   together.) Finally, Plaintiffs proposes how statutory damages would be handled,

13   which Plaintiffs believe is not an issue of evidentiary presentation but of jury

14   instructions and the verdict form.

15  ## II.   GENERAL NON-INDIVIDUALIZED DAMAGES ARE AVAILABLE IN
16  CIVIL RIGHTS CASES, INCLUDING CLASS ACTIONS, LIKE THIS.

17   Federal courts recognize that general damages are available in §1983 civil

18   rights class actions, and several courts have certified general damages for class

19   treatment. *See Betances v. Fischer*, 304 F.R.D. 416, 431-432 (S.D.N.Y. 2015) (in

20   over-detention class action, general damages for false imprisonment did not turn on

21   characteristics of individual class members and therefore could be calculated on a

22   class-wide basis; explaining that the "the jury could determine the damages

23   appropriate for each deprivation, based on the type of deprivation. For example, the

24   jury could determine a particular amount of damages for each day of incarceration,"

25   which could be multiplied by the number of days each class member was

26   incarcerated); *Aichele v. City of Los Angeles,* 314 F.R.D. 478, 496 (C.D. Cal. 2013)

27   (in §1983 over-detention class action, general damages available for emotional

28   distress and loss of dignity); *Barnes v. Dist. Of Columbia*, 278 F.R.D. 14, 20 (D.D.C.

2

2011) (in class action strip search case, allowing class wide trial for general damages for "the injury to human dignity that is presumed when a person is strip searched" but not for special damages, and noting that proof would be limited "to the details of … class members' … strip searches"); *Nassau County Strip Search Cases*, 742 F.Supp. 2d 304, 323 (E.D.N.Y. 2010) (in strip search class action, awarding general damages of $500 per search for affront to human dignity).

The concept of general damages has been most discussed in the Second Circuit. It flows from the principle that, "where the jury has found a constitutional violation and there is no genuine dispute that the violation resulted in some injury to the plaintiff, the plaintiff is entitled to an award of compensatory damages as a matter of law." *Kerman v. City of New York*, 374 F.3d 93, 124 (2d Cir. 2004). The underlying facts and conclusions in *Kerman* explain the distinction between general damages and emotional distress damages. The Second Circuit upheld a jury's determination that no damages were awarded for "relatively minor physical injuries (pain from being transported with his hands cuffed under him and subsequent soreness in his back and neck) and emotional or psychological injuries" from his arrest. *Kerman* 374 F.3d at 123. However, "[i]n contrast," where the jury found that the defendants used excessive force, and "since the jury's verdict that excessive force had been used plainly accepted the plaintiff's testimony that he had been beaten, we concluded that the plaintiff was entitled as a matter of law to some compensation." *Id.* at 124. "Similarly, *where the plaintiff was indisputably deprived of his liberty, and the conduct of the defendant responsible for the deprivation was found to be unlawful, we have held that the plaintiff is entitled to compensatory, not merely nominal, damages*." *Id.* (emphasis supplied).

Thus, in *Raysor v. Port Authority of New York and New Jersey,* 768 F.2d 34, 38–39 (2nd Cir. 1985), a $16 award "was inadequate to compensate the plaintiff for, *inter alia,* 'the loss of time ... involved in a case of false arrest.'" *Kerman* 374

F.3d at 125 (quoting *Raysor*). The *Kermnan* court discussed traditional tort principles and the distinction between general and special damages for false imprisonment:

> "[C]ompensatory damages that may be awarded for false imprisonment fall into two categories: general damages and special damages. *See, e.g.,* McCormick, *Handbook on the Law of Damages* §107, at 375–77 (1935) ("*McCormick on Damages* "). General damage is a "harm of a sort inseparable from [the unlawful] restraint." *Id.* at 375. For "false imprisonment, upon pleading and proving merely the unlawful interference with his liberty, the plaintiff is entitled to 'general' damages for loss of time and humiliation or mental suffering." *Id.; see, e.g., Prosser & Keeton* §11, at 48 ("The plaintiff is entitled to compensation for loss of time, for physical discomfort or inconvenience, and for any resulting physical illness or injury to health. Since the injury is in large part a mental one, the plaintiff is entitled to damages for mental suffering, humiliation, and the like." (footnotes omitted)). Items of "special damage" commonly include "physical discomfort, shock, or injury to health," "loss of ... employment," and "injury to the plaintiff's reputation or credit," and must be specifically pleaded and proven. *McCormick on Damages* at 376. In contrast, " '[g]eneral' damage ... need not be specifically proved-it may be inferred from the circumstances of the arrest or imprisonment" and "would include at least the value of the time lost by the plaintiff during the period of detention." *Id.*
>
> "*The damages recoverable for loss of liberty for the period spent in a wrongful confinement are separable from damages recoverable for such injuries as physical harm, embarrassment, or emotional suffering; even absent such other injuries, an award of several thousand dollars may be appropriate simply for several hours' loss of liberty*."

*Kerman*, 374 F.3d at 125-26 (citing cases involving remittiturs to $7500 and $10,000 for respectively three and five hours of detention) (emphasis supplied).

In *Hazle v. Crofoot*, the Ninth Circuit addressed the question of damages in a case where the plaintiff sued his parole agent and other state officials for violating his First Amendment rights when they revoked his parole and sent him back to prison for refusing to participate in a religion-based drug treatment program. 727 F.3d 983 (9th Cir. 2013). The Court approvingly quoted *Kerman* for the proposition that "where the jury has found a constitutional violation and there is no genuine dispute that the violation resulted in some actual injury to plaintiff, the plaintiff is entitled to an

4

award of compensatory damages as a matter of law" and that this rule regarding compensatory damages "applied with particular force to claims for loss of liberty." *Hazle* at 993 (quoting *Kerman* at 124). The *Hazle* court noted that this holding was "consistent with decisions by other circuits rejecting awards of merely nominal damages for unlawful conduct resulting in the loss of liberty." *Id. See also Schulz v. Lamb*, 591 F.2d 1268, 1272 (9th Cir. 1978) ("The award of token damages of only $1.00 was also in error. Arrest, handcuffing, transportation to jail, processing and incarceration for some four-and-one-half hours in a lockup call for some compensation for embarrassment, humiliation and inconvenience to a 27-year-old college graduate never before arrested, even if testimony as to long-lasting mental effects be entirely discounted.").

Corpus Juris Secondum summarizes the law on entitlement to damages for loss of freedom as follows:

> "a plaintiff … is entitled to compensatory damages for the loss of liberty, which is compensable as general damages in an unlawful imprisonment case, including compensation for the loss of time, sense of loss of freedom, which such a plaintiff is entitled to without the need for proof of amount. Such damages are separable from damages recoverable for such injuries as physical harm, embarrassment, or emotional suffering."

35 C.J.S. False Imprisonment § 83.

*Kerman* and *Hazle* are not class actions, but the indication that a plaintiff who has suffered a loss of liberty "is *entitled* to an award of compensatory damages as a matter of law" (emphasis supplied) necessarily leads to the conclusion that classwide general damages for the damages inherent in any loss of liberty are available. The class actions that have allowed such damages have fallen into two general categories – loss of liberty (generally some form of unlawful arrest or detention) and loss of human dignity (used in strip search cases).

*Betances v. Fischer*, 304 F.R.D. 416, 431 (S.D.N.Y. 2015) was a class action in which Plaintiffs sought class certification for a claim challenging the

administrative imposition of post-release supervision ("PRS") by the New York State Department of Correctional Services ("DOCS"). DOCS imposed PRS on convicted felons, either before or as they were released from prison; the Department of Parole ("DOP") then enforced those terms. The Second Circuit had previously found the system unconstitutional, and Plaintiffs claimed that in the years following that decision, state officials subjected them to various unlawful conditions and custody by continuing to impose the terms of PRS that had been declared unlawful. In certifying a 23(b)(3) damages class, the Court summarized the availability of general damages as follows:

> This case involves both general damages, which may be calculated on a class-wide basis, as well as special damages, which require individual determinations. The Second Circuit has discussed in detail the types of damages that may be awarded for the loss of liberty in the context of false imprisonment. The court noted that "[t]he damages recoverable for the loss of liberty for the period spent in a wrongful confinement are separable from damages recoverable for such injuries as physical harm, embarrassment, or emotional suffering...." General damages for the loss of liberty "'need not be specifically proved—it may be inferred from the circumstances of the arrest or imprisonment' and 'would include at least the value of the time lost by the plaintiff during the period of detention.'" Thus, these damages do not turn on any individual characteristics of any class members.
>
> This logic was extended to the harm suffered by a class of plaintiffs subjected to strip searches. There, the court concluded that "it [could] not be disputed that the violation at issue—the strip search—resulted in some injury to the class members." The court therefore held that "[a]t the very least, class members are entitled to general damages." Because the "class members were aggrieved by a single, admittedly unlawful policy and there is a strong commonality between the strip search violation and the harm[,] [t]here is no reason that a jury ... could not determine an amount of general damages awardable to each member of the class."
>
> Here, the injuries resulting from the defendants' enforcement of administratively-imposed PRS are not uniform—there are several distinct categories, all of which involve a loss of liberty. For those plaintiffs who were incarcerated based solely on a violation of administratively-imposed PRS, a jury may find that general damages for the loss of liberty inherent in false imprisonment are warranted, and may be calculated on a class-wide basis.

> Presumed damages may also be calculated for less severe liberty restrictions such as curfews and travel restrictions, also on a class-wide basis. Defendants are in possession of databases that identify each restriction that was placed on each class member. The jury can determine the damages appropriate for each deprivation, based on the type of deprivation. For example, the jury could determine a particular amount of damages for each day of incarceration. This amount could then be multiplied by the number of days each class member was incarcerated.

*Id.* at 431–32 (citing and quoting, *inter alia, In re Nassau Cnty. Strip Search Cases,* 2008 WL 850268, at *3–7 (E.D.N.Y. Mar. 27, 2008) (strip searches) and *Barnes v. District of Columbia,* 278 F.R.D. 14, 21 (D.D.C.2011) (assigning damages using a matrix based on the length of overdetention)).

Notably, *Betances* distinguished which of the damages qualified as general damages versus presumed damages. It found that classwide general damages were available "for the loss of liberty inherent in false imprisonment" and classwide presumed damages were available "for less severe liberty restrictions such as curfews and travel restrictions." Here, the relevant damages are general damages for loss of liberty.

There is some confusion in the case law as to whether "general damages" and "presumed damages" are distinct. In *Memphis Community School District v. Stachura,* 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986)), the Court overturned an award based on an instruction that damages may be awarded for the abstract value or importance of a constitutional right. However, "[w]hen a plaintiff seeks compensation for an injury that is likely to have occurred but difficult to establish, some form of presumed damages may possibly be appropriate," *id.,* 477 U.S. at 310–11, 106 S.Ct. 2537, 91 L.Ed.2d 249, and "presumed damages may roughly approximate the harm that the plaintiff suffered and thereby compensate for harms that may be impossible to measure," *id.* at 311, 106 S.Ct. 2537.

Some cases have described general or presumed damages to include emotional distress or pain and suffering. *See, e.g., Rodriguez v. City of Los Angeles*, 2014 WL

12515334, at *6–7 (C.D. Cal. Nov. 21, 2014) (in §1983 class action, general damages available for pain, suffering, emotional distress and loss of dignity) (citing *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1086-1087 (9th Cir. 2009) (compensatory damages may be awarded for humiliation and pain and suffering even where the plaintiff did not submit evidence of economic loss or mental or physical symptoms)); *Rodriguez v. City of Los Angeles*, No. CV111135DMGJEMX, 2015 WL 13308598, at *11-12 (C.D. Cal. Aug. 11, 2015). To avoid any issue regarding whether Plaintiffs' claim for classwide damages includes individualized emotional distress or pain and suffering, we want to be clear that we seek classwide general damages for loss of liberty not based on individual experience but the common experience of class members of being unlawfully arrested and held without timely OR release.

Thus, Plaintiffs use the term "general damages" to refer to the type of damages that are necessarily entailed in an unlawful loss of liberty. Whatever the applicability of presumed damages may be to situations where the violation is "difficult to establish," Plaintiffs distinguish such "difficult to establish" presumed damages from the "general damages" for loss of liberty here. Regardless of when presumed damages for a difficult to measure injury are available, general damages are available for loss of liberty, as *Kerman* and *Hazle* establish. In this case, Plaintiffs are seeking general damages for loss of liberty, not presumed damages for a difficult to measure injury.

*Amador v. Baca*, 299 F.R.D. 618, 630–35 (C.D. Cal. 2014) and *D.C. by & through Garter v. Cty. of San Diego*, 2017 WL 5177028, at *14-16 (S.D. Cal. Nov. 7, 2017) (following *Amador*) may be cited by Defendants as examples of cases rejecting presumed damages. Neither of these cases are apposite because neither involved claims for "loss of liberty," which the Ninth Circuit expressly acknowledged as the basis for non-individualized damages in *Hazle* (quoting *Kerman*), and neither addressed the potential differences between general and presumed damages. In

addition, *Amador* (on which *Garter* relied) is not persuasive (1) because it distinguishes *Hazle* without addressing the fundamental reasoning behind *Hazle*; (2) it recognized that *Hazle* cited *Kerman* favorably but did not adequately explain why *Kerman* should not be adhered to; and (3) it dismissed general damages by conflating them with the presumed damages at issue in *Stachura*.

Recently, Judge Birotte in this District found general damages were available in a class action against the Los Angeles County Sheriff's Department for holding people entitled to release from custody on ICE holds (similar to the loss of liberty claim here except that the claim here also includes unlawfully arrests). Defendants had moved to decertify the class on the ground that classwide damages were not available. The Court rejected that contention and distinguished the *Amador* case discussed in Fn. 1:

> [T]he County relies upon a Central District of California case, *Amador v. Baca*, 299 F.R.D. 618, 630–35 (C.D. Cal. 2014), to argue that general and presumed damages are not available here. (Reply at 10–12.) Much of the County's discussion, however, focuses on presumed damages, not general damages. (*See, e.g.*, Reply at 10 ("Judge Wilson rejected the concept that presumed damages have any application in §1983 cases where, as here, an individual's damages are not difficult to establish."), 11 ("Judge Wilson's analysis continued with a review of Supreme Court authorities relevant to the issue of presumed damages, noting that presumed damages in the context of common law defamation have been labeled 'an oddity of tort law, for it allows recovery of purportedly compensatory damages without evidence of actual loss.' "). While the discussion in *Amador* to which the County refers discusses "general damages," the conflation of presumed damages and general damages here is not appropriate, as they are distinct concepts and categories of damages. (Reply at 11–12.)
>
> Other district court decisions from this district recognize presumed and general damages as distinct categories of damages, and have found that general damages may be available on a class-wide basis in §1983 actions based upon unlawful detention. *See Rodriguez v. City of Los Angeles*, No. CV 11-01135 DMG (JEMx), 2014 WL 12515334, at *1, *5–7 (C.D. Cal. Nov. 21, 2014) (denying the defendants' motion for class decertification and recognizing that general damages, distinct from presumed damages, may be available on a class-wide basis in a §1983 action based on unlawful detentions); *see*

*also Aichele v. City of Los Angeles*, 314 F.R.D. 478, 496 (C.D. Cal. 2013) (certifying § 1983 over-detention class action and finding that general damages are available on a class-wide basis). The Court agrees with these decisions and finds that general damages are available on a class-wide basis here.

"At this stage, the question is only whether [Plaintiffs have] presented a workable method [for calculating class-wide damages]." We conclude that [they] have." *Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1184 (9th Cir. 2017). As such, the Court rejects the County's arguments that decertification is warranted here based on damages issues.

*Roy v. Cty. of Los Angeles*, No. CV1209012ABFFMX, 2018 WL 3436887, at *3–4 (C.D. Cal. July 11, 2018).

## III.   THE PROCEDURE COURTS HAVE USED FOR PRESENTATION OF CLASSWIDE GENERAL DAMAGES AND ITS APPLICATION TO GENERAL DAMAGES AND LIABILITY IN THIS CASE.

### A.   THE APPROACH TAKEN IN OTHER CLASS ACTIONS CERTIFYING CLASSWIDE GENERAL DAMAGES.

Under the general damages approach proposed here, damages are awarded based on the conditions to which Plaintiffs were subject independent of emotional distress/pain and suffering damages, without regard to individual factors. The most comprehensive discussion is in *Barnes v. D.C.*, 278 F.R.D. 14, 20-21 (D.D.C. 2011), where the Court addressed how general damages would be tried for the previously certified strip search and overdetention classes.

*Barnes* adopted what it described as the "*Dellums* method" (referring to of *Dellums v. Powell,* 566 F.2d 167 (D.C.Cir.1977)). In *Dellums*, the D.C. Circuit upheld an award of classwide damages based on the jury's determination of a matrix of values for the lengths of an unlawful arrest and detention. In that case, where people were held for up to several days, the Court used 12 hour increment or less in detention, 12 to 24 hours in detention, 24 to 48 hours of detention, and 48 to 72 hours

10

of detention.[1] The *Barnes* Court described the available general damages as compensation for "the injury to human dignity from an unlawful strip search or overdetention, that is presumed when a person is strip searched or overdetained" (citing *Augustin v. Jablonsky*, 819 F. Supp. 2d 153 (E.D.N.Y. 2011). *Augustin* is a strip search class action in which general damages were awarded on a classwide basis; it found that "an injury to human dignity was necessarily entailed in being strip searched and thus was common to each member of the class as to its cause and the resulting general, or presumed—as distinct from the special—damages sustained." *Id*. at 157.

As we noted previously, opinions have tended to conflate general and presumed damages, and these two opinions reflect that to the extent they use general and presumed damages interchangeably. We are using the term general damages here to refer to loss of liberty damages. While it is not necessary to resolve the distinction in this case, Plaintiffs suggest a potentially important distinction between them. General damages are usually connected with actions that in themselves necessarily cause tangible harm – such as an unlawful arrest or detention or unlawful strip search; such damages were well recognized at common law. Presumed damages are usually referred to in the context of less tangible harms (*e.g,,* voting (*Stachura*) or travel (*Betances*)). To reiterate, Plaintiffs seek a classwide award of general damages as compensation for loss of liberty or freedom.

We cite *Barnes* as the most informative decision about the process of trying classwide general damages because of its detailed discussion of how the trial process

---

[1] The Defendants in *Dellums* did not challenge the class certification generally on commonality grounds without separately challenging the damages matrix. The Court rejected Defendant's contention that the case was same as a mass accident, that false arrest was not subject to class treatment and that "determination of damages in this case requires individualization." 566 F.2d at 189, fn. 56. There was not more extensive discussion, but the case is regularly cited as an early example of the methodology for classwide general damages in a loss of liberty case.

would go. The Court first determined that, "[i]n accordance with the *Dellums* method as well as the method used in *Augustin, id.* at 157–58, 2011 WL 4953982, at *2, the parties shall each present the testimony of some members of the overdetention and strip-search classes, up to fifteen in total for each party." 278 F.R.D. at 20. Because the witnesses would be chosen by each party, and not through a statistically reliable random sample, the Court recognized that it would "not accurately represent the varying circumstances of the absent class members or the varying impacts of the District's conduct upon them." Id. at 20–21. To avoid the parties' cherry-picking witnesses, resulting in a trial using the "15 best and 15 worst cases," the Court "place[d] restrictions on the types of testimony that either party may elicit from the witnesses" and set the following parameters:

> [T]estimony shall be limited solely to the details of such class members' overdetentions and strip searches—*e.g.,* when they were supposed to be released, whether they had been ordered released by a court or whether their sentences had expired, how long they were overdetained, how the strip search was conducted, and so forth. No testimony will be permitted that could lead the jury's valuation astray by causing it to believe that the witness' story was typical of the stories of the absent class members. Therefore, the Court will not permit testimony concerning class members' backgrounds—*e.g.,* their occupations, education levels, criminal histories, family situations, and similar, personal facts. Because the chosen witnesses will not be selected at random, such testimony would mislead the jury by causing it to project these witnesses' backgrounds onto the class as whole, even though the backgrounds of the absent class members are likely to differ substantially from those of the witnesses selected by the parties. For the same reason, the Court will not permit testimony concerning the impact of these overdetentions or strip searches on these testifying class members. .... Nor will expert testimony concerning the emotional or other impact of overdetentions or strip searches on class members be permitted, as the jury is perfectly capable of assessing that generalized injury themselves based on the class members' testimony, the parties' arguments, and their own experiences. As to the strip searches, the jury will determine a dollar value for each strip search; for overdetentions, the jury will assign damages using a matrix based upon the length of overdetentions—*i.e.,* 0–12 hours, 0–24 hours, 0–36 hours, and so forth. To assist the jury in assigning values, the Court will allow expert testimony that is limited to

explaining the range of general damages that have been awarded by judges or juries in similar cases.

278 F.R.D. at 20-21.[2]

**B.     PLAINTIFFS' PROPOSED TRIAL PLAN FOR CLASSWIDE GENERAL DAMAGES.**

Plaintiffs propose a modified version of the *Barnes* approach adapted to the circumstances here. Because the liability issues and the damages issues overlap, we describe the class member testimony for both:

1.   Each side may designate up to seven (7) class members to testify.

2.   That testimony may include addressing the following non-exhaustive list: a) the crowd size, b) the audibility of any police announcements, c) the witness' location at relevant times (including location during any police announcements, location during any crowd  movement in response, location at the time of or in response to any police activity or announcements, location at the time of detention or arrest), d) observations of the police's overall activity, including clarity of instruction and police guidance in moving the crowd (not to include individualized actions not aimed at the crowd as a whole), e) the arrest process, f) the transport process after arrest, g) the booking process, h) the release process, i) the relevant dates and times of events, j) observations of others in the same situation, k) the length of time from arrest to release, and k) other similar information relevant to the circumstances of the assembly, police activity, and arrest and release.

---

[2] Mr. Litt, one of the counsel in this case, was also one of the counsel in *Barnes*. Because the case settled after the liability trial on the one outstanding overdetention subclass, there is no record of trial proceedings implementing this methodology. In *Jablonski*, there was a court trial on general damages after a grant of summary judgment on liability.

3.  Such witnesses may not address a) any specialized circumstances from their past that affected their experience, b) how the experience made them feel, c) special economic damages, d) pain and suffering or emotional distress, or e) any other similar individualized information.

4.  Similarly, neither side may elicit information regarding the witness' prior experiences or backgrounds—*e.g.,* their occupations, education levels, criminal histories, family situations, medical conditions or similar, personal facts.

With these parameters, it is likely that each class member's damages testimony will be relatively short (likely under an hour).

The jury would award damages for an unlawful arrest (independent of the time held) and would additionally award compensation for time spent in custody after the time in which Plaintiffs should have been released OR (which Plaintiffs contend is no more than two hours based on hours in custody).

Plaintiffs are still assessing whether to use two groupings of  hours to fix damages (released within 12 hours or after 12 hours of custody), but will likely seek a single amount for all class members because all releases occurred within 18-20 hours. The amount of time in custody would be derived from police records, based on the time of arrest and release reflected in those records. This should be something that can be stipulated to. Alternatively, Plaintiffs would present a summary witness under FRE § 1006 showing the number and identity of class members and the length of time in custody.

If the Court permitted it, Plaintiffs would also present expert testimony "explaining the range of general damages that have been awarded by judges or juries in similar cases." *Barnes*, 278 F.R.D. at 21. Because most class actions settle, and class settlements by definition do not account for individualized emotional distress or other damages, Plaintiffs propose to include such amounts in their expert testimony, along with expert testimony that settlements are compromises and therefore usually

14

understate the trial value of a claim. Plaintiffs have attached the expert report of Michael Avery to advise the Court of the nature of such testimony. Plaintiffs want to emphasize that the viability of classwide general damages is independent of whether the Court concludes that such expert testimony should be admitted. General damages could be tried without such testimony, and the jury would determine the appropriate amount of damages without it.

Under this approach, classwide general damages would be determined uniformly for each class member. Although it is likely that most class members would not pursue individualized damages, those class members who chose to do so would be entitled to pursue them. At that stage, the class could be decertified, and class members could pursue their own individual damages if they so chose, or other mechanisms for resolving such damages claims could be developed. *See, e.g., Carnegie v. Household Intern., Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("Rule 23 allows district courts to devise imaginative solutions to problems created by the presence in a class action litigation of individual damages issues. Those solutions include '(1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class.'") (quoting *In re Visa Check/MasterMoney Antitrust Litigation*, 280 F.3d 124, 141 (2d Cir. 2001)).[3]

---

[3] Although Plaintiffs are not aware of cases analyzing the issue through this prism, it is logical that, at least for those class members who were willing to forego special damages, and thereby limit their damages proof to the general circumstances of their arrest and detention, this procedure is  as much in the Defendants' interest as it is in Plaintiffs', since it would restrict damages determinations to cases where general damages were rejected by the class member.

