Barrett S. Litt, SBN 45527
Email: blitt@kmbllaw.com
KAYE, MCLANE, BEDNARSKI & LITT
975 East Green Street
Pasadena, California 91106
Telephone: (626) 844-7660
Facsimile: (626) 844-7670

Carol A. Sobel, SBN 84483
Email: carolsobel@aol.com
LAW OFFICE OF CAROL A. SOBEL
3110 Main Street, Suite 210
Santa Monica, California 90405
Telephone: (310) 393-3055
Facsimile: (310) 451-3858

ADDITIONAL COUNSEL LISTED
ON NEXT PAGE
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARMAINE CHUA, ET AL. PLAINTIFFS, vs. CITY OF LOS ANGELES, ET AL., DEFENDANTS. | CASE NO: 2:16-CV-00237-JAK-GJS(X) [HON. JOHN A. KRONSTADT] DECLARATION OF BARRETT S. LITT IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT HEARING DATE: SEPTEMBER 9, 2019 HEARING TIME: 8:30 A.M. COURTROOM: 10B |

1

ADDITIONAL PLAINTIFFS' COUNSEL

Paul Hoffman, SBN 71244
Email. hoffpaul@aol.com
Catherine Sweetser. SBN271142
Email. catherine.sdshhh@gmail.com
SCHONBRUN, SEPLOW, HARRIS & HOFFMAN
732 Ocean Front Walk
Venice, California 90291
Tel. (310) 396-0731
Fax. (310) 399-7040

Colleen M. Flynn, SBN 234281
Email. cflynnlaw@yahoo.com
LAW OFFICE OF COLLEEN FLYNN
3435 Wilshire Boulevard, Suite 2910
Los Angeles, California 9001 0
Tel. 213 252-9444
Fax. 213 252-0091

Matthew Strugar, SBN 232951
Email. matthewstrugar@gmail.com
LAW OFFICE OF MATTHEW STRUGAR
2108 Cove Avenue
Los Angeles, California 90039
Tel: 323 696-2299

I, **BARRETT S. LITT**, declare:

1.     This declaration is submitted in support of Plaintiffs' Motion for Preliminary Approval of the proposed class settlement in this case. The facts set forth herein are within my personal knowledge or knowledge gained from review of the pertinent documents.  If called upon, I could and would testify competently thereto.

2.     I am an attorney duly licensed to practice in the State of California.  Since 1984, I have been the principal or senior partner in firms that operate for the specific purpose of developing and maintaining a civil rights and public interest law practice that operates in the private sector on the basis of self-generated fee awards and other recoveries.  Since January 1, 2013, I have been a partner in the law firm of Kaye, McLane, Bednarski & Litt. Between September 2010 and December 31, 2012, I was a partner in the law firm of Litt, Estuar, and Kitson.  From July 2004 to September 2010, I was a partner in the law firm of Litt, Estuar, Harrison, and Kitson.  From 1998 to July 2004, I was the principal in the law firm of Litt & Associates, Inc.  From September 1, 1991 to May 1, 1997, when my then partner left the law firm to become Deputy General Counsel for Civil Rights at the federal Department of Housing and Urban Development, I was a partner at the firm of Litt & Marquez.  And for the seven years prior to that, I was a partner in the firm of Litt & Stormer, Inc.

3.     Carol Sobel, Paul Hoffman and I have acted as co-lead counsel in this case since it was filed. All three of us have litigated several protest class actions together as well as numerous other complex civil rights cases and class actions. Our qualifications and experience in class action litigation have been provided in declarations filed in connection with the motions for class certification and will not be repeated here, except to repeat that we are highly experienced in civil rights damages class actions. I am one of most experienced civil rights class action litigators in the country and have probably acted as class action counsel in more law enforcement related civil rights damages class actions than any lawyer in the country. I have attached as Exhibit 1 to this Declaration a copy of my current CV, which recites, inter alia, my class action cases to date.

4.      The settlement terms were negotiated at arms' length with the assistance of an experienced mediator and jurist, now retired Magistrate Judge Jay Gandhi, after three in-person mediation sessions and one subsequent direct party-to-party negotiation.

5.      This case was litigated extensively and vigorously. Plaintiffs conducted extensive discovery, both documents and numerous depositions. They also gathered substantial third-party evidence. They retained experts regarding the propriety of the police actions, reenactment of the audibility of the police unlawful assembly announcement and general damages.

6.      Based on our review of the arrest records and other discovery and outreach, we have determined that the size of the certified 6th & Hope class in this case is approximately 140 individuals.

7.      The proposal for incentive awards was at Class Counsel's initiative, and no discussion or agreement regarding incentive awards occurred with the Named Plaintiffs until the proposed settlement was reached. The amount of the proposed incentive awards was at Plaintiffs' counsel's initiative and reflects our assessment of a reasonable incentive award based on the contributions of the class representatives, the risk taken by them and the size of the settlement.

8.      In my experience in settling other protest class actions, we anticipate a claim rate of approximately 80-85%, but do not consider it likely that we will reach 100%. This is a considerably higher claim rate than most jail or other law enforcement class actions. This is due to the relatively small class size and the relative cohesiveness of protest class members. Most of my large law enforcement class actions, with class members numbering in the tens or hundreds of thousands, have had claims rates in the 15-20% range, occasionally higher.

