1    Barrett S. Litt, SBN 45527
     Email: blitt@kmbllaw.com
2    KAYE, MCLANE, BEDNARSKI & LITT
3    975 East Green Street
     Pasadena, California 91106
4    Telephone: (626) 844-7660
     Facsimile: (626) 844-7670
5
6    Carol A. Sobel, SBN 84483
     Email: carolsobel@aol.com
7    LAW OFFICE OF CAROL A. SOBEL
8    3110 Main Street, Suite 210
     Santa Monica, California 90405
9    Telephone: (310) 393-3055
     Facsimile: (310) 451-3858
10
11   ADDITIONAL COUNSEL LISTED
     ON NEXT PAGE
12   Attorneys for Plaintiffs

13                  UNITED STATES DISTRICT COURT
14                 CENTRAL DISTRICT OF CALIFORNIA

15   CHARMAINE CHUA, ET AL.              CASE NO: 2:16-CV-00237-JAK-GJS(X)
                                         [HON. JOHN A. KRONSTADT]
16          PLAINTIFFS,
                                         DECLARATION OF CAROL A. SOBEL
17                                       IN SUPPORT OF MOTION FOR
                                         PRELIMINARY APPROVAL OF CLASS
18     VS.                               ACTION SETTLEMENT
19
20   CITY OF LOS ANGELES, ET AL.,        HEARING DATE:   SEPTEMBER 9, 2019
                                         HEARING TIME:   8:30 A.M.
21          DEFENDANTS.                  COURTROOM:      10B
22
23
24
25
26
27
28

ADDITIONAL PLAINTIFFS' COUNSEL

Paul Hoffman, SBN 71244
Email. hoffpaul@aol.com
Catherine Sweetser. SBN271142
Email. catherine.sdshhh@gmail.com
SCHONBRUN, SEPLOW, HARRIS & HOFFMAN
732 Ocean Front Walk
Venice, California 90291
Tel. (310) 396-0731
Fax. (310) 399-7040

Colleen M. Flynn, SBN 234281
Email. cflynnlaw@yahoo.com
LAW OFFICE OF COLLEEN FLYNN
3435 Wilshire Boulevard, Suite 2910
Los Angeles, California 9001 0
Tel. 213 252-9444
Fax. 213 252-0091

Matthew Strugar, SBN 232951
Email. matthewstrugar@gmail.com
LAW OFFICE OF MATTHEW STRUGAR
2108 Cove Avenue
Los Angeles, California 90039
Tel: 323 696-2299

# DECLARATION OF CAROL A. SOBEL

I, CAROL A. SOBEL, declare:

1.     I am an attorney admitted to practice before the California Supreme Court and the United States District Court for the Central District of California.  I am an attorney for the plaintiffs in this case and one of three counsel approved by the Court to serve as class counsel ("Class Counsel").   I have personal knowledge of the facts set forth below and, if called to testify to them, would do so competently.

**The Organization of the Legal Team and Distribution of Assignments**

2.     Three primary law firms represented the plaintiff class in this action: Kaye, McLane, Bednarski & Litt; Schonbrun, Seplow, Harris & Hoffman; and Law Office of Carol A. Sobel.   In addition, four solo practitioners served as counsel in the case.   A total of nine lawyers, two law clerks, multiple law students and one undergraduate incurred time over the course of five years in this litigation.  Each firm representing Plaintiffs made unique contributions.

3.     Because of the number of lawyers involved, at the start of the case Class Counsel took steps to ensure that the case would be litigated efficiently and there would not be unnecessary duplication.  The assignment of tasks was based on Class Counsel's evaluation of what was needed for a specific task and who had the relevant expertise, or could do the task most efficiently.

4.     We discussed at the outset the presence of less-experienced attorneys at hearings before the Court, as well as at depositions and mediations, to observe and gain experience.  At the time, the Class Counsel notified all the other attorneys that they were welcome to attend; however, they could not bill for that time unless it was determined that their attendance was deemed necessary by Class Counsel.

