Barrett S. Litt, SBN 45527
Email: blitt@kmbllaw.com
KAYE, MCLANE, BEDNARSKI & LITT
975 East Green Street
Pasadena, California 91106
Telephone: (626) 844-7660
Facsimile: (626) 844-7670

Carol A. Sobel, SBN 84483
Email: carolsobel@aol.com
LAW OFFICE OF CAROL A. SOBEL
3110 Main Street, Suite 210
Santa Monica, California 90405
Telephone: (310) 393-3055
Facsimile: (310) 451-3858

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARMAINE CHUA, ET AL. <br><br> PLAINTIFFS, <br><br> VS. <br><br> CITY OF LOS ANGELES, ET AL., <br><br> DEFENDANTS. | CASE NO: 2:16-CV-00237-JAK-GJS(X) <br> [HON. JOHN A. KRONSTADT] <br><br> DECLARATION OF CAROL A. SOBEL IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND COSTS <br><br> HEARING DATE:   MARCH 16, 2020 <br> HEARING TIME:    8:30 A.M. <br> COURTROOM:       10B |

# DECLARATION OF CAROL A. SOBEL

I, CAROL A. SOBEL, declare:

1. I am an attorney admitted to practice before the California Supreme Court and the United States District Court for the Central District of California. I am an attorney for the plaintiffs in this case and one of three counsel approved by the Court to serve as class counsel ("Class Counsel"). I have personal knowledge of the facts set forth below and, if called to testify to them, would do so competently.

**The Organization of the Legal Team and Distribution of Assignments**

2. Three primary law firms represented the plaintiff class in this action: Kaye, McLane, Bednarski & Litt; Schonbrun, Seplow, Harris & Hoffman; and Law Office of Carol A. Sobel. In addition, four solo practitioners served as counsel in the case. A total of nine lawyers, two law clerks, multiple law students and one undergraduate incurred time over the course of five years in this litigation. Each firm representing Plaintiffs made unique contributions.

3. Because of the number of lawyers involved, at the start of the case Class Counsel took steps to ensure that the case would be litigated efficiently and there would not be unnecessary duplication. The assignment of tasks was based on Class Counsel's evaluation of what was needed for a specific task and who had the relevant expertise, or could do the task most efficiently.

4. We discussed at the outset the presence of less-experienced attorneys at hearings before the Court, as well as at depositions and mediations, to observe and gain experience. At the time, the Class Counsel notified all the other attorneys that they were welcome to attend; however, they could not bill for that time unless it was determined that their attendance was deemed necessary by Class Counsel.

5. In addition to limiting the number of attorneys who would bill for various events, Class Counsel assigned tasks to less-experienced attorneys where practical. So, for example, very little time was incurred by Class Counsel in propounding and responding to written discovery. The same was true for depositions.

All of the class representatives were defended at their deposition by lower-billing attorneys and the deposition of Commander Smith was taken by Catherine Sweetser. The depositions of the Chief of Police, the Incident Commander for the arrests and the PMK on LAPD policies and practices were all taken by Class Counsel Paul Hoffman. The remaining depositions of LAPD personnel were taken by lower billing attorneys. Rachel Steinback and Monique Alarcon assisted in preparation for the depositions taken by Paul Hoffman.

6. Mr. Litt had primary responsibility for substantive motions, including the motion for class certification, class settlement and the motion for general damages. As we have done in past large-scale protest cases, I also worked with Mr. Litt in preparing these motions. To the extent possible, any research needed on specific issues or to update previous research was done by less experienced attorneys.

7. Because Class Counsel's offices are widely dispersed - Pasadena, Santa Monica, Redondo Beach - we deliberately kept in-person co-counsel meetings to a minimal number. This avoided extensive hours incurred for travel. We also limited the number of all-counsel team conference calls. Most of the decisions about assignments of work were discussed and made by Class Counsel in telephone conferences and by email and then communicated to other counsel in the case assigned to do a specific task. For example, after the mediation efforts were unsuccessful, only Class Counsel met at Mr. Litt's office to discuss trial preparation and assignments for the other lawyers to prepare for trial.