In the event that the Court denies the motion to try classwide general damages, Plaintiffs propose that the class liability and statutory damages case be tried. If liability is found, Plaintiffs propose that the issue of further steps to address damages be reserved until that time. As *Carnegie* indicates, after a liability determination, there are various possible approaches, which can best be determined at the time. There certainly would be the opportunity to revisit settlement at that time. In the absence of settlement, the parties potentially could agree on streamlined approaches to individual damages determinations.

## IV.   LIABILITY AND STATUTORY DAMAGES TRIAL PLAN.

The Court has requested a trial plan for liability, in addition to one for general damages outlined above. *See* Doc. 108 (Plaintiffs shall "file a proposed trial plan for the presentation of evidence on a classwide basis as to alleged liability and corresponding statutory damages."). Below, we briefly summarize the key liability facts that form the basis of our claims and how they would be presented, and then address how statutory damages would be handled.

### A.   TRIAL PLAN FOR 6TH AND HOPE ARRESTS.

Demonstrations protesting the failure to indict Michael Brown's killer (in Ferguson, Mo.) were held around the country, including in Los Angeles on Nov. 24, 2014. Although LAPD had deployed plain clothes officers as "shadow units" with the demonstrators, it had no report of any planned unlawful activity. LAPD formed a line at 7th and Flower blocking the protest from proceeding down Flower toward the Staples Center. Capt. Bert of LAPD has testified that he ordered that the protest be dispersed due to protestors in the street and crossing against a red light (which Plaintiffs challenge as a lawful basis for a dispersal order). The stated rationale for the dispersal order was that demonstrators were becoming very loud and scaring pedestrians.

The dispersal order was issued using a PA system on a Suburban parked on 7th, approximately 50-75 feet back from the intersection. According to LAPD, it was

1  reiterated approximately two minutes later through the same sound system.

2  According to Lt. Pratt, protestors were directed to go north on Hope Street while,

3  according to Capt. Bert, they were told to go north on Flower, stay on the sidewalks

4  and had five minutes to disperse.  Capt. Bert has admitted that alternative routes were

5  not given to the demonstrators at the time.

6         The news video footage shows that the order was audible if you were very

7  close to the PA system, but does not show protestors in that immediate area. A

8  second set of video clips was taken close to where a large group of demonstrators

9  were present, and they are inaudible. Based on police testimony that the large group

10 of protestors were at the next intersection, the announcement was not audible to the

11 concentration of protestors.

12        Capt. Bert, by his own description, took some officers and set up a scrimmage

13 line at 5th and Flower, blocking the protestors from going North on Flower (even

14 though that was the route he directed on the PA system announcement). There is no

15 evidence that the police set up blocking perimeters along the east or west sides of the

16 routes they wanted the protestors to go as a means of directing protestors where to

17 walk. Capt. Bert has testified that, when he saw protestors off the sidewalk after the

18 dispersal order, he blocked egress at various intersections – thereby preventing

19 protestors from leaving – and ultimately pushed them into a cul-de-sac with no egress

20 at 6th and Hope, resulting in a completely chaotic situation and the arrests of class

21 members.

22        Based on the foregoing facts, Plaintiffs contend, *inter alia*, that the arrests were

23 unlawful because a) the dispersal order was not adequately communicated or audible

24 to the crowd, b) clear directions were not provided regarding how to disperse, c) no

25 exit routes were established or communicated to the protestors and, to the extent they

26 were, LAPD's actions contradicted them, d) LAPD's actions caused confusion

27 among the protestors regarding what they were supposed to do, and e) LAPD

28 ultimately forced protestors into an area from which they could not exit, and then

17

1  arrested them. All of this occurred in violation of established law, established POST

2  standard and established LAPD crowd dispersal policy.

3       Plaintiffs will submit class member testimony, video and LAPD testimony and

4  reports to establish these facts. They will also submit LAPD documents and policies.

5  Finally, they will submit expert police practices and audio standards testimony. If

6  classwide damages are being tried, Plaintiffs' presentation of class member testimony

7  would combine the description of events with the permitted damages testimony

8  previously outlined.

9       **B.    TRIAL PLAN FOR FAILURE TO PROVIDE TIMELY OR RELEASES.**

10       Plaintiffs' second claim is that the custodial detention of the demonstrators

11  arrested at 6th & Hope on November 24, 2014 for up to approximately 18-20 hours

12  did not comport with the requirements of California Penal Code sec. 853.6. That code

13  section provides that a misdemeanor arrestee be cited and released in the field, or

14  immediately after booking. Here, the class members were all held for several hours,

15  as much as 20 hours.

16       The protestors could and should have been processed in the field. The

17  alternative process that was available at the time is illustrated by the procedures at

18  Beverly & Alvarado on November 28, 2014.  There, the LAPD had the capacity to

19  run approximately forty people for wants and warrants in the field, document the

20  contact on video, search the people and then give them a dispersal order, all in less

21  than an hour and a half. The handling of the Beverly & Alvarado demonstrators on

22  November 28, 2014 demonstrates that it was completely feasible to have handled this

23  without any arrests, even if charges were going to be filed. In fact, with rare

24  exceptions, class members were booked and never charged with any crime. It was

25  apparent to LAPD based on their handling of such cases in the past that the actual

26  filing of charges was, at a minimum, highly unlikely.

27       In any event, even if arrests were appropriate, it should not take nearly a day to

28  book 140 misdemeanor arrestees. Based on prior experience, LAPD can process

1  booking and OR release in under an hour. Here, arrestees were held on buses for

2  some hours and then several hours passed before their release. Although Defendants

3  dispute it, the available evidence indicates that this was an intentional, punitive act.

4          LAPD Lieutenant Andy Neiman was quoted in the media as saying all

5  demonstrators who were unable to post bail would be held until they were able to

6  appear in court early the following week. LAPD Commander Andy Smith was

7  quoted in news media that, while LAPD would typically release individuals with

8  similar charges OR, "In this case, because these people are part of a protest that is

9  continuing, they will not be released on their own recognizance."

10          Plaintiffs will present class member, LAPD and expert testimony on this issue,

11  as well as documents.

12    **C.    TRIAL PLAN FOR STATUTORY DAMAGES UNDER §52.1 REQUIRES
13            ONLY JURY INSTRUCTIONS AND QUESTIONS POSED IN THE VERDICT
14            FORM**

14          Under Civil Code §52.1, statutory or actual damages (but not civil penalties)

15  provided by Civil Code §52(a) are available to a prevailing plaintiff. *Cuviello v. City*

16  *of Oakland*, No. C 06-5517 MHP, 2010 WL 3063199, at *4–6 (N.D. Cal. Aug. 3,

17  2010), *aff'd in part,* 434 F. App'x 615 (9th Cir. 2011). "Section 52 damages include

18  actual damages, treble damages and exemplary damages. Moreover, actual damages

19  include both special damages and general damages. Cal. Civ.Code §52(h)." *Id*. The

20  statute 'provides for minimum statutory damages ... for *every* violation of section

21  51, *regardless* of the plaintiff's actual damages.'" *Angelucci v. Century Supper Club*,

22  41 Cal. 4th 160, 174, 158 P.3d 718, 726 (2007) (quoting *Koire v. Metro Car Wash*

23  (1985) 40 Cal.3d 24, 33, 219 Cal.Rptr. 133, 707 P.2d 195). To obtain the

24  minimum statutory damages of $4,000, it is not necessary to prove harm and

25  causation. *See Koire,* 40 Cal.3d at 33.

26          Since the statute contains neither defining characteristics nor any requirement

27  or standards for awarding up to treble damages, their award is necessarily

28

1  discretionary. Since treble damages is a discretionary determination by the trier of

2  fact, it too does not present evidentiary issues and is an issue for jury instructions and

3  the verdict form.

4     The jury would be instructed that, for each violation of §52.1, it must award

5  each class member a minimum of the statutory damages of $4000, and has the

6  discretion to award up to three times that amount without proof of actual damages.

7  The verdict form would pose questions determining the jury's findings in that regard.

8  DATED: November 5, 2018        Respectfully Submitted,

9

10                                KAYE, MCLANE, BEDNARSKI & LITT, LLP
                                  LAW OFFICES OF CAROL SOBEL
11                                SCHOENBRON, DESIMONE, ET AL.
                                  LAW OFFICE OF COLLEEN FLYNN
12                                LAW OFFICE OF MATTHEW STUGAR

13

14                                By:__/s/ Barrett S. Litt_____
                                       Barrett S. Litt
15

16                                By:__/s/ Carol A. Sobel_____
17                                     Carol A. Sobel
18                                Attorneys for Plaintiff

19

20

21

22

23

24

25

26

27

28

Avery, Michael 10/13/2018
For Educational Use Only

Reynolds v. County of Los Angeles, Not Reported in Cal.Rptr.3d (2004)

KeyCite Red Flag - Severe Negative Treatment
Unpublished/noncitable

2004 WL 2538373
Not Officially Published
(Cal. Rules of Court, Rules 8.1105 and 8.1110, 8.1115)
Only the Westlaw citation is currently available.

California Rules of Court, rule 8.1115, restricts
citation of unpublished opinions in California courts.

Court of Appeal, Second District, Division 3,
California.

Jay REYNOLDS, Plaintiff and Appellant,
v.
COUNTY OF LOS ANGELES, Defendant and
Appellant.

Nos. B157249, B163468.
|
(Los Angeles County Super. Ct. No. BC226622).
|
Nov. 10, 2004.

APPEALS from a judgment of the Superior Court of Los
Angeles County, Susan Bryant-Deason and Joseph R.
Kalin, Judges. Affirmed as to the appeal of defendant and
dismissed as to the appeal of plaintiff.

**Attorneys and Law Firms**

Harold G. Becks & Associates, Harold G. Becks, L'Tanya
M. Butler; Greines, Martin, Stein & Richland, Martin
Stein and Barry M. Wolf for Defendant and Appellant.

Stolpman, Krissman, Elber & Silver and Dennis M. Elber
for Plaintiff and Appellant.

KITCHING, J.

**\*1** The County of Los Angeles appeals a judgment in
favor of plaintiff Jay Reynolds in Reynolds's suit brought
under title 42 of the United States Code section 1983
(section 1983). After the superior court dismissed charges
against Reynolds and ordered his release, the County of
Los Angeles continued to hold Reynolds in custody in jail
overnight until his administrative release was issued the
next morning. During this time other prisoners physically
attacked and raped Reynolds. We conclude that the case
was properly tried to the jury under a theory that his
continued detention was an unreasonable seizure under
the Fourth Amendment of the United States Constitution,
and therefore affirm the jury's award to plaintiff of
$25,000 damages for overdetention. The jury also
awarded plaintiff $1 million damages for physical and
sexual attacks on him by other inmates. We find that
because the inmates' criminal attacks were an intervening,
superseding cause which cut off the liability of the
County of Los Angeles, the $1 million damages award
must be reversed.

We also find that the County of Los Angeles, in its
administrative processing of Reynolds after his court-
ordered release but before issuing his administrative
release, did not act as a State of California policymaker
and thus can be liable under section 1983. Finally, we
conclude that the County of Los Angeles has not shown
instructional error.

Reynolds filed a cross-appeal from the grant of summary
adjudication as to his Eighth Amendment cause of action
alleging that the Los Angeles County Sheriff classified
Reynolds as "high risk" and placed him in a maximum
security cell. Reynolds provided no evidence that this
classification system was not reasonably related to the
legitimate government objective of managing the jail to
maintain security, and did not provide evidence that the
classification policy reflected "deliberate indifference" to
a substantial risk of serious harm. We affirm the grant of
summary adjudication.

As to the county's appeal from the order awarding
attorney fees to plaintiff Reynolds, reversal of the $1
million damages award requires remand to the trial court
for a redetermination of attorney fees.

**INTRODUCTION**

Avery, Michael 10/13/2018
For Educational Use Only

Reynolds v. County of Los Angeles, Not Reported in Cal.Rptr.3d (2004)

I. *Appeal of the County of Los Angeles*

## FACTS

*Reynolds's Arrest, Detention, Release and Return to the County Jail:* On March 8, 1999, a police officer stopped Jay Reynolds, age 36, for a traffic violation. The officer discovered a valid State of South Dakota warrant for Reynolds's failure to pay child support. Reynolds was arrested, taken to jail in Claremont, and transferred Los Angeles County Jail, where he was placed in Cell A-2 in Module 4300, with six other cellmates.

Reynolds went to court four times, riding on a prison bus to court, and was handcuffed during those trips. He understood that he was considered a fugitive from justice and that the court would rule on whether he should be extradited to South Dakota. Reynolds's sister-in-law, Tracey Reynolds, was involved in settling Reynolds's case with South Dakota authorities by paying money for Reynolds's outstanding child support, arrears, and interest.

**\*2** In his fifth court appearance on March 17, 1999, the court ordered Reynolds released because his case was dismissed. The court made the release order at approximately 11:30 a.m. Reynolds was not allowed to walk out of the courtroom. He was held for five minutes while two other people finished their court business, and escorted to a cell next to the courtroom. He was later handcuffed to another person before being placed on a bus, which took him back to the Inmate Reception Center, where he arrived at 6:35 p.m. on March 17, 1999. Still handcuffed, Reynolds waited in a holding cell for an hour and a half. Reynolds's papers were not logged in the Inmate Reception Center until 8:43 p.m. The jail did not generate a release pass for Reynolds until 7:41 a.m. the next morning, March 18, 1999.

*Other County Jail Inmates Attack and Rape Reynolds During the Night of March 17 and Morning of March 18, 1999:* A sheriff's deputy returned Reynolds to his cell in Module 4300. Reynolds was housed in that cell with six other cellmates during his seven previous nights in county jail. Reynolds testified that his cellmates had not bothered him before March 17, 1999, and he had experienced no prior problems with his cellmates.

Inside the cell, inmates Crudup and Jackson drank "pruno," an alcoholic prison brew. In a friendly conversation, Reynolds told another inmate, Mendez, that he was released. Jackson and Crudup talked in low voices for about half an hour after Reynolds entered the cell. Reynolds lay in his bunk and did not listen. Jackson went to another inmate, Garcia, slammed Garcia's body, and told him to get up. Crudup did the same thing to Reynolds, telling him to leave his bunk, and kept bothering Reynolds. Reynolds told him he was trying to sleep, but Crudup started punching his face. Reynolds rolled away from the blows, angering Crudup, who accused Reynolds of getting smart and talking back to him. Crudup walked to the end of the cell and then stormed back and started pounding on Reynolds's face and head. Jackson said Reynolds should have shut his mouth, which angered Crudup, who again beat and punched Reynolds. This occurred three or four times before Reynolds assumed a position sitting with his back against the wall.

Crudup told him to get down from his bunk. As Reynolds moved from his bunk, Crudup pulled him down, punched him, and threw him toward the front of the cell gates. There Crudup punched him, causing Reynolds to curl into a ball on his knees, covering his head and trying not to get hit. Crudup and Jackson took turns punching and kicking him. At the top of his lungs, Reynolds screamed for them to stop and for a guard to help him, but never saw any guards, then or during the whole night.

Reynolds stopped screaming when they threatened to kill him if he did not shut his mouth. Jackson picked him up by his hair, dragged him to the middle of the cell, and told him to stand there. Jackson kept putting his hands down Reynolds's pants, threatened him sexually, and then told Reynolds to pull down his pants. Reynolds refused, but pulled his pants down part way. Jackson kept punching and threatening him and making lewd comments about raping him. Crudup came back and punched Reynolds, hitting him as he fell to the ground and kicking him as he tried to go to a bunk. Reynolds crawled under a bunk to get away. Crudup told him to get out from under the bunk and reached for him. Reynolds crawled out from underneath the bunk. Crudup told him to get to the back of the cell, where there was no bunk, and punched him as he stood in front of the toilet. Crudup told him to stand up and put his hands on the back of the top bunk. Crudup told him to bend over. Reynolds resisted. Crudup grabbed Reynolds's trousers and told him to bend down. Jackson grabbed Reynolds's head and shoved it down. Jackson

Avery, Michael 10/13/2018
For Educational Use Only

Reynolds v. County of Los Angeles, Not Reported in Cal.Rptr.3d (2004)

and Crudup pushed Reynolds down and Crudup anally raped Reynolds. He penetrated Reynolds three different times.

**\*3** Jackson then pushed Reynolds to the floor and made him orally copulate his penis for five to ten minutes, then made him wash it off, and told Reynolds to get back to his bunk. Crudup again started punching Reynolds. Reynolds thought these events took two to three hours. Afterward Reynolds lay in his bunk until Crudup and Jackson went to sleep. He did not trust any of the inmate "trustees," who had watched the attacks and rapes. Reynolds heard the 4:00 a.m. court call, but waited until about 6:00 a.m. on March 18, 1999. At that time he heard or saw Officer Wargo and a nurse at the next cell. He showed Wargo his face and said, "I need out of here." Wargo got the cell open and took Reynolds to the front area, where he told an officer what happened and that he needed help.

Reynolds was taken to a holding cell for about 10 minutes, until Officer Wargo took him outside. His request to call his brother was denied. He was taken to an area where he spent an hour telling Wargo and three other officers what had happened inside his cell. Wargo then took him to the jail infirmary. He told a doctor that he wanted to remove a pubic hair that was still inside his mouth.

He was later handcuffed and placed in a car for transport to the Women's and Children's Center, where he was uncuffed and examined by a doctor. He was allowed to call his brother and sister-in-law, who picked him up at approximately 10:00 p.m. on March 18, 1999.

*Evidence Concerning the Process of Releasing Inmates from the County Jail:* The Inmate Reception Center ("IRC") at the county jail processes inmates entering and leaving the jail. The average daily population of the Los Angeles County Jail system is between 19,000 and 22,000 inmates. The more than 170 courts in Los Angeles County generate between 5,000 and 6,000 documents daily. A court can remand a pre-trial detainee to the sheriff's custody pending further court appearances, can sentence the detainee, or can order the release of the detainee.

When a court orders someone released, the detainee is transported by bus to the IRC for processing. The Sheriff's Department does not begin the process of releasing an inmate until the inmate's papers from court arrive at the IRC. An inmate is customarily returned to his jail cell until his papers are received and processed.

Records come into the IRC throughout the day and night from Los Angeles County courts. IRC personnel log in each order and separate orders into releases, sentences, remands, and other special court orders. Detainees remain incarcerated until release orders are separated from other orders and processed.

The clerk views release, remand, and resentencing orders as equally important. In 1999, between 700 and 900 inmates were ordered released, which included court-ordered releases, expirations, immigration holds, federal inmates to be picked up by the United States Marshal, and inmates to be released to an out-of-state agency.

**\*4** Each type of order goes to a different clerk. Clerks processing court orders at the IRC work in shifts, around the clock. A clerk who receives a release order first locates and pulls that detainee's booking jacket. It may take a clerk up to an hour and a half to pull booking jackets for 50 or 60 release orders. The process can be delayed if a booking jacket cannot be located easily or if a clerk must locate documents missing from a jacket, which can take three hours or more. It was unknown how long it took to pull Reynolds's booking jacket.

After locating a booking jacket, the clerk reviews paperwork to determine if release is possible. In Reynolds's case, the clerk had to check papers for his five court appearances to confirm that the computer matched what was in the file, update the computer with the release order, and confirm Reynolds was entitled to be released. That should have taken about 20 minutes. The jacket then goes to a release clerk on a different floor of the jail, taking an additional five minutes. The release clerk again reviews the file for correctness, taking approximately 15 minutes. Then the clerk sends a release pass for the inmate, which takes the computer about two minutes. The release pass verifies the inmate can be released.

The Sheriff's Department policy is to keep a person ordered released by the court in custody in the court building until Sheriff's Department personnel transport him back to the IRC. Upon arrival at the IRC, the person ordered released is returned to his cell. In this respect the treatment of a person ordered released does not differ from other inmates with pending cases. Processing of Reynolds's March 17, 1999 release order did not begin sooner than processing any other order affecting inmates with pending cases. Orders remanding an inmate to custody must be processed before 12:59 a.m., the last moment an inmate can be sent back to court the next day.

**Avery, Michael 10/13/2018**
**For Educational Use Only**

Reynolds v. County of Los Angeles, Not Reported in Cal.Rptr.3d (2004)

In 1999, the Sheriff's Department did not accept faxed release orders. A witness for the Sheriff's Department, Adana Allen, Head Custody Records Clerk for the IRC, testified that she did not know why sheriffs' deputies administering the jails did not fax release orders to the IRC as soon as they became available. The policy had changed, and at the time of trial the Sheriff's Department did accept faxes bearing court seals. The Sheriff's Department does not process an inmate for release based on a telephone call, because such a caller cannot be identified and verified. Allen had 32 years of service, knew the deputies, and could identify them. Allen testified that if she received telephone calls from sheriffs' deputies identifying inmates to be released and stating that court orders would be faxed to the IRC, Allen and her staff could process release documents earlier. The volume of such calls, however, would total 200 to 300 inmates daily.

Allen admitted that if a court lock-up deputy telephoned the IRC at 11:30 a.m. and informed the clerk that the court had ordered Reynolds released and the clerk could identify and verify the lock-up deputy, the clerk could get Reynolds's file and begin the release process. Allen agreed that if her staff had eight hours to process Reynolds's documentation, when Reynolds was returned to the central jail at 6:30 p.m., he would not have to go back to his cell and would be ready to be released, because his documentation would already have been checked.

**\*5** Allen testified that Reynolds's paperwork was updated as of the day before his remand order to appear in court on March 17, 1999, when it was known that Reynolds had no warrants in other pending cases. Allen agreed that if a deputy sheriff had telephoned at 11:30 a.m. or 12:00 noon on March 17, that information would have given a clerk at the IRC the opportunity to pull Reynolds's file. The clerk could then confirm that the file was updated the previous night, that no other warrants or pending cases existed, and that Reynolds could be released.

*Evidence Concerning Conditions of Reynolds's Confinement in the County Jail:* Sheriff's Deputy Alfredo Rosas, a deputy in charge of housing new inmates, was the module officer in Module 4300, where Reynolds was housed. Module 4300 was a 40-by-80-foot room with two rows of housing cells in a top tier, and two rows of housing cells in a bottom tier. A security office in the middle aisle is secured from inmates. A catwalk on top

allows a guard to view the cells. A deputy is locked inside the catwalk unless another deputy relieves him. A guard walks through the module every hour. Rosas was not sure whether a guard could see inside every cell from the catwalk or from the work station inside the security office. To be heard inside the security office, noise from the cells would have to be loud, at the screaming level.

Rosas was on duty in Module 4300 from 10:00 p.m. on March 17, 1999, until 6:00 a.m. on March 18, 1999. When he left work at 6:00 a.m. on March 18, he was not aware that during his shift Reynolds had been beaten, raped, sodomized, and forced to orally copulate.

*Reynolds's Suit Against the County of Los Angeles:* Reynolds sued the County of Los Angeles (and individual defendants who later obtained summary judgment) under section 1983 for violation of his civil rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, alleging that the Los Angeles County Sheriff illegally detained Reynolds in custody after the court ordered him released. The trial court granted summary adjudication for the County of Los Angeles in a fourth cause of action for detention of Reynolds in violation of the Eighth Amendment (cruel and unusual punishment). Only the section 1983 cause of action went to the jury.

*The Jury's Special Verdict:* The jury's special verdict found that:

1. Reynolds was overdetained in violation of his constitutional rights.

2. A Los Angeles County Sheriff's Department policy, custom or practice caused Reynolds to be overdetained in violation of federal rights under federal law.

3. Reynolds was overdetained when physically and sexually assaulted by cellmates.

4. Overdetention proximately caused the physical and sexual assault against Reynolds.

5. The jury awarded $25,000 in damages for being overdetained and $1 million in damages for being physically and sexually assaulted while overdetained. The trial court entered judgment on December 12, 2001. Plaintiff served notice of entry of judgment on December 19, 2001.

**Avery, Michael 10/13/2018**
**For Educational Use Only**

Reynolds v. County of Los Angeles, Not Reported in Cal.Rptr.3d (2004)

*6 *Proceedings After Trial:* On February 8, 2002, the trial court denied motions of the County of Los Angeles for a new trial and for judgment notwithstanding the verdict.