9.      The recovery for class members is substantial, especially when viewed from the perspective of the trial risks. Given the class size of approximately 140, and the class fund of $200,000, the minimum recovery per class member is approximately $1425. Given that not all class members will file claims, the likely recovery per class member

(assuming an 80-85% claims rate) is approximately $1700. While this is lower than amounts in some comparable cases, this case carried greater risk. Defendants claimed that the unlawful assembly order was justified and audible, and claimed that they did not deny OR release but rather needed the time to process the arrestees before releasing them. (In contrast to other denial of OR cases, all plaintiffs were released within approximately 18 hours of arrest.) While Plaintiffs believed they had a strong claim, they considered this claim to be more subject to dispute than other cases they have handled. Plaintiffs' counsel concluded that a recovery of between $1500-$2000 per class member is a fair settlement given the disputed nature of the claim and that all class members were released within 18 hours (in contrast to longer detentions in other cases).

10.     We did not send this case out for bid to individual professional class administrators but instead decided to have the class administration handled by Ms. Sobel's office. In our previous protest cases, where we have used professional class administrators, Ms. Sobel has ended up engaging in substantial independent outreach to class members because of her role in representing the protest organizers preceding and during the protests, as a result of which she has built substantial relationships with many protest organizers and activists in the Los Angeles area. In my recent experience in settling several class actions over the past few years, in each of which professional class administrators were retained, the minimum cost of a professional administrator, no matter how small the class size, is $30,000 or more. We have agreed instead that Ms. Sobel will do the class administration for $20,000. This is advantageous to the class because it is a lower cost than for a professional administrator and advantageous to Ms. Sobel because she will receive some compensation for her work in reaching class members whereas her similar work in other cases went completely uncompensated. Accordingly, we request that the Court appoint the Law Office of Carol Sobel as class administrator.

11.     The agreed-upon attorneys' fee award, subject to court approval, reflects a substantial discount from what Plaintiffs' counsel would have sought and would reasonably expect to be awarded as statutory attorneys' fees. While the fees are higher

than the Class Damages Fund, that is not uncommon in fee shifting cases where the damages are relatively small and substantial attorney effort is required to obtain relief. *See City of Riverside v. Rivera*, 477 U.S. 561, 106 S.Ct. 2686, 2695, 91 L.Ed.2d 466 (1986) (upholding statutory fee award of $245,456.25 although the compensatory and punitive damages totaled only $33,350, over a 10 to 1 ratio and quoting S.Rep. No. 94-1011, p.6 (176), reprinted in, U.S. Code Cong. & Admin.News 1976 pp. 5908, 5913 ("[b]ecause damage awards do not reflect fully the public benefit advanced by civil rights litigation, Congress did not intend for fees in civil rights cases ... to depend on obtaining substantial monetary relief. Rather, Congress made clear that it 'intended that the amount of fees ... not be reduced because the rights involved may be nonpecuniary in nature.' ") (emphasis added by Supreme Court)). As a result, "[e]ven in cases seeking only monetary relief, 'a successful civil rights plaintiff often secures important social benefits that are not reflected in nominal or relatively small damage awards.' *Id.* at 574. *See also, e.g., Rodriguez v. Cty. of Los Angeles*, 891 F.3d 776 (9th Cir. 2018) (upholding attorney fee award of $5,378,174.66 where the damages award was $950,000); *Quesada v. Thomason*, 850 F.2d 537, 540 (9th Cir. 1988) ("it is inappropriate for a district court to reduce a fee award below the lodestar simply because the damages obtained are small. Permitting such reductions would create an incentive to bring only those civil-rights cases that would produce large damage awards. This incentive conflicts with the purposes of section 1988") (citing *Rivera*).

12.   For my firm, we annually review rates for each attorney and other biller and determine the rate for each in complex civil rights cases (which by definition we consider includes class actions), and the rates set forth here for my firm reflect those rates.

13.   As this Court has requested, Plaintiffs have provided summaries of the time spent to date, organized in the manner specified in this Court's Standing Order in Civil Cases, which can be found in Exhibit D to the preliminary approval motion. That Standing Order also specifies that Plaintiffs provide an estimate of the remaining work to be done. That work includes filing a motion for approval of the attorneys' fees, dealing

with class administration issues that normally arise in the context of a settlement of this type, responding to any objections, drafting the motion for final approval and accompanying order, appearing at the hearing on the motion for final approval and handling issues from late class members inquiring if they can receive money even though they did not file timely. In my experience, depending on events that cannot be determined in advance, the low end of the attorney hours needed to address these issues is approximately 125 attorney hours, and it could easily be 200 hours or more. This estimate does not include paralegal time.

14.     Because Plaintiffs will be filing a full attorney's motion, we do not at this time provide the full support for the fees to be received. We have provided information on some awards in the Declaration of Carol Sobel demonstrating that previously approved rates for the counsel in this case are as high as $1150 and generally that the actual award in this case is reasonable by any measure. *See also, e.g., McKibben v. McMahon*, 2019 WL 1109683 *13-14 (C. D. Cal. 2019) (in a class action lodestar award, where the Court found that my rate of $1150, and other rates ranging from $875 for a 32 year attorney, $715 for a 15 year attorney, $600 for a ten year attorney, $480 for a six year attorney, $390 for a four year attorney, and paralegal rates from $$175-$335, "as reflected in Plaintiffs' motion for attorney's fees and costs[,] are reasonable").[1]

15.     In addition, given that the hours for the three appointed Class Counsel constitute in the range of half of the hours in the case, I provide support for the rates used for them (Carol Sobel, $1000; Paul Hoffman, $1050; Barry Litt, $1200) in the paragraphs below (which are supported by the submission as exhibits to this Declaration of my curriculum vitae, attached to this Declaration as Exhibit 1and my exhibit of fee awards, attached this Declaration as Exhibit 2.