5.     In addition to limiting the number of attorneys who would bill for various events, Class Counsel assigned tasks to less-experienced attorneys where practical. So, for example, very little time was incurred by Class Counsel in propounding and responding to written discovery.  The same was true for depositions.  All of the class

representatives were defended at their deposition by lower-billing attorneys and the deposition of Commander Smith was taken by Catherine Sweetser.  The depositions of the Chief of Police, the Incident Commander for the arrests and the PMK on LAPD policies and practices were all taken by Class Counsel Paul Hoffman.  The remaining depositions of LAPD personnel were taken by lower billing attorneys.  Rachel Steinback and Monique Alarcon assisted in preparation for the depositions taken by Paul Hoffman.

6.       Mr. Litt had primary responsibility for substantive motions, including the motion for class certification, class settlement and the motion for general damages. As we have done in past large-scale protest cases, I also worked with Mr. Litt in preparing these motions.  To the extent possible, any research needed on specific issues or to update previous research was done by less experienced attorneys.

7.       Because Class Counsel's offices are widely dispersed - Pasadena, Santa Monica, Redondo Beach - we deliberately kept in-person co-counsel meetings to a minimal number.  This avoided extensive hours incurred for travel.  We also limited the number of all-counsel team conference calls.  Most of the decisions about assignments of work were discussed and made by Class Counsel in telephone conferences and by email and then communicated to other counsel in the case assigned to do a specific task.  For example, after the mediation efforts were unsuccessful, only Class Counsel met at Mr. Litt's office to discuss trial preparation and assignments for the other lawyers to prepare for trial.

**The Work Necessary to Reach Settlement**

**The criminal process**

8.       Because this action arose from the mass arrest of demonstrators, it was necessary to deal with the criminal citations and resolve those charges favorably in a manner that did not bar a later civil rights action.  Colleen Flynn and I, along with another attorney from the National Lawyers Guild, have extensive experience working with the Los Angeles City Attorney's office over several decades to resolve arrests of

1   demonstrators without prosecutions.  We met the arrestees at the Criminal Courts
2   Building on their initial appearance dates. We also met at the Court, and subsequently
3   outside of court, with Charmaine Chua and other putative class members to gather
4   factual information necessary to file the tort claims and, ultimately, the Complaint.
5   Colleen Flynn is the primary attorney who billed for time on the criminal
6   representations.  She represented many of the class members at City Attorney
7   hearings, which resolved the charges against them prior to filing in the criminal court.
8   Ms. Flynn and Matthew Strugar were the primary contact with class members and
9   billed for meetings with a larger group of arrestees as part of the pre-filing
10  investigation in preparation for filing this action.

11  **Discovery**

12      9.      Reaching a settlement in this case required time-consuming work from
13  Plaintiffs' counsel.  There was a considerable amount of discovery for several reasons.
14  First, on the date of the arrest of the certified class at 6th and Hope, the City did not
15  videotape the dispersal order or most of the events surrounding the incident and,
16  ultimately, the arrests.  Consequently, the parties had to identify evidence from social
17  media posts and media reports, both written and video.

18      10.     The initial discovery the City produced was a total of almost 4 GB of
19  material the City collected from public sources.  It was delivered to Plaintiffs on 50
20  disks, along with Los Angeles Police Department documents and reports related to the
21  incidents underlying this action.  While many of the video clips and social media
22  postings contained duplicative materials, they also had significant variances based on
23  the length of the video or audio clip, or the angle from which a particular recording
24  was made.  In some instances, in the course of reviewing and analyzing these 4 GB
25  of discovery, Plaintiffs concluded that the materials produced by the City included
26  multiple versions of the same video resulting from editing done by Defendants.
27  Consequently, Plaintiffs had to go through all 4 GB of material produced by
28  Defendants, as well as all of the video and social media collected by Plaintiffs to

determine what was edited, how it was edited and, generally, to analyze and extract materials to be used in case development, settlement and, potentially, trial.

11.    In addition to the video and audio evidence, both sides took depositions and responded to extensive discovery requests from the other side. The five named Plaintiffs, including the class reps and organizational plaintiff, responded to written interrogatories and requests for document production propounded to each of them by each of the Defendants.  The responsibility for propounding and preparing discovery responses was primarily assigned to the lower level attorneys.