**The Work Necessary to Reach Settlement**

**The criminal process**

8. Because this action arose from the mass arrest of demonstrators, it was necessary to deal with the criminal citations and resolve those charges favorably in a manner that did not bar a later civil rights action. Colleen Flynn and I, along with another attorney from the National Lawyers Guild, have extensive experience working with the Los Angeles City Attorney's office over several decades to resolve

arrests of demonstrators without prosecutions. We met the arrestees at the Criminal Courts Building on their initial appearance dates. We also met at the Court, and subsequently outside of court, with Charmaine Chua and other putative class members to gather factual information necessary to file the tort claims and, ultimately, the Complaint. Colleen Flynn is the primary attorney who billed for time on the criminal representations. She represented many of the class members at City Attorney hearings, which resolved the charges against them prior to filing in the criminal court. Ms. Flynn and Matthew Strugar were the primary contact with class members and billed for meetings with a larger group of arrestees as part of the pre-filing investigation in preparation for filing this action.

**Discovery**

9. Reaching a settlement in this case required time-consuming work from Plaintiffs' counsel. There was a considerable amount of discovery for several reasons. First, on the date of the arrest of the certified class at 6th and Hope, the City did not videotape the dispersal order or most of the events surrounding the incident and, ultimately, the arrests. Consequently, the parties had to identify evidence from social media posts and media reports, both written and video.

10. The initial discovery the City produced was a total of almost 4 GB of material the City collected from public sources. It was delivered to Plaintiffs on 50 disks, along with Los Angeles Police Department documents and reports related to the incidents underlying this action. While many of the video clips and social media postings contained duplicative materials, they also had significant variances based on the length of the video or audio clip, or the angle from which a particular recording was made. In some instances, in the course of reviewing and analyzing these 4 GB of discovery, Plaintiffs concluded that the materials produced by the City included multiple versions of the same video resulting from editing done by Defendants. Consequently, Plaintiffs had to go through all 4 GB of material produced by Defendants, as well as all of the video and social media collected by Plaintiffs to

determine what was edited, how it was edited and, generally, to analyze and extract materials to be used in case development, settlement and, potentially, trial.

11. In addition to the video and audio evidence, both sides took depositions and responded to extensive discovery requests from the other side. The five named Plaintiffs, including the class reps and organizational plaintiff, responded to written interrogatories and requests for document production propounded to each of them by each of the Defendants. The responsibility for propounding and preparing discovery responses was primarily assigned to the lower level attorneys.

**The Number of Hours Claimed is Reasonable**

12. The number of hours claimed is reasonable, particularly in light of Plaintiffs' voluntary billing judgment reductions, which include:

1) deducting all time (24 hours) for Fred Zelaya, an attorney who worked at my office from October 2016 to the end of 2017;
2) only billing for a maximum of two attorneys at any court hearing, status conference, or deposition;
3) limiting the number of in-person team meetings and team conference calls where counsel worked on strategy, dividing up labor and assignments;
4) eliminating all student time other than Monique Alarcon, who also billed as an attorney for work after admission to the Bar.

13. Law student externs in my office did the initial collection of social media posts and other publicly available information concerning the protests. They also reviewed the discovery produced by the City, including the videos and social media, to try to identify duplicates that could be eliminated. Ultimately, Monique Alarcon was assigned to consolidate and supervise organization of this discovery.

14. As noted previously, many of the videos captured the same incidents but from different camera angles, or lengths of time. These differences in viewpoint and time were often critical to finding evidence to support a particular issue, such as the

audibility of the dispersal order. Since the validity of the dispersal order was a key element in liability, including the directions provided to the plaintiff class about compliance with the dispersal order, a careful review of this evidence was critical to counter representations by Defendants that they had provided an adequate dispersal order and conformed to the law and department policy.