On March 11, 2002, the County of Los Angeles filed a timely notice of appeal. On March 29, 2002, Reynolds filed a notice of appeal from the September 17, 2001, order granting defendant's motion for summary adjudication as to Reynolds's cause of action for violation of the Eighth Amendment of the United States Constitution.

The County of Los Angeles also appeals from an amended judgment filed November 8, 2002, awarding Reynolds $227,550 in attorney fees and $11,821.22 in costs.

**ISSUES**

The County of Los Angeles claims on appeal that:

1. As a matter of law, Reynolds failed to show that the Sheriff's Department's inmate release policy violated his federal constitutional or statutory rights, insofar as the Fourteenth Amendment prohibition of deprivation of liberty without due process of law was the only constitutional right potentially applicable to Reynolds's overdetention;

2. As a matter of law, Reynolds failed to show that the Sheriff's Department's inmate release policy proximately caused him to be assaulted;

3. Because the sheriff acts as a state official when setting policies governing the release of prisoners from jail, the County of Los Angeles cannot be held liable under section 1983; and

4. Erroneous jury instructions, and the rejection of a correct jury instruction, require reversal of the judgment.

1. *The $25,000 Damages Award Is Affirmed Under Plaintiff's Theory of Overdetention in Violation of the Fourth Amendment*
The County of Los Angeles claims Reynolds's evidence did not support the jury's finding that the county's inmate release policy violated his Fourth Amendment constitutional rights.

a. *Title 42 United States Code Section 1983*
Section 1983 states, in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]"

Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." (*Baker v. McCollan* (1979) 443 U.S. 137, 144, fn. 3 .) A section 1983 action has two essential elements: (1) whether a person acting under color of state law committed the conduct complained of; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States. (*Parratt v. Taylor* (1981) 451 U.S. 527, 535, overruled on other grounds, *Daniels v. Williams* (1986) 474 U.S. 327, 331-332.)

*7 The first inquiry in a section 1983 lawsuit is to identify the precise constitutional provision the defendant is charged with violating. (*Baker v. McCollan, supra,* 443 U.S. at p. 140; *Graham v. Connor* (1989) 490 U.S. 386, 394.) Relying on different factual grounds, the jury made two awards of damages. We review those awards separately.

**DISCUSSION**

**Avery, Michael 10/13/2018**
**For Educational Use Only**

Reynolds v. County of Los Angeles, Not Reported in Cal.Rptr.3d (2004)

b. *The Jury Properly Awarded $25,000 in Damages to Plaintiff Under the Fourth Amendment*

The County of Los Angeles argues that the Fourteenth Amendment protection against deprivation of liberty without due process of law was the only constitutional right potentially applicable to Reynolds's overdetention. Reynolds responds that detention by the County of Los Angeles after a court ordered him released was a seizure, triggering the Fourth Amendment protection against unreasonable seizure. The significance of these contentions is that the issue under the Fourth Amendment is whether detention of Reynolds after his court-ordered release was unreasonable, while a violation under the Fourteenth Amendment would require a finding that the Sheriff's administrative release policies were "arbitrary." We agree that the Fourth Amendment, and not the Fourteenth Amendment, applies to this case.

i. *Overdetention Analyzed as a Fourth Amendment "Seizure"*

The Fourth Amendment of the Constitution states: "The right of the people to be secure in their persons ... against unreasonable searches and seizures, shall not be violated[.]" Reynolds argues that actions by the County of Los Angeles after the court dismissed charges and released him constituted a seizure because "[w]henever an officer restrains the freedom of a person to walk away, he has seized that person." (*Tennessee v. Garner* (1985) 471 U.S. 1, 7.)

Reynolds also refers to definitions of "seizure" in other United Supreme Court cases. *Graham v. Connor, supra,* 490 U.S. 385 required the court to decide what constitutional standard governed a free citizen's claim that law enforcement officials used excessive force in making an arrest, investigatory stop, or other "seizure" of his person. *Graham* held that such claims were analyzed under the Fourth Amendment's "objective reasonableness" standard, rather than under a substantive due process standard. (*Id.* at p. 388.) Reynolds also cites *United States v. Brignoni-Ponce* (1975) 422 U.S. 873, stating that the Fourth Amendment "applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." (*Id.* at p. 878.)

Reynolds acknowledges that these three cases arose from claims that police officers used excessive force, an

element not present in his appeal. Reynolds argues that no constitutional distinction exists between police officers' use of excessive force and an illegal seizure claim, citing *Larson v. Neimi* (9th Cir.1993) 9 F .3d 1397, 1400. *Larson* holds that although excessive force differs from illegal seizure, the Fourth Amendment provides the analysis for both of these claims. As in *Graham v. Connor, supra,* 490 U.S. at page 395, because the Fourth Amendment provides a specific constitutional protection against "this sort of physically intrusive governmental conduct," the Fourth Amendment provides the basis for analyzing the case instead of a generalized Fourteenth Amendment substantive due process analysis. (*Larson,* at p. 1400.)

**\*8** In this appeal the question is whether the Sheriff's Department's continued custody of Reynolds after the trial court ordered him released constitutes a "seizure" from which the Fourth Amendment provides constitutional protection. If so, *Larson* would hold that the Fourth Amendment analysis applies. (*Larson v. Neimi, supra,* 9 F.3d at pp. 1400-1401, 1402.)

In arguing that the Fourth Amendment broadly applies to section 1983 claims based on a "seizure" by government authorities, Reynolds relies on *Lauro v. Charles* (2d Cir.2000) 219 F.3d 202. In *Lauro,* after arresting and charging Lauro as a criminal defendant, the police handcuffed Lauro, walked him outside the station house, drove him around the block in an unmarked police car, and walked Lauro back to the police station so that a television news crew could film him in a staged "perp walk." Lauro's civil suit against the police department and police officers asserted that the perp walk was an unreasonable seizure that violated the Fourth Amendment. (*Id.* at p. 208.) *Lauro* cited Supreme Court cases holding that where a claim can be characterized as a violation of the Fourth Amendment, it should be analyzed as such and not as a substantive due process claim. (*Ibid.*)

*Lauro* stated that Fourth Amendment protection applies to a person not only during an initial search and seizure by police, but also to persons lawfully in police custody. (*Lauro v. Charles, supra,* 219 F.3d at p. 212.) Lauro was lawfully under arrest. But with regard to the "perp walk" occurring after arrest, viewing that "seizure" either as (1) a separate seizure occurring when Lauro was forcibly removed from the police station, paraded before news cameras, and then returned to the station, or (2) as "a continuation and aggravation of the seizure that occurred when he was arrested," the Fourth Amendment required

Avery, Michael 10/13/2018
For Educational Use Only

Reynolds v. County of Los Angeles, Not Reported in Cal.Rptr.3d (2004)

that seizure to be reasonable. (*Ibid.;* see also *Lauro v. City of New York* (S.D.N.Y.1999) 39 F.Supp.2d 351, 363, fn. 8.) *Lauro* concluded that the staged perp walk was unrelated to the object of the arrest, had no legitimate law enforcement justification, and invaded Lauro's privacy to no purpose, and therefore violated the Fourth Amendment. (219 F.3d at p. 213.)

The trial court ordered Reynolds released at approximately 11:30 a.m. on March 17, 1999, because his case was dismissed. He was not allowed to leave the courtroom. He was later handcuffed to another person before being taken by bus back to the IRC, where he spent the night in his jail cell. Reynolds's papers were not logged into the IRC until 8:43 p.m. A release pass was not generated for Reynolds until the following morning at 7:41 a.m., March 18, 1999. Thus after the court ordered his release, Reynolds remained "seized" for Fourth Amendment purposes. A "seizure" triggering the protection of the Fourth Amendment occurs when government actors have, "by means of physical force or show of authority ... *in some way* restrained the liberty of a citizen [.]" (*Terry v. Ohio* (1968) 392 U.S. 1, 19, fn. 16, italics added; see also *Albright v. Oliver* (1994) 510 U.S. 266, 278-279, concurrence of Ginsburg, J.)

**\*9** Construing Reynolds's confinement after his court-ordered release as a "seizure," the question is whether, under the Fourth Amendment, a delay of more than 20 hours between the time the court ordered Reynolds's release and the sheriff issued a release pass was reasonable. Reynolds relies on *Lewis v. O'Grady* (7th Cir.1988) 853 F.2d 1366, holding that the reasonableness of the length of such confinement is a jury question. In *Lewis,* plaintiff Sandy Lewis was arrested and detained on an arrest warrant issued for another person. Lewis spent approximately 11 hours in custody after a judge determined he was not the person named in the arrest warrant. The judge found that Lewis was not the person named in the arrest warrant and returned him to the sheriff's custody, but never officially ordered Lewis discharged. (*Id.* at p. 1369.) Thus Lewis's ultimate release came not as a result of a judicial determination, but after administrative steps were taken to verify his identity. (*Ibid.*) *Lewis* recognized that transportation, completing paperwork, verification of identity, and similar administrative requirements precluded establishing a minimum time within which a prisoner due to be released could be kept in custody. *Lewis* concluded: "What is a reasonable time for detaining a prisoner in custody is a question best left open for juries to answer based on the

facts presented in each case." (*Id.* at p. 1370.)

Insofar as Reynolds *did* obtain a court order for his release, his claim to be released from custody within a reasonable time is stronger than the claim of the plaintiff in *Lewis.* Under *Lewis v. O'Grady,* the detention of Reynolds for more than 20 hours after he obtained a court order for his release should be analyzed according to the protection of the Fourth Amendment.

Defendant does not make a substantial evidence challenge to the jury's finding that the County of Los Angeles overdetained Reynolds in violation of his Fourth Amendment constitutional rights.

ii. *The Fourteenth Amendment Cases Cited by the County of Los Angeles Do Not Control This Case*
In relevant part, the due process clause of the Fourteenth Amendment of the United States Constitution states: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law[.]" The County of Los Angeles argues that only the Fourteenth Amendment would apply to Reynolds's section 1983 action. As to the jury's $25,000 award, we disagree. We analyze the jury's $1 million award separately.

*Slone v. Herman* (8th Cir.1993) 983 F.2d 107 states that when a prisoner's sentence became final the state lost its authority to hold the prisoner, and keeping the prisoner in jail for eight months deprived him of his Fourteenth Amendment right to liberty. (*Id.* at p. 110.) However, the authorities Slone cited for this conclusion clearly referred to continued custody of a prisoner after he completed his sentence. (*Ibid.,* citing *McNeil v. Director, Patuxent Institution* (1972) 407 U.S. 245, 246 and *Haygood v. Younger* (9th Cir.1985) 769 F.2d 1350, 1354-1355.) Reynolds was not convicted of a crime or sentenced to a prison term, and thus was not held in prison after such prison term had expired.

**\*10** *Kelch v. Director, Nevada Dept. of Prisons* (9th Cir.1993) 10 F.3d 684 held that the Nevada Board of Pardons Commissioners' rescission of an earlier commutation of a prisoner's sentence should be analyzed under the Fourteenth Amendment substantive due process

Avery, Michael 10/13/2018
For Educational Use Only

Reynolds v. County of Los Angeles, Not Reported in Cal.Rptr.3d (2004)

clause. (*Id.* at p. 685.) Because the prisoner acquired "a liberty interest" when the board commuted his sentence, that liberty interest entitled him to substantive due process, i.e., that a subsequent government action depriving him of life, liberty or property have a rational, non-arbitrary connection to a legitimate purpose. (*Id.* at p. 688.) The state had an interest in insuring its fair opportunity to present a case against prisoners petitioning for early release and protecting against the premature release of dangerous criminals. Before the first commutation hearing, neither the prisoner nor the board provided notice to the state. These omissions prevented the state from responding to the prisoner's application, causing the board to make its commutation decision on incomplete, inaccurate evidence. Thus the board's rescission of the commutation of the sentence after a second evidentiary hearing was "a rational, non-arbitrary means of effectuating the state's legitimate interests in informed and properly conducted commutation proceedings and in protecting the general population from dangerous criminals." (*Id.* at p. 689.) Rescission of the commutation of the prisoner's sentence therefore did not violate his substantive due process right. (*Ibid.*)

A case not cited by the County of Los Angeles frames its argument most clearly, and supports its argument that the Fourteenth Amendment should apply. *Brooks v. George County, Miss.* (5th Cir .1996) 84 F.3d 157 states: "We reference our decision in *Valencia v. Wiggins,* 981 F.2d 1440, 1449 (5th Cir. [ (1993) ] ) ..., by analogy, for the proposition that once the incidents of a valid arrest have long since been completed and the pretrial detainee remains in detention, the Fourth Amendment no longer applies when the challenge is solely to continued incarceration. In *Valencia,* this Circuit held that neither the Unreasonable Search and Seizure Clause of the Fourth Amendment nor the Cruel and Unusual Punishment Clause of the Eighth Amendment is applicable in determining whether a detention official's use of deliberate force was excessive. *Id.* The Due Process Clause of the Fifth and Fourteenth Amendments are the appropriate constitutional provisions for this determination. *Id.* [¶] As the Court stated, [¶] We do not believe that the Fourth Amendment provides an appropriate constitutional basis for protecting against deliberate official uses of force occurring, as in this case, after the incidents of arrest are completed, after the plaintiff has been released from the arresting officer's custody and after the plaintiff has been in detention awaiting trial for a significant period of time ... [.] As the Fourth Amendment protects against unreasonable

'seizures,' it seems primarily directed to the initial act of restraining an individual's liberty, such as an investigatory stop or arrest. *Id.* at 1443-1444.[¶] The logic of *Valencia* applies to the instant case. The Fourth Amendment is inapplicable to a pretrial detainee who was properly arrested and is awaiting trial. That detainee has recourse to due process protections, not protection against unreasonable seizures after a lawful seizure has occurred. Since Brooks has shown no defect in his actual arrest, he has made no claim under the Fourth Amendment." (*Id.* at pp. 166-167, italics omitted.)

**\*11** *Brooks* involved a claim that the plaintiff was deprived of property without due process of law while in prison. *Brooks* did not involve a Fourteenth Amendment liberty right, and its facts did not include imprisonment of the plaintiff after the court ordered him released. Nonetheless *Brooks* is authority for limiting the scope of the Fourth Amendment protection against unreasonable seizure of the person to the detention or arrest of that person, and for not extending the Fourth Amendment protection to the period of detention or prison custody occurring after a valid arrest. When a seizure is not unreasonable because the arrest occurs pursuant to a valid warrant, subsequent detention is analyzed by reference to the Fourteenth Amendment protection against deprivation of liberty without due process of law. (*Baker v. McCollan, supra,* 443 U.S. at pp. 142-143.)

In arguing that the Fourth Amendment does not apply to Reynolds's suit, the County of Los Angeles argues that overdetention after a valid arrest does not give rise to a Fourth Amendment claim, citing *Baker v. McCollan, supra,* 443 U.S. 137. In *Baker,* the plaintiff was deprived of his liberty for three days pursuant to a warrant conforming to the requirements of the Fourth Amendment. The plaintiff did not attack the validity of that warrant and did not base the section 1983 claim on an unconstitutional seizure. Instead plaintiff claimed that the sheriff failed to investigate and determine that the wrong man was imprisoned. (*Id.* at pp. 143-144.) *Baker* held that pretrial detention for three days did not constitute a deprivation of liberty without due process of law under the Fourteenth Amendment. (*Id.* at p. 145.) *Baker,* however, does not preclude using the Fourth Amendment to analyze the continued imprisonment of a person ordered released by the court after charges are dismissed as a "seizure." Unlike the plaintiff in *Baker,* Reynolds *does* challenge the sheriff's authority to hold him in prison custody after the court dismissed charges against him and ordered him released.

Avery, Michael 10/13/2018
For Educational Use Only

Reynolds v. County of Los Angeles, Not Reported in Cal.Rptr.3d (2004)

Although *Baker* involved a pretrial detention in prison custody, other cases analyze detention of an inmate after he should be released by applying the Fourteenth Amendment protection against deprivation of liberty without due process of law.

The facts in *Pennington v. Hobson* (S.D.Ind.1989) 719 F.Supp. 760 and *Afrika v. Selsky* (S.D.N.Y.1990) 750 F.Supp. 595 differ from the facts in Reynolds's case. A third case cited by the County of Los Angeles, *Calhoun v. New York State Div. of Parole Officers* (2d Cir.1993) 999 F.2d 647, also differs factually and appears to rely on procedural due process rather than on the substantive due process prohibition of deprivation of liberty.

### iii. *Conclusion: The $25,000 Damage Award for Overdetention Was Correct*

The case most closely resembling the facts of Reynolds's case, and which provided the governing principles under which Reynolds's case was tried and under which the jury was instructed, is *Lewis v. O'Grady, supra,* 853 F.2d 1366, using the Fourth Amendment analysis of continued imprisonment of a person after the court dismissed charges and issued a release order. We find no error in the use of the Fourth Amendment as the right violated in this section 1983 case.

### 2. *Because Cellmates' Criminal Attacks Were an Intervening Superseding Cause Which Cut Off the Liability of the County of Los Angeles, the $1 Million Damages Award Must Be Reversed*

**\*12** Although not challenging the overdetention as a cause-in-fact of Reynolds's injuries, the County of Los Angeles claims on appeal that the inmate release policy did not proximately cause the assault on Reynolds. We conclude that substantial evidence does not support the jury's findings on the issue of legal causation, because the cellmates' criminal attacks on Reynolds were an intervening, superseding cause which cuts off the liability of the County of Los Angeles.

### a. *Causation*

Causation involves two elements: (1) cause in fact and (2) legal causation. (*PPG Industries, Inc. v. Transamerica Ins. Co.* (1999) 20 Cal.4th 310, 315.) "An act is a cause in fact if it is a necessary antecedent of an event." (*Ibid.*) With regard to legal causation however, "[t]o simply say ... that the defendant's conduct was a necessary antecedent of the injury does not resolve the question of whether the defendant should be liable.... [T]he law must impose limitations on liability other than simple causality. These additional limitations are related not only to the degree of connection between the conduct and the injury, but also with public policy." (*Id.* at pp. 315-316.)

" ' " 'Legal cause' exists if the actor's conduct is a 'substantial factor' in bringing about the harm and there is no rule of law relieving the actor from liability. [Citations.]" ' (*Rosh v. Cave Imaging Systems, Inc.* (1994) 26 Cal.App.4th 1225, 1235[ ], quoting *Nola M. v. University of Southern California* (1993) 16 Cal.App.4th 421, 427[ ].)" (*Lombardo v. Huysentruyt* (2001) 91 Cal.App.4th 656, 665-666.) Legal causation limits liability. In some situations where a defendant's conduct constitutes the actual, cause in fact of harm, the defendant will be absolved from liability because of the manner in which the injury occurred. " ' "Thus, where there is an independent intervening act which is not reasonably foreseeable, the defendant's conduct is not deemed the 'legal' or proximate cause." ' " (*Ibid.*)

The County of Los Angeles does not challenge cause in fact, and concedes that the evidence shows that the inmate release policy, pursuant to which Reynolds was overdetained in the county jail until 7:41 a.m. the morning after his court-ordered release, was a cause in fact of the attack on and rape of Reynolds during the night. That is, if Reynolds had been released on the day the court ordered his release, the attacks would not have happened. The County of Los Angeles argues, however, that there was no other connection between the inmate release policy and the attacks.

The issue is whether a rule of law-in this appeal, an intervening, superseding cause-absolves the county from liability.

Avery, Michael 10/13/2018
For Educational Use Only

Reynolds v. County of Los Angeles, Not Reported in Cal.Rptr.3d (2004)

b. *The Definition of Intervening, Superseding Cause*

The term "superseding cause" means "an independent event [that] intervenes in the chain of causation, producing harm of a kind and degree so far beyond the risk the original [wrongdoer] should have foreseen[,] that the law deems it unfair to hold him responsible." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 573, fn. 9.)

**\*13** "A defendant's conduct is superseded as a legal cause of an injury if, among other things, the intervening force is highly unusual or extraordinary, not reasonably likely to happen and, therefore, not foreseeable. [Citations.] ... The defendant has the burden to prove the affirmative defense of superseding cause, that is, that the intervening event is so highly unusual or extraordinary that it was unforeseeable." (*Arreola v. County of Monterey* (2002) 99 Cal.App.4th 722, 760.) "[F]or an intervening act properly to be considered a superseding cause, the act must have produced 'harm of a kind and degree so far beyond the risk the original tortfeasor should have foreseen that the law deems it unfair to hold him responsible.' [Citation.]" (*Lugtu v. California Highway Patrol* (2001) 26 Cal.4th 703, 725.)

c. *The Jury Was Instructed on Intervening, Superseding Cause*

In the instructions on causation, the jury was instructed: "A defendant is not liable if plaintiff's injury was caused by a new or independent source of an injury which intervenes between the defendant's act or omission and the plaintiff's injury and which produces a result which was not reasonably foreseeable by the defendant."

The jury's special verdict finding that "plaintiff's over-detainment" was "a proximate cause of the physical and sexual assault committed against plaintiff" impliedly found that the physical and sexual assault was not a new or independent source of an injury, which intervened between the act or omission of the County of Los Angeles and Reynolds's injury and which produced a result not reasonably foreseeable by the County of Los Angeles. Unless the facts are undisputed, a determination of an intervening, superseding cause is left to the trier of fact. (*Lombardo v. Huysentruyt, supra,* 91 Cal.App.4th at p. 666.) Foreseeability in this context is likewise a question for the trier of fact. (*Ibid.*)

d. *Criminal Conduct Is Ordinarily a Superseding, Intervening Cause*

Although causation in the section 1983 context is a question of federal law, in determining the meaning of the concept we look to state tort analogs, because " 'principles of causation borrowed from tort law are relevant to civil rights actions brought under section 1983.' " (*Warner v. Orange County Dept. of Probation* (2d Cir.1997) 115 F.3d 1068, 1071; see also *Malley v. Briggs* (1986) 475 U.S. 335, 344, fn. 7; *Oklahoma City v. Tuttle* (1985) 471 U.S. 808, 833, fn. 9 (Brennan, J., concurring); *Monroe v. Pape* (1961) 365 U.S. 167, 187, overruled on other grounds, *Monell v. New York City Dept. of Social Services* (1978) 436 U.S. 658, 663.)

The general rule is: "Criminal conduct which causes injury will ordinarily be deemed *the* proximate cause of an injury, superseding any prior negligence which might otherwise be deemed a contributing cause." (*Koepke v. Loo* (1993) 18 Cal.App.4th 1444, 1449, italics in original; see also *Isaacs v. Huntington Memorial Hospital* (1985) 38 Cal.3d 112, 131; *Bullis v. Security Pac. Nat. Bank* (1978) 21 Cal.3d 801, 812; *Leslie G. v. Perry & Associates* (1996) 43 Cal.App.4th 472, 481; *Nola M. v. University of Southern California, supra,* 16 Cal.App.4th at p. 427.)[i]

**\*14** The question is whether the third party criminal acts that caused Reynolds's injuries were foreseeable, such that they should not be regarded as a superseding cause which cuts off liability of the County of Los Angeles.

e. *Foreseeability*

As we have seen, " ' "where there is an independent intervening act which is not reasonably foreseeable, the defendant's conduct is not deemed the 'legal' or proximate cause." ' " (*Lombardo v. Huysentruyt, supra,* 91 Cal.App.4th at pp. 665-666.)

In the context of a section 1983 action, "personal participation is not the only predicate for section 1983 liability. Anyone who 'causes' any citizen to be subjected to a constitutional deprivation is also liable. The requisite

Avery, Michael 10/13/2018
For Educational Use Only

Reynolds v. County of Los Angeles, Not Reported in Cal.Rptr.3d (2004)

causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." (*Arnold v. Intern. Business Machines* (9th Cir.1981) 637 F.2d 1350, 1355.)

The law distinguishes between foreseeability as a factor in determining duty and foreseeability as a factor in causation. In negligence cases, "[f]oreseeability, when analyzed to determine the existence or scope of a duty, is a question of law to be decided by the court." (*Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 678.) In determining "duty," a court's task "is not to decide whether a particular plaintiff's injury was reasonably foreseeable in light of a particular defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party." (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 573, fn. 6, italics omitted.) The question of foreseeability in determining legal cause of the plaintiff's injury, by contrast, is (1) a question of fact for the jury, and (2) a "more focused, fact-specific" determination. (*Ibid.*) Thus the question is whether a particular defendant's conduct made a particular plaintiff's injury reasonably foreseeable.