---

[1] That case, like this one, involved a class action settlement where the fees were awarded on a lodestar basis as a statutory fee, and Plaintiffs' counsel substantially discounted the rates they would have sought in a contested fee motion upon prevailing in the case.

16.     As I mentioned, my full curriculum vitae is attached. To give some sense of my experience, I mention here the largest civil rights cases (in dollar terms) in which I have been the lead counsel (seven of which are class actions) and which have been resolved as of this writing:

➢ *Williams v. Block*, Case No. CV97-03826 CW (C.D. Cal.) and related cases (a series of cases regarding county jail overdetention and strip searches, settled for $27 Million and a complete revamp of jail procedure);

➢ *Craft v. County of San Bernardino*, EDCV05-0359 SGL (C.D. Calif.) (reported at 2008 U.S.Dist. LEXIS 27526) (certified class action against the Sheriff of San Bernardino County for blanket strip searches of detainees, arrestees, and persons ordered released from custody; partial summary judgment decided for plaintiffs; $25.5 Million settlement plus injunctive relief in 2008);

➢ *Craig Coley v. City of Simi Valley* (wrongful conviction case of man imprisoned for 39 years for crime he did not commit; settled pre-filing for $21 Million; case handled jointly with Neufeld, Scheck & Brustin, who are based in New York);

➢ *McClure v. City of Long Beach* (fair housing case against City of Long Beach for preventing six group homes for the handicapped from opening; jury verdict before remittitur of $22.5 Million (exclusive of attorneys' fees) rendered 8/04/04; case settled for $20 Million);

➢ *MIWON v. City of Los Angeles*, Case No.: CV07-3072 AHM (FMMx) (class action on behalf of demonstrators attacked by LAPD in MacArthur Park on May 1, 2007; settled in 2009 for $12.75 Million plus injunctive relief);

➢ *Bynum v. District of Columbia*, Case No. 02-956 (RCL) (D.D.C.) (certified class action against the District of Columbia for overdetentions and strip searches of persons ordered released from custody, settled for $12 Million

in 2006);

➢ *Nozzi v. Housing Authority of the City of Los Angeles*, Case No. CV 07-00380 PA (FFMx) (settlement of approximately $9.4 Million for failing to provide proper mandated notice prior to subsidy reduction to Section 8 Housing Choice Voucher Program holders pending);

➢ *O'Connell v. County of Los Angeles,* Case No. 13-CV-01905 MWF (PJWx)  ($15 Million settlement in wrongful conviction case pending);

➢ *Goldstein v. City of Long Beach*, et al., Case No. CV04-9692 AHM (Ex) (C.D. Cal.) (wrongful conviction case against Long Beach Police Department based on violation of *Brady v. Maryland* for man imprisoned for 24 years; $7.95 Million settlement in August 2010);

➢ *Lopez v. Youngblood*, 609 F.Supp.2d 1125 ((E.D. Cal. 2009) (Settlement approved for putative class fund of approximately $7 Million for inmates strip searched after becoming entitled to release, and strip searches in groups);

➢ *Barnes v. District of Columbia*, Case 1:06-cv-00315-RCL 02-956 (RCL) (D.D.C.) (*Bynum* follow-up certified class action against the District of Columbia for overdetentions and strip searches of persons ordered released from custody, settled for $6 Million in 2006).

17.     This list does not include at least four pending class actions, two of which are currently in settlement negotiations and which I expect to resolve for eight figures, and two others of which are in earlier stages but will likely resolve in the eight figures if we are successful.

18.     My qualifications have been noted by various courts or opposing experts. Following are a few examples:

a.  Central District Judge Consuelo Marshall, in a fee decision in *Rodriguez et al. v. County of Los Angeles et al*., CV 10-6342-CBM (AJWx) (12/27/2014), found that "Barrett S. Litt, who served predominantly in a consulting role on this case, is

considered one of the leading civil rights attorneys in the country" and that the requested rate "of $975 per hour for Attorney Litt is supported by his strong reputation and experience."

b. Kenneth Moscaret, a well-known defense fee auditor, recently stated in a declaration where he addressed my qualifications that I had "an outstanding background and reputation in civil rights/constitutional litigation in Los Angeles", that I was "one of the top litigators in [my] field" and that he believed that my "skill, experience, and reputation in his field are deserving of a premium rate" (although he thought a premium rate was lower than I do).

c. Magistrate Judge Carla Woehrle, in awarding attorneys' fees in *Williams v. Block*, *supra*, commented that I am "considered one of the outstanding civil rights litigators in California, with special expertise in class actions, [and] the other attorneys involved in this litigation on behalf of the class are highly regarded, experienced and capable civil rights attorneys…."