**The Number of Hours Claimed is Reasonable**

12.    The number of hours claimed is reasonable, particularly in light of Plaintiffs' voluntary billing judgment reductions, which include:

1)    deducting all time (24 hours) forFred Zelaya, an attorney who previously worked at my office from October 2016 to the end of 2017;

2)    only billing for a maximum of two attorneys at any court hearing, status conference, or deposition;

3)    limiting the number of in-person team meetings and team conference calls where counsel worked on strategy, dividing up labor and assignments;

4)    eliminating all student time other than Monique Alarcon, who also billed as an attorney after admission to the Bar.

13.    Law student externs in my office did the initial collection of social media posts and other publicly available information concerning the protests.  They also reviewed the discovery produced by the City, including the videos and social media, to try to identify duplicates that could be eliminated.  Ultimately, Monique Alarcon was assigned to consolidate and supervise organization of this discovery.  As noted previously, many of the videos captured the same incidents but from different camera angles, or lengths of time.  These differences in viewpoint and time were often critical

to finding evidence to support a particular issue, such as the audibility of the dispersal order. Since the validity of the dispersal order was a key element in liability, including the directions provided to the plaintiff class about compliance with the dispersal order, a careful review of this evidence was critical to counter representations by Defendants that they had provided an adequate dispersal order and conformed to the law and department policy.

14. There were some significant discovery disputes and Plaintiffs initiated the process for a motion to compel before the matter was resolved. There was also a change in attorneys for the City midway through the litigation, which resulted in a more cooperative relationship between the parties and helped resolve the discovery disputes.

15. The parties participated in two settlement meetings with Magistrate Judge Gandhi: one in Orange County before he entered private mediation, and one at JAMS in Los Angeles after Judge Gandhi left the bench. In addition, the parties had telephonic exchanges with Judge Gandhi in further attempts to reach a settlement.

16. When the City notified Plaintiffs that it was no longer interested in discussing a potential settlement, Plaintiffs began preparing for trial. The first task was the disclosure of expert witnesses. Class Counsel had responsibility for this task. Paul Hoffman had initial responsibility for identifying and contacting a sound expert who could testify to the audibility of the dispersal order. This was key because the validity of the arrest depended upon compliance with state law requiring notice of an unlawful assembly and an opportunity to leave prior to arrest. I had responsibility for identifying and contacting a police practices expert who could testify to the tactical procedures used at both 6th and Hope and Beverly and Alvarado, where Plaintiff Kyle Todd was detained. For both of these experts, but particularly the sound expert, considerable time was spent responding to their requests for various evidence in the case. The sound expert reconstructed the scene and conducted audibility tests at the location where the dispersal order was purportedly given.

17.    At the same time, because both the Court and Defendants raised issues about the availability of general damages for the class members, Plaintiffs filed a Motion for General Damages, which was prepared by Mr. Litt.   Plaintiffs also retained a third expert, Michael Avery, to assist on the issue of damages.   The outcome of the motion would be significant on the presentation of testimony and non-testimonial evidence on damages at trial.

**The Incentive Awards to the Class Representatives**

18.    Plaintiffs propose an incentive award of $5,000 for each of the class representatives for the certified class at 6th & Hope, and for Kyle Todd, who represented the uncertified class at Beverly & Alvarado.  In this instance, each was required to commit considerable time to developing and prosecuting the case with counsel. Each of the individual named plaintiffs engaged in multiple telephone calls, meetings and emails with counsel to develop the facts for the complaint.  Each also had multiple discussions with Class Counsel to assist with the preparation of the class certification motion and submitted a declaration in support of the motion for certification of the class.

19.    In addition, each named Plaintiff  was deposed and each responded to written discovery in this case.  All of the  Defendants, including the City of Los Angeles, served each named Plaintiff with Requests for Production and Interrogatories.  That required them to consult with counsel about, and respond to, requests to collect various documents and.

20.    During the preparation of the Rule 26 expert reports, the individual Plaintiffs assisted in responding to questions from several of the experts about the audibility of dispersal orders and the actions of the police leading up to the arrests at 6th & Hope and the detention at Beverly & Alvarado.  Although the Court did not certify the class for Beverly & Alvarado, Kyle Todd participated in the conduct of this litigation to the same extent as the class representatives for 6th & Hope because the challenged policies applied to the detentions at Beverly & Alvarado were central to

Plaintiffs' case and, in particular, through their expert report reinforced the deficiencies in the City policies for responding to large-scale protests.