15. There were some significant discovery disputes and Plaintiffs initiated the process for a motion to compel before the matter was resolved. There was also a change in attorneys for the City midway through the litigation, which resulted in a more cooperative relationship between the parties and helped resolve the discovery disputes.

16. The parties participated in two settlement meetings with Magistrate Judge Gandhi: one in Orange County before he entered private mediation, and one at JAMS in Los Angeles after Judge Gandhi left the bench. In addition, the parties had telephonic exchanges with Judge Gandhi in further attempts to reach a settlement.

17. When the City notified Plaintiffs that it was no longer interested in discussing a potential settlement, Plaintiffs began preparing for trial. The first task was the disclosure of expert witnesses. Class Counsel had responsibility for this task. Paul Hoffman had initial responsibility for identifying and contacting a sound expert who could testify to the audibility of the dispersal order. This was key because the validity of the arrest depended upon compliance with state law requiring notice of an unlawful assembly and an opportunity to leave prior to arrest. I had responsibility for identifying and contacting a police practices expert who could testify to the tactical procedures used at both 6th and Hope and Beverly and Alvarado, where Plaintiff Kyle Todd was detained. For both of these experts, but particularly the sound expert, considerable time was spent responding to their requests for various evidence in the case. The sound expert reconstructed the scene and conducted audibility tests at the location where the dispersal order was purportedly given.

18. At the same time, because both the Court and Defendants raised issues about the availability of general damages for the class members, Plaintiffs filed a Motion for General Damages, which was prepared by Mr. Litt. Plaintiffs also retained a third expert, Michael Avery, to assist on the issue of damages. The outcome of the motion would be significant on the presentation of testimony and non-testimonial evidence on damages at trial.

**The Incentive Awards to the Class Representatives**

19. Plaintiffs propose an incentive award of $5,000 for each of the class representatives for the certified class at 6th & Hope, and for Kyle Todd, who represented the uncertified class at Beverly & Alvarado. In this instance, each was required to commit considerable time to developing and prosecuting the case with counsel. Each of the individual named plaintiffs engaged in multiple telephone calls, meetings and emails with counsel to develop the facts for the complaint. Each also had multiple discussions with Class Counsel to assist with the preparation of the class certification motion and submitted a declaration in support of the motion for certification of the class.

20. In addition, each named Plaintiff was deposed and each responded to written discovery in this case. All of the Defendants, including the City of Los Angeles, served each named Plaintiff with Requests for Production and Interrogatories. That required them to consult with counsel about, and respond to, requests to collect various documents and.

21. During the preparation of the Rule 26 expert reports, the individual Plaintiffs assisted in responding to questions from several of the experts about the audibility of dispersal orders and the actions of the police leading up to the arrests at 6th & Hope and the detention at Beverly & Alvarado. Although the Court did not certify the class for Beverly & Alvarado, Kyle Todd participated in the conduct of this litigation to the same extent as the class representatives for 6th & Hope because the challenged policies applied to the detentions at Beverly & Alvarado were central

to Plaintiffs' case and, in particular, through their expert report reinforced the deficiencies in the City policies for responding to large-scale protests.

22. In addition, the named Plaintiffs maintained contact with class members. Beginning with the first discussion with Class Counsel at the first appearance at Criminal Court, Ms. Chua, in particular, assumed responsibility for maintaining contact with potential class members. In that role, the named plaintiffs disseminated periodic updates on the case that were provided to them by Class Counsel and maintained ongoing connections with putative class members. Because of the time that they have spent to maintain contact information, Class Counsel expects that there will be an exceptionally high rate of participation in the settlement at less expense because a significant percentage of outreach to putative class members can be done through the contact information maintained by the class representatives.