In negligence cases involving harm caused by third party crimes, the absence of prior similar criminal assaults means that the requisite degree of foreseeability can rarely, if ever, be proven sufficient to show that the landowner's duty of care includes the hiring of security. (*Ann M. v. Pacific Plaza Shopping Center, supra,* 6 Cal.4th at p. 679.) Although made in the "duty" context, we believe this rule from *Ann M.* also applies to a jury's particularized factual determination of "causation." The evidence did not show that prior similar incidents gave the County of Los Angeles notice so as to make the cellmates' attacks on Reynolds foreseeable. No attacks had occurred in the seven previous days in which Reynolds was housed with those cellmates. Neither Reynolds nor anyone else made a report to county jail officials that Reynolds's cellmates had threatened him with attack or that a dispute between Reynolds and his cellmates made such an attack imminent or likely. We note that even if there were such a report, and even if prison officials negligently disregarded it, there would be no liability for prison officials' negligent failure to take preventative action. (*Davidson v. Cannon* (1986) 474 U.S.

344, 347.) Although the Fourteenth Amendment was the constitutional right claimed to have been violated in *Davidson,* we do not see how identifying the constitutional right violated as the Fourth Amendment, as the jury found, changes that result. In the context of foreseeability, the absence of any prior incidents or threats of cellmates' criminal violence against Reynolds or of disputes or trouble between Reynolds and his cellmates, and the absence of any reports of these events or threatened events to prison authorities, mean that they were not specifically foreseeable. Thus under *Arnold,* the County of Los Angeles did not know, nor should it have known, that the criminal attacks on Reynolds were going to occur.

**\*15** Neither is there evidence regarding prior incidents of criminal attacks by cellmates on other cellmates generally in the county jail, which would indicate the general foreseeability of violence by prisoners against cellmates. The jury heard no evidence that rates of attacks by prisoners on cellmates was sufficiently high or frequent so as to make it foreseeable in these circumstances that these specific prisoners would attack Reynolds.

There was no evidence that returning an inmate subject to a release order to the same cell and cellmates with whom he was in custody without incident for seven previous days made it foreseeable that a criminal attack would occur.

Therefore substantial evidence does not support the jury's implied finding that cellmates' violent criminal attacks on Reynolds were foreseeable. We conclude that the intervening cause of those criminal attacks was also a superseding cause, that is, that although the County of Los Angeles overdetained Reynolds in violation of the Fourth Amendment when the criminal attacks against him occurred, the lack of foreseeability of those attacks makes them a superseding cause which cuts off the liability of the County of Los Angeles for harm suffered in those criminal third party attacks.

We therefore reverse that portion of the judgment ordering payment of $1 million in damages by the County of Los Angeles to Reynolds.

3. *The County of Los Angeles Did Not Act as a State of California Policymaker, and Can Be Liable Under*

Avery, Michael 10/13/2018
For Educational Use Only

Reynolds v. County of Los Angeles, Not Reported in Cal.Rptr.3d (2004)

**Section 1983**

The County of Los Angeles claims that the Sheriff acted as a state official when setting policies for release of prisoners from jail and therefore the County of Los Angeles cannot be held liable under section 1983. "[S]tates and state officers sued in their official capacity are not considered persons under section 1983 and are immune from liability under the statute by virtue of the Eleventh Amendment and the doctrine of sovereign immunity." (*Venegas v. County of Los Angeles* (2004) 32 Cal.4th 820, 829, italics omitted.) This exemption of the state and its state officers from section 1983 liability "applies to officers such as sheriffs if they were acting as state agents with final policymaking authority over the complained-of actions." (*Ibid.; Streit v. County of Los Angeles* (9th Cir.2001) 236 F.3d 552, 559; *County of Los Angeles v. Superior Court* (1998) 68 Cal.App.4th 1166, 1171.)

The County of Los Angeles argues based on *County of Los Angeles v. Superior Court, supra,* 68 Cal.App.4th 1166 ("*Peters* "),[2] which held that "in setting policies concerning release of persons from the Los Angeles County Jail, the Los Angeles County Sheriff acts as a state officer performing state law enforcement duties, and not as a policymaker on behalf of the County of Los Angeles." (*Id.* at p. 1178.) In *Peters,* the plaintiff posted bail to be released on June 18, 1997, but the Los Angeles County Sheriff detained plaintiff for 10 more days in purported reliance on a warrant the sheriff knew or reasonably should have known did not apply to plaintiff. (*Id.* at pp. 1168-1169.) The sheriff's function involved determining whether to release a person who might be subject to arrest on an outstanding warrant, which *Peters* called a law enforcement function. (*Id.* at p. 1177, citing Gov.Code, §§ 26601, 26602 and Pen.Code, § 816.) *Venegas v. County of Los Angeles, supra,* 32 Cal.4th 820 similarly held that a sheriff, when investigating possible criminal activity, including detaining suspects, searching their home and vehicle, and seizing documents, performs law enforcement activities and therefore acts on behalf of the state, making the county immune from section 1983 liability. (*Id.* at pp. 826, 839.)

**\*16** By contrast, Reynolds argues that the Los Angeles County Sheriff did not act as a policy maker for the State of California in determining when to release Reynolds, and therefore the County of Los Angeles is not immune from section 1983 liability.

Reynolds argues based on *Streit v. County of Los Angeles,*

*supra,* 236 F.3d 552, which held that the Los Angeles County Sheriff, when implementing its policy of conducting prisoner release records checks, acts for the county in its capacity as administrator of the Los Angeles County Jails. Therefore the County of Los Angeles (and the Los Angeles County Sheriff's Department) were subject to section 1983 liability. (*Id.* at pp. 555-556.) In *Streit,* plaintiffs alleged they were detained in county jails after all legal justification for their seizure and detention ended while the Sheriff's Department ran a check of a computerized law enforcement database to confirm that no other law enforcement agency wanted the prisoner, and further alleged that the Sheriff's Department ran this computerized check only after all "wants and holds" arriving on the day a prisoner was scheduled for release were entered into the computer database, causing the prisoners' incarceration to extend beyond their release dates. (*Id.* at p. 556.)

*Streit* distinguished *Peters* as involving the Los Angeles County Sheriff acting on a facially valid warrant in detaining prisoners, which it characterized as "a law enforcement function with which the [Los Angeles County Sheriff's Department] is tasked under [Government Code section 12560]." (*Streit v. County of Los Angeles, supra,* 236 F.3d at p. 564.) In *Streit,* by contrast, the sheriff's function involved an "administrative search for outstanding warrants, wants, or holds upon which it would be required to act, if they existed." (*Ibid.*) *Streit* concluded: "Searching for wants and holds that may or may not have been issued for persons whom the state has no legal right to detain is an administrative function of jail operations for which the [Los Angeles County Sheriff's Department] answers to the County." (*Ibid.,* citing Gov.Code, §§ 25303, 26605.)

*Cortez v. County of Los Angeles* (9th Cir.2002) 294 F.3d 1186 similarly cited the Los Angeles County Sheriff's constitutional, statutory, and administrative authority to manage county jails under California law. (*Id.* at p. 1190.) *Cortez* held that when the county sheriff assigned a prisoner pursuant to the sheriff's policy of segregating gang members from other inmates, the sheriff acted on behalf of the county and therefore was subject to section 1983 liability for those actions. (*Ibid.*)

This appeal, in part, involves the sheriff's policy of assignment of prisoners in his custody, which *Cortez* defined as action taken on behalf of the county, not the state. This appeal also involves the detention of a person as to whom the court had dismissed charges and had

Avery, Michael 10/13/2018
For Educational Use Only

Reynolds v. County of Los Angeles, Not Reported in Cal.Rptr.3d (2004)

ordered released, and thus resembles *Streit*. The facts show that the Los Angeles County Sheriff's personnel continued to detain Reynolds so as to determine whether he was entitled to be released, which involved determining whether an outstanding warrant existed against Reynolds in another case. Under *Cortez* and *Streit*, we conclude that the County of Los Angeles is subject to section 1983 liability.

#### 4. *The County of Los Angeles Has Not Shown Instructional Error*

**\*17** The County of Los Angeles claims that the trial court erroneously instructed the jury on the wrong constitutional right, and erroneously rejected a jury instruction stating that deference should be given to a jail administrator's judgments regarding the institution's operation.

##### a. *Because the County Did Not Request a Correct, Complete Instruction That Reflected Its Theory of the Litigation, No Error Occurred in Failing to Deliver a Fourteenth Amendment "Arbitrariness" Instruction*

The County of Los Angeles claims the trial court should have instructed that the Fourteenth Amendment governed Reynolds's overdetention claim and that the County of Los Angeles only could have been held liable if its inmate release policy was arbitrary.

As regards the $25,000 damage award, we have rejected the claim that the Fourth Amendment did not govern this case. The County of Los Angeles concedes that it did not request an instruction embodying the Fourteenth Amendment "arbitrariness" standard. It claims the trial court had a sua sponte duty to instruct on this standard. Although all instructions are deemed excepted to (Code Civ. Proc., § 647), " '[i]n a civil case, each of the parties must propose complete and comprehensive instructions in accordance with his theory of the litigation; if the parties do not do so, the court has no duty to instruct on its own motion.' " (*Agarwal v. Johnson* (1979) 25 Cal.3d 932, 950-591, overruled on other grounds, *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 575.) "Neither a trial court nor a reviewing court in a civil action is obligated to seek out

theories plaintiff might have advanced, or to articulate for him that which he has left unspoken." (*Finn v. G.D. Searle & Co.* (1984) 35 Cal.3d 691, 701-702.) We reject the claim that instructional error occurred because the trial court did not deliver a Fourteenth Amendment "arbitrariness" instruction.

##### b. *The Trial Court's Rejection of a "Deference to Prison Administrators" Proposed Instruction Was Not Error*

The County of Los Angeles also claims that the trial court erroneously rejected an instruction which the County of Los Angeles did propose. This proposed instruction, based on *Bell v. Wolfish* (1979) 441 U.S. 520, stated:

"Governmental action does not have to be the only alternative or even the best alternative for it to be reasonable. The test for constitutionality turns on whether the articulated purpose for the restriction is rationally related to a legitimate governmental interest and whether it is reasonably tailored to achieve the stated goal. Prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, their expert judgment should be deferred to."

**\*18** The County of Los Angeles argues briefly that even if the Fourth Amendment reasonableness standard applied to Reynolds's section 1983 action, this instruction should have been delivered as a proper statement of the law which was relevant to the facts. *Bell*, however, reviewed constitutional challenges to prison conditions and practices according to whether, under the Due Process Clause, prison conditions amounted to punishment of a pretrial detainee. (*Bell v.. Wolfish, supra,* 441 U.S. at p. 535.) The prison conditions and practices included "double-bunking" of inmates, a regulation permitting inmates to receive books and magazines only if mailed directly from the publisher or book club, a prohibition against receiving packages of food or personal property from outside the facility, unannounced searches of inmate

**Avery, Michael 10/13/2018**
**For Educational Use Only**

Reynolds v. County of Los Angeles, Not Reported in Cal.Rptr.3d (2004)

living areas by prison staff, required exposure of body cavities for visual inspection after each contact visit an inmate had with a person from outside the institution. None of these regulations and conditions were at issue in Reynolds's lawsuit. The *Bell* decision has relevance to the analysis of whether summary judgment was correctly granted as to Reynolds's Eighth Amendment cause of action, *post. Bell,* however, did not involve whether the length of time between the court's dismissal of charges and release order and the prisoner's ultimate release was reasonable. *Bell* contains neither facts nor issues in common with the Fourth Amendment overdetention at issue in this appeal. The use of the proposed instruction would therefore have been inappropriate. (*Drake v. Dean* (1993) 15 Cal .App.4th 915, 924.) We find no error in the trial court's rejection of the proposed instruction.

II. *Reynolds's Appeal from the Grant of Summary Judgment on His Eighth Amendment Cause of Action*
Reynolds appeals from the grant of summary judgment in defendant's favor on his cause of action for violation of his fourth cause of action under section 1983 for violation of his Eighth Amendment constitutional right against cruel and unusual punishment.

**STANDARD OF REVIEW**

"A defendant's motion for summary judgment should be granted if no triable issue exists as to any material fact and the defendant is entitled to a judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) The burden of persuasion remains with the party moving for summary judgment. [Citation.] When the defendant moves for summary judgment, in those circumstances in which the plaintiff would have the burden of proof by a preponderance of the evidence, the defendant must present evidence that would preclude a reasonable trier of fact from finding that it was more likely than not that the material fact was true [citation], or the defendant must establish that an element of the claim cannot be established, by presenting evidence that the plaintiff 'does not possess and cannot reasonably obtain, needed

evidence.' [Citation.] We review the record and the determination of the trial court de novo." (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1002-1003.)

**\*19** A defendant moving for summary judgment bears the burden of showing that a cause of action has no merit because plaintiff cannot establish an element of the claim or because defendant has a complete defense. The burden then shifts to the plaintiff opposing the summary judgment motion to establish that a triable issue of fact exists as to these issues. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.)

**FACTS**

*Allegations of the Complaint:* Reynolds's cause of action for violation of his Eighth Amendment right against cruel and unusual punishment alleged that Los Angeles County central jail personnel placed him in a maximum security cell because he was charged with Penal Code section 1551, a crime Los Angeles County Sheriff's personnel categorize with murder, rape, kidnapping, robbery, and other crimes requiring a high security classification. This cause of action alleged that defendant's classification policy recklessly, arbitrarily, and with deliberate indifference exposed Reynolds to a substantial risk of serious damage to his health and safety while he was in defendant's custody, and that the policy was the moving force between other inmates' assault and rape of Reynolds in violation of his Eighth Amendment rights.

The county moved for summary judgment on the ground that classifying and housing Reynolds in a high security module did not violate his Eight Amendment rights.

*Undisputed Facts in the Summary Judgment Motion:* On March 8, 1999, Reynolds was transported to the Los Angeles County central jail and processed by defendants pursuant to their official, policy, custom, and practice. Inmates in the central jail range from pre-trial detainees to those serving lengthy county jail sentences and face charges ranging from petty theft to murder. Some county jail inmates have never before been in jail; others are state prison veterans.

Avery, Michael 10/13/2018
For Educational Use Only

Reynolds v. County of Los Angeles, Not Reported in Cal.Rptr.3d (2004)

To classify inmates as low, medium, or high security prisoners, the classification system assigns each of the following criterion a point value: charge pending, prior convictions, bail amount, age, and previous escape attempts. Charges such as murder, kidnaping, mayhem, and rape result in a "high security" classification. Because Reynolds was charged with violating Penal Code section 1551 .1, a crime the sheriffs categorize with murder, rape, kidnaping, and robbery, he was placed in a maximum security cell. The classification policy does not attempt to discover the basis for the Penal Code section 1551.1 charge.

The "Wants and Detainer's" Department processes additional holds on inmates in custody. When this department receives notification that another state has an outstanding warrant on and desires extradition of someone in county custody, the department places a "no bail hold" on that person and code that person Penal Code section 1551.1. Generally information received from another state does not contain information on the underlying charge causing the state to request a hold for extradition.

**\*20** The security classification system seeks to categorize individuals by the level of security required according to the severity or seriousness of the crime they are charged with and according to their previous criminal history. Persons in custody receiving a "high" security classification require closer supervision and greater security measures than lower classifications. "High" security inmates are placed in the most secure areas in cells containing fewer inmates than lower security classifications.

*Trial Court's Grant of Summary Judgment:* On September 17, 2001, the trial court granted summary judgment after finding that Reynolds had presented no evidence that he had a constitutional right to be classified in a certain manner or to be housed in a certain location, and presented no evidence that defendants acted with deliberate indifference in classifying him as a high security risk.

As stated, Reynolds filed a cross-appeal from the September 17, 2001, order granting summary judgment as to his Eighth Amendment cause of action.

## ISSUES

The cross-appeal claims that:

1. Reynolds was deprived of his constitutional right to safety;

2. The constitutional deprivations are due to the sheriff's policy;

3. The sheriff's policy amounted to deliberate indifference to Reynolds's constitutional rights; and

4. The policy was the moving force behind the constitutional violation.

## DISCUSSION

As a preliminary matter, it is important to note that the cross-appeal deals solely with the classification of Reynolds when he was validly in custody, which caused Reynolds to be assigned to his cell in the county central jail. Reynolds also acknowledges that the Eighth Amendment applies only to convicted prisoners. As has long been recognized, the due process clause of the Fourteenth Amendment is the pertinent constitutional guarantee applicable to a claim that the state has imposed punishment on a pretrial detainee lawfully committed to pretrial detention but not yet found guilty of any crime. (*Bell v. Wolfish, supra,* 441 U.S. at pp. 535-536, fn. 16.) "Cases determining that conditions or practices violate the Eighth Amendment remain useful, however, because *a fortiori* such conditions or practices amount to punishment when applied to detainees." (*Lock v. Jenkins* (7th Cir.1981) 641 F.2d 488, 491, fn. 7.)

Reynolds claims that the classification system deprived him of his constitutional right to safety. This right refers to the Fourteenth Amendment due process "liberty interest in personal security." (*Davidson v. Cannon, supra,* 474 U.S. at p. 346.) "[I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.' Conversely, if a restriction or condition is not reasonably related to a legitimate goal- if it is arbitrary or purposeless-a court permissibly may

**Avery, Michael 10/13/2018**
**For Educational Use Only**

Reynolds v. County of Los Angeles, Not Reported in Cal.Rptr.3d (2004)

infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees." (*Bell v. Wolfish, supra,* 441 U.S. at p. 539, fn. omitted; *Turner v. Safley* (1987) 482 U.S. 78, 89: "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.")

**\*21** The interest in ensuring a detainee's presence at trial, and the interest in managing a prison facility by taking steps to maintain security and order at the institution, are both legitimate governmental interests. (*Bell v. Wolfish, supra,* 441 U.S. at p. 540.) "Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment.... [T]he effective management of the detention facility once the individual is confined is a valid objective that may justify imposition of conditions and restrictions of pretrial detention and dispel any inference that such restrictions are intended as punishment." (*Ibid.*)

"In determining whether restrictions or conditions are reasonably related to the Government's interest in maintaining security and order and operating the institution in a manageable fashion, courts must heed our warning that '[s]uch considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.' [Citations.]" (*Bell v. Wolfish, supra,* 441 U.S. at pp. 540-541, fn. 23.)

With regard to the Los Angeles County Sheriff's classification of Reynolds as "high security" and placement of Reynolds in a maximum security cell, Reynolds has provided no evidence that this classification system was not reasonably related to the legitimate government objective of managing the prison to maintain security.

Moreover, Reynolds has not provided evidence that the classification policy reflects "deliberate indifference" to a substantial risk of serious harm. (*Farmer v. Brennan* (1994) 511 U.S. 825, 835.) "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists, and he must also draw the inference." (*Id* at p. 837.) In the summary judgment proceeding, Reynolds produced no evidence that a Los Angeles County Sheriff's prison official was "deliberately indifferent" in applying the classification system to Reynolds when placing him in county jail custody. Reynolds did not show that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noticed by Los Angeles County Sheriff prison officials in the past, and that a defendant-official had been exposed to information concerning the risk. Such evidence could create a triable issue of fact as to whether the defendant-official had the actual knowledge of the substantial risk of serious harm and acted or failed to act despite his knowledge. (*Id.* at p. 842.) Reynolds relied on a declaration by an expert witness, Clifford Powell, which provided no evidence concerning a substantial risk of inmate attacks in the Los Angeles County jail system or the Los Angeles County Sheriff's knowledge of a substantial risk of inmate attacks.

**\*22** Reynolds failed to create a triable issue of fact concerning "deliberate indifference" to a substantial risk of serious harm. We affirm the grant of summary judgment.

III. *The Appeal From the Attorney Fee Award*

**FACTS**

After judgment was entered leaving the amount of attorney fees and costs undetermined, Reynolds's counsel filed a cost memorandum. The County of Los Angeles filed a motion to tax costs. Reynolds's counsel also filed a motion seeking $279,025 in attorney fees pursuant to Code of Civil Procedure section 1021.5 and 42 United States Code section 1988.

On November 8, 2002, the trial court filed an amended judgment, which awarded Reynolds $227,550.00 attorney fees and $11,821.22 costs.

On November 27, 2002, the County of Los Angeles filed

**Avery, Michael 10/13/2018**
**For Educational Use Only**

Reynolds v. County of Los Angeles, Not Reported in Cal.Rptr.3d (2004)

a notice of appeal from the amended judgment entered on November 8, 2002.

## ISSUES

The County of Los Angeles argues that if, in the underlying appeal, the judgment is reversed in its entirety, the order for attorney fees and costs must also be reversed, and if the judgment is reversed in part, the order for attorney fees and costs should be reversed and remanded to the trial court for a downward adjustment.

## DISCUSSION

Title 42 of the United States Code section 1988(b) states that in an action to enforce a provision of section 1983, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs[.]"

To qualify for attorney fees under section 1988, a plaintiff must be a "prevailing party." (*Farrar v. Hobby* (1992) 506 U.S. 103, 110.) "[T]o qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim." (*Id.* at p. 111.) This relief can take the form of an enforceable judgment against the defendant against whom fees are sought. (*Ibid.*)

"[T]he extent of a plaintiff's success is a crucial factor in determining the proper amount of an award of attorney's fees under 42 U.S.C. § 1988. Where the plaintiff has

failed to prevail on a claim that is distinct in all respects from his successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee. Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the [trial court] did not adopt each contention raised. But where the plaintiff achieved only limited success, the [trial court] should award only that amount of fees that is reasonable in relation to the results obtained." (*Hensley v. Eckerhart* (1983) 461 U.S. 424, 440.)

The reversal of the $1 million jury award means that the matter must be remanded to the trial court to recalculate its determination of the attorney fee award.

## DISPOSITION

The jury's award of $1 million to Reynolds is reversed. In other respects the judgment is affirmed. The order awarding attorney fees and costs to Reynolds is reversed and that matter is remanded to the trial court for redetermination of the attorney fee award. The parties are ordered to bear their own costs on appeal.

We concur: CROSKEY, Acting P.J., and ALDRICH, J.

**All Citations**

Not Reported in Cal.Rptr.3d, 2004 WL 2538373

Footnotes

1    Although the general rule has an exception, it does not apply here. The general rule does not apply when the hazard which occurred is the very hazard against which the defendant owed a duty to prevent. (Rest.Torts2d, § 449, p. 482; see also com. b to § 449, p. 483.) In such circumstances, a third party's criminal act will come under the exception and will not constitute an intervening, superseding cause that relieves the defendant from liability. (See, e.g., *Bullis v. Security Pac. Nat. Bank, supra,* 21 Cal.3d at pp. 811-812 and *Nola M. v. University of Southern California, supra,* 16 Cal.App.4th at pp. 426-427.)

2    The real party in interest in *County of Los Angeles v. Superior Court, supra,* 68 Cal.App.4th 1166 was Rebecca

**Avery, Michael 10/13/2018**
**For Educational Use Only**

Reynolds v. County of Los Angeles, Not Reported in Cal.Rptr.3d (2004)

Peters.

---

**End of Document**                                      © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

MARVIN SEALES,

     Plaintiff,

v.

CITY OF DETROIT, OFFICER JOHN DOE I,
individually and in his official capacity, OFFICER
JOHN DOE II, individually and in his official capacity,
and OFFICER JOHN DOE III, individually and
in his official capacity,

     Defendants.

Case No.    CZ
Hon.

_____

GEOFFREY N. FIEGER (P30441)
MARTIN T. SHEPHERD (P65331)
Fieger, Fieger, Kenney Giroux & Danzig, P.C.
Attorneys for Plaintiffs
19390 W. Ten Mile Rd.
Southfield, MI 48075
248-355-5555
m.shepherd@fiegerlaw.com

_____

## **COMPLAINT AND DEMAND FOR TRIAL BY JURY**

    There is another no other civil action between these parties arising out of
the same transaction or occurrence as alleged in this complaint pending in
this court, nor has any such action been previously filed and dismissed or
transferred after having been assigned to a judge, nor do I know of any
other civil action not between these parties arising out of the same
transaction or occurrence as alleged in this complaint that is either
pending, or was previously filed and dismissed, transferred, or otherwise
disposed of after having been assigned to a judge in this court.