d. United States District Judge Stephen Larson, in awarding attorneys' fees in *Craft v. County of San Bernardino*, *supra*, commented that "Plaintiffs' counsel are experienced civil rights litigators who are at the top of their field of expertise – civil rights litigation with special expertise in civil rights class actions."

e. In awarding attorneys' fees in *Gamino v. County of Ventura*, Case No. CV02-9785 CBM (Ex), the Court stated in 2005, "Mr. Litt is widely known as one of the foremost civil rights attorneys in California, having a particular expertise in civil rights class actions and other complex multi-party civil rights cases, especially law enforcement class actions."

f. In *Molina v. Lexmark International Inc.*, LA Super. Ct. No. BC339177, Order Granting Plaintiff's Motion for Attorney's Fees and Costs in the Amount of $5,772,008.07, filed Oct. 28, 2011 at 4., where I submitted a declaration in support of a fee motion, Judge Gregory W. Alarcon described another attorney and me as "acknowledged experts in attorney fees in class action cases . . . ."

19.     As my case list demonstrates, I have been involved with, and successful in, a wide range of complex civil rights cases, and have regularly brought fee motions under numerous federal and state fee shifting provisions. I frequently provide fee declarations in support of fee applications by other attorneys in civil rights cases, which have been cited in fee orders in the Central District to support fees that are in line with those that counsel for the Plaintiffs are seeking in this case. See, e.g., *Rauda v. City of Los Angeles*, CV08-3128 CAS (PJW), Fee Order dated 12/20/2010, p.10 ("With respect to the reasonableness of the fees requested, the Court finds that plaintiffs have sufficiently documented the fees requested. It further concludes, and is satisfied based on the declarations of Barrett S. Litt and Carol A. Sobel in support of plaintiffs' motion that the hourly rates requested by plaintiffs are consistent with those in the relevant legal community for individuals having the stature of plaintiffs' counsel."); *Lauderdale v. City of Long Beach*, No. CV 08-979 ABC (JWJx), Fee Order dated 1/11/2010, p.11 ("Barrett S. Litt, another experienced civil rights litigator, also testified that the rates are in line with the Southern California market, his own experience, and fee awards in similar cases.").

20.     I regularly review a variety of material to keep abreast of rates charged and awarded for complex litigation in Southern California. I do this in several ways, including contacting firms to provide (on either a public or confidential basis) current rate information; speaking with other attorneys familiar with complex litigation rates; reviewing court filings and cases regarding attorneys' fees (including both fee applications and fee awards); and obtaining other sources of fee information. In particular, I collect a wide variety of civil rights awards (either lodestar awards or lodestar crosschecks in civil rights class action fee awards) and class action awards in consumer cases with lodestar crosschecks, the results of which are described further on in this declaration. This has included review of rates sought and awarded to such boutique civil rights firms as my own firm(s); the ACLU; the Disability Rights Legal Center; Disability Rights Advocates; Public Counsel, Hadsell, Stormer et al.; the Law Offices of

Carol Sobel; Schonbrun, DeSimone et al.; and awards to various individual civil rights practitioners. In addition, to the extent I am able, I collect information regarding commercial rates; there are periodically reported decisions addressing fee awards in commercial cases, which I periodically review; and I periodically review or collect rates from various large law corporate firms they have provided to courts or elsewhere.

## SOURCE MATERIALS RELIED ON FOR RATE OPINIONS

21.     The rate information on which I rely is set forth in full in Exhibit 2 to this Declaration, which is incorporated by this reference and is broken into three tables, described as follows:

> ➢ Table 1: *Civil Rights Lodestar Awards/Lodestar Crosschecks*. These are taken from reported attorney fee awards, or filed court orders, in civil rights cases where there was either a direct lodestar award or a lodestar crosscheck against a percentage of the settlement or award fee.

> ➢ Table 2: *Consumer/Wage & Hour Class Action Lodestar Crosschecks*. This is self-explanatory, and was taken from reported cases.

> ➢ Table 3: *Commercial or Reported Standardized Rates Reflected in Select Attorney Fee Awards, Declarations or Reports*. These are a firm's standard rates reported either in a court filing, referred to in a court decision, provided to counsel, or contained in the 2009 Court Express summary of bankruptcy filings referred to previously.

22.     Exhibit 2 contains three cuts of the same information, each containing three tables, organized and designated as follows: 1) organized by case; 2) organized by years of graduation, most to least; and 3) organized by rates, highest to lowest (based on the adjusted rate for the year 2014, which concept is described below). I draw on this rate information in addressing the reasonableness of the rates requested in the Plaintiffs' motion, and include what I consider the most relevant references in the body of this Declaration.