21. In addition, the named Plaintiffs maintained contact with class members. Beginning with the first discussion with Class Counsel at the first appearance at Criminal Court, Ms. Chua, in particular, assumed responsibility for maintaining contact with potential class members. In that role, the named plaintiffs disseminated periodic updates on the case that were provided to them by Class Counsel and maintained ongoing connections with putative class members. Because of the time that they have spent to maintain contact information, Class Counsel expects that they will be able to have an exceptionally high rate of participation in the settlement at less expense because a significant percentage of outreach to putative class members can be done through the contact information maintained by the class representatives.

22. I should have instructed the individual named Plaintiffs to keep track of the time they expended in their role as required in the Court's Standing Order. I did not do so. I have reconstructed the time they expended based on my interactions with them over the course of this litigation, my review of the time records of all counsel for their interactions with the named Plaintiffs, as well as my review of the materials the individual Plaintiffs provided to prepare discovery responses and the time for deposition preparation and deposition, I would estimate that each spent approximately 50 hours in their role as class representatives to date. This is a somewhat low estimate of the total hours the class representatives have contributed to this case to date. I anticipate that they will spend considerable additional time assisting my office in disseminating the notice of a settlement to putative class members and encouraging individuals to respond.

**The Categorization of Tasks Pursuant to the Court's Standing Order**

23. Pursuant to Exhibit G of the Court's Standing Order, revised 3/25/19, Class Counsel established 17 categories of "tasks" and had each attorney assign the number corresponding to that task to each entry in their EXCEL time sheet. In some

instances, the work performed fell into more than one category.  Rather than applying some artificial time allocation to the work, and to avoid any instance of double billing, all entries were assigned to what was determined to be the primary task category.  For example, if the entry involved email or a telephone conference concerning a specific motion, such as Class Certification, the entry was assigned to "Task 6," the Class Certification Motion, and not "Task 15," "Co-counsel meetings."

24.     The following categories were assigned:

Task 1 -      Pre-filing investigation
Task 2 -      Pre-filing research
Task 3 -      Criminal representation
Task 4 -      Drafting Complaint/Amended Complaint
Task 5 -      Rule 26/Scheduling
Task 6 -      Class Certification Motion
Task 7 -      Discovery Preparation and Analysis
Task 8 -      Depositions
Task 9 -      Trial Preparation
Task 10 -     Motion for General Damages; Research
Task 11 -     Miscellaneous Case Management
Task 12 -     Mediation/Settlement
Task 13 -     Settlement Negotiations/Agreement
Task 14 -     Motion for Fees and Costs
Task 15 -     Co-counsel Meetings: In-Person and Telephonic
Task 16 -     Post-filing Legal Research
Task 17 -     Client Communications

25.     In the exercise of billing judgment, I reviewed the time records for each person for whom fees are sought.  My purpose was to ensure that each biller maintained their time records in six minute increments, that no attorney billed for paralegal or clerical tasks, and also to remove any improper, unnecessarily duplicative or excessive hours.  I estimate that more than 300 hours were deducted in total.  This includes all time (24 hours) for document review by Fred Zelaya, previously an attorney in my office; all time (138 hours) for research and drafting a litigation memo by Brett Davidson, an undergraduate at Yale who worked in my office in the summer

1   of 2015;  approximately 95 hours by several law students in my office in the summer

2   of 2017 who did some of the initial document review in the case; and, all time by Paul

3   Hoffman's law students, who did the original draft complaint.   In my review, I

4   concluded that most of the work done by these individuals was duplicated after their

5   departure.

6      26.    Specifically, as the case developed, Monique Alarcon and Weston

7   Rowland, both law clerks in my office, engaged in extensive review and organization

8   of the discovery produced by the City to make it more useful and accessible as the

9   case proceeded.    Some degree of necessary duplication would be compensable,

10   including the need to refresh familiarity with the evidence and gain familiarity when

11   there is a change in personnel as the case continues over several years, as here.

12   *Moreno v. City of Sacramento* , 534 F.3d 1106, 1112 (9th Cir. 2008). "It is only where

13   the lawyer does unnecessarily duplicative work that the court may legitimately cut the

14   hours." *Id*. at 1113.