23. I should have instructed the individual named Plaintiffs to keep track of the time they expended in their role as required in the Court's Standing Order. I did not do so. I have reconstructed the time they expended based on my interactions with them over the course of this litigation, my review of the time records of all counsel for their interactions with the named Plaintiffs, as well as my review of the materials the individual Plaintiffs provided to prepare discovery responses and the time for deposition preparation and deposition, I would estimate that each spent approximately 50 hours in their role as class representatives to date. This is a somewhat low estimate of the total hours the class representatives have contributed to this case to date. I anticipate that they will spend additional time assisting my office in disseminating the notice of a settlement to putative class members and encouraging individuals to respond.

**The Categorization of Tasks Pursuant to the Court's Standing Order**

24. Pursuant to Exhibit G of the Court's Standing Order, revised 3/25/19, Class Counsel established 17 categories of "tasks" and had each attorney assign the number corresponding to that task to each entry in their EXCEL time sheet. In some

instances, the work performed fell into more than one category. Rather than applying some artificial time allocation to the work, and to avoid any instance of double billing, all entries were assigned to what was determined to be the primary task category. For example, if the entry involved email or a telephone conference concerning a specific motion, such as Class Certification, the entry was assigned to "Task 6," the Class Certification Motion, and not "Task 15," "Co-counsel meetings."

25. The following categories were assigned:

| | |
|---|---|
| Task 1 - | Pre-filing investigation |
| Task 2 - | Pre-filing research |
| Task 3 - | Criminal representation |
| Task 4 - | Drafting Complaint/Amended Complaint |
| Task 5 - | Rule 26/Scheduling |
| Task 6 - | Class Certification Motion |
| Task 7 - | Discovery Preparation and Analysis |
| Task 8 - | Depositions |
| Task 9 - | Trial Preparation |
| Task 10 - | Motion for General Damages; Research |
| Task 11 - | Miscellaneous Case Management |
| Task 12 - | Mediation/Settlement |
| Task 13 - | Settlement Negotiations/Agreement |
| Task 14 - | Motion for Fees and Costs |
| Task 15 - | Co-counsel Meetings: In-Person and Telephonic |
| Task 16 - | Post-filing Legal Research |
| Task 17 - | Client Communications |
| Task 18 - | Motion for Attorney Fees |

26. In the exercise of billing judgment, I reviewed the time records for each person for whom fees are sought. My purpose was to ensure that each biller maintained their time records in six minute increments, that no attorney billed for paralegal or clerical tasks, and also to remove any improper, unnecessarily duplicative or excessive hours. I estimate that more than 300 hours were deducted in total. This includes all time (24 hours) for document review by Fred Zelaya, previously an attorney in my office; all time (138 hours) for research and drafting a litigation memo

by Brett Davidson, an undergraduate at Yale who worked in my office in the summer of 2015; approximately 95 hours by several law students in my office in the summer of 2017 who did some of the initial document review in the case; and, all time by Paul Hoffman's law students, who did the original draft complaint. In my review, I concluded that most of the work done by these individuals was duplicated after their departure and should not be billed twice.

27. Specifically, as the case developed, Monique Alarcon, now a lawyer in my office and Weston Rowland, a law clerk, engaged in extensive review and organization of the discovery produced by the City to make it more useful and accessible as the case proceeded. Some degree of necessary duplication would be compensable, including the need to refresh familiarity with the evidence and gain familiarity when there is a change in personnel as the case continues over several years, as across nearly five years here. *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008). "It is only where the lawyer does unnecessarily duplicative work that the court may legitimately cut the hours." *Id*. at 1113.

28. In addition to deducting all time described in the preceding paragraph, I eliminated more than 40 hours by a number of billers for attendance and travel time at the two mediation sessions, the depositions of Chief Beck and Captain Bert, and the Court's hearing on the class certification motion. As stated in paragraph 10, above, no more than two attorneys were billed for any court hearing or deposition with the exception of the depositions of the Chief of Police and the Incident Commander who directed the detention and arrests, who was also later designated and deposed as the PMK. For those depositions, Plaintiffs also billed an additional lawyer who had responsibility for preparing materials for Mr. Hoffman's review and preparation for these depositions. The same is true for the mediations with Magistrate Judge Gandhi. Although almost every attorney attended the mediations, Plaintiffs seek compensation only for Class Counsel and Monique Alarcon, who had responsibility for organizing the discovery and was most familiar with the evidence.