            */s/ Martin T. Shepherd*
           Martin T. Shepherd (P65331)

FIEGER, FIEGER, KENNEY, GIROUX & DANZIG, P.C. • A PROFESSIONAL CORPORATION
19390 WEST TEN MILE ROAD • SOUTHFIELD MICHIGAN 48075 • TELEPHONE (248) 355-5555 • FAX (248) 355-5148

NOW COMES the Plaintiff, MARVIN SEALES, by and through his attorneys, FIEGER, FIEGER, KENNEY, GIROUX, & DANZIG, P.C., and for his Complaint against the above named Defendants, states as follows:

## JURISDICTION AND VENUE

1.     This action arises under the United States Constitution and under the laws of the United States Constitution, particularly under the provisions of the Fourth Amendment of the United States Constitution and under the laws of the United States, particularly under the Civil Rights Act, Title 42 of the United States Code, Sections 1983 and 1988.

2.     This Court has jurisdiction of this cause under the provisions of Title 28 of the United States Code, sections 1331 and 1343.

3.     Venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C. § 1391. All Defendants reside and may be found in the Eastern District of Michigan and all of the events giving rise to these claims occurred in this district.

4.     That Plaintiff brings this suit against each and every Defendant in their individual and official capacities.

5.     That each and every act of Defendants, as set forth herein, were done by those Defendants under the color and pretense of the statutes, ordinances, regulations, laws, customs, and usages of the State of Michigan, and by virtue of, and under the authority of, each individual Defendant's employment with the State of Michigan.

## PARTIES

6.     Plaintiff, MARVIN SEALES, is a citizen of the State of Michigan and resident of Harper Woods, Wayne County, Michigan.

FIEGER, FIEGER, KENNEY, GIROUX & DANZIG, P.C. • A PROFESSIONAL CORPORATION
19390 WEST TEN MILE ROAD • SOUTHFIELD MICHIGAN 48075 • TELEPHONE (248) 355-5555 • FAX (248) 355-5148

7.      At all times relevant, Defendant CITY OF DETROIT was and is a municipal corporation, duly organized and carrying on governmental functions, including the formation, organization, and operation of the Detroit Police Department, in the City of Detroit, County of Wayne, State of Michigan.

8.      At all times relevant, DEFENDANT JOHN DOE I (hereinafter referred to as "DOE I") was a police officer employed by DEFENDANT CITY OF DETROIT, acting under color of state law.

9.      At all times relevant, DEFENDANT JOHN DOE II (hereinafter referred to as "DOE II") was a police officer employed by DEFENDANT CITY OF DETROIT, acting under color of state law.

10.     At all times relevant, DEFENDANT JOHN DOE III (hereinafter referred to as "DOE III") was a police officer employed by DEFENDANT CITY OF DETROIT, acting under color of state law.

11.     That the amount in controversy exceeds the amount of $75,000.00, and pursuant to 28 U.S.C. 1332, this action is otherwise within the jurisdiction of this Court.

## COMMON ALLEGATIONS

12.     On or about January 18, 2012, Plaintiff, MARVIN SEALES, was working as a technician at the Reinhart Food Service facility, 24838 Ryan Road, Warren, Michigan.

13.     During the time that MARVIN SEALES was working at Reinhart, on or about January 18, 2012, Defendants JOHN DOE I, JOHN DOE II, and JOHN DOE III entered the warehouse area of the Reinhart facility, handcuffed MARVIN SEALES, and instructed him to "come with us."

FIEGER, FIEGER, KENNEY, GIROUX & DANZIG, P.C. • A PROFESSIONAL CORPORATION
19390 WEST TEN MILE ROAD • SOUTHFIELD MICHIGAN 48075 • TELEPHONE (248) 355-5555 • FAX (248) 355-5148

14.     Defendants JOHN DOE I, JOHN DOE II, and JOHN DOE III then escorted MARVIN SEALES, who was handcuffed behind his back, outside of the Reinhart warehouse.

15.     MARVIN SEALES'S supervisor, Mark Weed, along with numerous other employees, witnessed Defendants JOHN DOE I, JOHN DOE II, and JOHN DOE III escorting MARVIN SEALES in handcuffs.

16.     Defendants JOHN DOE I, JOHN DOE II, and JOHN DOE III later accused MARVIN SEALES of using aliases and false picture identification.

17.     On January 18, 2012, Defendants JOHN DOE I, JOHN DOE II, and JOHN DOE III arrested MARVIN SEALES.

18.     On January 18, 2012, Defendants JOHN DOE I, JOHN DOE II, and JOHN DOE III delivered MARVIN SEALES to either or both the Wayne County Jail and/or Detroit Police Department Northeast/11th Precinct lockup.

19.     MARVIN SEALES was arrested and incarcerated from January 18, 2012 until February 1, 2012.

20.     When JOHN DOE I, JOHN DOE II, and JOHN DOE III arrested MARVIN SEALES, they were, in fact, looking for a man named Roderick Siner.

21.     At the time of MARVIN SEALES'S arrest, a mugshot and further identification of Roderick Siner were available to Defendants JOHN DOE I, JOHN DOE II, and JOHN DOE III.

22.      Upon information and belief, Siner and MARVIN SEALES do not, in any way, resemble one another.

FIEGER, FIEGER, KENNEY, GIROUX & DANZIG, P.C. • A PROFESSIONAL CORPORATION
19390 WEST TEN MILE ROAD • SOUTHFIELD MICHIGAN 48075 • TELEPHONE (248) 355-5555 • FAX (248) 355-5148

23.     Upon information and belief, the prosecutor assigned to the case noticed the glaring dissimilarity between the mugshot of Roderick Siner and the appearance of MARVIN SEALES during a criminal pretrial hearing.

24.     On February 1, 2012, Judge Deborah Ford of the 36th Judicial District, Michigan, signed an ORDER of Dismissal which states that MARVIN SEALES is not the correct defendant in the case. (EXHIBIT 1)

25.     As a result of the incarceration described above, MARVIN SEALES was unable to be present at work and was, thereby, terminated from employment at Reinhart Food Service.

## COUNT I

## VIOLATIONS OF 42 U.S.C. 1983: FALSE DETENTION, ARREST, IMPRISONMENT AND CONFINEMENT

26.     Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 25 above with the same force and effect as if herein set forth.

27.     As a result of their unlawful detention and confinement of MARVIN SEALES, Defendants deprived MARVIN SEALES of his right to liberty without due process of law, his right to equal protection of the laws, and the due course of justice was impeded, in violation of the Fifth and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. sec. 1983.

28.     That the action and omission of acts by all Defendants under 42 USC Section 1983 was unreasonable and performed knowingly, deliberately, intentionally, maliciously, with gross negligence, callousness, and reckless indifference to MARVIN SEALES'S well being and in disregard of MARVIN SEALE'S safety, with wanton disregard for his right to liberty and freedom of movement and used unreasonable and unnecessary force, failed to follow promulgated police policies in the lawful detention, arrest and imprisonment of citizens, and

FIEGER, FIEGER, KENNEY, GIROUX & DANZIG, P.C. • A PROFESSIONAL CORPORATION
19390 WEST TEN MILE ROAD • SOUTHFIELD MICHIGAN 48075 • TELEPHONE (248) 355-5555 • FAX (248) 355-5148

failed to properly train, supervise, develop and implement policies to prevent the unlawful and wrongful termination of his liberties and, by reason of which, Plaintiff is entitled to compensatory and punitive damages.

29.     That the conduct of Defendants JOHN DOE I, JOHN DOE II, and JOHN DOE III was pursuant to, and in execution and implementation of, officially sanctioned policies, practices, ordinance, regulations, or customs of Defendant CITY of DETORIT, and each of the named Defendants exhibited a deliberate indifference by intentional acts, gross negligence and/or engaging in omissions to breach MARVIN SEALES civil liberties and freedoms and causing constitutional deprivation of his individual rights, to wit:

   a.   Failure to properly train police officers and detention officers in the proper identification of a suspected criminal. Such omitted training was a grossly negligent and reckless act that amounted to a deliberate indifference to, and was in violation of, MARVIN SEALE'S constitutional rights.

   b.   Failure to hire individuals whose character and personality would not pose a potential danger to the residents and guests of CITY of DETROIT and MARVIN SEALES.

   c.   Failure of CITY OF DETROIT to discipline, investigate, and/or discharge any officers involved in the wrongful detention, arrest and imprisonment which ratifies and/or condones any officers' unconstitutional conduct.

   d.   Failure to train and inadequate training in the proper amount of force to be utilized for citizens, arrestees and/or detainees.

   e.   Knowingly and recklessly hiring and training as police officers and detention officers individuals who were not able to distinguish between accused criminals and innocent citizens.

   f.   Knowingly and recklessly failing to discipline, instruct, supervise or control officers' conduct, thereby encouraging acts or omissions that contributed to the arrest of MARVIN SEALES.

   g.   That the individual officers failed to check files and computer information available to them that would have given them pertinent information on Roderick Siner.

FIEGER, FIEGER, KENNEY, GIROUX & DANZIG, P.C. • A PROFESSIONAL CORPORATION
19390 WEST TEN MILE ROAD • SOUTHFIELD MICHIGAN 48075 • TELEPHONE (248) 355-5555 • FAX (248) 355-5148

FIEGER, FIEGER, KENNEY, GIROUX & DANZIG, P.C. • A PROFESSIONAL CORPORATION
19390 WEST TEN MILE ROAD • SOUTHFIELD MICHIGAN 48075 • TELEPHONE (248) 355-5555 • FAX (248) 355-5148

h.   That all Defendants, including officials, supervisors, and officers individually and as agents for Defendant CITY of DETROIT, personally participated in the implementation, execution, and omission of the official policies, training, ordinances, regulations, and/or customs referred to above.

i.   That all officials, supervisors, and officers had a duty to adequately train and supervise all police officers and detention officers who had a duty to act reasonably and without deliberate indifference the civil liberties and freedoms of MARVIN SEALES.

30.   That as a direct and proximate result of the aforementioned unlawful conduct and omissions of Defendants, Plaintiff suffered fear, pain, anguish, and the following damages:

a.   annoyance, vexation, and humiliation suffered by plaintiff from the inception of the arrest;

b.   loss of dignity;

c.   loss of reputation;

d.   Lost income;

e.   Compensatory and punitive damages; and

f.   Any and all other damages otherwise recoverable under USC Section 1983 and Section 1988.

WHEREFORE, Plaintiff demands judgment against all the Defendants jointly and severally, for actual, general, special, compensatory damages and further demands judgment against each of said Defendants, jointly and severally, for punitive damages, plus the costs of this action, including attorney's fees, and such other relief deemed to be just and equitable.

## COUNT II
## VIOLATIONS OF 42 U.S.C. 1983: STRIP SEARCH

31.   Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 30 above with the same force and effect as if herein set forth.

32.   As a result of the unlawful and malicious arrest, detention, and confinement of MARVIN SEALES, described above, Defendants JOHN DOE I, JOHN DOE II, and JOHN

FIEGER, FIEGER, KENNEY, GIROUX & DANZIG, P.C. • A PROFESSIONAL CORPORATION
19390 WEST TEN MILE ROAD • SOUTHFIELD MICHIGAN 48075 • TELEPHONE (248) 355-5555 • FAX (248) 355-5148

DOE III caused MARVIN SEALES to be subjected to a strip search of his body, including his rectal cavity, in a situation where there was no reason to believe that weapons or contraband had been concealed on or in his body, and thus deprived MARVIN SEALES of both his right to liberty without due process of law and his right to equal protection of the laws, and the due course of justice was impeded, in violation of the Fourth, Fifth, Ninth, and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. sec. 1983.

WHEREFORE, Plaintiff demands judgment against all the Defendants jointly and severally, for actual, general, special, compensatory damages and further demands judgment against each of said Defendants, jointly and severally, for punitive damages, plus the costs of this action, including attorney's fees, and such other relief deemed to be just and equitable.

Dated: April 16, 2012                      Respectfully Submitted,


                                           /s/ Martin T. Shepherd
                                           GEOFFREY N. FIEGER (P30441)
                                           MARTIN T. SHEPHERD (P65331)
                                           Fieger, Fieger, Kenney, Giroux & Danzig, P.C.
                                           Attorneys for Plaintiffs
                                           19390 West Ten Mile Road
                                           Southfield, Michigan 48075
                                           (248) 355-5555
                                           m.shepherd@fiegerlaw.com

## REQUEST FOR JURY TRIAL

Plaintiff, by and through his attorneys, Fieger, Fieger, Kenney, Giroux & Danzig, P. C., hereby requests a trial by jury in the above-captioned matter.

Dated:  April 16, 2012         Respectfully Submitted,


             /s/ Martin T. Shepherd
             GEOFFREY N. FIEGER (P30441)
             MARTIN T. SHEPHERD (P65331)
             Fieger, Fieger, Kenney, Giroux & Danzig, P.C.
             Attorneys for Plaintiffs
             19390 West Ten Mile Road
             Southfield, Michigan 48075
             (248) 355-5555
             m.shepherd@fiegerlaw.com

FIEGER, FIEGER, KENNEY, GIROUX & DANZIG, P.C. • A PROFESSIONAL CORPORATION
19390 WEST TEN MILE ROAD • SOUTHFIELD MICHIGAN 48075 • TELEPHONE (248) 355-5555 • FAX (248) 355-5148

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARVIN SEALES,

               Plaintiff,

                                              Case No.: 4:12-cv-11679

v.                                     Honorable Gershwin A. Drain

Police Officer, THOMAS
ZBERKOT, in his individual
capacity,

               Defendant.

_____/

## JUDGMENT IN A CIVIL CASE

This action having come before the Court and jury, and the Court having conducted a full trial on the merits, including the giving of opening and closing statements, calling witnesses, admitting exhibits, and all other indicia of a trial, and the Court having provided a verdict form to the Jury, and the Jury having found unanimously in favor of Plaintiff as shown by the verdict form filed 07/27/2018 (Doc #152) and the Court being otherwise fully advised in the premises;

The total verdict was in favor of Plaintiff against Defendant in the amount of $3,500,000 broken down as follows:

42 U.S.C. § 1983 – Compensatory Damages..........$750,000.00

42 U.S.C. § 1983 – Punitive Damages................$1,500,000.00

False Imprisonment Under State Law Damages.......$500,000.00

False Arrest Under State Law Damages................ $250,000.00

Gross Negligence Under State Law Damages..........$500,000.00

IT IS ORDERED AND ADJUDGED that JUDGMENT be and the same is hereby ordered in favor of the Plaintiff in the amount of **$3,500,000.00** - Total Judgment as of August 7, 2018.

**IT IS FURTHER ORDERED** that the Court shall retain jurisdiction for the purpose of determining the amount of attorney fees and costs pursuant to 42 U.S.C 1988, costs pursuant to Fed. R. Civ. P. 54(d)(1), sanctions and prejudgment interest and post judgment interest.

**IT IS FURTHER ORDERED** that post judgment interest from the date of entry of this judgment shall be computed daily to the date of payment and shall accrue at the legal rate and shall be compounded annually pursuant to 28 U.S.C. § 1961.

SO ORDERED.

Dated:  September 5, 2018                    /s/Gershwin A. Drain
                                             GERSHWIN A. DRAIN
                                             United States District Judge

# CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
September 5, 2018, by electronic and/or ordinary mail.
<u>/s/ Tanya Bankston</u>
Case Manager

3

Avery, Michael 10/13/2018
For Educational Use Only

Seales v. City of Detroit, Mich., 724 Fed.Appx. 356 (2018)

724 Fed.Appx. 356
This case was not selected for publication in West's
Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also U.S.Ct. of App. 6th Cir.
Rule 32.1.
United States Court of Appeals, Sixth Circuit.

Marvin **SEALES**, Plaintiff-Appellee,
v.
CITY OF **DETROIT**, MICH., et al., Defendants,
**Detroit** Police Officer Thomas Zberkot
Defendant-Appellant.

No. 17-1096
|
Filed January 31, 2018

**Synopsis**
**Background:** Arrestee brought action against arresting
officer, asserting claims under § 1983 for false arrest and
false imprisonment in violation of the Fourth
Amendment, and state law gross negligence, arising out
of his mistaken arrest and continued detention for 14
days. The United States District Court for the Eastern
District of Michigan, Gershwin A. Drain, J., 2017 WL
24868, granted officer's motion for summary judgment
based on qualified and governmental immunity in part
and denied it in part. Officer appealed.

**Holdings:** The Court of Appeals, Clay, Circuit Judge,
held that:

[1]  officer did not violate a clearly established
constitutional right by mistakenly arresting plaintiff;

[2]  fact issues existed as to whether officer violated a
constitutional right by continued detention of plaintiff for
14 days;

[3]  officer was not entitled to qualified immunity from
false imprisonment claim; and

[4]  fact issues precluded summary judgment on officer's
claim to governmental immunity from gross negligence

claim.

Affirmed.

West Headnotes (4)

[1]  **Civil Rights**
 Sheriffs, police, and other peace officers

Police officer did not violate a clearly
established constitutional right, as would
disqualify him from having qualified immunity
from plaintiff's § 1983 false arrest claim, by
mistakenly arresting plaintiff, who had a
completely different name than suspect listed in
the arrest warrant, where suspect's identifying
information was similar to plaintiff's in a
number of respects, as plaintiff had essentially
the same name as suspect's alias, plaintiff was
same sex, race, and age as suspect, plaintiff was
working in same geographic location in which
suspect resided, officer found plaintiff at address
where he was told suspect could be found by
task force that had developed a location for
suspect, and, since officer believed he was
arresting a man who used an alias, he would
have expected plaintiff to lie about his name.
U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

Cases that cite this headnote

[2]  **Federal Civil Procedure**
 Civil rights cases in general

Genuine issue of material fact existed as to
whether arresting officer acted with something
akin to deliberate indifference in failing to
ascertain that arrestee was not person identified
in arrest warrant and imprisoning him for 14
days, even though police officers were in
possession of exculpatory evidence and arrestee
repeatedly protested his misidentification,

Avery, Michael 10/13/2018
For Educational Use Only

Seales v. City of Detroit, Mich., 724 Fed.Appx. 356 (2018)

precluding summary judgment on issue of whether officer violated arrestee's Fourth Amendment right based on continued detention, as element of qualified immunity analysis with respect to arrestee's § 1983 false imprisonment claim against officer. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

[3] **Civil Rights**
   🔑 Sheriffs, police, and other peace officers

Arrestee had clearly established constitutional right to be free from continued detention after officers should have known that he was not the person named in arrest warrant, precluding arresting officer's claim to qualified immunity from arrestee's § 1983 false imprisonment claim, where arrestee was imprisoned for 14 days, he repeatedly protested his misidentification, and exculpatory evidence was available to officers at time of his arrest and detention. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

[4] **Federal Civil Procedure**
   🔑 Tort cases in general

Genuine issue of material fact existed as to whether arresting officer's conduct in continuing arrestee's detention for 14 days despite his protestations that he was not person named in arrest warrant and availability of exculpatory evidence constituted gross negligence under Michigan law precluded summary judgment on officer's claim to governmental immunity from arrestee's gross negligence claim. U.S. Const. Amend. 4.

Cases that cite this headnote

*357 ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

**Attorneys and Law Firms**

James S. Craig, Fieger Law, Southfield, MI, for Plaintiff-Appellee

Sheri L. Whyte, City Of Detroit Law Department, Detroit, MI, for Defendant-Appellant

BEFORE: CLAY, GIBBONS, and COOK, Circuit Judges.

**Opinion**

CLAY, Circuit Judge.

Defendant-Appellant Detroit Police Officer Thomas Zberkot ("Zberkot") appeals from the judgment entered by the district court denying in part his motion for summary judgment. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

**BACKGROUND**

**I. Factual History**

Thomas Zberkot is a police officer for the City of Detroit Police Department who was on assignment to the Detroit Fugitive Apprehension Team ("DFAT"). On January 18, 2012, Zberkot and other members of DFAT were assigned to execute an arrest warrant for Rodrick Siner ("Siner") for charges including assault with intent to commit murder. Apparently, Siner used a number of aliases, including "Marvin Seals."

Marvin Seales was working as a technician at the Reinhart Food Service facility. The team, including Zberkot, arrested Seales during his shift at the facility.

Avery, Michael 10/13/2018
For Educational Use Only

Seales v. City of Detroit, Mich., 724 Fed.Appx. 356 (2018)

Seales was taken to the Detroit Police Department Northeastern District for processing. Zberkot processed Seales. Seales told Zberkot on several occasions that he was not Siner and they had the wrong individual.

Seales was transferred to the Wayne County Jail. He was incarcerated from January 18, 2012 until February 1, 2012. On February 1, during his preliminary examination, the victim in Siner's case saw Seales and told the prosecutor he was the wrong person. The prosecutor moved to dismiss based on insufficient evidence. The judge signed an Order of Dismissal detailing that Seales was not the correct defendant and that he was "wrongly arrested and detained from 1/18/12–2/1/12." (R. 70-13, Order of Dismissal, PageID # 456.)

**II. Procedural History**

On April 9, 2013, Seales filed an Amended Complaint against the City of Detroit, Zberkot, and Wayne County. Seales brought six counts against Defendants including: **\*358** (I) a § 1983 claim for false detention, arrest, imprisonment, and confinement against the City of Detroit; (II) a false/wrongful arrest and false imprisonment claim against all Defendants; (III) a willful and wanton misconduct, deliberate indifference/gross negligence claim against all Defendants; (IV) an intentional infliction of emotional distress claim against all Defendants; (V) a § 1983 claim for deprivation of rights under the First, Fourth, Fifth, and Fourteenth Amendments to the US Constitution and Article I, §§ 5, 6, 11 and 17 under the Michigan Constitution against Zberkot; and, (VI) a *Monell* claim against the City of Detroit.

On July 23, 2013, Defendants filed a Notice of Suggestion of Pendency of Bankruptcy Case and Application of the Automatic Stay after the City of Detroit ("the City") filed for bankruptcy. On July 29, 2013, the district court entered an Order administratively closing the case without prejudice. The Order provided that the case may be reopened upon motion should the City emerge from bankruptcy. On October 6, 2015, Seales filed a Motion to Set Aside Bankruptcy Stay and Reopen Case after the City emerged from Bankruptcy Court protection. On November 17, 2015, the district court granted Plaintiff's motion.

On September 9, 2016, Defendants City of Detroit and Zberkot filed a Motion for Partial Summary Judgment. On September 14, 2016, Defendants filed an Amended Motion for Partial Summary Judgment. Wayne County was dismissed from the case after several counts were dismissed by stipulation, and the remaining count was dismissed on summary judgment.

On January 3, 2017, the district court issued its Opinion and Order granting in part and denying in part Defendants City of Detroit and Zberkot's Amended Motion for Partial Summary Judgment. The district court granted summary judgment as to Counts I, II, III, IV, and VI against the City, and dismissed all claims against the City. The court granted summary judgment as to Count IV (intentional infliction of emotional distress) for Zberkot, but denied summary judgment as to Counts II (false/wrongful arrest and false imprisonment), III (gross negligence), and V (Section 1983) against Zberkot. The district court found that Zberkot was not entitled to qualified immunity on the § 1983 claim, that he was not entitled to immunity under Michigan law for the gross negligence claim, and that because he did not argue he should be shielded by immunity, he was not entitled to immunity on the false arrest and false imprisonment claim.

On January 27, 2017, Zberkot timely filed his notice of appeal. Zberkot argues that he is entitled to qualified immunity because he did not "violate clearly established rights guaranteed by the U.S. Constitution." (Zberkot Br. at 4.) He also argues that he is immune from liability under Michigan law for the claims of gross negligence and false arrest and false imprisonment. Therefore, he argues he is entitled to summary judgment as a matter of law.

**DISCUSSION**

**I. QUALIFIED IMMUNITY**

Avery, Michael 10/13/2018
For Educational Use Only

Seales v. City of Detroit, Mich., 724 Fed.Appx. 356 (2018)

### Standard of Review

This Court reviews a district court's denial of summary judgment on qualified immunity grounds *de novo*. *Harrison v. Ash,* 539 F.3d 510, 516 (6th Cir. 2008) (citing *Monette v. Electronic Data Sys. Corp.,* 90 F.3d 1173, 1176 (6th Cir. 1996)). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party **\*359** bears the burden of showing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party must demonstrate the "basis for its motion, and identify[ ] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548 (internal citations and quotation marks omitted). The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal citations and quotation marks omitted). The reviewing court must then determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505. A court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### Analysis

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). To determine whether government officials are entitled to qualified immunity, we ask two questions: "First, taken in the light most favorable to the party asserting the injury, do the facts alleged show that the officer's conduct violated a constitutional right? Second, is the right clearly established?" *Silberstein v. City of Dayton,* 440 F.3d 306, 311 (6th Cir. 2006) (citing *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). Courts may address these two prongs in whichever order they choose. *Pearson v. Callahan,* 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). Plaintiff bears the burden of showing that defendants are not entitled to qualified immunity. *Chappell v. City Of Cleveland,* 585 F.3d 901, 907 (6th Cir. 2009).