23.     In the charts that I attach as Exhibit 2, and incorporate as relevant into the body of this Declaration, I provide the following information:

| Term | Description |
|------|-------------|
| Attorney | The name of the attorney awarded the rate listed or, for the commercial firms, their normal rates (or indicate if the individual identity is unknown) |
| Firm | The firm listed |
| Practice Yrs | The years in practice at the time of the award or, if it could be clearly determined from the opinion or other available information, the years in practice when the fee application was made. In parentheses are the years of law school graduation |
| Rate | The rate awarded in the case of awards, or normally charged for commercial firms |
| Year | The year of the award or the year of the fee application if those rates were used. |
| Adjusted Rate | An adjustment to the fee award to compensate for the passage of time, the basis for which is described in ¶¶ 22-27 below. |

24.     The name of the case in which the fee was awarded or, for commercial rates (where applicable) filed for, is noted by the use of a superscript number next to the name of the attorney. At the conclusion of the first set of charts in Exhibit 2 (and incorporated as relevant if the reference is used in the body of this Declaration), the name and case number, and/or Westlaw cite of the case is listed if the source is from a public filing. If

the source is not from a public filing, the non-public source is identified. [2] In the past, I often attached documents not reported in Westlaw as exhibits. However, the total of those now numbers several hundred pages, and so it has become less practical and useful to attach them, and I have not done so. In the event the Court or opposing counsel wishes me to provide them, I will do so

25.     The years of practice for an attorney are based on either information directly provided by the source or, where it was not so provided, by checking the attorney's website or the California State Bar Member Search. In some cases, the year of admission to the Bar may not be completely reliable because there may be reasons that an attorney's years of admission to the California State Bar are less than the years of practice. For example, an attorney may have practiced in another state before California or may have delayed admission while clerking for a judge or for some other reason. Where the attorney graduated from a California law school, it is likely that s/he graduated the same year as the Bar admission.

26.     With respect to my analysis of commercial rates in Table 3 of Exhibit 2, it is well established that civil rights rates were intended by Congress to be comparable to complex commercial litigation such as antitrust. *See, e.g., Craft v. Cnty. of San Bernardino*, 624 F. Supp. 2d 1113, 1122-23 (C.D. Cal. 2008) ("declarations establish that the hourly rates set are similar to those for attorneys of comparable skill and experience at the rates paid for complex federal litigation, which was Congress' intent for civil rights cases. *See City of Riverside v. Rivera*, 477 U.S. 561, 575-576, 106 S.Ct. 2686 (1986) (quoting Senate Report, at 6, U.S. Code Cong. & Admin. News 1976, p. 5913, *supra*, (Congress intended civil rights fees to be comparable to that for 'other types of equally complex Federal litigation, such as antitrust cases')"). I am aware of nothing to suggest

---

[2] So, for example, if the superscript uses the number "81" to designate the case, then the exhibit is maintained in my files as Exhibit 81.

that the legal work involved in the rates referenced in Table 3 is more complex than a complex civil rights case.

## ADJUSTMENT FACTOR

27.     In this declaration and in the rate charts attached as Exhibit 2, I use "Adjusted Rates" to compare the rates requested in this case to the historical rate data that I have presented. The "Adjusted Rate" is an inflation adjustment to show what a prior rate would be equivalent to in 2018 adjusted for the passage of time. The adjustment is based on the mean (numerical average) of the nation-wide Legal Services Component of the Consumer Price Index produced by the Bureau of Labor Statistics of the United States Department of Labor, which is reproduced by Dr. Michael Kavanaugh in his website for the "Updated Laffey Matrix." The "Updated Laffey Matrix" has been cited, and relied on, by courts in D.C.[3]

28.     I used an adjustment factor of 3% per annum. I reached this number by taking the average (mean) annual rate increase of the Legal Services CPI nationally for the years June 2008 to May 2019, which came to 3.0145% per year, and which I rounded down to 3%. See http://www.laffeymatrix.com/see.html. That this is a reliable and conservative national figure is confirmed by the fact that the inflation rate calculated for these years was significantly lower than the average inflation factor for the previous ten years, which was more than 4.5%, as reflected in the Updated Laffey Matrix.

---

[3] *See Salazar v. Dist. of Columbia*, 123 F. Supp. 2d 8, 13 (D.D.C. 2000); *Smith v. Dist. of Columbia*, 466 F. Supp. 2d 151, 155 (D.D.C. 2006) (the use of the updated *Laffey* Matrix is reasonable and consistent with previous precedent from our Court of Appeals, as well as from this Court in *Salazar*" and is "more accurate in that the calculation was based on increases/decreases in legal services rather than increase/decreases in the entire CPI"); *McDowell v. District of Columbia*, Civ. A. No. 00-594 (RCL), LEXSEE 2001 U.S. Dist. LEXIS 8114 (D.D.C. June 4, 2001) ("Plaintiffs may point to such evidence as an updated version of the Laffey matrix"); *Salazar v. Dist. of Columbia*, 750 F. Supp. 2d 70, 72 (D.D.C. 2011) (affirming use of the adjusted rate based on the national legal services data for monitoring work in the case, and rejecting Defendant's contention that the United States Attorney's matrix should be used instead).