15      27.    In addition to deducting all time described in the preceding paragraph,

16   I eliminated more than 40 hours for attendance and travel time at the two mediation

17   sessions, the depositions of Chief Beck and Captain Bert, and the Court's hearing on

18   the class certification motion.   As stated in paragraph 10, above, no more than two

19   attorneys were billed for any court hearing or deposition with the exception of the

20   depositions of the Chief of Police and the Incident Commander who directed the

21   detention and arrests, who was also later designated as the PMK.   For those

22   depositions, Plaintiffs also billed an additional lawyer who had responsibility for

23   preparing materials for Mr. Hoffman's review and preparation for these depositions.

24   The same is true for the mediations with Magistrate Judge Gandhi.  Although almost

25   every attorney attended the mediations, Plaintiffs seek compensation only for Class

26   Counsel and Monique Alarcon, who had responsibility for organizing the discovery

27   and was most familiar with the evidence.   She was able to identify video and other

28   evidence requested by Mag. Judge Gandhi in the course of the mediations.

DECLARATION OF CAROL A. SOBEL IN SUPPORT OF MOTION FOR ATTORNEY FEES

**The Requested Rates are Reasonable:**

28.    In consultation with Mr. Litt, I determined the reasonable rate for each of the attorneys, the law student and law graduate for whom compensation is sought by this motion.   I have extensive experience assessing reasonable market rates for civil rights and public interest lawyers who do not customarily bill their clients.

29.    My declarations in support of fee applications have been cited repeatedly as evidence of reasonable market rates throughout California.   For example, in *Nadarajah v. Holder,* 569 F.3d 906, 912-914 (9th Cir. 2009), the Ninth Circuit referenced my declaration with approval in support of the rates fpr ACLU attorneys under the Equal Access to Justice Act ("EAJA").   In *Torrance Unified School District v. Magee*, 2008 U.S. Dist. LEXIS 95074 (CD CA 2008), granting fees pursuant to the federal IDEA statute, 20 U.S.C. §1415(i)(3)(c), the Court cited to my declaration as persuasive evidence of rates.   In *Atkins v. Miller*, CV 01-01574 DDP (CD CA 2007), this Court awarded fees to a 1975 graduate at $675 an hour, specifically citing to my declaration and that of Barry Litt to support the rate.   *Id*. at pp. 8-9 and n.4. Additional cases in which my declarations have been cited favorably include, among others, *Charlebois v. Angels Baseball LP*, SACV 10-0853 DOC (May 30, 2012); *Orantes-Hernandez v. Holder*, 713 F.Supp.2d 29, 963-964 (C.D.Cal.2010); *Hiken v. DOD*, 2013 U.S. Dist. LEXIS 118165 (N.D. Cal. Jan. 14, 2013), *Vasquez v. Rackauckas*, 2011 U.S. Dist. LEXIS 83696 (C.D. Cal. 2011); *Rauda v. City of Los Angeles*, 2010 U.S. Dist. LEXIS 138837 (C.D. Cal. 2010); *Jochimsen v. County of Los Angeles, supra*; *Dugan v. County of Los Angeles*, cv-11-08145 CAS (C.D. Cal. March 3, 2014); and *Flores v. City of Westminster*, SA-CV-11-0278 DOC (C.D. Cal. Oct. 23, 2014).   In *Jochimsen*, a unanimous court found me qualified to opine on reasonable market rates.

30.    In addition, I have litigated statutory fee issues at the appellate level in several of my cases.   Most notably, I was co-lead counsel and argued before the California Supreme Court in *Tipton-Whittingham v. City of Los Angeles*, 34

Cal.4th 604 (2004), the companion case to *Graham v. Daimler-Chrysler*, 34 Cal.4th 533 (2004), establishing the continued vitality of the "catalyst" fee doctrine in California courts.  I was also lead counsel in *Jones v. City of Los Angeles*, 555 Fed.Appx. 659 (2014), establishing entitlement to fees as a "prevailing party" based on the Ninth Circuit's necessary approval of a settlement that was conditioned on vacatur of the panel decision.