She was able to identify video and other evidence requested by Mag. Judge Gandhi in the course of the mediations.

**The Requested Rates are Reasonable:**

29. In consultation with Mr. Litt, I determined the reasonable rate for each of the attorneys, the law student and law graduate for whom compensation is sought by this motion. I have extensive experience assessing reasonable market rates for civil rights and public interest lawyers who do not customarily bill their clients.

30. My declarations in support of fee applications have been cited repeatedly as evidence of reasonable market rates throughout California. For example, in *Nadarajah v. Holder,* 569 F.3d 906, 912-914 (9th Cir. 2009), the Ninth Circuit referenced my declaration with approval in support of the rates fpr ACLU attorneys under the Equal Access to Justice Act ("EAJA"). In *Torrance Unified School District v. Magee*, 2008 U.S. Dist. LEXIS 95074 (CD CA 2008), granting fees pursuant to the federal IDEA statute, 20 U.S.C. §1415(i)(3)(c), the Court cited to my declaration as persuasive evidence of rates. In *Atkins v. Miller*, CV 01-01574 DDP (CD CA 2007), this Court awarded fees to a 1975 graduate at $675 an hour, specifically citing to my declaration and that of Barry Litt to support the rate. *Id*. at pp. 8-9 and n.4. Additional cases in which my declarations have been cited favorably include, among others, *Charlebois v. Angels Baseball LP*, SACV 10-0853 DOC (May 30, 2012); *Orantes-Hernandez v. Holder*, 713 F.Supp.2d 29, 963-964 (C.D.Cal.2010); *Hiken v. DOD*, 2013 U.S. Dist. LEXIS 118165 (N.D. Cal. Jan. 14, 2013), *Vasquez v. Rackauckas*, 2011 U.S. Dist. LEXIS 83696 (C.D. Cal. 2011); *Rauda v. City of Los Angeles*, 2010 U.S. Dist. LEXIS 138837 (C.D. Cal. 2010); *Jochimsen v. County of Los Angeles, supra*; *Dugan v. County of Los Angeles*, cv-11-08145 CAS (C.D. Cal. March 3, 2014); *Flores v. City of Westminster*, SA-CV-11-0278 DOC (C.D. Cal. Oct. 23, 2014); *Wagafe v. Trump*, Case 2:17-cv-00094-RAJ [Doc. 223] (W.D. WA 02/27/19); *Webb v. Officer J. Ackerman*, 13-cv-01992 PLA (C.D. Cal. January 4, 2018) [Doc. 180, p.5]; *Hiken v. DOD*, 836 F.3d 1037 (9th Cir.

2016); and *Carrillo v. Schneider Logistics,* awarding fees in Circuit Case No. 12-55042 (9th Cir. Apr. 2014), following the affirmance of a preliminary injunction. *See* 501 Fed. Appx. 713, 2012 U.S. App. LEXIS 26601 (9th Cir. Dec. 28, 2012). The Ninth Circuit cited to my declaration in approving EAJA rates to the ACLU and other immigration attorneys in *Gomez-Sanchez v. Barr, sub nom Gomez-Sanchez v. Sessions,* 892 F.3d 985 (9th Cir. 2018). . In *Jochimsen*, a unanimous court found me qualified to opine on reasonable market rates.

31. In addition, I have litigated statutory fee issues at the appellate level in several of my cases. Most notably, I was co-lead counsel and argued before the California Supreme Court in *Tipton-Whittingham v. City of Los Angeles*, 34 Cal.4th 604 (2004), the companion case to *Graham v. Daimler-Chrysler*, 34 Cal.4th 533 (2004), establishing the continued vitality of the "catalyst" fee doctrine in California courts. I was also lead counsel in *Jones v. City of Los Angeles*, 555 Fed.Appx. 659 (2014), establishing entitlement to fees as a "prevailing party" based on the Ninth Circuit's necessary approval of a settlement that was conditioned on vacatur of the panel decision.