On appeal, Zberkot argues that his actions did not constitute a constitutional violation or violate clearly established law. He argues that based on the warrant and the DFAT investigation, "at the time it was reasonable to conclude that Plaintiff was the person identified in the warrant" and that Zberkot's arrest "was not an unreasonable seizure rising to the level of a civil rights violation." (Zberkot Br. at 11.) Zberkot argues that based on this "particular set of facts," "Zberkot did not violate clearly established law." (*Id.*)

There are two potential constitutional violations involved in this case: first, mistakenly arresting **Seales** instead of Siner when executing the arrest warrant for Siner and, second, mistakenly detaining **Seales** for fourteen days after the arrest.

### A. Mistaken Arrest

[1] We first consider whether Zberkot violated a clearly established constitutional right by mistakenly arresting **Seales**, when the person actually named in the warrant was Siner. "Arrest warrants in the hands of a police officer, unless facially invalid, are presumed valid." *Fettes v. Hendershot,* 375 Fed.Appx.. 528, 532 (6th Cir. 2010). "[P]olice and correction employees may rely on facially valid arrest warrants even in the face of vehement claims of innocence **\*360** by reason of mistaken identity or otherwise." *Masters v. Crouch,* 872 F.2d 1248, 1253 (6th Cir. 1989) (citing *Baker v. McCollan,* 443 U.S. 137, 145, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)); *Baker,* 443 U.S. at 145–46, 99 S.Ct. 2689 ("[W]e do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence[.]"). Here, **Seales** does not challenge the facial validity of the warrant. He does, however, argue that the officers unreasonably mistook **Seales** for Siner and their

Avery, Michael 10/13/2018
For Educational Use Only

Seales v. City of Detroit, Mich., 724 Fed.Appx. 356 (2018)

unreasonable mistake violates the Fourth Amendment.

"[W]hen the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest." *Hill v. California*, 401 U.S. 797, 802, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971) (internal citations and quotation marks omitted); *see also Fettes*, 375 Fed.Appx. at 532 ("The Supreme Court has held that if, in executing a presumptively valid arrest warrant, the police reasonably mistake a second person as being the individual named in the warrant and arrest him, the arrest of the second person does not offend the Constitution."); *Ingram v. City of Columbus*, 185 F.3d 579, 595 (6th Cir. 1999) ("Where the police have probable cause to arrest one party but reasonably mistake a second party for the first, their arrest of the second party is valid." (citing *Hill*, 401 U.S. at 801, 91 S.Ct. 1106)).

In *Hill*, the police had probable cause to arrest Hill, the man named in the warrant, but mistakenly arrested a man with a completely different name—Miller. 401 U.S. at 802–03, 91 S.Ct. 1106. Miller told the officers he was Miller, not Hill, but the officers arrested him anyway. *Id.* at 803, 91 S.Ct. 1106. The Court found the mistake was reasonable because Miller generally matched Hill's description, was in Hill's home, answered Hill's door, and did not seem credible to police. *Id.* 803–04, 91 S.Ct. 1106. That Miller produced identification did not make the arrest unreasonable because "aliases and false identifications are not uncommon." *Id.* at 803, 91 S.Ct. 1106. The Court observed that "sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment and on the record before [the Court] the officers' mistake was understandable and the arrest a reasonable response to the situation facing them at the time." *Id.* at 804, 91 S.Ct. 1106.

In *Fettes*, an arrest warrant was intended for Robert Fettes, Jr., and was issued for "Robert Fettes." 375 Fed.Appx. at 532. Robert Fettes, Sr. was arrested by mistake. *Id.* Fettes, Sr. protested to the police that the warrant was not for him, but he was held for about two hours before he was released. *Id.* Fettes argued that the officer should have done a better job verifying that the warrant was intended for Fettes, Jr. and not Fettes, Sr. *Id.* The Court found no constitutional violation. *Id.* at 532–33. By contrast, in *Ingram*, the Court found that a genuine issue of fact existed as to whether the officer's mistake was a reasonable one. 185 F.3d at 596. There, officers chased a man who tried to sell drugs to an undercover

officer. *Id.* at 584. The suspect ran into someone else's house and hid under a bed. *Id.* Officers followed him into the house and arrested another man they found sleeping in the basement. *Id.* at 585. The Court found that there was a question of fact as to whether the officer's mistake was a reasonable one because the plaintiff was found napping in his basement and "could not have been the same man who attempted to sell drugs to [an officer] and then outran several officers who were in 'hot pursuit' " and because the plaintiff did not look like the **\*361** man the officers had been chasing. *Id.* at 596.

Courts from outside of this circuit similarly look to the totality of the circumstances surrounding the arrest to determine its reasonableness. *See Tibbs v. City of Chicago*, 469 F.3d 661, 664–65 (7th Cir. 2006) (finding the officer did not act unreasonably when he mistakenly arrested someone with the same first and last name, race, and sex, but different middle initial as the person listed in the warrant); *Rodriguez v. Farrell*, 280 F.3d 1341, 1347 (11th Cir. 2002) (finding a mistaken arrest reasonable where police arrested a man with the same name as the alias of another man listed in an arrest warrant and where the two also were the same sex, age, and race, were born in neighboring towns in the same state, even though the two had a five inch difference in height); *Hill v. Scott*, 349 F.3d 1068, 1073 (8th Cir. 2003) (finding it not an unreasonable mistake when officers arrested a man with a similar name because they had "remarkably similar descriptions"); *Patton v. Przybylski*, 822 F.2d 697, 699–700 (7th Cir. 1987) (finding no unreasonable mistake where police arrested a man with the same name and of the same race as the man listed in the arrest warrant, even though he had a driver's license from a different state that listed a different address and birthdate from that listed in the arrest warrant); *Brown v. Patterson*, 823 F.2d 167, 169 (7th Cir. 1987) (finding the police officer did not act unreasonably when he mistakenly arrested someone whose name matched the suspect's alias and who had a similar birthday, was of the same race and sex, and lived in a similar geographic area); *Blackwell v. Barton*, 34 F.3d 298, 303–04 (5th Cir. 1994) (finding a mistaken arrest reasonable because she was "of the same height and weight, sex, race, age, nickname, and at the location where he expected to find [her]," even though the two had different last names).

Turning to the specific facts of this case, on January 18, 2012, Zberkot was on assignment to DFAT. There was an outstanding arrest warrant for Rodrick Siner, who used the alias Marvin Seals. The warrant had been assigned to

Avery, Michael 10/13/2018
For Educational Use Only

Seales v. City of Detroit, Mich., 724 Fed.Appx. 356 (2018)

another Task Force officer. DFAT needed another officer to help apprehend Siner and so Zberkot assisted the apprehension at the location that had been developed.[1] The team went to the location developed for Siner and they executed the arrest warrant. Zberkot and the other members of DFAT "made contact with named subject" and arrested **Seales** at his place of work. (R. 80-4, Arrest Report, PageID # 658; R. 28, Amended Complaint, PageID # 123.) The officers told **Seales** that there was a warrant out for his arrest. **Seales** said that he was not Siner and they had the wrong individual. **Seales** was then transported to the police station and released to Zberkot for processing.

Even though **Seales** argues that Zberkot's mistake was unreasonable as **Seales** was arrested "for no other reason other than the similarity of his name to that of Siner's alias, 'Marvin Seals,' " (**Seales** Br. at 13, 17), **Seales**' identifying information was similar to Siner's in a number of respects. **Seales** had essentially the same name as Siner's alias,[2] was the same sex, same race, and the same age as Siner, and was working in the same geographic location in which Siner resided. Additionally, **\*362** DFAT had previously developed the address for where the team could find Siner, and Zberkot found **Seales** at that address. Finally, because Zberkot believed he was arresting a man who used an alias, Zberkot would have expected **Seales** to lie about his name. Consequently, it was not unreasonable for Zberkot to mistakenly believe he was arresting Siner when in fact he was arresting **Seales**. Thus, **Seales** has not established that Zberkot unreasonably mistook **Seales** for Siner and in doing so violated **Seales**' constitutional rights.

### B. Continued Detention

We next consider whether Zberkot violated a clearly established right based on **Seales**' continued detention. This constitutional violation is "based on his continued incarceration even after Defendant Zberkot and **Detroit** employees should have known he was not the person named in the warrant." (R. 83, Opinion, PageID # 689.)

### i. Violation of a Constitutional Right

In *Baker*, the Supreme Court found that "one ... could not be detained indefinitely in the face of repeated protests of innocence even though the warrant under which he was arrested and detained met the standards of the Fourth Amendment." 443 U.S. at 144, 99 S.Ct. 2689. "[D]epending on what procedures the State affords defendants following arrest and prior to actual trial, mere detention pursuant to a valid warrant but in the face of repeated protests of innocence will after the lapse of a certain amount of time deprive the accused of 'liberty ... without due process of law.' " *Id.* at 145, 99 S.Ct. 2689. Nonetheless, in *Baker*, the Supreme Court held that a detention for three days, from December 30, 1972 to January 2, 1973, was not a constitutional violation, despite the plaintiff's repeated protests of mistaken identity. *Id.* at 144–45, 99 S.Ct. 2689.

While the Supreme Court has not since elaborated on *Baker* or the circumstances in which this kind of detention would implicate constitutional due process rights, the Sixth Circuit has. This Court held that "someone who is wrongly imprisoned as a result of mistaken identity can state a constitutional claim against his jailers based on their failure to ascertain that they had the wrong man." *Gray v. Cuyahoga Cty. Sheriff's Dep't*, 150 F.3d 579, 582 (6th Cir. 1998). To determine whether a constitutional violation has occurred, the "principal question" is whether the officers "acted with something akin to deliberate indifference in failing to ascertain that the [person] they had in custody was not the person wanted ... on the outstanding ... warrant." *Id.* at 583. In answering this question, this Court has considered the following factors: (1) the length of time an individual was detained; (2) whether the individual protested his innocence; and, (3) whether any exculpatory evidence was available to officers at the time of arrest or detention. *See id.* at 582–83.

For example, in *Gray*, the Court found a genuine issue of material fact as to whether Gray's mistaken identity detention violated his constitutional rights, where he was imprisoned for forty-one days and where the defendant officers were in possession of a photograph of the suspect that "bore virtually no resemblance to Gray" and a physical description that did not match Gray. *Id.* The Court also noted that there was no evidence that the officers "conducted a reasonable inquiry into the discrepancy between the photograph and the real Gray." *Id.* at 583.

Avery, Michael 10/13/2018
For Educational Use Only

Seales v. City of Detroit, Mich., 724 Fed.Appx. 356 (2018)

On the other hand, in *Flemister v. City of Detroit*, the Court found that a detention of four-and-a-half days was an insufficient period of time to amount to a constitutional violation, even though the plaintiff repeatedly protested his innocence and **\*363** both photographs and fingerprints were available that would have cleared up the mistake. 358 Fed.Appx. 616, 620 (6th Cir. 2009). Finally, in *Thurmond v. County of Wayne*, the Court found that a detention of thirty-five days did not violate the plaintiff's constitutional rights, where the plaintiff never protested his innocence and the deputies were not in possession of any potentially exculpatory evidence. 447 Fed.Appx. 643, 649 (6th Cir. 2011).

From these cases, it is clear that officers act with "something akin to deliberate indifference" when they fail to verify the identity of the person they have in custody, despite knowledge or notice that the person in custody is not the one listed in the arrest warrant. Protestations of innocence or misidentification and the availability and accessibility of exculpatory evidence are relevant considerations for deciding whether officers have notice that they need to conduct some sort of inquiry. The duration of confinement matters insofar as it allows officers opportunities for a reasonable inquiry.

Other circuits have likewise recognized this constitutional right to be free from continued detention after officers know or have notice that that the person in custody is not the one listed in the arrest warrant. *See Garcia v. Cty. of Riverside*, 817 F.3d 635, 641 (9th Cir. 2016) ("No person deserves to be incarcerated without good reason, and incarceration on a warrant without a reasonable investigation of identity, when the circumstances demand it, is subject to review under the Due Process Clause. The issue is whether LASD's treatment of Plaintiff's contention that he was not the warrant subject was so superficial, under the circumstances, that it ignored a duty to investigate and offended due process."); *Russo v. City of Bridgeport*, 479 F.3d 196, 208 (2d Cir. 2007) ("[W]e hold that the right mentioned in *Baker* ... protected [the plaintiff] from a sustained detention stemming directly from the law enforcement officials' refusal to investigate available exculpatory evidence."); *Fairley v. Luman*, 281 F.3d 913, 918 (9th Cir. 2002) ("[Plaintiff] had a liberty interest in being free from a twelve-day incarceration without any procedural safeguard in place to verify the warrant he was detained on was his and in the face of his repeated protests of innocence. In light of the importance of [plaintiff's] liberty interest, the significant risk of

deprivation of that interest through the City's warrant procedures, and the minimum burden to the City of instituting readily available procedures for decreasing the risk of erroneous detention, the procedures afforded by the City to [plaintiff] failed to provide him due process under the Fourteenth Amendment"); *Lee v. City of Los Angeles*, 250 F.3d 668, 683–84 (9th Cir. 2001) (finding that plaintiff's allegations were sufficient to establish that defendant officers violated plaintiff's "liberty interest in being free from incarceration" by "recklessly and with deliberate indifferent to [the plaintiff's] right to due process ... fail[ing] to take any steps to identify him before arresting him ... and causing his incarceration for two years"); *Cannon v. Macon Cty.*, 1 F.3d 1558, 1563 (11th Cir. 1993)[3] (recognizing a "constitutional right to be free from continued detention after it was or should have been known that the detainee was entitled to release").

**\*364** [2]In light of the case law, the question is whether the evidence, when viewed in the light most favorable to Seales, creates a genuine issue of material fact as to whether Zberkot "acted with something akin to deliberate indifference" in failing to ascertain that Seales was not the person identified in the warrant, where Seales was imprisoned for fourteen days, where officers were in possession of exculpatory evidence, and where Seales repeatedly protested his misidentification. We hold that it does.

Seales has alleged that he protested his innocence to Zberkot and his fellow deputies numerous times. This allegation finds some support in the record. *See Bays v. Montmorency Cty.*, 874 F.3d 264, 268 (6th Cir. 2017) ("In [making the qualified immunity determination], we assume the truth of all record-supported allegations by the non-movant." (citing *Plumhoff v. Rickard*, ⸺ U.S. ⸺, 134 S.Ct. 2012, 2017, 188 L.Ed.2d 1056 (2014))). For example, Wayne County was asked whether Seales told "anyone in the Wayne County Jail that he was not Rodrick Siner and/or Marvin Seals or he was not the person for which there were an outstanding warrant by the DFAT[.]" (R. 75-7, Answer to Interrogatories, PageID # 575.) Wayne County responded that "Plaintiff filed a grievance on January 24, 2012," six days after his arrest, and attached a grievance log in which the reason for the grievance is listed as "Wrong b[oo]king name." (*Id.* at # 575, 579.) Wayne County did not produce the actual grievance because "despite a diligent search, [it] was unable to locate the original grievance." (*Id.* at # 575.) Seales' deposition transcript also supports his allegation that he protested his misidentification. He said "I kept

Avery, Michael 10/13/2018
For Educational Use Only

Seales v. City of Detroit, Mich., 724 Fed.Appx. 356 (2018)

telling everyone I'm not Roderick Siner.... It's not me."[4] (R. 70-3, Seales Depo., PageID # 379, 24:24–25:9). In sum, there is evidence indicating that Seales protested his innocence multiple times and claimed he had been misidentified.

Next, the record shows that significant exculpatory evidence existed and it was in the possession of police. Seales alleges that at the time of his arrest and incarceration, a mug shot and "further identification" of Siner were available to officers. (R. 28, Amended Complaint, PageID # 125.) The photos show two men who look nothing alike. There is also some evidence that recorded fingerprints for Siner were available to the officers. Finally, officers would have possessed the information contained in Siner's arrest warrant. For example, the Detroit Police Department Arrest Report includes Siner's age, date of birth, height, weight, and home address. Though it does not appear we have evidence of Seales' height or weight, we know that Seales was born on a different date and presumably lived at a different address.

Although there is record evidence that Seales continuously protested the misidentification and that exculpatory evidence was readily available, there is no evidence that the officers made any attempt to verify Seales' identity. For instance, nothing suggests that officers checked Seales' fingerprints, photographs, or biographical information against the information that *365 they had on Siner. It appears that the officers failed to confirm Seales' identity, even though simple identification procedures would have revealed the mistake.

In all, we think these facts taken together would permit a reasonable trier of fact to find that Seales' constitutional rights were violated.

### ii. Clearly Established

[3] The next step in the qualified immunity analysis is to decide whether the right was clearly established. We hold that it was.

"The relevant, dispositive inquiry in determining whether

a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151. For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (citations omitted). An official "can still be on notice that [his] conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). To determine whether a constitutional right is clearly established, we "look [ ] first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits." *Bell v. Johnson*, 308 F.3d 594, 602 (6th Cir. 2002) (quoting *Chappel v. Montgomery Fire Prot. Dist. No. 1*, 131 F.3d 564, 579 (6th Cir. 1997)). Further, "an action's unlawfulness can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs." *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (citing *Hope*, 536 U.S. at 730, 122 S.Ct. 2508).

The Supreme Court long ago recognized that after a certain amount of time, continued detention in the face of repeated protests deprives the accused of liberty without due process. *Baker*, 443 U.S. at 145, 99 S.Ct. 2689. Since then, this Court has laid out the "principal question" for determining whether a constitutional violation has occurred—have the defendants "acted with something akin to deliberate indifference in failing to ascertain that the [person] they had in custody was not the person wanted by the Michigan authorities on the outstanding ... warrant[?]" *Gray*, 150 F.3d at 583. The Court has also set forth three factors courts should examine to determine whether a detention violates due process—(1) the length of time an individual is detained, (2) whether the detainee protested his or her innocence, and (3) whether potentially exculpatory evidence was available to officers at the time of arrest and detention. *See Gray*, 150 F.3d at 582–83; *Thurmond*, 447 Fed.Appx. at 649; *Flemister*, 358 Fed.Appx. at 620.

On top of clearly laying out the standards for determining whether a constitutional violation has occurred, some

Avery, Michael 10/13/2018
For Educational Use Only

Seales v. City of Detroit, Mich., 724 Fed.Appx. 356 (2018)

courts in this circuit have addressed time periods similar to those in this case. For example, *Gray* expressly relied on the findings of two district courts, which held, following *Baker*, that two imprisonments lasting thirty days and twelve days constituted constitutional violations. 150 F.3d at 582. Additionally, in *Cleveland v. City of Detroit*, the court denied summary judgment to officer defendants after the plaintiff "spen[t] two weeks in jail," when there was **\*366** evidence in the record that the officers were aware of the plaintiff's mistaken identity claim and the officers "had the ability to resolve it with the information then available to them." 275 F.Supp.2d 832, 838, 840 (E.D. Mich. 2003).

Several other circuits to have expounded on this issue have held that similar conduct constitutes a violation of a clearly established right. *See Russo v. City of Bridgeport*, 479 F.3d 196, 208, 211 (2d Cir. 2007) (finding that the plaintiff had a clearly established right, which protected him "from a sustained detention stemming directly from the law enforcement officials' refusal to investigate available exculpatory evidence"); *Fairley v. Luman*, 281 F.3d 913, 918 (9th Cir. 2002) (finding that the plaintiff "had a liberty interest in being free from a twelve-day incarceration without any procedural safeguard in place to verify the warrant he was detained on was his and in the face of his repeated protests of innocence"); *Cannon v. Macon Cty.*, 1 F.3d 1558, 1561, 1563–64 (11th Cir. 1993) (finding that a jury could find the officer acted with deliberate indifference to the plaintiff's clearly established due process right where she was detained for seven days and the officer did not attempt to verify that she was the person wanted and exculpatory information existed).

In light of these cases, we find Seales had a clearly established constitutional right to be free from continued detention after officers should have known that he was not the person named in the warrant. Accordingly, we find the district court correctly determined that Zberkot was not entitled to qualified immunity. It is for the trier of fact to decide whether Zberkot violated Seales' constitutional rights.

**II. Immunity under Michigan Law**

**Standard of Review**

"[T]his Court reviews a district court's denial of summary judgment *de novo*." *Harrison*, 539 F.3d at 516 (citing *Monette*, 90 F.3d at 1176). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

**Analysis**

"An employee of a governmental agency acting within the scope of his or her authority is immune from tort liability unless the employee's conduct amounts to gross negligence that is the proximate cause of the injury." *Kendricks v. Rehfield*, 270 Mich.App. 679, 716 N.W.2d 623, 625 (2006) (citing MICH. COMP. LAWS § 691.1407(2)). Gross negligence is "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MICH. COMP. LAWS § 691.1407(8)(a).

Under Michigan law, courts look to whether:

(a) the individual was acting or reasonably believed that he was acting within the scope of his authority,

(b) the governmental agency was engaged in the exercise or discharge of a governmental function, and

(c) the individual's conduct amounted to gross negligence that was the proximate cause of the injury or damage.

*Odom v. Wayne Cty.*, 482 Mich. 459, 760 N.W.2d 217, 228 (2008). The dispute in the instant case is over the third prong—whether Zberkot's conduct was grossly negligent. "[Gross negligence] has been characterized as a willful disregard of safety measures and a singular disregard for substantial risks." *Oliver v. Smith*, 290 Mich.App. 678, 810 N.W.2d 57, 62 (2010) (citing *Tarlea v. Crabtree*, 263 Mich.App. 80, 687 N.W.2d 333, 339 (2004)). "It is as though, if an objective observer watched the actor, he could conclude, reasonably, **\*367** that the actor simply did not care about the safety or welfare of those in his charge." *Tarlea*, 687 N.W.2d at 339–40.

Avery, Michael 10/13/2018
For Educational Use Only

Seales v. City of Detroit, Mich., 724 Fed.Appx. 356 (2018)

"[T]he burden is upon a plaintiff to plead facts in avoidance of immunity." *Michonski v. City of Detroit*, 162 Mich.App. 485, 413 N.W.2d 438, 441 (1987) (citing *Furness v. Public Service Comm.,* 100 Mich.App. 365, 299 N.W.2d 35 (1980)). "Summary disposition is precluded where reasonable jurors honestly could have reached different conclusions with respect to whether a defendant's conduct amounted to gross negligence." *Stanton v. City of Battle Creek,* 237 Mich.App. 366, 603 N.W.2d 285, 289 (1999), *aff'd,* 466 Mich. 611, 647 N.W.2d 508 (2002). On the other hand, if "on the basis of the evidence presented, reasonable jurors could not differ with respect to whether a defendant was grossly negligent, summary disposition should be granted." *Id.*

The district court concluded that "it is not appropriate to grant Defendant Zberkot immunity at the summary judgment stage, when reasonable jurors could find that Zberkot's conduct amounted to gross negligence." (R. 83, Opinion, PageID # 703.) Zberkot argues that the district court erred because "there is no evidence that the actions of Defendant Zberkot were so reckless as to demonstrate a substantial lack of concern for whether an injury results." (Zberkot Br. at 13.) Zberkot appears to argue that this is because the warrant and "information supplied by DFAT" demonstrated that "Plaintiff was the proper person to be arrested." (*Id.*)

In coming to its conclusion, the district court relied on *Kendricks*. In *Kendricks*, the plaintiff was incarcerated for seven months, despite protestations of innocence claiming that his twin brother was the person they sought and the existence of exculpatory photographic and fingerprint evidence. 716 N.W.2d at 682–83. The Michigan court found that "reasonable jurors could reach the conclusion that defendants were grossly negligent" and so "[t]he question of whether the officers' conduct demonstrated a sufficient lack of concern to constitute gross negligence is a question for a trier of fact." *Id.* at 683.

Zberkot distinguishes this case from *Kendricks*. He notes that the opinion admits that "[w]e agree that the mistake was reasonable at the point of arrest, and might be inclined to agree that a delay of a day or even several days before investigating plaintiff's claim of mistaken identity could have been reasonable under these circumstances." *Kendricks*, 716 N.W.2d at 682. The court said, however, "we cannot agree that holding plaintiff without investigating the claim for *seven months* was even remotely reasonable." *Id.* (emphasis in original).