29.     Other information indicates that the 3% inflation factor is an understatement of the increase in rates over the past several years in major metropolitan areas. The 3% adjustment is a national figure, and fees in urban large metropolitan areas likely have risen more rapidly. Thus, for example, the Wall Street Journal reported in April 2013, that, in "the first quarter of 2013, the 50 top-grossing U.S. law firms boosted their partner rates by as much as 5.7%, billing on average between $879 and $882 an hour" and that, in 2012, "legal fees in general rose 4.8% and associate billing rates rose by 7.4%, according to a coming report by TyMetrix Legal Analytics, a unit of Wolters Kluwer, and CEB, a research and advisory-services company. Those numbers are based on legal-spending data from more than 17,000 law firms." See Jennifer Smith, On Sale: the $1,150-Per-Hour-Lawyer, Wall St. J., Apr. 9, 2013, at http://www.wsj.com/articles.  A 2016 article reported an average billing rate increase of 3.2%. See Elizabeth Olson, Higher Fees Increase Law Firm Revenues by 4.1 Percent, N.Y. Times, Aug. 15, 2016, at www.nytimes.com/2016/08/16/business/dealbook/higher-fees-increase-law-firm-revenue-by-4-1-percent.html. According to a March 2017 release from Wolters Kluwer's ELM Solutions and CEB, 2016 rates rose 7.3% at the associate level and 3.2% at the partner level. See also Forbes, July 7, 2016 ("According to data from CEB, the average hourly rate charged by major law firm partners nearly doubled since 2000").[4] These figures are considerably higher than the 3% adjustment factor that I have used.

30.     The adjustment factor is important because it is not a valid comparison to take a fee from five years ago for, e.g., a ten-year lawyer and compare it to a fee

---

[4] See also, e.g., Hildebrandt Institute, *Top Law Firms Still Tops in Rates, Billable Hours* at 22, January 10, 2013, available at http://hildebrandtblog.com/2013/01/10/top-law-firms-still-tops-in-rates-billable-hours ("A survey from The National Law Journal (NLJ) (registration required) found that median partner rates were up 4.5 percent from 2011 to $517 an hour in 2012, and the median associate rate rose 3.5 percent to $323, with hourly rates ranging from $130 to $1,285 and a median hourly rate of $432. This gibes with the findings of the Major Lindsey & Africa (MLA) "Partner Compensation Survey 2012," which recorded an hourly rate range from $115 to $1,265 and an average partner billing rate of $584 (up from $555 in 2010).")

requested by a ten-year lawyer today because the five-year-old fee does not account for the change in rates in today's legal dollars. In other words, the adjustment factor is simply a measure of inflation and the present value of money. In the same way that one cannot rent a one-bedroom apartment in 2018 for the same monthly rate as a one-bedroom apartment in 2013, one cannot hire a ten-year attorney in 2018 for the same rate that was charged by a ten-year attorney in 2013.

31.    The adjustment factor is a tool to approximate what the current rate for an attorney of the same years of experience would be awarded now, as opposed to when the award was actually made. It is important to understand, when looking at rates awarded to the same attorney in previous cases that the adjustment factor does not account for increased experience or expertise. A five-year old award for a particular attorney must be adjusted for both inflation and increases in skill and experience. To illustrate the point, assume that attorney John Doe was awarded a fee in 2013 when he was a ten-year attorney. My Adjusted Rate for the 2013 award only accounts for what a similar ten-year attorney would receive today. It does not account for the fact that that John Doe is now a fifteen-year attorney with five more years' experience.  Since both the U.S. and California Supreme Courts have authorized payment of current rates to account for delay in payment, a simple inflation adjustment will not adequately compensate that attorney for the increased experience that s/he now has at the time of payment. Thus, it is to be expected that the current rate for attorneys who have received previous awards will be meaningfully above the adjusted rate based on a prior award.

32.    I have spent the time I have explaining the adjustment factor used because, in analyzing the rates, the only way to compare rates from prior years to the current year rates requested by plaintiffs' counsel in this case is to neutralize the effect of inflation and market changes over time.

33.    I have at times been asked why I do not use generic surveys to determine rates. The simple answer is that surveys do not provide the most useful information for the relevant market. I principally rely on actual awarded rates in civil rights cases or class

action lodestar cross checks in civil rights cases because these are awards in the same market, i.e., the market for Plaintiffs' complex civil rights cases in the major markets in California (Los Angeles and the Bay Area). *See, e.g., Blum v. Stenson*, 465 U.S. 886, 896, 104 S.Ct. 1541, 1547 (1984) ("the statute and legislative history establish that 'reasonable fees' under § 1988 are to be calculated according to the prevailing market rates in the relevant community"); *Trevino v. Gates*, 99 F.3d 911, 925 (9th Cir. 1996) ("the district court should not have relied on the rates paid by the City to private attorneys for defending excessive force cases as a starting point for the reasonable hourly rate....Private attorneys hired by a government entity to defend excessive force cases are not in the same legal market as private plaintiff's attorneys who litigate civil rights cases."). The relevant community here is Plaintiffs' lawyers in complex civil rights cases in Los Angeles (and, because rates in Northern California are comparable, Bay Area civil rights awards as well). Surveys do not reflect that market. Class actions and commercial rates for complex litigation are used as comparators because Congress intended civil rights awards to be comparable. See discussion in ¶ 25.

34.    As reflected by Exhibit 2, the rates sought in this case are well within the range of the rates charged by attorneys of comparable experience in the Southern California area for complex federal and civil rights work. Below I address the rates sought in this case, and compare them to attorneys of comparable or lesser experience, skill and reputation seeking or charging comparable or lesser rates.

### RATES FOR ATTORNEYS LITT, HOFFMAN AND SOBEL

35.    Below I list some relevant comparable rates from my Table 1 (Civil Rights/Public Interest Awards and Lodestar cross-checks). Ms. Sobel, Mr. Hoffman and I are attorneys ranging from 41-50 years' experience. All have been recognized as Super Lawyers for many years and are recognized as leading civil rights lawyers in California. All have substantial class action experience, including with particular expertise in protest class actions. The lodestar rates being used for them range from $1000-$1200 per hour. (Carol Sobel, $1000; Paul Hoffman, $1050; Barry Litt, $1200; see ¶14.)