31.    The hourly rates Plaintiffs applied are within the range of fees that comparably experienced public interest and civil rights attorneys in the Los Angeles area for comparable work. *See also* Declaration of Barrett S. Litt, filed concurrently herewith.  The Supreme Court's decision in *Blum v. Stenson*, 465 U.S. 886 (1984), and subsequent precedents authorize rates for public interest attorneys that are equal to market rates for comparably skilled attorneys at private commercial firms engaged in similarly complex federal litigation, the rates sought here are the rates approved for public interest and civil rights lawyers and generally are well below the rates approved for comparably skilled attorneys at prestige law firms.

32.    Although Plaintiffs applied these rates to calculate the lodestar, it is significant that the total fee is very substantially discounted by the amount available for fees and costs in the total settlement.  Thus, even if the rates were discounted by 20% or more, the amount of the fee awarded would still be considerably less than that discounted lodestar.

33.    As stated above, in consultation with Mr. Litt, I set the rate schedule for all of the attorneys, law students, law graduates and paralegal seeking compensation in this matter.  We set the billing rates based on the historical rates approved for several of the personnel, as well as by comparison to recent awards for attorneys at several public-interest and civil rights firms.  True and correct copies of the fee awards and supporting declarations referenced are attached as exhibits.  Each exhibit has the ECF header or file stamp of the relevant court.

34.     The personnel for whom compensation is sought are listed in the chart below.  The resumé for each attorney is attached at Exhibit 4.  For each person, the chart lists the firm where they work, their year of graduation from law school, if applicable, the amount of experience they have now and the rate applied to calculate the lodestar.  The time for Monique Alarcon was calculated with two different rates.  Ms. Alarcon is now an associate at my office.  She also incurred time in this matter as a summer law clerk working with me in 2015.  Her time is divided into the work she performed as a law student and the work she performed as a lawyer, with different billing rates applied for each.

| Personnel | Firm | Graduation | Experience | Rate |
|---|---|---|---|---|
| Barrett S. Litt | KMBL | 1969 | 50 | $1200 |
| Paul L. Hoffman | SSHH | 1976 | 43 | $1050 |
| Carol A. Sobel | SSHH | 1978 | 41 | $1000 |
| Matthew Strugar | STRUGAR | 2004 | 15 | $725 |
| Colleen Flynn | FLYNN | 2004 | 15 | $725 |
| Catherine Sweetser | SSHH | 2008 | 11 | $650 |
| Rachel Steinback | STEINBACK | 2008 | 11 | $650 |
| Colleen Mullen | SSHH | 2014 | 5 | $500 |
| Monique Alarcon | LOCAS | 2016 | 3 | $420 |
| Monique Alarcon | LOCAS | law student | 3L | $200 |
| Weston Rowland | LOCAS | law student | 3L | $200 |
| Julia White | KMBL | sr. paralegal | 30 | $360 |

35.     Barrett Litt seeks $1200 for his work on this case.  He was approved in 2017 at the historical rate of $1,150 in *Nozzi v. Housing Authority of the City of Los Angeles*, Case 2:07-cv-00380-PA-FFM (C.D. Cal. 2017) (Doc.323, p.4). More recently, in *McKibben v. McMahon*, 2019 WL 1109683 (C.D. Ca. 2019), Case No. EDCV 14-2171 JGB (Spx) Mr. Litt was approved at the 2018 rate of $1,150 an hour, just four percent below the 2019 rate he seeks. Ex. 2, p. 26. The motion for attorney fees in *McKibben* was filed in 2018. *Id.*, p. 2.

36.     Paul Hoffman seeks $1,050 for his work on this case.  In *McKibben,* fees were approved at the 2018 rate of $875 an hour for David McLane, identified as a 1986 law graduate.  Mr. Hoffman has 11 years more experience.  His 2019 rate is $175 an hour above Mr. McLane's approved 2018 rate, which averages out to an hourly increase of $17.50 annually.  The rate Mr. Hoffman seeks is below the 2015 rate of $1100 an hour for attorney Paul Kiesel in *Stone v. Howard Johnson*, Case No. 12-CV-01684 PSG (MANx), (C.D. Cal. 2015).    The Declaration of Matthew Young, setting out the requested rates in a motion for final approval of a class action, is attached at Exhibit 2.  The Court's Order entering final approval of the settlement, including the motion for fees, is entered on the Court's docket at Document 123.