32. The hourly rates Plaintiffs applied are within the range of fees that comparably experienced public interest and civil rights attorneys in the Los Angeles area for comparable work. *See also* Declaration of Barrett S. Litt, filed concurrently herewith. The Supreme Court's decision in *Blum v. Stenson*, 465 U.S. 886 (1984), and subsequent precedents authorize rates for public interest attorneys that are equal to market rates for comparably skilled attorneys at private commercial firms engaged in similarly complex federal litigation, the rates sought here are the rates approved for public interest and civil rights lawyers and generally are well below the rates approved for comparably skilled attorneys at prestige law firms.

33. Although Plaintiffs applied these rates to calculate the lodestar, it is significant that the total fee is very substantially discounted by the amount available for fees and costs in the total settlement. Thus, even if the rates were discounted by

20% or more, the amount of the fee awarded would still be considerably less than that discounted lodestar.

34. As stated above, in consultation with Mr. Litt, I set the rate schedule for all of the attorneys, law students, law graduates and paralegal seeking compensation in this matter. We set the billing rates based on the historical rates approved for several of the personnel, as well as by comparison to recent awards for attorneys at several public-interest and civil rights firms. True and correct copies of the fee awards and supporting declarations referenced are attached as exhibits. Each exhibit has the ECF header or file stamp of the relevant court.

35. The personnel for whom compensation is sought are listed in the chart below. The resumė for each attorney is submitted as a separate filing. For each person, the chart lists the firm where they work, their year of graduation from law school, if applicable, the amount of experience they have now and the rate applied to calculate the lodestar. The time for Monique Alarcon was calculated with two different rates. Ms. Alarcon is now an associate at my office. She also incurred time in this matter as a summer law clerk in 2015. Her time is divided between work performed as a law student and work as a lawyer, with different billing rates for each.

| Personnel | Firm | Graduation | Experience | Rate |
|---|---|---|---|---|
| Barrett S. Litt | KMBL | 1969 | 50 | $1200 |
| Paul L. Hoffman | SSHH | 1976 | 43 | $1050 |
| Carol A. Sobel | SSHH | 1978 | 41 | $1000 |
| Matthew Strugar | STRUGAR | 2004 | 15 | $725 |
| Colleen Flynn | FLYNN | 2004 | 15 | $725 |
| Catherine Sweetser | SSHH | 2008 | 11 | $650 |
| Rachel Steinback | STEINBACK | 2008 | 11 | $650 |
| Colleen Mullen | SSHH | 2014 | 5 | $500 |
| Monique Alarcon | LOCAS | 2016 | 3 | $450 |
| Monique Alarcon | LOCAS | law student | 3L | $200 |
| Weston Rowland | LOCAS | law student | 3L | $200 |

| Julia White | KMBL | sr. paralegal | 30 | $360 |

36. Barrett Litt seeks $1200 for his work on this case. He was approved in 2017 at the historical rate of $1,150 in *Nozzi v. Housing Authority of the City of Los Angeles*, Case 2:07-cv-00380-PA-FFM (C.D. Cal. 2017) (Doc.323, p.4). Exhibit 1. More recently, in *McKibben v. McMahon*, 2019 WL 1109683 (C.D. Ca. 2019), Case No. EDCV 14-2171 JGB (Spx) Mr. Litt was approved at the 2018 rate of $1,150 an hour, just four percent below the 2019 rate he seeks. Exhibit 1, p. 26. The motion for attorney fees in *McKibben* was filed in 2018. *Id.*, p. 2.

37. Paul Hoffman seeks $1,050 for his work on this case. In *McKibben,* fees were approved at the 2018 rate of $875 an hour for David McLane, identified as a 1986 law graduate. Ex. 2, p. 15. Mr. Hoffman has 11 years more experience now. His 2019 rate is $175 an hour above Mr. McLane's approved 2018 rate, which averages out to an hourly increase of $15.90 annually.