[4]Even with this distinction in mind, we find that there is still "sufficient indicia of gross negligence to create a genuine issue of material fact." *Id.* Because of Zberkot's alleged role in denying Seales his constitutional right, as discussed above, we believe that reasonable jurors could reach the conclusion that Zberkot was grossly negligent. Consequently, Zberkot is not entitled to governmental immunity and the district court correctly denied Zberkot's motion for summary judgment on this claim.

**III. FALSE ARREST AND FALSE IMPRISONMENT CLAIM**

"This court does not normally address issues raised for the first time on appeal." *Elkins v. Richardson-Merrell, Inc.,* 8 F.3d 1068, 1072 (6th Cir. 1993) (citations omitted).

> Propounding new arguments on appeal in attempting to prompt us to reverse the trial court— arguments never considered **\*368** by the trial court—is not only somewhat devious, it undermines important judicial values.... In order to preserve the integrity of the appellate structure, we should not be considered a "second shot" forum, a forum where secondary, back-up theories may be minted for the first time.

*Isaak v. Trumbull Sav. & Loan Co.,* 169 F.3d 390, 396 n.3 (6th Cir. 1999) (quoting *Estate of Quirk v. C.I.R.,* 928 F.2d 751, 758 (6th Cir. 1991)).

The Court adheres to this rule except in " 'exceptional cases or particular circumstances' or when the rule would produce 'a plain miscarriage of justice.' " *Elkins,* 8 F.3d at 1072 (quoting *Pinney Dock and Transp. Co. v. Penn Cent. Corp.,* 838 F.2d 1445, 1461 (6th Cir. 1988)).

In his motion for summary judgment, Zberkot argued that he was entitled to immunity on Seales' gross negligence claim, but he did not argue that he was immune from liability with respect to the false arrest and/or false imprisonment claim. On appeal, however, Zberkot argues that he is still entitled to immunity on this claim because

Avery, Michael 10/13/2018
For Educational Use Only

Seales v. City of Detroit, Mich., 724 Fed.Appx. 356 (2018)

in his motion for summary judgment he argued that "he was immune from liability as to intentional tort claims," which "applies to the claims of false arrest and imprisonment." (Zberkot Br. at 15.) More specifically, in his motion for summary judgment, Zberkot says, "Plaintiffs allegations of intentional tort, under the factual circumstances, were also not sufficient to remove the individual Defendant's immunity because Plaintiff failed to plead or prove facts which amounted to gross negligence as required under the governmental immunity act." (R. 74, Motion, PageID # 504.) Even though Zberkot uses the phrase "intentional tort," he does not argue that he should be shielded by immunity for Seales' false arrest and false imprisonment claim. The section header and the sentence itself only reference gross negligence, or Count III in Seales' amended complaint. Additionally, the statute Zberkot cites in support of his argument (MCL 691.1407.(2)(C)) refers only to gross negligence, and the case law he cites involve claims of gross negligence. Nowhere in the two pages dedicated to this argument does Zberkot discuss immunity with regard to the false arrest and/or imprisonment claim. He exclusively discusses immunity as to the gross negligence claim. Therefore, because this argument for immunity on the false arrest and/or false imprisonment claim was not presented to the district court, it is not properly before this Court.

Even on appeal, Zberkot's brief barely makes the argument that he is entitled to immunity under Michigan law. Zberkot spends approximately two sentences on this issue. In the first sentence he describes a Michigan case where the Michigan Court of Appeals found a detective was immune to a claim of false imprisonment. In the second sentence, Zberkot makes the conclusory assertion that "[s]imilarly in our case, there is no evidence of any malicious intent on the part of Officer Zberkot." (Zberkot Br. at 15.) Thus, not only did Zberkot not argue that he

was entitled to immunity on this specific claim in his motion for summary judgment before the district court, but he hardly makes this argument on appeal either.

We do not believe this case presents the kind of exceptional circumstances that would "warrant disregarding the general rule." *Elkins*, 8 F.3d at 1072; *see also Harris v. TD Ameritrade, Inc.*, 805 F.3d 664, 667–68 (6th Cir. 2015) (declining to review a claim when it was raised for the first time in an appellate brief and when the argument contained in the brief was **\*369** not "presented with sufficient clarity and completeness for [the Court] to resolve").

Consequently, Zberkot cannot argue on appeal that this Court should reverse the district court's denial of summary judgment with regard to the claim of false arrest/imprisonment based on immunity because Zberkot did not raise this claim before the district court and does not sufficiently present the argument before this Court.

### CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

### All Citations

724 Fed.Appx. 356

Footnotes

1   There is no evidence in the record providing how this location was developed or who developed it.

2   The alias "Marvin Seals" is one-letter off from the name "Marvin Seales." This minor difference in spelling does not make Zberkot's mistake unreasonable in light of all the other circumstances.

3   *Cannon* also cited to *Sivard v. Pulaski County*, 959 F.2d 662 (7th Cir.1992) for the proposition that "continued detention where sheriff knew it was wrongful states claim under § 1983 for due process violation" and to *Sanders v. English*, 950 F.2d 1152 (5th Cir. 1992) for the proposition that "failure to release after officer knew or should have known that plaintiff had been misidentified gives rise to cause of action under § 1983." 1 F.3d at 1563.

**Avery, Michael 10/13/2018**
**For Educational Use Only**

**Seales v. City of Detroit, Mich., 724 Fed.Appx. 356 (2018)**

---

4    We note that only a portion of <mark>Seales</mark>' deposition transcript made it into the record. The final question on the
     pages provided—"when you were first taken, arrested and taken to the precinct, did you ask the arresting officers
     why you were there, have any ..."—also likely elicited testimony from <mark>Seales</mark> about protesting his innocence
     during his arrest and initial detainment. (R. 70-3, <mark>Seales</mark> Depo., PageID # 383, 41:23–25.) Additionally, <mark>Seales</mark>'
     counsel represented at oral argument that <mark>Seales</mark> testified that he protested his misidentification to Zberkot and
     other officers during his arrest on other missing pages of the deposition transcript. Unfortunately, those pages
     are not in the record.

---

**End of Document**                                      © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2018 Thomson Reuters. No claim to original U.S. Government Works.   12

**Avery, Michael 10/8/2018**
**For Educational Use Only**

Sesay vs. Wal-Mart Stores, 28 Trials Digest 3d 1 (1890)

28 Trials Digest 3d 1, 1000 WL 34638 (Cal.Superior) (Verdict and Settlement Summary)

Copyright (c) 2018 Thomson Reuters/West
Superior Court, Los Angeles County, California.

Sesay vs. Wal-Mart Stores

**TOPIC:**
Synopsis: SETTLEMENT--==Wrongful detention== claimed for suspected theft of bullets and cologne

Case Type: Civil Rights

DOCKET NUMBER: KC027388

STATE: California
COUNTY: Los Angeles

No Date Given

JUDGE: C. Edward Simpson
**ATTORNEYS:**
Plaintiff: John Messina, Messina & De Weese, Covina.; Kelly Warren, Messina & De Weese, Covina.
Defendant: Barry C. Snyder, Snyder & Strozier, Santa Barbara.; Clark T. Stirling, Law Offices of Clark T. Stirling, Santa Barbara.

**SUMMARY:**
Verdict/Judgment: Settlement

Verdict/Judgment Amount: $17,000

Range: $1-$49,999
Plaintiff accepted defendant's CCP 998 of $17,000 following completion of jury selection.

Trial Type: Jury

Trial Length: 1 day.

Deliberations: Not Applicable

Jury Poll: Not Applicable

**EXPERTS:**
Plaintiff: Not reported.
Defendant: Not reported.

**TEXT:**

**CASE INFORMATION**

**Avery, Michael 10/8/2018**
**For Educational Use Only**

**Sesay vs. Wal-Mart Stores, 28 Trials Digest 3d 1 (1890)**

## FACTS/CONTENTIONS

According to Defendant: Plaintiff claimed that defendant loss prevention officer lied to the police about plaintiff having left the store with merchandise. The plaintiff was identified only as Sesay. The defendants were Wal-Mart Stores and Jonathan Verdugo, a Wal-Mart loss prevention officer. Jonathan Verdugo later admitted that he was wrong when he told police and wrote on his report that plaintiff had left the store before being stopped.

Defendants contended that while plaintiff never left the store with the merchandise--bullets and cologne--he had been observed very suspiciously taking bullets from a box, stuffing the bullets in his pocket and entering the rest room. Defendants also contended that plaintiff gave the police one story about his intent but gave a very different version at his deposition.

## CLAIMED INJURIES

According to Defendant: Emotional distress (plaintiff was detained by the police after Verdugo called and reported that plaintiff had been stopped on suspicion of theft; the detention lasted less than two hours).

## CLAIMED DAMAGES

According to Defendant: Not reported.

## SETTLEMENT DISCUSSIONS

According to Defendant: Demand: 'Six figures' initially; $50,000 at settlement conference prior to trial. Offer: Not reported. The case settled after jury selection was completed.

## COMMENTS

According to Defendant: Barry C. Snyder represented defendant Wal-Mart. Clark T. Stirling represented defendant Jonathan Verdugo and provided the information in this report.

Trials Digest, A Thomson/West business
Los Angeles County Superior Court/Pomona

Avery, Michael 10/13/2018
For Educational Use Only

Shoyoye v. County of Los Angeles, 203 Cal.App.4th 947 (2012)

137 Cal.Rptr.3d 839, 12 Cal. Daily Op. Serv. 2285, 2012 Daily Journal D.A.R. 2491

KeyCite Yellow Flag - Negative Treatment

Rejected by B.B. v. County of Los Angeles, Cal.App. 2 Dist., July 10, 2018

203 Cal.App.4th 947
Court of Appeal, Second District, Division 4,
California.

Adetokunbo SHOYOYE, Plaintiff and Appellant,
**v.**
**COUNTY OF LOS ANGELES**, Defendant and
Appellant.

No. B223542.
|
Feb. 23, 2012.
|
Rehearing Denied March 13, 2012.
|
Review Denied May 9, 2012.·

**Synopsis**
**Background:** Arrestee brought action against county for false imprisonment and violation of the Tom Bane Civil Rights Act, alleging that he was unlawfully detained in jail. The Superior Court, Los Angeles County, No. BC388511, Michael L. Stern, J., entered judgment on jury verdict for arrestee and awarded damages, and county appealed.

**Holdings:** The Court of Appeal, Suzukawa, J., held that:

[1] employees' actions did not show any coercion or intimidation independent from that inherent in wrongful detention of arrestee at county jail, and

[2] reversal of judgment on civil rights claim did not require reversal of damages award.

Affirmed in part, reversed in part.

West Headnotes (11)

[1] **Appeal and Error**
    Defenses

Record on appeal did not support arrestee's contention that county had admitted liability at trial under the Tom Bane Civil Rights Act and had therefore forfeited any argument to the contrary; record revealed that county's counsel argued that any violation of arrestee's constitutional rights was not intentional, but due to a mistake, and was not accomplished by means of threats, intimidation, or coercion. West's Ann.Cal.Civ.Code § 52.1.

2 Cases that cite this headnote

[2] **Civil Rights**
    Threats, intimidation, and harassment

The essence of a claim under the Tom Bane Civil Rights Act is that the defendant, by the specified improper means, i.e. threats, intimidation or coercion, tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law. West's Ann.Cal.Civ.Code § 52.1.

61 Cases that cite this headnote

[3] **Civil Rights**
    Threats, intimidation, and harassment

The Tom Bane Civil Rights Act does not require a plaintiff to allege that the defendant acted with discriminatory animus or intent based upon the plaintiff's membership in a protected class of persons. West's Ann.Cal.Civ.Code § 52.1.

2 Cases that cite this headnote

Avery, Michael 10/13/2018
For Educational Use Only

**Shoyoye v. County of Los Angeles, 203 Cal.App.4th 947 (2012)**

137 Cal.Rptr.3d 839, 12 Cal. Daily Op. Serv. 2285, 2012 Daily Journal D.A.R. 2491

[4]    **Civil Rights**
       👉Threats, intimidation, and harassment

A defendant is liable under the Tom Bane Civil Rights Act if he or she interfered with or attempted to interfere with the plaintiff's constitutional rights by the requisite threats, intimidation, or coercion. West's Ann.Cal.Civ.Code § 52.1.

155 Cases that cite this headnote

[5]    **Civil Rights**
       👉Threats, intimidation, and harassment

Legislature meant the Tom Bane Civil Rights Act to address interference with constitutional rights involving more egregious conduct than mere negligence. West's Ann.Cal.Civ.Code § 52.1.

27 Cases that cite this headnote

[6]    **Civil Rights**
       👉Malicious prosecution and false imprisonment; mental health commitments
       **Civil Rights**
       👉Arrest and detention

The apparent purpose of the Tom Bane Civil Rights Act is not to provide relief for an over-detention brought about by human error rather than intentional conduct. West's Ann.Cal.Civ.Code § 52.1.

15 Cases that cite this headnote

[7]    **Civil Rights**
       👉Threats, intimidation, and harassment

The act of interference with a constitutional right must itself be deliberate or spiteful in order to support a cause of action under the Tom Bane Civil Rights Act. West's Ann.Cal.Civ.Code § 52.1.

21 Cases that cite this headnote

[8]    **Civil Rights**
       👉Malicious prosecution and false imprisonment; mental health commitments
       **Civil Rights**
       👉Arrest and detention

Where coercion is inherent in the constitutional violation alleged, the Tom Bane Civil Rights Act's requirement of "threats, intimidation, or coercion" is not met; the statute requires a showing of coercion independent from the coercion inherent in the wrongful detention itself. West's Ann.Cal.Civ.Code § 52.1.

181 Cases that cite this headnote

[9]    **Civil Rights**
       👉Arrest and detention

County employees' actions did not show any coercion or intimidation independent from that inherent in wrongful detention of arrestee at county jail for 16 days, as required to support arrestee's Tom Bane Civil Rights Act claim; while county employees were negligent in assigning arrestee a parole hold in the computer system, and in failing to detect the error during the subsequent quality control procedure, no employee had actual or presumed knowledge that he should have been released, no employee coerced him to stop inquiring about his release, threatened him for doing so, or punished him in any way, and, while employees may have been rude and indifferent to his inquiries, no one ignored him deliberately while knowing that he should in fact have been released. West's Ann.Cal.Civ.Code § 52.1.

Avery, Michael 10/13/2018
For Educational Use Only

Shoyoye v. County of Los Angeles, 203 Cal.App.4th 947 (2012)

137 Cal.Rptr.3d 839, 12 Cal. Daily Op. Serv. 2285, 2012 Daily Journal D.A.R. 2491

See *Cal. Jur. 3d, Civil Rights, §§ 2, 106; Cal. Civil Practice (Thomson Reuters 2011) Civil Rights Litigation, § 3:19; 8 Witkin, Summary of Cal. Law (10th ed. 2005) Constitutional Law, § 895.*

64 Cases that cite this headnote

[10] **Appeal and Error**
👉As to damages and costs

Reversal of judgment in favor of arrestee on Tom Bane Civil Rights Act claim did not require reversal of damages award, although jury did not apportion damages award between that claim and arrestee's successful false imprisonment claim, as damages attributable to each cause of action were identical, and arrestee's counsel did not suggest that jury award damages for each cause of action separately or award additional damages because of the civil rights claim. West's Ann.Cal.Civ.Code § 52.1.

Cases that cite this headnote

[11] **False Imprisonment**
👉Nature and Elements of False Imprisonment

The elements of a tortious claim of false imprisonment are: (1) the nonconsensual, intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time, however brief.

7 Cases that cite this headnote

**Attorneys and Law Firms**

**\*\*841** Casselman Law Offices, Gary S. Casselman, Los

Angeles, and Danielle Casselman for Plaintiff and Appellant.

Hurrell Cantrall LLP, Los Angeles, Thomas C. Hurrell, and Melinda Cantrall for Defendant and Appellant.

SUZUKAWA, J.

**\*950 INTRODUCTION**

Defendant, the County of Los Angeles (County), appeals from a judgment after jury verdict in favor of plaintiff Adetokunbo Shoyoye arising out of Shoyoye's wrongful detention in County jail. The County acknowledges that although its initial detention of Shoyoye was justified, it overdetained him by about 16 days as a result of unintentional clerical error. The County contends on appeal that the evidence presented at trial was insufficient to support a verdict in favor of Shoyoye pursuant to Civil Code section 52.1 (the Tom Bane Civil Rights Act).[1] In this case of first impression, we agree and conclude that not every wrongful detention is a violation of section 52.1. The evidence here was insufficient to establish the "threats, intimidation, or coercion" necessary to implicate section 52.1. Accordingly, we reverse the judgment as to that cause of action, and reverse the award of attorney fees made pursuant to that statute. We affirm the judgment and damage award in favor of Shoyoye on his claim for false imprisonment.

**FACTUAL BACKGROUND**

*The Operative Complaint*
Plaintiff's third amended complaint alleged causes of action for (1) violations of Penal Code section 1384; (2) false imprisonment; (3) violation of section 52.1; (4) violation of **\*\*842** 42 United States Code section 1983;

**Avery, Michael 10/13/2018**
**For Educational Use Only**

Shoyoye v. County of Los Angeles, 203 Cal.App.4th 947 (2012)
137 Cal.Rptr.3d 839, 12 Cal. Daily Op. Serv. 2285, 2012 Daily Journal D.A.R. 2491

and (5) negligence and negligence per se. The trial court granted the County's motion for nonsuit as to the 42 United States Code section 1983 cause of action, and prior to the case being submitted to the jury, the parties agreed that they would present for the jury's consideration only the causes of action for false imprisonment and violation of section 52.1.

*951 *Shoyoye's Arrest and Incarceration*
The evidence presented at trial included the following undisputed facts. Shoyoye was lawfully arrested on August 19, 2007, when he was reporting an unrelated incident to the police, and the police discovered he had two outstanding warrants.[2] The first warrant related to his failure to address a citation he received for riding the subway without a ticket, and the second warrant arose when a former roommate stole his identity and was convicted of grand theft under Shoyoye's name. Shoyoye was incarcerated, and shortly thereafter he appeared in court and was ordered released on the first warrant. A few days later he appeared on the second warrant in a different court, and that matter was also resolved in his favor. On August 22, 2007, he was ordered released, subject to any other holds. He was transported back to Men's Central Jail, where he was processed and placed in a dormitory, expecting to be released at any time.

*The Error Resulting in Shoyoye's* Overdetention
A County employee mistakenly attached to Shoyoye's paperwork information pertaining to a parolee scheduled to be sent to state prison for violating the terms of his parole. The other prisoner's name was Marquis Lance Parsee. A "Department of Corrections hold" (DCL) intended for Parsee was entered into the County Sheriff's computer system regarding Shoyoye. A subsequent quality control check failed to detect the error. If a County employee had looked at the paper file on Shoyoye rather than the computer records, he or she would have realized that the DCL hold did not pertain to Shoyoye.

*Shoyoye's Efforts to Be Released, and the County*

*Employees' Treatment of Him*
While he was at Men's Central Jail, Shoyoye attempted to ask one deputy or another almost every day about being released, but he received no assistance. Shoyoye was then transferred to the Pitchess Detention Center in Castaic, where he was processed and assigned a bed in a dormitory. He did not understand why he was not being released.

Shoyoye asked a total of six to eight people for assistance during his incarceration. At Pitchess Detention Center, inmates were periodically permitted to submit one written question on a "yellow sheet" form. Shoyoye submitted such a form asking, "Why am I here?" He received the response that he was subject to a "DCL hold." He submitted another form inquiring what a "DCL hold" was, along with one other question, and received the *952 response that he was only entitled to ask one question and he had asked two. He submitted other yellow sheets indicating he believed he should not be there, but he received no helpful responses.

Shoyoye told custody assistant Lawrence Wong that he thought he should be released. Wong acknowledged that if what he said was true, then there was a problem. Wong told him to talk to Deputy Niels Gittisarn. Shoyoye asked him for assistance, and Gittisarn told him, "Get back to me." However, when Shoyoye **843 attempted to speak to him the next day, Gittisarn rebuffed him, yelling that he was busy. Other inmates accused Shoyoye of being an informant when they saw him talking to Gittisarn, and thereafter he was hesitant to approach any County employees for fear of being labeled an informant.

Shoyoye asked a deputy named Rodriguez what a DCL hold was, and Rodriguez replied, "[T]hat means that you are going to prison, boy." Rodriguez asked what he had done, and when Shoyoye said it was for not having a ticket on the subway, Rodriguez lost interest.

Shoyoye attended a church service in order to speak to the jail chaplain about his plight. The chaplain listened sympathetically, but did not offer assistance.

Deputy Oren Son monitored the laundry facility where Shoyoye worked. Shoyoye told him that he was being held for a felony he did not commit. Son looked at him as he spoke, but then returned to the book he was reading and gave him the silent treatment for a few minutes, until Shoyoye eventually gave up and walked away. Shoyoye knew that if a laundry worker took breaks or refused to

Avery, Michael 10/13/2018
For Educational Use Only

Shoyoye v. County of Los Angeles, 203 Cal.App.4th 947 (2012)
137 Cal.Rptr.3d 839, 12 Cal. Daily Op. Serv. 2285, 2012 Daily Journal D.A.R. 2491

work, he would be subjected to harsh housing discipline and suspension of privileges. Shoyoye asked a civilian employee who worked in the laundry facility, Patsy Hazlett, for assistance after she praised him for good work performance, but she said she could not help him.

Asked if any of his efforts resulted in anything being done to determine his **overdetention** status, he replied, "All I got was disinterest, being sent away. No. Nothing was done." He felt that he had failed to make himself heard, that although he was civil and polite he got nowhere: there was no " 'customer service,' if you will." He described the deputies as walking and talking tough. Shoyoye thought about escaping but feared he would get shot; he never seriously considered doing so.

Incident to his incarceration, Shoyoye was subjected to strip searches that included anal cavity searches, required to wait naked in line to shower in close proximity to other inmates, and shackled. On one occasion, he was **\*953** showering when he was approached by an aggressive inmate, and he immediately fled the shower room, still covered in soap. He witnessed criminal activity and fights, and was housed in a large dormitory with hundreds of inmates, many of whom were gang members. He did not drink water because the commode was connected directly to the drinking fountain. He was exposed to a chicken pox outbreak. He feared being sent to prison, or put into "the hole" for further discipline, or having physical force or violence used against him. He was mistaken for an informant by other inmates and feared what they might do to him.

*Shoyoye's Release*
Shoyoye's roommate, Rudy Ramirez, located him at Pitchess Detention Center and visited him there. Shoyoye asked Ramirez to contact Shoyoye's boss, Benjamin Swett, and Ramirez did so. Eventually Swett contacted a state Assembly man's office, and was put in touch with Renee Hansen, the chief of legislative affairs for California's Department of Corrections and Rehabilitation (CDCR). She located Shoyoye in the County's Web site, and found a reference to a CDCR number. She telephoned the inmate locator for CDCR and inquired to whom that CDCR number pertained, and was told it was Marquis Parsee. She then ascertained that Parsee was also being held in the County jail, under the same parole hold

number as Shoyoye. She contacted the County jail and informed them of her suspicion that they had applied an erroneous **\*\*844** parole hold number to Shoyoye. They concluded **\*\*844** she was correct, and immediately took steps to effect Shoyoye's release. Shoyoye was released on September 7, 2007, 16 days after he had been ordered released on August 22, 2007.

*The Verdict, the Judgment, and the Posttrial Motions*
A special verdict form was submitted to the jury. The jury answered each of the following questions in the affirmative: (1) "Did the **County of Los Angeles** hold [Shoyoye] in custody?"; (2) "Was there an unnecessary delay in releasing [Shoyoye]?"; (3) "Was the **County of Los Angeles**' conduct a substantial factor in causing harm to [Shoyoye]?"; (4) "Did the employee(s) of the **County of Los Angeles** intentionally act or fail to act with [respect to Shoyoye's] right to be free from the unreasonable seizure by actual or implied use of threats, intimidation or coercion?"; and (5) "Was the **County of Los Angeles**' employee(s') conduct in violating plaintiff [Shoyoye's] right to be free from unreasonable seizures a substantial factor in causing harm to [Shoyoye]?" The jury awarded Shoyoye $22,700 in economic damages for past and future lost earnings and property loss, and $180,000 in noneconomic damages for past and future pain and suffering.