36.     Adjusted rates awarded in civil rights cases support these rates, as is reflected in the Table 1 excerpts below. There are several awards for lawyers of substantially less experience receiving comparable or greater rates in adjusted dollars. For example, Jose Allen – an attorney at Skadden Arps – has been awarded over $1200 in adjusted dollars in two reported civil rights cases (once as a 25 year attorney and once as a 31 year attorney). As noted previously, complex civil rights litigation is most appropriately compared to other complex litigation, including complex commercial litigation, and should be compensated at similar rates. As I discuss immediately below, when commercial rates are used as the measure, the rates requested here are clearly on the low side as the Table 3 excerpts below demonstrate.

| Table 1: Civil Rights Lodestar Awards/Lodestar Crosschecks | | | | | |
|---|---|---|---|---|---|
| **Attorney** | **Firm** | **Pract Yrs (Grad Yr)** | **Rate** | **Year** | **Adjusted Rate** |
| Ian Herzog[24] | Law Office of Ian Herzog | 44 (1967) | $1,000 | 2011 | $1,267 |
| Jose R. Allen[35] | Skadden, Arps | 31 (1985) | $1150 | 2016 | $1,257 |
| Barrett S. Litt[38] | KMBL | 49 (1969) | $1,150 | 2017 | $1,220 |
| Jose R. Allen[4] | Skadden Arps | 25 (1985) | $930 | 2010 | $1,213 |
| Barrett S. Litt[40] | KMBL | 49 (1969) | $1,150 | 2018 | $1,185 |
| Barrett S. Litt[34] | KMBL | 45 (1969) | $975 | 2014 | $1,130 |
| Sid Wolinsky[4] | DRA* | 49 (1961) | $835 | 2010 | $1,089 |
| Paul R. Fine[24] | Daniels, Fine, Israel, Schonbuch & Lebovits | 39 (1972) | $850 | 2011 | $1,077 |
| Barrett S. Litt[6] | Litt, Estuar & Kitson | 40 (1969) | $800 | 2009 | $1,075 |
| Sid Wolinsky[13] | DRA* | 51 (1961) | $860 | 2012 | $1,058 |
| Barrett S. Litt[8] | Litt, Estuar & Kitson | 43 (1969) | $850 | 2012 | $1,045 |
| Unnamed[10] | Rosen Bien & Galvan | 48 (1962) | $800 | 2010 | $1,044 |
| Barrett S. Litt[15] | Litt, Estuar & Kitson | 39 (1969) | $750 | 2008 | $1,038 |
| Barrett S. Litt[7] | Litt, Estuar & Kitson | 38 (1969) | $725 | 2007 | $1,034 |

| Table 1: Civil Rights Lodestar Awards/Lodestar Crosschecks | | | | | |
|---|---|---|---|---|---|
| **Attorney** | **Firm** | **Pract Yrs (Grad Yr)** | **Rate** | **Year** | **Adjusted Rate** |
| Dan Stormer[8] | HSKRR**** | 38 (1974) | $825 | 2012 | $1,015 |
| Bill Lann Lee[18] | Lewis, Feinberg, Lee, Renaker, & Jackson | 38 (1974) | $825 | 2012 | $1,015 |
| Stephen Glick[24] | Law Offices of Stephen Glick | 37 (1974) | $800 | 2011 | $1,013 |
| Paul L. Hoffman[6] | Schonbrun, de Simone | 33 (1976) | $750 | 2009 | $1,008 |
| Mark Rosenbaum[2] | ACLU | 35 (1974) | $740 | 2009 | $994 |
| Christopher Cox[29] | Weill Gotschall | 23 (1991) | $850 | 2014 | $985 |
| Larry Paradis[13] | DRA* | 27 (1985) | $800 | 2012 | $984 |
| Sanford J. Rosen[12] | Rosen Bien & Galvan | 46 (1962) | $700 | 2008 | $969 |
| Daniel B. Kohrman[4] | AFL***** | 26 (1984) | $740 | 2010 | $966 |
| Carol Sobel[2] | Law Ofc Carol Sobel | 31 (1978) | $710 | 2009 | $954 |
| Carol A. Sobel[6] | Law Offices of Carol Sobel | 31 (1978) | $710 | 2009 | $954 |
| Laurence Paradis[4] | DRA* | 26 (1985) | $730 | 2010 | $952 |

37.     Although not justified on the merits, it is the case that rates for complex commercial litigation in adjusted dollars are generally higher, often significantly higher, than awarded civil rights rates for attorneys of comparable or less experience, as the following chart demonstrates. The following commercial rates in adjusted dollars, many for attorneys with far fewer years of experience, substantially exceed the rates requested here, especially since only about 1/3 of those in the chart below have over 30 years' experience and the rates in adjusted dollars all exceed $1000 per hour.