37.     I am personally familiar with Mr. Kiesel.  He served as co-counsel with me on a federal lawsuit against the Los Angeles Police Department in the mid-90s.  I am aware that Mr. Kiesel is a 1985 law graduate.  Mr. Hoffman has  13 more years experience in 2019 than Mr. Kiesel had in 2015.

38.     The rate of $1,000 an hour was applied to calculate the lodestar for my time.  In May, I settled the attorney fees in *Mitchell v. City of Los Angeles*, Case No. 2:16-cv-01750-SJO-JPR (C.D. Ca.), using this rate.  Over the last few years, I have resolved attorney fees in several matters applying rates of $900 an hour up to $975.  The last court-awarded fee I received was from the Ninth Circuit, approving my 2014 rate of $875 an hour in *CPR for Skid Row v. City of Los Angeles*, 779 F.3d 1098 (9th Cir. 2015).  The rate of $1,000 an hour represents an increase of slightly less than three percent annually from my last court-approved rate in *CPR for Skid Row*.  It is almost 10 percent below the 2015 rate approved for Paul Kiesel in Exhibit 2.

24.     Matthew Strugar seeks a rate of $725 an hour.  He was awarded fees in 2017 at the historical rate of $700 an hour in *Mannings Beef v. Los Angeles Cow Save*, LASC Case No. 651650 (08/12/17) (Hon. Barbara Meiers).  In 2017 in

*Nozzi*, Stephanie Carroll, identified as a 2004 law graduate at Public Counsel, was billed at $730 an hour.  In *McKibben,* the Court approved the rate of $715 an hour for Melissa Goodman of the ACLU, identified as a tenth-year attorney at the time. Ex. 1, p.27.  Finally, DRLC billed Mr. Strugar at $660 an hour in 2017 in *Garcia v. Los Angeles County Sheriff's Department*, Case No. 2:09-cv-08943 DMG SH. Ex.3, ¶40.

39.     Colleen Flynn also seeks a rate of $725 an hour.  She and Matthew Strugar graduated law school the same year.

40.     Catherine Sweetser seeks a rate of $650 an hour.  This is the same rate Ms. Sweetser applied to the settlement of the attorney fees in *Mitchell v. City of Los Angeles*,  2:16-cv-01750-SJO-JPR.  In *Garcia*, DRLC billed Carly Munson, identified as a 2006 law graduate then with 11 years of experience, at $625 an hour. Ex.3, p.18.  The difference in Ms. Munson's 2017 rate and Ms. Sweetser's 2019 rate represents a modest increase of approximately 2 percent annually in the base rate for an attorney with similar experience. In *McKibben*, the Court approved the 2018 rate of $600 an hour for Lindsay Battles, then with 10 years experience. Ex. 2, p. 27.

41.     Rachel Steinback also seeks a rate of $650 an hour.   She and Ms. Sweetser graduated from law school the same year and have similar experience.

42.     Colleen Mullen seeks a rate of $500 an hour. In *Garcia*, DRLC billed Elliot Field, identified as a 2009 law graduate, at the 2017 rate of $525 an hour. Ex.3, ¶¶ 48-49.  In 2017, Mr. Field had two more years of experience than Ms. Mullen has now.  In *McKibben,* Brendan Hamme, a 2012 law graduate and now staff attorney at the ACLU, was approved at the 2018 rate of $480 an hour.

43.     Monique Alarcon seeks a rate of $420 an hour.  As of June 1, she began her fourth billing year.  In *McKibben*, attorneys with four years of experience were approved at the 2018 rate of $390 an hour. Ex.2, p. 27.

44.     Plaintiffs also seek compensation for Ms. Alarcon for time incurred as a law student in my office in the summer of 2015, and for Weston Rowland, a law student in my office in the summer of 2017.   The rate sought is $200 an hour. In *Garcia*, law clerks at the Disability Rights Legal Center were billed at the 2017 rate of $250 an hour.  Ex. 3, ¶50.  In *McKibben*, law clerks were approved at $225 an hour.  Ex. 2, p.27.

45.     Plaintiffs also seek compensation at the rate of $360 an hour for Julia White, a Senior Paralegal at Kaye, McLane, Bednarski & Litt.  Ms. White was approved at the rate of $335 an hour in 2017 in *McKibben v. McMahon*. Ex.2, p.27.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 12th day of July, 2019 at Santa Monica, California.

CAROL A. SOBEL