38. The rate Mr. Hoffman seeks is below the 2015 rate of $1100 an hour for attorney Paul Kiesel in *Stone v. Howard Johnson*, Case No. 12-CV-01684 PSG (MANx), (C.D. Cal. 2015). The Declaration of Matthew Young, setting out the requested rates in a motion for final approval of a class action, is attached at Exhibit 3. The rates are set forth at Ex. 3, p. 41. The Court's Order entering final approval of the settlement, including the motion for fees, is entered on the Court's docket at Document 123.

39. I am personally familiar with Mr. Kiesel. He served as co-counsel with me on a federal lawsuit against the Los Angeles Police Department in the mid-90s. I am aware that Mr. Kiesel is a 1985 law graduate. Mr. Hoffman has 13 more years experience in 2019 than Mr. Kiesel had in 2015.

40. The rate of $1,000 an hour was applied to calculate the lodestar for my time. In May, I settled the attorney fees in *Mitchell v. City of Los Angeles*, Case No. 2:16-cv-01750-SJO-JPR (C.D. Ca.), using this rate. Over the last few years, I have resolved attorney fees in several matters applying rates of $900 an hour up to $975.

1  The last court-awarded fee I received was from the Ninth Circuit, approving my 2014 rate of $875 an hour in *CPR for Skid Row v. City of Los Angeles*, 779 F.3d 1098 (9th Cir. 2015). The rate of $1,000 an hour represents an increase of slightly less than three percent annually from my last court-approved rate in *CPR for Skid Row*. It is almost 10 percent below the 2015 rate approved for Paul Kiesel in Exhibit 3.

41. In *Hadsell v. City of Baldwin Park*, LASC Case No. BC548602 (June 25, 2019), the Superior Court recently approved the requested rates of $1100 an hour for Mssrs. Gary Dordick and Carney Shegarian. I reviewed the Court's Minute Orders on the motion for attorneys' fees. A true and correct copy of the Notice of Ruling and Minute Order is attached at Exhibit 4. There, the Court recently approved the requested rates of $1100 an hour for Mssrs. Dordick and Shegarian. *Id.*, p. 2. Based on a review of their respective firm's websites and the State Bar website, I believe that Mr. Dordick is a 1987 admittee and Mr. Shegarian is a 1990 admittee. Both have considerably less experience than do I and Mr. Hoffman.

42. Mr. Shegarian was approved at the same rate in 2018 in the Los Angeles Superior Court case in *Dr. Lauren Pinter-Brown v. University of California at Los Angeles*, LASC Case No. BC624838 (Aug. 2018). A true and correct copy of the Court's Minute Order approving fees is attached at Exhibit 5. I downloaded the Court's Order on attorney fees from the Los Angeles Superior Court's online services on December 12, 2019. Chart No. 1 to the Minute Order sets out the approved rates for each attorney at Shergerian and Associates for whom fees were sought. Mr. Shegerian's approved 2018 rate is $1,100 an hour.

24. Matthew Strugar seeks a rate of $725 an hour. He was awarded fees in 2017 at the historical rate of $700 an hour in *Mannings Beef v. Los Angeles Cow Save*, LASC Case No. 651650 (08/12/17) (Hon. Barbara Meiers). In 2017 in *Nozzi*, Stephanie Carroll, identified as a 2004 law graduate at Public Counsel, was billed at $730 an hour. Ex. 1, p.27. In *McKibben,* the Court approved the rate of $715 an hour for Melissa Goodman of the ACLU, identified as a tenth-year attorney at the

time. Ex. 2, p. 26. Finally, DRLC billed Mr. Strugar at $660 an hour in 2017 in *Garcia v. Los Angeles County Sheriff's Department*, Case No. 2:09-cv-08943 DMG SH. Exhibit 6, ¶40.