**\*954** The court pointed out to counsel that "issues could be raised that the damages go to separate causes of action. And these are distinctly different causes of action." The court inquired whether counsel wanted to direct the jury to indicate whether the damages it awarded were as to each cause of action. Shoyoye's counsel objected to any apportionment request, while counsel for the County was in favor of it. The court decided not to seek further elaboration or apportionment from the jury. The court entered judgment in favor of Shoyoye on February 1, 2010.

The County then filed a motion for judgment notwithstanding the verdict and a motion for new trial, arguing that the evidence at trial was insufficient as a matter of law to support the jury's verdict regarding the section 52.1 claim because Shoyoye failed to present any evidence that County employees violated his constitutional rights by the use of threats, intimidation, or

**Avery, Michael 10/13/2018**
**For Educational Use Only**

Shoyoye v. County of Los Angeles, 203 Cal.App.4th 947 (2012)
137 Cal.Rptr.3d 839, 12 Cal. Daily Op. Serv. 2285, 2012 Daily Journal D.A.R. 2491

coercion. Extensive briefing of the issue ensued.

[1] Ultimately, the court denied the County's posttrial motions. Thereafter, the County filed a timely notice of appeal from both the judgment and the order denying its posttrial motions.[3]

**DISCUSSION**

**I. Standard of Review**
Denial of defendant's motion for judgment notwithstanding the verdict is reviewed to determine whether substantial evidence supports the jury verdict. (*Dell'Oca v. Bank of New York Trust Co., N.A.* (2008) 159 Cal.App.4th 531, 554–555, 71 Cal.Rptr.3d 737.)

"Under [the substantial evidence] standard of review, our duty 'begins and ends' with assessing whether substantial evidence supports the verdict. [Citation.] '[The] reviewing court starts with the presumption **845 that the record contains evidence to sustain every finding of fact.' [Citation.] We review the evidence in the light most favorable to the respondent, resolve all evidentiary conflicts in favor of the prevailing party and indulge all reasonable inferences possible to uphold the jury's verdict. [Citation.]" (*US Ecology, Inc. v. State of California* (2005) 129 Cal.App.4th 887, 908, 28 Cal.Rptr.3d 894.) However, *955 issues of statutory interpretation and of application of a statute to undisputed facts are reviewed de novo. (*Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 284, 73 Cal.Rptr.2d 596.)

**II. Statutory Interpretation**
We begin with the language of section 52.1, sometimes referred to as the Tom Bane Civil Rights Act. It provides in relevant part as follows:

"(a) If a person or persons, whether or not acting under color of law, interferes by threats, intimidation, or

coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state, the Attorney General, or any district attorney or city attorney may bring a civil action for injunctive and other appropriate equitable relief in the name of the people of the State of California, in order to protect the peaceable exercise or enjoyment of the right or rights secured....

"(b) Any individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of this state, has been interfered with, or attempted to be interfered with, as described in subdivision (a), may institute and prosecute in his or her own name and on his or her own behalf a civil action for damages, including, but not limited to, damages under Section 52, injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of the right or rights secured." The statute further provides in subdivision (h) that "In addition to any damages, injunction, or other equitable relief awarded in an action brought pursuant to subdivision (b), the court may award the petitioner or plaintiff reasonable attorney's fees."

Throughout the pendency of this matter, Shoyoye has predicated the County's liability under section 52.1 solely on a claim of interference with either the Fourth Amendment to the United States Constitution or article I, section 13 of the California Constitution, which both pertain to the right of the people to be secure against unreasonable searches and seizures.[4]

[2] [3] [4] "The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., 'threats, intimidation or coercion'), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not *956 required to do under the law. (*Jones* [*v. Kmart Corp.* (1998) ] 17 Cal.4th [329,] 334 [70 Cal.Rptr.2d 844, 949 P.2d 941] [*Jones* ].)" (*Austin B. v. Escondido Union School Dist.* (2007) 149 Cal.App.4th 860, 883, 57 Cal.Rptr.3d 454.) The legislative history of section 52.1, enacted in 1987, makes clear that the crucial motivation behind passage of section 52.1 was to address the increasing incidence of hate crimes in California. (Stats.1987, ch. 1277, § 3, p. 4544; see (A.B.63). See *Jones, supra,* at p. 338, 70 Cal.Rptr.2d 844, 949 P.2d 941.) However, the statutory language does not limit

Avery, Michael 10/13/2018
For Educational Use Only

Shoyoye v. County of Los Angeles, 203 Cal.App.4th 947 (2012)

137 Cal.Rptr.3d 839, 12 Cal. Daily Op. Serv. 2285, 2012 Daily Journal D.A.R. 2491

**846** its application to hate crimes. Notably, the statute does not require a plaintiff to allege the defendant acted with discriminatory animus or intent based upon the plaintiff's membership in a protected class of persons. (Cf. § 51.7; *Venegas v. County of Los Angeles* (2004) 32 Cal.4th 820, 841–843, 11 Cal.Rptr.3d 692, 87 P.3d 1 (*Venegas II* ).) A defendant is liable if he or she interfered with or attempted to interfere with the plaintiff's constitutional rights by the requisite threats, intimidation, or coercion. (*Venegas II, supra,* at p. 843, 11 Cal.Rptr.3d 692, 87 P.3d 1.)

In *Venegas II,* sheriff's deputies stopped a car in which a husband and wife were driving, based on the husband's resemblance to a suspect in an ongoing investigation of an automobile theft ring. The car had no license plates or visible vehicle identification number. The husband informed the officers that he was the brother of the person they were looking for, but when asked to produce identification he said it was at his home nearby. He declined to sign an entry and search waiver form to allow the officers to enter his home and retrieve his identification, instead agreeing the officers could accompany his wife to their home to get it. One officer assured the couple their home would not be searched. However, upon reaching the home, the officers convinced the wife to sign a broadly worded entry and search waiver form granting them authority to enter the house and conduct a search. Officers searched the entire house and found papers showing the husband was on felony probation. They directed the officers detaining the husband to arrest him for a misdemeanor Vehicle Code violation and for violating his probation; he was later booked into custody. The officers detained the wife for two hours but did not arrest her or charge her with anything. They determined the following day that the car was not stolen, and directed that the husband be released from custody. He was released two days later; no charges were ever filed against him. The husband and wife filed an action against individual officers involved in the incident, the city and county, and the county sheriff's department. The plaintiffs' complaint included causes of action on the husband's behalf under section 52.1, and for false detention and arrest. (*Venegas II, supra,* 32 Cal.4th at pp. 827–828, 11 Cal.Rptr.3d 692, 87 P.3d 1.) The matter was tried, and the trial court granted nonsuit in favor of the defendants. (*Id.* at p. 828, 11 Cal.Rptr.3d 692, 87 P.3d 1.)

The Supreme Court reversed, holding that the trial court erred in requiring the plaintiffs to allege they were

members of a protected class in order to maintain a cause of action under section 52.1 based on unreasonable search **957** and seizure. "According to County, the section applies only to so-called hate crimes and requires a showing, not alleged here, that the defendants acted with 'discriminatory animus,' i.e., an intent to threaten or coerce another in violation of their constitutional rights, based on the victim's actual or apparent racial, ethnic, religious, or sexual orientation or other minority status. [Citation.] We disagree, as nothing in Civil Code section 52.1 requires any showing of actual intent to discriminate." (*Venegas II, supra,* 32 Cal.4th at p. 841, 11 Cal.Rptr.3d 692, 87 P.3d 1.) The Supreme Court noted that section 52.1, subdivision (g) states that an action brought under that section is " 'independent of any other action, remedy, or procedure that may be available to an aggrieved individual under any other provision of law,' " including section 51.7, which does require allegations of violence or intimidation because of the victim's actual or apparent characteristics (for example, race, sexual orientation, or disability). **847** (*Venegas II, supra,* at pp. 841–842, 11 Cal.Rptr.3d 692, 87 P.3d 1.) Indeed, section 52.1 was amended in 2000 to add language to subdivision (g) in order to clarify that the section applies to an affected plaintiff without regard to his or her membership in a protected class. (Stats.2000, ch. 98, § 3, p. 1533; *Venegas II, supra,* at p. 842, 11 Cal.Rptr.3d 692, 87 P.3d 1.)

The *Venegas* court acknowledged that in *Jones, supra,* 17 Cal.4th 329, 338, 70 Cal.Rptr.2d 844, 949 P.2d 941, it had stated that section 52.1 was adopted " 'to stem a tide of hate crimes' " (*Venegas II, supra,* 32 Cal.4th at p. 843, 11 Cal.Rptr.3d 692, 87 P.3d 1), but asserted that "our statement did not suggest that section 52.1 was limited to such crimes, or required plaintiffs to demonstrate that County or its officers had a discriminatory purpose in harassing them, that is, that they committed an actual hate crime." (*Venegas II, supra,* at p. 843, 11 Cal.Rptr.3d 692, 87 P.3d 1.) The court disagreed, however, with the county's assertion that such an interpretation would mean that section 52.1 would apply in all tort actions. "Civil Code section 52.1 does not extend to all ordinary tort actions because its provisions are limited to threats, intimidation, or coercion that interferes with a constitutional or statutory right.... [W]e need not decide here whether section 52.1 affords protections to every tort claimant, for plaintiffs in this case have alleged unconstitutional search and seizure violations extending far beyond ordinary tort claims. All we decide here is that, in pursuing relief for those constitutional violations under

Avery, Michael 10/13/2018
For Educational Use Only

**Shoyoye v. County of Los Angeles, 203 Cal.App.4th 947 (2012)**

137 Cal.Rptr.3d 839, 12 Cal. Daily Op. Serv. 2285, 2012 Daily Journal D.A.R. 2491

section 52.1, plaintiffs need not allege that defendants acted with discriminatory animus or intent, so long as those acts were accompanied by the requisite threats, intimidation, or coercion. The Court of Appeal was correct in holding that plaintiffs adequately stated a cause of action under section 52.1." (*Venegas II, supra,* at p. 843, 11 Cal.Rptr.3d 692, 87 P.3d 1.)

Unlike the Supreme Court in *Venegas II,* we are indeed required to decide here whether section 52.1 affords protection to every claimant who alleges interference with his or her right to be free of an unreasonable seizure, i.e., **overdetention** beyond the time lawfully permitted, where the **overdetention** occurs because of mere negligence rather than a volitional act intended to **\*958** interfere with the exercise or enjoyment of the constitutional right. In other words, if the circumstances of the **overdetention** are coextensive with those that would support a tort claim for negligent false imprisonment, and do not involve any additional showing of ill will or blameworthy conduct, is section 52.1 applicable? Shoyoye contends that the intimidation and coercion inherent in being incarcerated is sufficient to show that defendant interfered by threats, intimidation, or coercion with his right to be free from an unreasonable seizure. Naturally the County disagrees. We are thus called upon to decide this issue of first impression, which we conceptualize as involving two related questions: What type of interference is contemplated by the statute—intentional and callous interference only or also incidental interference brought about by negligent conduct? As applicable here, where coercion is inherent in the constitutional violation alleged, as it is in an unreasonably prolonged detention, is the statutory requirement satisfied or does the statute require a showing of coercion independent from the coercion inherent in the wrongful detention itself?

*A. Intentional Interference with a Constitutional Right*

" 'The objective of statutory interpretation, of course, is to ascertain and effectuate legislative intent. If the words are clear, a court may not alter them to accomplish a purpose that does not appear on **\*\*848** the face of the statute or from its legislative history. [Citation.] At the same time, however, a statute is not to be read in isolation; it must be construed with related statutes and considered in the context of the statutory framework as a whole. [Citation.] A court must determine whether the literal meaning of a

statute comports with its purpose or whether such a construction of one provision is consistent with other related provisions.' (*Gomes v. County of Mendocino* (1995) 37 Cal.App.4th 977, 986 [44 Cal.Rptr.2d 93].)" (*Hicks v. E.T. Legg & Associates* (2001) 89 Cal.App.4th 496, 505, 108 Cal.Rptr.2d 10.)

[5] [6] The statutory framework of section 52.1 indicates that the Legislature meant the statute to address interference with constitutional rights involving more egregious conduct than mere negligence. Subdivision (e) contains a provision that directs the plaintiff to inform his or her local law enforcement agency of orders made pursuant to the section, such as for injunctive relief, in "locations where the court determines that *acts of violence* against the plaintiff are likely to occur." (Italics added.) Similarly, subdivision (j) states that: "Speech alone is not sufficient to support an action brought pursuant to subdivision (a) or (b), except upon a showing that the speech itself *threatens violence* against a specific person or group of persons; and the person or group of persons against whom the threat is directed reasonably fears that, because of the speech, *violence* will be committed against them or their property and that the person *threatening violence* had the apparent ability to **\*959** carry out the threat." (Italics added.) While we are not prepared to and need not decide that every plaintiff must allege violence or threats of violence in order to maintain an action under section 52.1 (see e.g., *Cabesuela v. Browning–Ferris Industries of California, Inc.* (1998) 68 Cal.App.4th 101, 80 Cal.Rptr.2d 60), we conclude that the multiple references to violence or threats of violence in the statute serve to establish the unmistakable tenor of the conduct that section 52.1 is meant to address. The apparent purpose of the statute is not to provide relief for an **overdetention** brought about by human error rather than intentional conduct.

[7] We further note that when section 52.1 was amended in 1990 to allow plaintiffs to recover monetary damages in addition to the remedy of injunctive relief the statute originally provided (Stats.1990, ch. 392, § 1, p. 1749), the Legislature also considered, but rejected, a proposal to delete the language requiring interference "by threats, intimidation, or coercion." A bill analysis prepared by the Department of Justice commented that "As a general proposition, statutory or common law remedies are already available to redress interference with rights protected by state or federal constitutions or laws (e.g., tort). Civil Code § 52.1 focuses specifically on the *additional* element present especially in hate violence,

Avery, Michael 10/13/2018
For Educational Use Only

Shoyoye v. County of Los Angeles, 203 Cal.App.4th 947 (2012)

137 Cal.Rptr.3d 839, 12 Cal. Daily Op. Serv. 2285, 2012 Daily Journal D.A.R. 2491

viz., putting persons in fear of their safety. It is the element of threat, intimidation, or coercion that is being emphasized in Civil Code § 52.1. [¶] The proposed deletion would, in effect, make the civil rights remedy as an alternative cause of action in virtually every tort action: *Any* tort (and, perhaps, some contractual interferences) could be characterized as interference with 'rights secured by the Constitution or laws of the United States or of rights secured by the Constitution of laws of this state.' " (Dept. of Justice, Analysis of Assem. Bill No. 2683 (1989-1990 Reg. Sess.) Mar. 1, 1990, p. 2. see also Assem. Com. on Judiciary, hearing on Assem. Bill No. 2683 (1989-1990 Reg. Sess.) Mar. 7, 1990 pp. 2–3: "Does not the inclusion of the terms [threats, intimidation, or coercion] clearly define the types of interferences that the Act originally intended to curb (i.e. hate **849 violence)?") The legislative history thus supports our conclusion that the statute was intended to address only egregious interferences with constitutional rights, not just any tort. The act of interference with a constitutional right must itself be deliberate or spiteful.

*B. Coercion Inherent in a Detention Is Insufficient*

[8] Thus, we conclude that where coercion is inherent in the constitutional violation alleged, i.e., in an overdetention in County jail, the statutory requirement of "threats, intimidation, or coercion" is not met. The statute requires a showing of coercion independent from the coercion inherent in the wrongful detention itself.

*960 The issue was squarely presented in a federal district court case, *Gant v. County of Los Angeles* (C.D.Cal.2011) 765 F.Supp.2d 1238 (*Gant*). There, several plaintiffs alleged federal and state constitutional violations arising from their arrests and subsequent detentions on warrants intended for different people. Having determined that there was no California case law addressing the issue, the *Gant* court looked to a Massachusetts decision, *Longval v. Commissioner of Correction* (1989) 404 Mass. 325, 535 N.E.2d 588 (*Longval*), appropriately so because section 52.1 was modeled closely on the Massachusetts Civil Rights Act of 1979. (*Gant, supra,* at p. 1253. see *Jones, supra,* 17 Cal.4th at p. 335, 70 Cal.Rptr.2d 844, 949 P.2d 941.) The court in *Gant* observed: "Massachusetts case law suggests that the statute's coercion element is not met merely because the constitutional violation itself is inherently

coercive. In [*Longval* ], the Massachusetts Supreme [Judicial] Court considered a prisoner's claim under the corresponding state civil rights law that his rights were violated when he was unlawfully transferred to an administrative segregation unit in another prison without a hearing. [ (*Longval, supra,* at p. 590.) ] There, the court held that '[a] direct violation of a person's rights does not by itself involve threats, intimidation, or coercion and thus does not implicate the Act.' [Citation.] Thus, it held, 'we see no coercion, within the meaning of the ... Act, simply from the use of force by prison officials, authorized to use force, in order to compel a prisoner to do something he would not willingly do, even if it turns out that the official had no lawful right to compel the prisoner to take that action.' [Citation.] Because the use of force was intrinsic to the alleged violation itself, it did not also satisfy the additional 'force' or 'coercion' element of the statute." (*Gant, supra,* 765 F.Supp.2d at p. 1253; quoting *Longval, supra,* at p. 593.) The *Longval* court observed: "Shackling and handcuffing Longval and taking him to Concord was not by itself coercive under the Civil Rights Act, as Longval claims. If the officials had *some further purpose* in treating Longval as they did, threats, intimidation, or coercion might be involved. Conduct, even unlawful conduct, however, lacks these qualities when all it does is take someone's rights away directly. [Citation.]" (*Longval, supra,* at p. 593; italics added.)

The *Gant* court adopted this analysis and rejected the section 52.1 claims of the wrongfully arrested plaintiffs, holding that: "[A] wrongful arrest and detention, without more, cannot constitute 'force, intimidation, or coercion' for purposes of section 52.1." (*Gant, supra,* 765 F.Supp.2d at pp. 1253–1254.) "[S]ection 52.1 requires a showing of coercion independent from the coercion inherent in a wrongful detention itself." (*Id.* at p. 1258.) We agree.

**850 We note the contrary holding in *Cole v. Doe* (N.D.Cal.2005) 387 F.Supp.2d 1084 in which the federal district court held that the "[u]se of law enforcement authority to effectuate a stop, detention (including use of handcuffs), and search can constitute interference by 'threat[ ], intimidation, or coercion' *961 if the officer lacks probable cause to initiate the stop, maintain the detention, and continue a search." (*Id.* at p. 1103.) However, we do not find the case persuasive because the *Cole* court's analysis focused on whether the use or attempted use of excessive physical force or violence must be alleged (concluding that it did not). (*Id.* at pp. 1103–1104.) Our focus is not so limited.

Avery, Michael 10/13/2018
For Educational Use Only

Shoyoye v. County of Los Angeles, 203 Cal.App.4th 947 (2012)
137 Cal.Rptr.3d 839, 12 Cal. Daily Op. Serv. 2285, 2012 Daily Journal D.A.R. 2491

*C. Shoyoye Did Not Prove Coercion Independent from That Inherent in a Wrongful Detention*

[9] The evidence presented at trial showed only that County employees were negligent in assigning to Shoyoye a parole hold in the computer system, and in failing to detect the error during the subsequent quality control procedure. None of the County employees here wrongfully detained Shoyoye with actual or presumed knowledge that he should have been released. Early on, someone followed through on his inquiry and ascertained that he had a DCL hold. The employees could reasonably rely on the information in the computer system, based on the reasonable assumption that the quality control check would catch errors. As a result, the County employees thought he should be there. Any intimidation or coercion that occurred was simply that which is reasonable and incident to maintaining a jail. The coercion was not carried out in order to effect a knowing interference with Shoyoye's constitutional rights. This is in stark contrast to *Venegas II,* for example, in which the evidence presented could support a finding that the probable cause that initially existed to justify stopping the plaintiffs eroded at some point, such that the officers' conduct became intentionally coercive and wrongful, i.e., a knowing and blameworthy interference with the plaintiffs' constitutional rights. (*Venegas II, supra,* 32 Cal.4th at p. 843, 11 Cal.Rptr.3d 692, 87 P.3d 1 ["plaintiffs in this case have alleged unconstitutional search and seizure violations extending far beyond ordinary tort claims"].)

Here, County employees certainly were rude to him at times, but they did not threaten or intimidate Shoyoye for voicing his opinion that he should be released. They coerced him to remain incarcerated, but they did not for example coerce him to stop inquiring about his release, threaten him for doing so, or punish him in any way. No one ignored him deliberately, knowing that he should in fact be released, let alone purposefully threaten or intimidate him. At worst they were rude and indifferent to his inquiries. But jail officials do not have a duty to be polite. There is no evidence that Shoyoye was treated differently than other inmates who were lawfully incarcerated, or that any conduct directed at him was for the purpose of interfering with his constitutional rights. He felt physically threatened by other prisoners who thought he might be an informant, not by County

officials. No doubt the experience was traumatic and frightening, but there **\*962** was no evidence of any coercion independent of that inherent in a wrongful detention itself. We therefore conclude, as a matter of law based on the undisputed facts, that Shoyoye did not establish a violation of section 52.1. We reverse that portion of the judgment finding against the County on the cause of action pursuant to section 52.1. Accordingly, we also reverse the award of attorney fees in favor of Shoyoye that **\*\*851** were awarded pursuant to subdivision (h) of the statute.[5]

**III. Reversal of the False Imprisonment Verdict and Associated Damage Award Is Not Required**

[10] The County asserts that if the judgment in favor of Shoyoye under section 52.1 is reversed, we must reverse the entire judgment because the jury did not apportion the damage award between the section 52.1 cause of action and the false imprisonment claim. We conclude under the factual circumstances present here, where the damages attributable to each cause of action are identical, that reversal of the false imprisonment verdict and associated damage award is not required.

[11] "The elements of a tortious claim of false imprisonment are: (1) the nonconsensual, intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time, however brief." (*Easton v. Sutter Coast Hospital* (2000) 80 Cal.App.4th 485, 496, 95 Cal.Rptr.2d 316.) The evidence presented at trial was clearly sufficient to establish those elements.

Shoyoye did not present evidence at trial of any threats, intimidation, or coercion apart from that which is incident to detention in County jail. Indeed, he vehemently argued that the intimidation and coercion inherent in his wrongful detention were alone sufficient to support his claim. Plaintiff's counsel did not suggest to the jury that they should award damages for each cause of action separately, or award additional damages because of the section 52.1 claim. Under these circumstances, we need not reverse the entire judgment because the measure of damages for false imprisonment, as this case was presented to the jury, was identical to the measure of damages for violation of section 52.1. We do not decide whether an additional award would be warranted to compensate a plaintiff for the more egregious conduct

**Avery, Michael 10/13/2018**
**For Educational Use Only**

**Shoyoye v. County of Los Angeles, 203 Cal.App.4th 947 (2012)**

137 Cal.Rptr.3d 839, 12 Cal. Daily Op. Serv. 2285, 2012 Daily Journal D.A.R. 2491

which we have concluded is necessary to establish a violation of section 52.1. But we do find that the verdict here included no such augmentation.

imprisonment, and the associated monetary damage award is affirmed. The parties are to bear their own costs on appeal.

We concur: EPSTEIN, P.J., and MANELLA, J.

**\*963 DISPOSITION**

**All Citations**

The judgment in favor of Shoyoye as to the section 52.1 cause of action is reversed, as is the award of attorney fees in favor of Shoyoye, which was granted under the authority of that section. The judgment in favor of Shoyoye is affirmed as to the cause of action for false

203 Cal.App.4th 947, 137 Cal.Rptr.3d 839, 12 Cal. Daily Op. Serv. 2285, 2012 Daily Journal D.A.R. 2491

Footnotes

*     Kennard and Werdegar, JJ., are of the opinion that the petition should be granted.

1     All further undesignated statutory references are to the Civil Code.

2     Shoyoye conceded that there was probable cause for his arrest and initial detention.

3     We reject Shoyoye's contention that the County admitted liability at trial and has therefore forfeited any argument to the contrary. Shoyoye concedes, and the record makes clear, that defense counsel argued that any violation of plaintiff's constitutional rights was not intentional, but due to a mistake, and was not accomplished by means of threats, intimidation, or coercion.
      Without specifically deciding the issue, we assume for purposes of this opinion that a constitutional violation occurred and that Shoyoye was unreasonably detained beyond the time detention was justified.

4     Although the parties discuss whether the County is a person within the meaning of the statute, we do not find it necessary to answer that question in order to resolve this appeal.

5     This conclusion of course renders moot Shoyoye's cross-appeal regarding the amount of the attorney fee award.

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.