| Table 3: Commercial or Reported Standardized Rates Reflected in Select Attorney Fee Awards, Declarations or Reports | | | | | |
|---|---|---|---|---|---|
| Atty | Firm | Practice Yrs [Grad Yr] | Rate | Year | Adjusted Rate |
| Thomas J. Nolan[82] | Skadden Arps | 40 (1971) | $1095 | 2011 | $1,387 |
| Daniel Perry[93] | Milbank, Tweed | 14 (2000) | $1135 | 2014 | $1,316 |
| Jason D. Russell[82] | Skadden Arps | 18 (1993) | $1030 | 2011 | $1,305 |
| Unnamed[92] | Davis, Polk & Wardwell | 23 (1986) | $960 | 2009 | $1,290 |
| Unnamed[92] | Davis, Polk & Wardwell | 19 (1990) | $955 | 2009 | $1,283 |
| Marc Becker[81] | Quinn Emanuel | 24 (1988) | $1035 | 2012 | $1,273 |
| Unnamed[91] | Paul Hastings | 36 (1974) | $940 | 2010 | $1,226 |
| Wayne Barsky[86] | Gibson Dunn | 26 (1983) | $905 | 2009 | $1,216 |
| Unnamed[85] | Paul Hastings | 33 (1978) | $940 | 2011 | $1,191 |
| Gordon Kirscher[90] | O'Melveny &Myers | 38 (1971) | $860 | 2009 | $1,156 |
| Unnamed[92] | O'Melveny & Myers | 34 (1975) | $860 | 2009 | $1,156 |
| Unnamed[92] | Klee, Tuchin, Bogdanoff, & Stern | 19 (1990) | $850 | 2009 | $1,142 |
| Arturo Gonzalez[83] | MoFo | 28 (1985) | $950 | 2013 | $1,134 |
| Daniel Kolkey[86] | Gibson Dunn | 32 (1977) | $840 | 2009 | $1,129 |
| Unnamed[84] | Lieff Cabraser | 42 (1970) | $900 | 2012 | $1,107 |
| Unnamed[84] | Lieff Cabraser | 38 (1974) | $900 | 2012 | $1,107 |
| Unnamed[11] | Arnold & Porter | 39 (1974) | $910 | 2013 | $1,087 |
| Andrew Bridges[98] | Fenwick & West | 29 (1986) | $930 | 2014 | $1,078 |
| Unnamed[85] | Paul Hastings | 23 (1998) | $850 | 2011 | $1,077 |
| Unnamed[92] | Weil, Gotscahl & Manges | 23 (1986) | $799 | 2009 | $1,074 |
| Brian J. Hennigan[89] | Irell & Manella | 25 (1983) | $775 | 2008 | $1,073 |
| Unnamed[92] | Gibson Dunn & Crutcher | 25 (1974) | $790 | 2009 | $1,062 |

21

| Atty | Firm | Practice Yrs [Grad Yr] | Rate | Year | Adjusted Rate |
|------|------|------------------------|------|------|---------------|
| Marcellus McRae[86] | Gibson Dunn | 21 (1988) | $785 | 2009 | $1,055 |
| Delilah Vinzon[93] | Milbank, Tweed | 12 (2002) | $900 | 2014 | $1,043 |
| Alejandro Mayorkas[90] | O'Melveny &Myers | 23 (1986) | $770 | 2009 | $1,035 |
| Unnamed[92] | Hennigan, Bennett & Dorman | 30 (1979) | $760 | 2009 | $1,021 |
| Unnamed[92] | Pachulski, Stang et al. | 27 (1982) | $750 | 2009 | $1,008 |
| Unnamed[92] | White & Case | 24 (1985) | $750 | 2009 | $1,008 |
| Unnamed[92] | Morrison & Foerster | 24 (1985) | $750 | 2009 | $1,008 |
| Victoria Maroulis[81] | Quinn Emanuel | 13 (1999) | $815 | 2012 | $1,002 |

*Table 3: Commercial or Reported Standardized Rates Reflected in Select Attorney Fee Awards, Declarations or Reports*

38.     While I have used the terminology "rate requested" throughout this Declaration, that term should be clarified. Because of the agreement to significantly reduce the fees in this case, we are not requesting a lodestar award. Rather, we are establishing what we believe are justifiable hourly rates in order to demonstrate that the fee we are actually seeking is reasonable. (This fee, when work still to be submitted or done is included, will be in the range of approximately 50% of the lodestar based on the rates we provide.)

39.     The fees and costs exclusive of experts and mediations total $7,163.27 to date (covering legal research, filing and copy charges, postage, deposition transcripts, messenger, discovery tapes and the like. The expert charges total $12, 210 for police practices, sound and general damages experts.

40.     Based on my prior experience in settling numerous class actions (see my CV), I anticipate that an additional 50-125 hours (exclusive of class administration) will

22

be spent between the attorneys' fee motion, dealing with certain class issues or class member inquiries, responses to objections if there are any, and the final approval motion and final approval order. It is not possible to be more accurate because of unknown circumstances that may arise, and the varying time needed depending on the existence and state of objections. In addition, only my firm's time is fairly current (i.e., through July 9); the other attorneys' time is through late 2018. Thus, the final tally of time will include that absent time.

41.     Before submitting the Preliminary Approval motion and proposed Order, I provided a copy of both to defense counsel, who indicated they have no disagreements with either and concur in entry of the proposed Preliminary Approval Order.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 12, 2019, at Pasadena, California.


__/s/ Barrett S. Litt_____
Barrett S. Litt