43. Colleen Flynn also seeks a rate of $725 an hour. She and Matthew Strugar graduated law school the same year and, in my opinion, have comparable experience. I have known both since their first year of law school and co-counseled with both of them on multiple occasions. In addition, Mr. Strugar was a summer law clerk in my office after his 1L year.

44. Catherine Sweetser seeks a rate of $650 an hour. This is the same rate Ms. Sweetser applied to the settlement of the attorney fees in *Mitchell v. City of Los Angeles*, 2:16-cv-01750-SJO-JPR. In *Garcia*, DRLC billed Carly Munson, identified as a 2006 law graduate then with 11 years of experience, at $625 an hour. Ex.6, p.18. The difference in Ms. Munson's 2017 rate and Ms. Sweetser's 2019 rate represents a modest increase of approximately 2 percent annually in the base rate for an attorney with similar experience. In *McKibben*, the Court approved the 2018 rate of $600 an hour for Lindsay Battles, then with 10 years experience. Ex. 2, p. 27. In *Pinter-Brown*, the 2018 approved rate for Anthony Nguyen is $675 an hour. Ex. 5, Chart 1. In *Hadsell,* the Court approved the 2019 rate of $800 an hour for Mr. Nguyen. Ex. 4, p. 2. Based on my review of the State Bar website, I understand Mr. Nguyen is a 2009 admittee. In 2018, he had two years less experience than Ms. Sweetser has now.

45. Rachel Steinback also seeks a rate of $650 an hour. She and Ms. Sweetser graduated from law school the same year and have similar experience.

46. Colleen Mullen seeks a rate of $500 an hour. In *Garcia*, DRLC billed Elliot Field, identified as a 2009 law graduate, at the 2017 rate of $525 an hour. Ex.6, ¶¶ 48-49. In 2017, Mr. Field had two more years of experience than Ms. Mullen has now. In *McKibben,* Brendan Hamme, a 2012 law graduate and now staff attorney at the ACLU, was approved at the 2018 rate of $480 an hour. In Ex. 2, p.27. In *Pinter-*

DECLARATION OF CAROL A. SOBEL IN SUPPORT OF MOTION FOR ATTORNEY FEES
15

*Brown*, the Court approved the 2018 rate of $500 an hour for Taylor Prainito, identified in the Order as a 2012 graduate. Ex. 5, p. 12.

47. Monique Alarcon seeks a rate of $420 an hour. As of June 1, she is in her fourth billing year. In *McKibben*, attorneys with four years of experience were approved at the 2018 rate of $390 an hour. Ex.2, p. 27. In *Hadsell*, the Court approved the 2019 rate of $500 an hour for Mark Lim, identified as a 2016 graduate, the same year as Ms. Alarcon. Ex. 4, p.2. The prior year, Mr. Lim was approved at the rate of $400 an hour in *Pinter-Brown*. Ex. 5, p. 12.

48. Plaintiffs also seek compensation for Ms. Alarcon as a law student in my office in the summer of 2015, and for Weston Rowland, a law student in the summer of 2017. The rate sought is $200 an hour. In *Garcia*, law clerks at the Disability Rights Legal Center were billed at the 2017 rate of $250 an hour. Ex. 6, ¶50. In *McKibben*, law clerks were approved at $225 an hour. Ex. 2, p.27.

49. Plaintiffs also seek compensation at the rate of $360 an hour for Julia White, a Senior Paralegal at Kaye, McLane, Bednarski & Litt. Ms. White was approved at the 2018 rate of $335 an hour in *McKibben v. McMahon*. Ex.2, p.27.

50. At this time, I can provide the Court with an update on outreach to putative class members. The Court previously approved Plaintiffs' counsel to handle the claim process in house through my office. To date, we have contacted approximately 70 percent of the potential class of 125 individuals. There are no objections or opt-outs at this point and more than 40 percent of the eligible class already submitted claim forms. We continue to believe that we will have a participation rate approaching 90 percent.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 19th day of December, 2019 at Santa Monica, California.



CAROL A. SOBEL